## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>PATRIOT COAL CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-32450 (KLP)<br><br>Jointly Administered |
| BLACK DIAMOND COMMERCIAL FINANCE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA CONSERVATION LEGACY FUND, INC. and ERP COMPLIANT FUELS, LLC,<br><br>Defendants. | |
| VIRGINIA CONSERVATION LEGACY FUND, INC. and ERP COMPLIANT FUELS, LLC,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>BLACK DIAMOND COMMERCIAL FINANCE, LLC,<br><br>Counterclaim-Defendant. | Adv. Proc. No. 16-03105 (KLP)<br><br>**REDACTED AND FILED UNDER SEAL PURSUANT TO ECF DOC. NO. 64** |

## VCLF'S MEMORANDUM OF LAW IN OPPOSITION TO BLACK DIAMOND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Patrick J. Potter
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard, Suite 1400
McLean, Virginia 22102-4856
Telephone:  (703) 770-7900
Facsimile:  (703) 770-7901
E-mail:  patrick.potter@pillsburylaw.com

William M. Sullivan, Jr. (admitted *pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036-3006
Telephone:  (202) 663-8027
Facsimile:  (202) 663-8007
E-mail:  wsullivan@pillsburylaw.com

Andrew M. Troop (admitted *pro hac vice*)
Samuel S. Cavior (admitted *pro hac vice*)
Joshua I. Schlenger (admitted *pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036-4039
Telephone:  (212) 858-1000
Facsimile:  (212) 858-1500
E-mail:  andrew.troop@pillsburylaw.com

*Attorneys for Virginia Conservation Legacy Fund,
Inc. and ERP Compliant Fuels, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ................................................................................................................ 2

    A. Black Diamond's Familiarity with the Patriot Assets and Involvement in the Patriot
       Chapter 11 Proceeding ................................................................................ 2

    B. The Commitment Letter .............................................................................. 3

    C. Black Diamond Fails to Provide VCLF Any Draft Loan Documentation ......... 4

    D. Black Diamond Instructs VCLF to Obtain Additional Financing on the Sidelines of
       the Patriot Confirmation Hearing .............................................................. 5

    E. Black Diamond is Involved in Changes to the VCLF-Patriot APA Between
       September 21 and October 23, 2015 ........................................................... 6

    F. On the Eve of the Scheduled Closing, Black Diamond Demands Material Changes to
       the Commitment Letter ............................................................................. 6

    G. VCLF Attempts to Cobble Together a Closing with Patriot ........................... 10

    H. VCLF Apprises Black Diamond of Its Breach and Offers It a Final Chance to Perform. 10

ARGUMENT ...................................................................................................... 12

I.  BLACK DIAMOND REPUDIATED THE COMMITMENT LETTER BY OCTOBER
    23, 2015 .......................................................................................................... 12

    A. Legal Standard ......................................................................................... 12

    B. Black Diamond Refused to Finance Under the Terms of the Commitment Letter,
       Demanding Material Changes to the Commitment Letter at the Eleventh Hour on a
       Take-It-Or-Leave-It Basis ........................................................................ 15

    C. Black Diamond's Repudiation Was Positive and Unequivocal ..................... 20

    D. VCLF's Attempts on October 23 and 25, 2015 to Persuade Black Diamond to Change
       Its Mind Did Not Constitute a Waiver ....................................................... 23

II.  BLACK DIAMOND'S REPUDIATION IMMEDIATELY RELIEVED VCLF OF ITS
    OWN PERFORMANCE OBLIGATIONS UNDER THE COMMITMENT LETTER ........ 29

CONCLUSION ................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*AG Properties of Kingston, LLC v. Besicorp-Empire Dev. Co., LLC*,
    14 A.D.3d 971 (3d Dep't 2005) .......................................................................24, 27

*AM Cosmetics, Inc. v. Solomon*,
    67 F. Supp. 2d 312 (S.D.N.Y. 1999).........................................................................24

*Angelone v. Chang*,
    761 N.E.2d 426 (Ind. Ct. App. 2001).........................................................................27

*BT Triple Crown Merger Co. v. Citigroup Global Mkts., Inc.*,
    19 Misc. 3d 1129(A), (Sup. Ct., N.Y. Cty. 2008)....................................................20

*Crosspoint Seven v. Mfs. Life Ins. Co.*,
    148 F. App'x 535 (7th Cir. 2005) ..................................................................26, 27

*De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*,
    243 N.Y. 283 (1926) ..................................................................................................24

*DiFolco v. MSNBC Cable L.L.C.*,
    831 F. Supp. 2d 634 (S.D.N.Y. 2011)................................................................12, 20

*Eden United, Inc. v. Short*,
    573 N.E.2d 920 (Ind. Ct. App. 1991).........................................................................27

*Grp. 1 Auto., Inc. v. Country Imported Car Corp.*,
    No. 07-CV-1454 RRM WDW, 2012 WL 11955634 (E.D.N.Y. Aug. 15, 2012) ...................24

*Heart Const. Corp. v. Gower*,
    6 Misc. 3d 1018(A), 800 N.Y.S.2d 347 (Dist. Ct. Nassau Cty. 2004) ....................27

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*,
    92 N.Y.2d 989 (1998) ................................................................................................12

*Inamed Corp. v. Kuzmak*,
    275 F. Supp. 2d 1100 (C.D. Cal. 2002) ..............................................................28, 29

*Israel Cancer Research Fund, Inc. v. Harvey & Gloria Kaylie Foundation, Inc.*,
    33 Misc. 3d 1237(A), (Sup. Ct., N.Y. Cty. 2011)....................................................13

*Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*,
    692 N.E.2d 905 (Ind. Ct. App. 1998).........................................................................27

*Kain Dev., LLC v. Krause Properties, LLC*,
   130 A.D.3d 1229 (3d Dep't 2015) ...................................................................29

*Kelly Capital, LLC v. S & M Brands, Inc.*,
   873 F. Supp. 2d 659 (E.D. Va. 2012) .............................................................13

*Long Is. R. R. Co. v. Northville Indus. Corp.*,
   41 N.Y.2d 455 (1977) ...............................................................................12, 29

*Mindel v. Image Point Prods., Inc.*,
   725 F. Supp. 189 (S.D.N.Y. 1989).................................................................24

*Mometal Structures, Inc. v. T.A. Ahern Contractors Corp.*,
   No. 09-CV-2791 (MKB), 2013 WL 764717 (S.D.N.Y. Feb. 28, 2013)..................13

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
   92 N.Y.2d 458 (1998) ...............................................................................12, 27

*QK Healthcare, Inc. v. InSource, Inc.*,
   108 A.D.3d 56 (2d Dep't 2013) .....................................................................29

*In re Randall's Island Family Golf Centers, Inc.*,
   261 B.R. 96 (Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002) .........24

*REA Express, Inc. v. Interway Corp.*,
   538 F.2d 953 (2d Cir. 1976).........................................................................13

*Rhodes v. Davis*,
   628 F. App'x 787 (2d Cir. 2015) ........................................................13, 14, 15

*Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*,
   686 F. Supp. 1015 (S.D.N.Y. 1988)................................................................24

*SPI Commc'ns v. WTZA-TV Assoc. Ltd. P'ship*,
   229 A.D.2d 644 (3d Dep't 1996) ..............................................................12, 13

<u>Rules</u>

Federal Rules of Civil Procedure,
   Rule 30 ..........................................................................................................3, 7

Federal Rules of Bankruptcy Procedure,
   Rule 7030 ..........................................................................................................3

iii

Virginia Conservation Legacy Fund, Inc. and ERP Compliant Fuels, LLC (collectively, "VCLF") respectfully submit this Memorandum in Opposition to Black Diamond Commercial Finance, LLC's ("Black Diamond") *Motion for Partial Summary Judgment* (ECF Doc. No. 209).[1]

## PRELIMINARY STATEMENT

At oral argument on March 21, 2017, counsel for Black Diamond stated unequivocally that ████████████████ REDACTED ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████[2]  This assertion was the basis for Black Diamond's motion to compel (which it subsequently withdrew) and its now-pending motion for sanctions. Indeed, at the deposition of Jason McCoy, the VCLF witness that Black Diamond apparently believes was "shopping" for alternative closing financing between September 21, 2015, and October 23, 2015, Black Diamond's counsel utilized *a total of 45 exhibits* in an attempt to procure an admission to this effect. But Black Diamond was unable to procure any evidence from Mr. McCoy or any other witness supporting its contention, and to this day, it has adduced no evidence that VCLF breached the non-solicitation provision of the Commitment Letter—because it did not.

Now, astonishingly, after eleven depositions in this case, Black Diamond comes before this Court and has the temerity to argue that the case can be resolved in its favor *without resolving the very issue that Black Diamond claimed was at the heart of this case*. If nothing

---

[1]  Black Diamond's supporting memorandum of law is referred to herein as "BD Mem."

[2]  *See* Declaration of William M. Sullivan, Jr. in Support of VCLF's Opposition to Black Diamond's Motion for Partial Summary Judgment ("Sullivan Declaration" or "Sullivan Dec."), Ex. A (3/21/17 Hearing Tr. 4:1-15).

1

else, Black Diamond's motion practice in this adversary proceeding is a startling picture of inconsistency and unfocused litigation tactics. If it is something else, it is evidence of a pattern by Black Diamond: making something unequivocally clear (like repudiating the Commitment Letter) and then ignoring that fact by subsequent conduct (like commencing this lawsuit).

Black Diamond's present motion for partial summary judgment is without merit and should be denied. The documentary evidence and the testimony developed at depositions establish conclusively that (1) Black Diamond repudiated the Commitment Letter by October 23, 2015, by demanding that VCLF agree to material changes to the Commitment Letter, on a take-it-or-leave-it basis, and (2) VCLF's subsequent conduct did not violate the Exclusivity provision of the Commitment Letter because Black Diamond had already repudiated. This evidence does not merely raise an issue of material fact sufficient to require denial of Black Diamond's summary judgment motion; rather, it requires granting summary judgment on these issues in VCLF's favor, pursuant to VCLF's initial motion for partial summary judgment (ECF Doc. No. 132).[3]

## **FACTS**

A.   **Black Diamond's Familiarity with the Patriot Assets and Involvement in the Patriot Chapter 11 Proceeding**

REDACTED

---

[3] VCLF incorporates herein by reference its papers in support of its own motion for partial summary judgment, as well as its *Statement of Facts, Alleged by Black Diamond to be Material, as to Which VCLF Contends a Genuine Issue Exists*, filed contemporaneously herewith.

2

Ehrlich Dep. Tr.[4] 46:22-54:3.  Likewise, 

*Id.* 52:5-12.

### B.    The Commitment Letter

*See* Murphy

Dep. Tr.[5] 127:19-25.

*See* Ehrlich Dep. Tr. 66:13-72:16.

*See* Deckoff

Dep. Tr.[6] 80:1-86:7; Sullivan Dec., Ex. E.

*Id.*

---

[4] "Ehrlich Dep. Tr." refers to excerpts of the transcript of the deposition of Black Diamond's Richard Ehrlich, taken on October 17, 2017, attached to the Sullivan Declaration as Exhibit B.  Though Mr. Ehrlich signed an errata sheet for his deposition transcript on January 11, 2018, that errata sheet was untimely under Fed. R. Civ. P. 30(e), applicable to these proceedings pursuant to Fed. R. Bankr. P. 7030, because the court reporter delivered the deposition transcript to the parties on November 1, 2017, more than 30 days prior to the submission of the errata sheet.  Accordingly, Sullivan Dec., Ex B does not include Mr. Ehrlich's untimely errata sheet.

[5] "Murphy Dep. Tr." refers to excerpts of the transcript of the deposition of Brendan Murphy, formerly of Teneo, taken on October 19, 2015, with the witness's errata sheet, attached to the Sullivan Declaration as Exhibit C.

[6] "Deckoff Dep. Tr." refers to excerpts of the transcript of the deposition of Black Diamond's Stephen Deckoff, taken on October 31, 2017, attached to the Sullivan Declaration as Exhibit D.  Though Mr. Deckoff signed an errata sheet for his deposition transcript on January 11, 2018, that errata sheet was untimely under Fed. R. Civ. P. 30(e) because the court reporter delivered the deposition transcript to the parties on November 13, 2017, more than 30 days prior to the submission of the errata sheet.  Accordingly, Sullivan Dec., Ex. D does not include Mr. Deckoff's untimely errata sheet.

**REDACTED**

**REDACTED** *See* Sullivan Dec., Ex. F (9/20/15 e-mail from R. Ehrlich to T. Clarke). **REDACTED**

September 21, 2015, VCLF and Black Diamond's loan origination entity, Black Diamond

Commercial Finance, LLC ("BDCF"),[7] signed the Commitment Letter **REDACTED**

**REDACTED**. Ehrlich Dep. Tr. 158:6-12. The signatory for VCLF was Thomas

Clarke and the signatory for BDCF was Stephen Deckoff. *See* Declaration of C. William

Phillips, dated Dec. 14, 2017 ("Phillips Dec."), Ex. A (Commitment Letter).

**REDACTED**

**REDACTED**

**REDACTED** *See* Ehrlich Dep. Tr. 104:2-14. **REDACTED**

**REDACTED**

**REDACTED** *See* Clarke Dep. Tr.[8] 36:12-21. Ultimately,

Blackhawk and VCLF were the winning bidders at the auction.

### C. Black Diamond Fails to Provide VCLF Any Draft Loan Documentation

Despite VCLF's repeated requests, neither Black Diamond nor its lawyers ever presented

VCLF with any draft loan documentation pursuant to the Commitment Letter. At his deposition,

Mr. Clarke explained **REDACTED**



---

[7] This is distinguished from Black Diamond Commercial Management, LLC ("BDCM").

[8] "Clarke Dep. Tr." refers to excerpts of the transcript of the deposition of VCLF's Thomas Clarke, taken on November 10, 2017, together with the witness's errata sheet, attached to the Sullivan Declaration as Exhibit G.

**REDACTED**

Clarke Dep. Tr. 196:10-24.   **REDACTED**

**REDACTED**   *Id.* 197:4-16.

**REDACTED**

**REDACTED**   (*id.* 198:4-200:5),   **REDACTED**

**REDACTED**

**REDACTED**.

Black Diamond's failure to provide any loan documentation (among other things) also

**REDACTED**

**REDACTED**

**REDACTED**. *See* Clarke Dep. Tr. 34:5-36:21, 54:19-55:13, 76:7-12, 115:7-10, 150:24-151:3.

**D.**   **Black Diamond Instructs VCLF to Obtain Additional Financing on the Sidelines of the Patriot Confirmation Hearing**

The confirmation hearing in the Patriot chapter 11 case took place the week of October 5, 2015.  On the eve of the confirmation hearing, and with Black Diamond's knowledge and blessing,   **REDACTED**

**REDACTED**

**REDACTED**. *See* Clarke Dep. Tr. 12:4-14:20.   **REDACTED**

**REDACTED**

**REDACTED**. *See id.* 170:3-20.

5

E.   **Black Diamond is Involved in Changes to the VCLF-Patriot APA Between September 21 and October 23, 2015**

Real-world developments following September 21, 2015, necessitated updates to the

VCLF-Patriot APA, as executed on August 16, 2015.  For example, Patriot informed VCLF that

REDACTED

. *See* Clarke Dep. Tr. 54:15-25, 63:2-64:14 (REDACTED

); *id.* 209:14-210:16 (REDACTED

); *id.* 175:6-25, 212:11-23 (REDACTED

).[9]  In turn, Black Diamond itself REDACTED

. *Id.* 105:14-23.

F.   **On the Eve of the Scheduled Closing, Black Diamond Demands Material Changes to the Commitment Letter**

REDACTED

*See* Ehrlich Dep. Tr. 264:16-265:15.  This was a practical necessity:  As

Patriot had advised the Court and stakeholders in the chapter 11, coal prices had fallen

dramatically and Patriot was expecting to run out of cash just before the end of the month.  *See*

Clarke Dep. Tr. 100:24-103:9; Sullivan Dec., Ex. H (10/8/15 Confirmation Hr'g Tr. 69:18-

70:12) (based on Patriot's projections, "the company runs out of cash or goes negative cash in

week 28, which is the week beginning October 24[, 2015]"); *see also* Sullivan Dec., Ex. I

---

[9]   *See also* Clarke Dep. Tr. 312:8-21 (REDACTED

); *id.* 313:8-16 REDA

); *id.* 317:24-319:6 REDACTED

).

6

(10/7/15 Confirmation Hr'g Tr. 106:9-10) (Marc Puntus of Centerview, representing Patriot: "I

believe it is a matter of weeks before the debtors will run out of cash.").

Knowing this, 

- A reduction of the term loan amount from $10 million to $5 million, none of which could be drawn at closing;

- Replacement of the asset-based loan facility with a receivables purchase facility, REDACTED, rather than a 17% interest rate on amounts advanced under the terms of the Commitment Letter;[11]

- New financial covenants REDACTED,[12] and that REDACTED,[13];

---

[10] *See* Clarke Dep. Tr. 295:10-20   REDACTED .

[11]   REDACTED
*See* Clarke Dep. Tr. 71:5-10.   REDACTED
. *See id.* 187:14-188:3, 208:12-209:13.   REDACTED
. *See id.* 53:10-56:11; 65:5-69:24.

[12] *See* Gravenhorst Dep. Tr. 162:25-164:22   REDACTED
. "Gravenhorst Dep. Tr." refers to excerpts of the transcript of deposition of Black Diamond's Hugo Gravenhorst, taken on October 10, 2017, attached to the Sullivan Declaration as Exhibit J. Though Mr. Gravenhorst signed an errata sheet for his deposition transcript on January 11, 2018, that errata sheet was untimely under Fed. R. Civ. P. 30(e) because the court reporter delivered the deposition transcript to the parties on October 23, 2017, more than 30 days prior to the submission of the errata sheet. Accordingly, Sullivan Dec., Ex. J does not include Mr. Gravenhorst's untimely errata sheet.

[13] *See* K. McCoy Dep. Tr. 173:7-176:19 (   REDACTED
); Clarke Dep. Tr. 56:3-11   REDACTED

- A personal guarantee of 50% of Black Diamond's projected internal rate of return by Mr. Clarke; and

- Limitations on the amounts VCLF could pay its professionals at closing.

**REDACTED**

██████ Mr. Clarke himself conducted a "back-of-the-envelope" modeling on the morning of October 23, 2015.  *See* Phillips Dec., Exs. MM-NN.  Based on this modeling, **REDACTED**

████████████████████████████████████████████████████

████████████████[14]  *See* Clarke Dep. Tr. 55:7-13, 154:9-155:6, 277:5-278:24, 280:11-283:15.

**REDACTED**

██████ on October 23, 2015, Mr. Ehrlich instructed Hugo Gravenhorst of BDCF—an individual who had no prior involvement with this transaction, and who had never before communicated with Mr. Clarke—to send Mr. Clarke a series of e-mails memorializing the "modif[ications]"[15] that Black Diamond was demanding to the Commitment Letter (the "Gravenhorst E-mails").[16]  *See* Phillips Dec., Exs. P -S (Gravenhorst E-mails, sent at 10:24 a.m.,

---

**REDACTED** ).  "K. McCoy Dep. Tr." refers to excerpts of the deposition of VCLF's Kenneth McCoy, taken on October 26, 2017, with the witness's errata sheet, attached to the Sullivan Declaration as Exhibit K.

[14] Black Diamond points to ██████ **REDACTED** ██████
████████ *See* BD Mem. 11 (citing Phillips Dec., Ex. O).
█████████████ **REDACTED** █████████████
████████████████████████████████████████
████████ Murphy Dep. Tr. 239:6-23.

[15] To be clear, when the Gravenhorst E-mails state, "These new terms and conditions will modify our existing commitment letter dated September 21, 2015" (Phillips Dec., Exs. P-S), they are not using the term "modify" as Merriam-Webster defines it, "to make minor changes in."  Rather, ██████ **REDACTED** ██████
████████████████████████████████  *See* Ehrlich Dep. Tr. 293:6-20; *see also id.* 382:5-10
████████ **REDACTED** ████████ ).

[16] As of the time of Mr. Ehrlich's deposition, and notwithstanding VCLF's demand, Black Diamond was still withholding the six e-mails by which Mr. Ehrlich transmitted the text of the Gravenhorst E-mails to Mr. Gravenhorst, even though there is nothing privileged about them.  *See* Sullivan Dec., Ex. L.  Brazenly, Black

1:20 p.m., 2:04 p.m., and 2:18 p.m.).  Following the transmission of each of these e-mails, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [17] *See* Clarke Dep. Tr.

47:3-49:6, 56:12-58:25, 68:4-69:24, 74:4-77:19, 81:16-83:8, 142:9-144:25.  REDACTED

[REDACTED] *See*

*id.* 285:17-288:11 ( REDACTED

[REDACTED]

[REDACTED] ).

At no point in REDACTED

[REDACTED]

[REDACTED] . *See* Clarke Dep. Tr. 288:12-22. REDACTED

[REDACTED]

[REDACTED]

[REDACTED] . *See id.* 295:10-

297:10.

---

Diamond waited to produce these e-mails until three days after Mr. Ehrlich's deposition had passed, towards the end of the deposition of Black Diamond's restructuring lawyer, Adam Harris.  Black Diamond has agreed to the reopening of Mr. Ehrlich's deposition so that he can be examined regarding these six e-mails, and the deposition has tentatively been scheduled for January 26, 2018.  At Mr. Ehrlich's reopened deposition, the issue of repudiation will likely be revisited, given the centrality of the six e-mails to that topic.

[17] Mr. Clarke gave this testimony despite the fact that [REDACTED] REDACTED

[REDACTED] . *See* Clarke Dep. Tr. 5:25-6:7.  Black Diamond's counsel clearly believed that REDACTED

[REDACTED] , but Mr. Clarke gave truthful and complete testimony nonetheless.

9

### G.    VCLF Attempts to Cobble Together a Closing with Patriot

With Black Diamond's refusal to perform under the Commitment Letter and Black Diamond's clear statements that it would only do a deal incorporating the new terms in the Gravenhorst E-mails, VCLF's representatives understood that Black Diamond had reneged on its signed financing commitment.  Accordingly, beginning late in the day on October 23, 2015, VCLF consulted with Patriot, the UMWA, and other potential lenders to obtain replacement closing financing or consideration to consummate the VCLF-Patriot transaction.  Mr. Clarke believed that ████████████ REDACTED ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████. *See* Clarke Dep. Tr. 95:7-96:7, 102:18-103:9.

As a result of these discussions, VCLF extracted an additional $5 million loan from UMWA, as well as a purchase money note from Patriot for $6 million.  With these last minute accommodations, VCLF was able to close with Patriot on October 27, 2015.  In light of Black Diamond's repudiation of the Commitment Letter, VCLF did not convey any equity interests to Black Diamond at the closing.[18]

### H.    VCLF Apprises Black Diamond of Its Breach and Offers It a Final Chance to Perform

In light of Black Diamond's repudiation of the Commitment Letter on October 23, 2015, VCLF's representatives temporarily ceased communications with Black Diamond.  Black

---

[18] As this Court is aware, VCLF ████████ REDACTED ████████████

████████████████████████████████████████. *See* Clarke Dep. Tr. 218:11-223:24; K. McCoy Dep. Tr. 198:3-206:25; J. McCoy Dep. Tr. 233:22-235:14.  "J. McCoy Dep. Tr." refers to excerpts of the transcript of deposition of VCLF's Jason McCoy, taken on November 2, 2017, with the witness's errata sheet, attached to the Sullivan Declaration as Exhibit M.

Diamond, ████████████████ REDACTED ████████████████

████████████████████████████. *See* Clarke Dep. Tr. 91:5-92:23.

Among other things, ████████████ REDACTED ████████████

████████████████████████████████████████████

████████████████████. *See* Murphy Dep. Tr. 362:17-25 ███REDACTED███

████████████████. 

On Sunday, October 25, 2015, VCLF's counsel, Patrick Potter, sent a letter to Black

Diamond's counsel, Adam Harris, recounting the ways that Black Diamond had repudiated the

Commitment Letter.  Although there was no doubt that Black Diamond had reneged, VCLF gave

Black Diamond one last opportunity to change its mind and again agree to finance VCLF's

acquisition under the terms of the Commitment Letter.  *See* Phillips Dec., Ex. EE, at BDCF-

00077232 – 35.  Mr. Harris's response, that same day, confirmed that Black Diamond was not

prepared to finance under the terms of the Commitment Letter, but rather was willing to proceed

only on the basis of the terms set forth in the Gravenhorst E-mails:  "Black Diamond is prepared

to proceed with consummation of the financing for VCLF *on the terms set forth in Mr.*

*Gravenhorst's emails to Mr. Clarke from Friday, October 23rd . . . .*"  *Id.*, Ex. FF (emphasis

added).  Mr. Potter responded later that evening, noting that Mr. Harris had confirmed Black

Diamond's October 23, 2015, repudiation of its lending commitment.  *Id.*, Ex. GG.  Though Mr.

Harris further responded to Mr. Potter, at 11:34 p.m. on October 25, 2015, suggesting that Black

Diamond might be willing to "document and consummate a financing transaction for VCLF

based upon the terms of the September 21st Commitment Letter," that so-called offer was

illusory because it was conditioned on a return to the "Asset Purchase Agreement executed by

VCLF and Patriot on August 16, 2015"—which Black Diamond knew was impossible, given all

of the developments that had occurred since then and changes to the transaction Black Diamond

had endorsed and, in some cases, encouraged. *See id.*, Ex. C. Indeed, Mr. Harris's e-mail

plainly made the point that Black Diamond, in fact, was only willing to lend on the terms

"outlined in Mr. Gravenhorst's emails to VCLF on Friday[, October 23, 2015]." *Id.*

     This lawsuit was commenced by Black Diamond the very next day.

## ARGUMENT

## I.    BLACK DIAMOND REPUDIATED THE COMMITMENT LETTER BY OCTOBER 23, 2015

### A.    Legal Standard

     Under New York law, anticipatory repudiation constitutes a breach of contract, "entitling

the nonrepudiating party to recover damages for a total breach *and* excusing it from further

performance." *SPI Commc'ns v. WTZA-TV Assoc. Ltd. P'ship*, 229 A.D.2d 644, 645 (3d Dep't

1996) (citing *Long Is. R. R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463-64 (1977))

(emphasis added). Repudiation is assessed objectively; whether a party subjectively intended to

repudiate is "irrelevant." *See DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 642

(S.D.N.Y. 2011) ("The law is clear . . . that whether Plaintiff repudiated the contract is based on

an objective, not a subjective, standard. . . . Plaintiff's subjective intent is irrelevant."). The

communication of intent not to perform can be based on the repudiating party's "words or

deeds," and must be unequivocal. *Norcon Power Partners, L.P. v. Niagara Mohawk Power

Corp.*, 92 N.Y.2d 458, 463 (1998).

     As relevant to this case, a party anticipatorily repudiates a contract by adopting a "take-it-

or-leave-it" position by refusing to perform the contract unless the other party accepts new terms

or an untenable construction of an essential term. *See IBM Credit Fin. Corp. v. Mazda Motor

Mfg. (USA) Corp.*, 92 N.Y.2d 989, 993 (1998) (plaintiff's "insistence on an untenable

interpretation of a key contractual provision, and refusal to perform otherwise, constituted an anticipatory breach of the contract"); *see also REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976) ("Under New York law, insistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof.") (cited favorably in *Kelly Capital, LLC v. S & M Brands, Inc.*, 873 F. Supp. 2d 659, 677 (E.D. Va. 2012) (applying New York law)). Anticipatory repudiation "can be grounded upon a finding that the other party . . . has communicated its intent to perform only upon the satisfaction of extracontractual conditions." *SPI Commc'ns*, 229 A.D.2d at 645.[19]

Repudiation can be established at the summary judgment stage by, among other things, showing that a counterparty demanded material changes to a preliminary agreement (such as a term sheet) on the eve of the closing of the definitive agreement. *See Rhodes v. Davis*, 628 F. App'x 787, 790 (2d Cir. 2015) ("Davis's insistence on additional terms beyond those stated in the Stipulation or reasonably necessary to effect closing constituted an anticipatory breach"). In a strikingly similar case, the *Rhodes* Court held that one party repudiated a preliminary stipulation by presenting to the counterparty, the day before the closing deadline, a 12-page draft definitive agreement whose terms were at odds with the stipulation, including by requiring the counterparty to assume personal obligations not set forth in the stipulation:

> The 12–page stock purchase agreement that Davis sent Rhodes *the day before the closing deadline contained several terms at odds with the Stipulation,* including, for example, substitution of new entity ASI Services, Inc., for Davis himself as purchaser of

---

[19] *See also Mometal Structures, Inc. v. T.A. Ahern Contractors Corp.*, No. 09-CV-2791 (MKB), 2013 WL 764717, at *8 (S.D.N.Y. Feb. 28, 2013) (finding that plaintiff repudiated a subcontract by sending a letter stating it would not perform unless defendant "agreed to modify the terms of the Subcontract" to reflect seven substantial modifications, such as requiring the defendant to "pay the steel escalation costs and storage costs," and to void a portion of the subcontract "pertaining to liquidated damages"); *Israel Cancer Research Fund, Inc. v. Harvey & Gloria Kaylie Foundation, Inc.*, 33 Misc. 3d 1237(A), at *2 (Sup. Ct., N.Y. Cty. 2011) (holding, on a motion to dismiss, that allegations that defendant failed to make payments despite plaintiff's repeated requests and that defendant had "explicitly taken the position that it will continue to withhold that funding unless [plaintiff] takes on obligations beyond those set forth in the [Agreements]" sufficiently supported claim for repudiation).

Rhodes's shares, as well as that entity's assumption of post-closing obligations (including liabilities) that the Stipulation specifically assigned to Davis individually.  The agreement also required *Rhodes* to make representations and grant warranties not agreed to in the Stipulation, and *to assume indemnification obligations for breach of representations in the purchase agreement*.  Further, while the purchase agreement represented that it constituted the entire agreement between the parties, it notably omitted a Stipulation provision requiring defendants to indemnify Rhodes for any post-January 1, 2008 liability.  Meanwhile, a membership agreement that *Davis sent Rhodes on the closing date* further *expanded* Rhodes's indemnification, non-disparagement, and warranty obligations *beyond those agreed to in the Stipulation*.

. . .

On this record, we conclude as a matter of law that Rhodes satisfactorily demonstrated a breach by Davis, and Rhodes's willingness and ability to perform his obligations when due under the Stipulation.  Before the closing deadline passed, *Davis unequivocally and positively repudiated the Stipulation by insisting on terms that were not agreed to in the Stipulation, and not necessary to effect the closing called for therein*.

*Id.* at 790-91 (emphasis added).  The Court recognized that, "[w]hile the question of anticipatory breach is generally an issue of fact for the jury, where, as here, the relevant communications are in writing and unambiguous, the issue may be decided as a matter of law."  *Id.* at 790.  The Court therefore affirmed the district court's granting of summary judgment in favor of Rhodes (the non-repudiating party) based on the new terms insisted on by Davis.  *Id.* at 793.

Importantly, the cases cited by Black Diamond for the legal standard for repudiation are inapposite.  They either do not involve repudiation via demand for material change of terms on a take-it-or-leave-it basis (a standard applied in New York, but not all U.S. jurisdictions), or else do not apply New York law at all.  Notably, Black Diamond chose New York as the governing law for the Commitment Letter.  *See* Phillips Dec., Ex. A (Commitment Letter), at BDCF-00028160 ("This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York.").

14

**B.**    **Black Diamond Refused to Finance Under the Terms of the Commitment Letter, Demanding Material Changes to the Commitment Letter at the Eleventh Hour on a Take-It-Or-Leave-It Basis**

Black Diamond here did to VCLF exactly what the repudiating party did in *Rhodes*:  On the eve of the closing of the VCLF-Patriot APA, Black Diamond informed VCLF that the terms of the Commitment Letter were no longer operative, insisting on new, onerous, and materially different terms as conditions to financing the transaction. ███ REDACTED ███

███████████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Clarke Dep. Tr. 301:19-302:18.  It would not lend on the previously agreed terms in the Commitment Letter.  This is a hornbook instance of repudiation under New York law.

As set forth above, the terms Black Diamond demanded in the Gravenhorst E-mails on October 23, 2015, were materially different from those in the Commitment Letter—to VCLF's detriment.  Specifically, on the eve of closing, Black Diamond conditioned its lending on: (1) reducing its commitment from $25 million to $20 million; (2) restructuring the financing from an asset-based loan to a receivables purchase facility such that VCLF would receive $0 at closing and only receive the first $2.5 million of needed working capital on December 2, 2015 (more than a month after closing); (3) Mr. Clarke personally guarantying 50% of Black Diamond's desired 44% internal rate of return; (4) imposing new financial covenants that Black Diamond's witnesses confirmed are not typical, and that VCLF's witnesses confirmed would put VCLF in default almost immediately, allowing Black Diamond to assume control over the Federal 2 Mine and control ERP Settlement, LLC, without having advanced any funds (or, at least, any substantial funds); and (5) limiting the amount VCLF could pay its restructuring

15

professionals' fees to $2 million—even though Black Diamond knew those fees were much

higher.[20]

Black Diamond's insistence on these terms was unequivocally on a take-it-or-leave-it

basis. Throughout the day on October 23, 2015, Mr. Clarke repeatedly ███REDACTED███

████████████████████████████████████████████████████████████

███████████████████████████. *See, e.g.*, Clarke Dep. Tr. 278:5-281:11 (Mr.

Clarke explained ████████████REDACTED████████████

████████████████████); *id.* 301:19-302:18 (███REDACTED███

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████). But ███REDACTED███

███████████████████████████ *Id.* 47:3-49:6. As

Mr. Clarke recounted:



*Id.* 301:19-302:18 (emphasis added). ███REDACTED███ confirms that Black Diamond was

unwilling to negotiate regarding the Gravenhorst E-mails, a fact confirmed two days later when

---

[20] *See* Ehrlich Dep. Tr. 341:8-21; Clarke Dep. Tr. 48:22-49:3 ████REDACTED████
████████████████████████████████████████████████████).

Black Diamond's counsel, Mr. Harris, wrote to VCLF that Black Diamond was only "prepared to proceed with consummation of the financing for VCLF on the terms set forth in Mr. Gravenhorst's emails to Mr. Clarke from Friday, October 23rd." Phillips Dec., Ex. C, at BDCF-00077292.

The timing of the Gravenhorst E-mails also confirms that Black Diamond was strategically looking to "jam" VCLF with new, take-it-or-leave-it terms on the business day before the scheduled closing of the VCLF-Patriot transaction. As late as October 25, 2015,



. Ehrlich Dep. Tr. 264:16-265:15; *see also* Clarke Dep. Tr. 100:24-103:9 (

). REDACTED

. *See* Clarke Dep. Tr. 109:8-110:16. Indeed, the Court was so advised of this fact at the confirmation hearing on October 8, 2015:

> [THE COURT:] You have no reason to believe that the company's forecasts [which, among other things, showed Patriot running out of cash] are inaccurate?
>
> [ANDERS MAXWELL, representing the administrative agent for the Patriot term facility:] I am not challenging the company's forecasts.
>
> Q. Okay. Can you take a look and just tell me when the company is going to run out of money, based on the company's forecasts, if a plan is not confirmed?
>
> A. Your Honor, on page 14, I had summarized what is traditionally referred to as static pool analysis. It's intended to show the thirteen-week rolling forecast going out over the – into the future, and we had used that to make some general objections. And based on these forecasts, which are no longer current – I

17

gather there's been at least one more recent forecast prepared, which I have not reviewed, but based on these schedules on page 14 – again, these are not my projections; these are the company's projections – *the company runs out of cash or goes negative cash in week 28, which is the week beginning October 24[, 2015].*

Q.  And you can't identify any other means that Patriot has to address its liquidity crisis other than selling the company soon?

A.  Well, conceptually, I can certainly think of other things one could do, *but I have no alternatives to offer the company, sitting here today.*

Sullivan Dec., Ex. H, at 69:15-70:12 (emphasis added).[21]  Black Diamond knew this—its counsel appeared at that hearing telephonically (*see id.* at 3)—and intentionally waited until the very last minute to spring new terms on VCLF.

That Black Diamond demanded changes to the Commitment Letter and accompanying term sheet to "memorialize" these new terms, rather than engaging in drafting and negotiation over loan documents themselves, confirms Black Diamond's intent not to close on the terms of the Commitment Letter. ████████████ REDACTED ████████████

████████████████████████████████ *See* Harris Dep. Tr.[22] 220:7-17

(noting, ████████████ REDACTED ████████████

████████████████████████████████████████

████████████████████████████████).  The only logical inference is that Black Diamond refused to incur the expense necessary to produce and negotiate draft loan documents because it had decided that it was not lending to VCLF on the

---

[21] *See also supra* at 6-7.

[22] "Harris Dep. Tr." refers to excerpts of the transcript of deposition of Adam Harris, taken on October 20, 2017, attached to the Sullivan Declaration as Exhibit N.

terms previously negotiated.  And, here, VCLF **REDACTED**

**REDACTED**.  *See* Clarke Dep. Tr. 99:10-16, 196:3-197:24.

Black Diamond's intent to force new, onerous terms on VCLF is also confirmed by the

fact that **REDACTED**

**REDACTED**.  *See* Clarke Dep. Tr. 59:2-14, 75:7-17,

137:18-138:23; Gravenhorst Dep. Tr. 141:18-20.  Mr. Clarke testified that **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**.  *See* Clarke Dep. Tr. 142:9-25.  Indeed, **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED** Gravenhorst Dep. Tr. 260:3-16.  There can be no doubt that Black

Diamond used Mr. Gravenhorst for the specific purpose of conveying that Black Diamond

intended to lend to VCLF only on the new and onerous terms contained in the Gravenhorst E-

mails.  Mr. Ehrlich, who had been one of Mr. Clarke's main points of contact at Black Diamond,

**REDACTED** (*see* Sullivan Dec., Ex.

L), and could easily have sent the e-mails himself.

Black Diamond's attempt to rebut this conclusion by claiming after-the-fact that **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**.  Mr. Ehrlich confirmed that **REDACTED**

**REDACTED**

**REDACTED**.  *See* Ehrlich Dep. Tr. 113:2-114:16.  Likewise, when VCLF's counsel

19

pointed out to Mr. Deckoff that ████████████ REDACTED ████████████

████████████████████████████████████████████████████████████ he

responded, ██████ REDACTED ██████ and conceded that ██████ REDACTED ██████

██████████████. *See* Deckoff Dep. Tr. 253:15-254:19. The evidence demonstrates

that Mr. Gravenhorst's participation was in no way required, but rather was exploited to push

materially different terms on VCLF perceiving its back was to the wall.

### C. Black Diamond's Repudiation Was Positive and Unequivocal

Repudiation is assessed objectively, and whether a party subjectively intended to

repudiate is "irrelevant." *See DiFolco*, 831 F. Supp. 2d at 641-43. As demonstrated above, the

objective facts demonstrate that Black Diamond repudiated the Commitment Letter by October

23, 2015: The Gravenhorst E-mails could not be more clear and unequivocal, and Mr. Harris's

confirmation on October 25, 2015, that Black Diamond would close only on the basis of the

Gravenhorst E-mails, was equally clear and unequivocal.

These objective facts are confirmed by the contemporaneous perceptions of VCLF's

representatives that Black Diamond was repudiating the Commitment Letter. Under New York

law, the perception of the non-repudiating party of the repudiator's conduct, in light of all the

circumstances, is relevant to the objective assessment of whether a repudiation occurred. *See BT*

*Triple Crown Merger Co. v. Citigroup Global Mkts., Inc.*, 19 Misc. 3d 1129(A), at *5 (Sup. Ct.,

N.Y. Cty. 2008) (holding, in a case dealing with alleged repudiation of a Commitment Letter by

a party that demanded allegedly conflicting new terms, that "Barns' and Brizius' perception that

the defendants were threatening them with non-performance, when coupled with the rather

ominous tone of the defendants' internal emails," could be sufficient to demonstrate that "the defendants presented the plaintiffs with an ultimatum").[23]

Here, VCLF's witnesses all understood that Black Diamond's transmission of the Gravenhorst E-mails was intended to be a repudiation of the Commitment Letter and an attempt to force new terms on VCLF at the last minute.  Mr. Murphy of Teneo, REDACTED

Murphy Dep. Tr. 247:10-20.  Mr. Ken McCoy, for his part, testified REDACTED

K. McCoy Dep. Tr. 119:6-10.  As noted above, Mr. Clarke, who was interfacing directly with Black Diamond on October 22 and 23, 2015, likewise understood that REDACTED .

---

[23] In this case, the court determined that there remained a disputed fact as to whether an ultimatum was given.  *See BT Triple Crown*, 19 Misc. 3d 1129(A), at *5.  In the present case, because we have (i) the statements of the repudiating party in writing (*i.e.*, the Gravenhorst E-mails and Mr. Harris's e-mails on the evening of October 25, 2015, confirming that the Gravenhorst E-mails meant exactly what they said and reflected the new terms on which Black Diamond would lend), (ii) Mr. Ehrlich's statements to Mr. Clarke that REDACTED , and (iii) the undisputed perception of the recipient (*i.e.*, VCLF) that these statements were a repudiation, there is no genuine issue of material fact requiring a trial.

21

Black Diamond's conduct also confirmed what **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**. *See* K. McCoy Dep. Tr. 141:22-142:7 (after

receiving the Gravenhorst E-mails, Mr. McCoy and Mr. Clarke noted that they **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**); J. McCoy Dep. Tr. 134:23-137:21

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

Clarke Dep. Tr. 35:18-25 **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**. As Mr. Jason

McCoy explained, with the sending of the Gravenhorst E-mails on October 23, 2015, **REDACTED**

**REDACTED**

**REDACTED** J. McCoy Dep. Tr. 157:9-158:22.

The only evidence Black Diamond points to in support of its argument that VCLF did not

truly believe that Black Diamond had repudiated is a selective misquotation of an e-mail VCLF's

counsel Patrick Potter sent Patriot's counsel Ross Kwasteniet, on the evening of October 23,

22

2015.  *See BD* Mem. 4 (discussing Phillips Dec., Ex. E).  Black Diamond claims that, in that e-

mail, Mr. Potter wrote: ████████████████ REDACTED ████████████████

████████████████████   *See BD* Mem. 4.  BD misinterprets this sentence to

mean that even Mr. Potter believed, as of 8:54 p.m. EDT on October 23, 2015, that the

Commitment Letter transaction was still alive and being negotiated, and had not been repudiated

by Black Diamond.  Astonishingly, Black Diamond fails to quote the *very next sentence* of Mr.

Potter's e-mail, which makes clear that the "BD Deal" to which Mr. Potter referred was not the

financing transaction embodied in the Commitment Letter, but rather the new, material, and

onerous terms demanded by Black Diamond, on a take-it-or-leave-it basis, in the Gravenhorst E-

mails: ████████████████ REDACTED ████████████████

Phillips Dec., Ex. E (emphasis added).  This sentence establishes, unambiguously, that Mr. Potter

was referring to the terms demanded in the Gravenhorst E-mails, as the Commitment Letter

terms did not provide for a personal guaranty.  *See* Phillips Dec., Ex. A (Commitment Letter).

And, if this were not clear enough, Mr. Potter confirmed this meaning at his deposition.  *See*

Potter Dep. Tr.[24] 230:6-231:23 ████████████ REDACTED ████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ .



### D.      VCLF's Attempts on October 23 and 25, 2015 to Persuade Black Diamond to Change Its Mind Did Not Constitute a Waiver

Black Diamond maintains that the letter VCLF's counsel sent Black Diamond on

October 25, 2015, which asked "Black Diamond [to] advise VCLF as to whether [it] intends to

---

[24] "Potter Dep. Tr." refers to excerpts of the transcript of deposition of VCLF's counsel Patrick Potter, taken on October 16, 2017, with the witness's errata sheet, attached to the Sullivan Declaration as Exhibit O.

close tomorrow under the BD Commitment (without modification)," is proof that Black

Diamond did not repudiate the Commitment Letter because, "[h]ad Defendants believed that

Black Diamond had repudiated the Commitment Letter on October 23, it would not have sought

assurances that Black Diamond would perform on October 25."  BD Mem. 28.  This statement is

unsupported as a matter of fact and law because (1) VCLF's counsel's letter made clear that

Black Diamond *had* repudiated, and (2) VCLF simply gave Black Diamond an opportunity to

change its mind and provide the financing it had agreed to in the Commitment Letter.

New York law is clear that a non-repudiating party's attempts to persuade the repudiator

to perform as originally agreed do not constitute a waiver of the breach.  *See In re Randall's*

*Island Family Golf Centers, Inc.*, 261 B.R. 96, 101-02 (Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R.

521 (S.D.N.Y. 2002) ("He may refuse, for a time, to acquiesce in the repudiation, and urge the

repudiator to perform without waiving any of his rights.") (internal citations omitted); *Mindel v.*

*Image Point Prods., Inc.,* 725 F. Supp. 189, 194 (S.D.N.Y. 1989)  ("This effect of Mindel's

repudiation was not altered by Image Point's attempts to convince Mindel to change his mind,

nor was it altered by Image Point's proposal for amicable termination."); *AM Cosmetics, Inc. v.*

*Solomon*, 67 F. Supp. 2d 312, 318 (S.D.N.Y. 1999) ("However, a party's reluctance to terminate

a contract upon a breach and its attempts to encourage the breaching party to adhere to its

obligations under the contract do not necessarily constitute a waiver of the innocent party's rights

in the future.") (citing *Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp.

1015, 1023 (S.D.N.Y. 1988)); *Grp. 1 Auto., Inc. v. Country Imported Car Corp.*, No. 07-CV-

1454 RRM WDW, 2012 WL 11955634, at *16 (E.D.N.Y. Aug. 15, 2012) ("Although plaintiff

here attempted to help Country and IRL cure their defaults under the Amended Agreement and

Promissory Note, those efforts do not go so far as to constitute a waiver of plaintiff's rights under

those agreements."); *AG Properties of Kingston, LLC v. Besicorp-Empire Dev. Co., LLC*, 14

A.D.3d 971, 971 (3d Dep't 2005) ("[W]here a nonrepudiating party affords the repudiating party

an opportunity to repent, but it does not do so, the nonrepudiating party's subsequent failure to

perform is not a breach.") (citing *De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*,

243 N.Y. 283, 292-93 (1926)).

VCLF twice urged Black Diamond to retract its repudiation, but Black Diamond failed to

do so.  First, as noted above, Mr. Clarke ███████████ REDACTED ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████.  Clarke Dep. Tr. 286:6-

288:11, 295:10-297:10, 301:19-302:18.  Second, on Sunday, October 25, 2015, VCLF's counsel

formally described to Black Diamond all the ways that Black Diamond had repudiated the

Commitment Letter, but nonetheless offered Black Diamond a final opportunity to finance under

its terms:

> Black Diamond's conduct permits no interpretation other than that
> it is anticipatorily breaching or otherwise repudiating the BD
> Commitment.  Reducing the amount of funds, demanding a
> personal guarantee, and otherwise adversely changing the terms on
> which Black Diamond will proceed is not a modification of the BD
> Commitment that VCLF can or will accept.  Black Diamond is
> proposing a fundamentally different (and materially worse for
> VCLF) financing, which is entirely inconsistent with the BD
> Commitment.  Indeed, the lack of any meaningful legal work to
> prepare for Monday's closing strongly suggests that Black
> Diamond concluded weeks ago not to proceed – I note that, as of
> the sending of this letter, Black Diamond and its counsel have not
> provided a single draft of any document, even though the closing is
> scheduled for tomorrow.
>
> Patriot has emphasized to VCLF that the VCLF transaction must
> close tomorrow, and has intimated that there may be damage
> claims against VCLF if VCLF does not close.  And, while we
> contend that Black Diamond has anticipatorily breached or
> repudiated the BD Commitment (and in any event does not plan to
> perform thereunder), thus relieving VCLF of any obligation to

25

> close, we hereby demand that Black Diamond advise VCLF as to
> whether Black Diamond intends to close tomorrow under the BD
> Commitment (without modification), and under the original form
> of APA acceptable to Patriot as modified during the course of the
> confirmation process and last Thursday's negotiations (*not* the
> version tendered by Black Diamond to VCLF on Wednesday
> evening). . . .

Phillips Dec., Ex. EE, at BDCF-00077234.  Mr. Potter's e-mail could not have been clearer that

VCLF understood Black Diamond to have repudiated, but was giving Black Diamond a final

chance to repent.

This case could not be more different from *Crosspoint Seven v. Mfs. Life Ins. Co.*, 148 F.

App'x 535 (7th Cir. 2005), a case Black Diamond claims is "directly analogous" to the present

one.  *See* BD Mem. 24.  *Crosspoint* is distinguishable from this case in at least four key ways.

*First*, in *Crosspoint*, the court held that a party's *request* to the other party to restructure

an agreement to account for newly acquired information failed to amount to a repudiation.  *See*

148 F. App'x at 537-38.  But here, as noted above, Black Diamond did not merely request that

VCLF consider changes to the Commitment Letter:  Black Diamond *demanded* that VCLF do so,

on a take-it-or-leave-it basis, on the eve of the scheduled closing or there would be no funding.

*See* Clarke Dep. Tr. 280:11-16.  This was not the case in *Crosspoint*.

*Second*, the party alleging repudiation in *Crosspoint* "continued to take actions necessary

to close the deal" with the repudiating party, signaling that the non-repudiating party did not

think that the other party had in fact repudiated.  *See* 148 F. App'x at 358.  For example, the

party alleging repudiation "applied for no alternative financing, paid no other lender any fees,

and entered into no additional contracts or agreements," indicating that the party did not

materially change its position in reliance on the repudiation.  *Id.*  Here, it is undisputed that, after

Mr. Clarke had exhausted his efforts with Mr. Ehrlich on October 23, 2015, VCLF did just that:

suddenly without financing to close on the deal with Patriot, it conferred with Patriot, the

UMWA, and potential lenders beginning on the evening of October 23, 2015, in an effort to

cobble together minimal financing to close on the VCLF-Patriot APA.  VCLF had relied upon

Black Diamond to close the deal, and—once Black Diamond repudiated—VCLF undertook

stopgap efforts to accomplish the closing with Patriot.

*Third*, despite Black Diamond's desperate attempts to equate Mr. Potter's October 25,

2015 letter to Black Diamond with the "non-repudiating" party's letter in *Crosspoint* merely

requesting clarification of the counter-party's intention, the two letters could not be more

different.  As noted above, Mr. Potter's October 25th letter did not seek clarification of Black

Diamond's intent at all:  it *twice* affirmatively stated that Black Diamond had repudiated the

Commitment Letter no later than October 23, 2015, and, at most, "while [contending] Black

Diamond has anticipatorily breached or repudiated the BD Commitment (and in any event does

not plan to perform thereunder),"[25] it offered Black Diamond a final opportunity to reverse

course, to "repent."  *See AG Properties*, 14 A.D.3d at 971.  Black Diamond's characterization of

Mr. Potter's letter as a "request for clarification" (which influenced the Court in *Crosspoint* to

conclude that even the non-repudiating party was unclear whether there had been a repudiation)

is belied by the letter itself.

*Fourth* and finally, the *Crosspoint* court applied the legal standard for repudiation

developed under Indiana case law—a much more rigorous standard than the one under New

York law.[26]  But even applying Indiana law, Black Diamond's unilateral demand of new terms

---

[25] Phillips Dec., Ex. EE, at BDCF-00077234.

[26] *See Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.,* 692 N.E.2d 905, 911 (Ind. Ct. App. 1998) ("Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach."); *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. Ct. App. 2001) ("[T]he requirement that the repudiating statement be clear and absolute is a strict one.").  For example, while the doctrine of implied repudiation does not appear to be well-defined or even accepted by the vast number of Indiana courts, New York courts broadly apply the doctrine.  *See Norcon*, 92 N.Y.2d at 463; *Heart Const. Corp. v. Gower*, 6 Misc. 3d 1018(A), 800 N.Y.S.2d 347 (Dist. Ct. Nassau Cty. 2004) ("[R]epudiation may be express or implied.").

constituted repudiation.  "The demanding of the other party a performance to which the party has

no right under the contract constitutes [] an anticipatory breach." *Eden United, Inc. v. Short*, 573

N.E.2d 920, 929 (Ind. Ct. App. 1991) (party's conduct at closing suggesting that it would only

abide by its own interpretation of the agreement amounted to repudiation).

Black Diamond also improperly relies on *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100

(C.D. Cal. 2002), for the proposition that a party's threat to abandon a contract if the parties'

dispute cannot be resolved does not amount to a repudiation.  BD Mem. 21, n.31.  Once again,

Black Diamond relies on factually distinguishable case law, and in the process, mischaracterizes

the appropriate legal standard.

*Inamed* involved a disagreement between parties over the *interpretation* of a preliminary

letter agreement and its legal consequences.  More specifically, the parties had agreed to a

preliminary letter agreement in January 2000 outlining terms of a settlement agreement;

subsequently, in February 2000, one of the parties transmitted to the counter-party a "proposed

draft of the Settlement Agreement."  275 F. Supp. 2d at 1114.  The counter-party then sent a

letter in March 2000 identifying a few inconsistencies between the January 2000 letter agreement

and the February 2000 draft settlement agreement, but significantly, "[n]owhere in the letter [did

the party] state that his client [would] not settle the dispute on the terms outlined in the January []

2000 letter agreement . . . ."  *Id.*  Additionally, "[n]owhere in the letter [did the party] state that

his client . . . refuse[d] to continue negotiations regarding a formal settlement agreement."  *Id.*

Here, Black Diamond's communications with VCLF on October 23, 2015, had nothing to

do with its *interpretation* of the Commitment Letter.  It is undisputed that Black Diamond

transmitted new terms to VCLF and not mere interpretations of the Commitment Letter; indeed,

each one of the Gravenhorst E-mails pointedly stated, "These *new* terms and conditions will

modify our existing commitment letter dated September 21, 2015." Phillips Dec., Exs. P-S

(emphasis added).  Not only that, but as Mr. Clarke testified, REDACTED

. *See* Clarke Dep. Tr. 58:10-25, 60:5-21, 138:7-23, 144:18-

25, 148:3-11, 282:5-283:15, 292:4-8, 301:19-302:4.  This situation therefore cannot be

analogized to *Inamed*.

## II.    BLACK DIAMOND'S REPUDIATION IMMEDIATELY RELIEVED VCLF OF ITS OWN PERFORMANCE OBLIGATIONS UNDER THE COMMITMENT LETTER

It is well-established under New York law that an anticipatory breach by one party to a

contract excuses performance by a nonrepudiating counter-party.  *See Long Is. R. R. Co.*, 41

N.Y.2d at 463 ("[R]epudiation entitles the nonrepudiating party to claim damages for total

breach."); *Kain Dev., LLC v. Krause Properties, LLC*, 130 A.D.3d 1229, 1232 (3d Dep't 2015)

("Upon a showing of [] anticipatory repudiation, the nonrepudiating party is entitled to forgo

further performance and to claim damages for total breach."); *QK Healthcare, Inc. v. InSource,*

*Inc.,* 108 A.D.3d 56, 63 (2d Dep't 2013) ("Under the doctrine of anticipatory repudiation, where

one party repudiates its contractual obligations prior to the time designated for performance, the

nonrepudiating party may immediately claim damages for total breach and be absolved from its

obligations of future performance.").

Black Diamond's repudiation of the Commitment Letter occurred no later than the

afternoon of October 23, 2015, when REDACTED

.  Under New York law, this repudiation

immediately relieved VCLF of its own performance obligations under the Commitment Letter,

including obligations in the "Exclusivity" section. *See* Clarke Dep. Tr. 52:3-7 (REDACTED

REDACTED

. In other words, once Black Diamond repudiated, VCLF was free to solicit alternative closing financing and it was no longer obligated to convey any equity interests to Black Diamond.

It is undisputed that the solicitations of alternative financing identified in Black Diamond's motion papers did not occur until *after* Black Diamond had demanded the terms in the Gravenhorst E-mails and confirmed that it would accept nothing less than those terms.[27] Likewise, VCLF did not re-allocate the equity interests in ERP Federal Mining Complex, LLC and ERP Settlement, LLC, until the closing of the VCLF-Patriot Transaction on October 27, 2015. In either instance, VCLF's actions were undertaken well after Black Diamond had already repudiated, and do not constitute a breach of the Commitment Letter.

## CONCLUSION

Black Diamond's motion for partial summary judgment should be recognized for what it is—a bait-and-switch attempt quite similar to the one perpetrated by Black Diamond on VCLF on October 23, 2015. Notwithstanding Black Diamond's eleventh-hour attempt to redefine the issues in this case, the evidence is decidedly against the determinations Black Diamond now asks this Court to make. Accordingly, VCLF respectfully submits that this Court deny Black

---

[27] Black Diamond's claim that UMWA's loan to VCLF was a breach of the Commitment Letter is without basis for a separate reason: REDACTED

. *See* Clarke Dep. Tr. 12:4-14:20. REDACTED . *See id.* at 170:3-20.

30

Diamond's motion for partial summary judgment and grant VCLF's motion for partial summary judgment.

Respectfully submitted,

Dated: January 19, 2018
McLean, Virginia

_/s/ Patrick J. Potter_
Patrick J. Potter (VSB No. 39766)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard, Suite 1400
McLean, Virginia 22102-4856
Telephone:  (703) 770-7900
Facsimile:  (703) 770-7901
E-mail:  patrick.potter@pillsburylaw.com

William M. Sullivan, Jr. (admitted _pro hac vice_)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036-3006
Telephone:  (202) 663-8027
Facsimile:  (202) 663-8007
E-mail:  wsullivan@pillsburylaw.com

Andrew M. Troop (admitted _pro hac vice_)
Samuel S. Cavior (admitted _pro hac vice_)
Joshua I. Schlenger (admitted _pro hac vice_)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036-4039
Telephone:  (212) 858-1000
Facsimile:  (212) 858-1500
E-mail:  andrew.troop@pillsburylaw.com

_Counsel to Virginia Conservation Legacy Fund,_
_Inc. and ERP Compliant Fuels, LLC_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 19, 2018, I filed the foregoing *Memorandum of Law in Opposition to Black Diamond's Motion for Partial Summary Judgment* by uploading it to this Court's CM/ECF system, which will send notification of such filing to all CM/ECF participants, and that I served a copy on opposing counsel of record in this adversary proceeding by e-mail and Federal Express overnight.

   */s/ Patrick J. Potter*          
Patrick J. Potter
