Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41044)
McGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1178
Facsimile: (804) 698-2186
Email: dhayes@mcguirewoods.com
        jmaddock@mcguirewoods.com

- and -

C. William Phillips (admitted *pro hac vice*)
Jonathan M. Sperling (admitted *pro hac vice*)
David W. Haller (admitted *pro hac vice*)
Micaela McMurrough (admitted *pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone: (212) 841-1000
Facsimile: (212) 841-1010
Email: cphillips@cov.com
        jsperling@cov.com
        dhaller@cov.com
        mmcmurrough@cov.com

*Counsel to Black Diamond Commercial
Finance, LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.*, | Case No. 15-32450 (KLP) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 16-03105 (KLP) |
| BLACK DIAMOND COMMERCIAL FINANCE, LLC, | |
| Plaintiff, | |
| v. | |

VIRGINIA CONSERVATION LEGACY FUND, INC.
and ERP COMPLIANT FUELS, LLC,

        Defendants.

VIRGINIA CONSERVATION LEGACY FUND, INC.
and ERP COMPLIANT FUELS, LLC,

        Counterclaim-Plaintiffs,

        v.

BLACK DIAMOND COMMERCIAL FINANCE, LLC,

        Counterclaim-Defendant.


**BLACK DIAMOND'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

SUMMARY ........................................................................................................... 1

PROPOSED FINDINGS OF FACT ...................................................................... 5

I.      Background ............................................................................................... 5

II.     Patriot, VCLF, and ERP Execute an Asset Purchase Agreement...................... 7

III.    VCLF and ERP Needed Financing to Obtain the Assets and Liabilities Described
        in the August 16 APA. ................................................................................ 8

        A.     *VCLF and ERP Needed Financing to Place a Bid for the Assets and
               Liabilities Described in the August 16 APA.* ......................................... 8

        B.     *VCLF and ERP Needed Financing to Acquire the Assets and Liabilities
               Described in the August 16 APA.* ...................................................... 9

IV.     VCLF and ERP Are Unable to Acquire Financing from Any Party Other than
        Black Diamond. ........................................................................................ 10

V.      Black Diamond Agrees to Provide Financing to VCLF and ERP. .................... 12

VI.     The Commitment Letter ............................................................................. 14

        A.     *Execution* ...................................................................................... 14

        B.     *Commitment* ................................................................................... 15

        C.     *Consideration* ................................................................................. 16

        D.     *Conditions* ..................................................................................... 16

        E.     *Exclusivity* ..................................................................................... 18

        F.     *Merger and Modification Clauses* ...................................................... 19

        G.     *VCLF and ERP's Performance* .......................................................... 19

VII.    The Termination Date of the Commitment Letter is Extended. ....................... 22

VIII.   Patriot and Old Republic Insurance Company Execute a Settlement Agreement. .......... 23

IX.     Black Diamond Works to Close the Transaction. .......................................... 23

X.      VCLF and ERP Solicit Alternative Financing in Breach of the Commitment
        Letter. ...................................................................................................... 25

XI.      The Bankruptcy Court Confirms Patriot's Plan of Reorganization. ............................... 30

XII.     Black Diamond Learns of Changes to VCLF and ERP's Business Plan. ...................... 31

         A.     *Coal Inventory* ......................................................................................... 32

         B.     *Longwall* .................................................................................................. 33

         C.     *Bula Baptist Church* .................................................................................. 33

XIII.    VCLF, ERP, and Patriot Agree in Principle to Changes to the August 16 APA
         without Black Diamond's Knowledge or Consent. ........................................... 34

XIV.     Black Diamond Proposes Changes to the Draft Modified Asset Purchase
         Agreement. ......................................................................................................... 35

XV.      Six Days Before the Anticipated Closing, VCLF and ERP Finally Provide Black
         Diamond with Updated Financial Models. ......................................................... 37

XVI.     Messrs. Ehrlich and Clarke Discuss Changes to Black Diamond's Financing
         Commitment. ...................................................................................................... 39

         A.     *Messrs. Ehrlich and Clarke Discuss Changes to Black Diamond's*
                *Financing Commitment on October 22, 2015.* .................................... 40

         B.     *Teneo Runs Financial Models on October 22, 2015 Reflecting Modified*
                *Financing Terms.* ................................................................................ 41

         C.     *Messrs. Ehrlich and Clarke Discuss the New Financing Terms on October*
                *23, 2015.* .......................................................................................... 42

XVII.    VCLF and ERP Call Off the Financing Transaction with Patriot. ................... 45

XVIII.   Black Diamond Did Not "Jam" VCLF and ERP. ............................................. 48

XIX.     Black Diamond Repeatedly Reaches Out to VCLF and ERP to Continue
         Negotiations. ...................................................................................................... 49

XX.      VCLF and ERP Secure Alternative Financing from Patriot and the UMWA. ................ 49

XXI.     Mr. Potter Writes a Letter Accusing Black Diamond of Repudiation — Without
         Knowing about Black Diamond's Negotiations with Mr. Clarke. ................... 52

XXII.    VCLF and ERP Falsely Accuse Black Diamond of Repudiation. .................... 54

XXIII.   VCLF and ERP Close Their Transaction with Patriot without Providing Black
         Diamond with the Equity Interests. .................................................................. 57

XXIV.    Black Diamond Did Not Repudiate the Commitment Letter. ......................... 57

XXV.    Black Diamond Suffered Damages as a Result of VCLF and ERP's Breach of the
Commitment Letter............................................................................................... 61

    A.    *VCLF and ERP's Breach of the Commitment Letter Resulted in Black
Diamond's Loss of More than $5 Million in Interest Income.* ........................... 61

    B.    *VCLF and ERP Were Required to Reimburse Black Diamond for the
Attorneys' Fees that Black Diamond Incurred in Connection with Its
Financing Transaction with VCLF and ERP.* ....................................................... 62

    C.    *VCLF and ERP Were Required to Provide Black Diamond with an Equity
Interest in HoldCo, Which Equity Interest Had a Value of $26,666,784.65
as of October 26, 2015.* ...................................................................................... 62

    D.    *VCLF and ERP Were Required to Provide Black Diamond with an Equity
Interest in HealthCo, Which Equity Interest Had a Value of at Least
$35,220,895.38 as of October 26, 2015.* ............................................................. 64

    E.    *VCLF and ERP's Purported "Evidence" of Black Diamond's Inability to
Monetize HealthCo's Surplus Collateral Is Unpersuasive.* ............................... 70

XXVI.    The Federal Mine Closes. ...................................................................................... 79

PROPOSED CONCLUSIONS OF LAW ..................................................................................... 80

I.    VCLF and ERP Have Breached Contractual Obligations Owed to Black
Diamond under the Commitment Letter. ............................................................... 80

    A.    *The Commitment Letter Is a Binding, Enforceable Agreement.* ........................... 80

    B.    *Black Diamond Performed under the Commitment Letter.* ................................. 81

    C.    *Black Diamond, VCLF, and ERP Extended the Termination Date of the
Commitment Letter.* ............................................................................................ 82

    D.    *VCLF and ERP Breached the Commitment Letter.* .............................................. 83

    E.    *Black Diamond Was Damaged by VCLF and ERP's Breach.* .............................. 88

II.    Black Diamond Did Not Repudiate the Commitment Letter. ........................................ 92

III.    VCLF and ERP's Counterclaim Is Meritless................................................................. 94

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1199 Hous. Corp. v. Int'l Fidelity Ins. Co.*,
    788 N.Y.S.2d 88 (N.Y. App. Div. 2005) ........................................................................ 86

*Air China Ltd. v. Li*,
    No. 07 CIV 11128 LTS DFE, 2008 WL 754450 (S.D.N.Y. Mar. 17, 2008).................... 87

*Apfel v. Prudential-Bache Sec., Inc.*,
    616 N.E.2d 1095 (N.Y. 1993) ...................................................................................... 81

*Avalon Constr. Corp. v. Kirch Holding Co.*,
    175 N.E. 651 (N.Y. 1931)............................................................................................ 95

*In re Best Payphones, Inc.*,
    432 B.R. 46 (S.D.N.Y. 2010)....................................................................................... 93

*Bibeault v. Advanced Health Corp.*,
    No. 97 Civ. 6026(WHP), 2002 WL 24305 (S.D.N.Y. Jan. 8, 2002) ............................... 95

*In re Bradlees Stores, Inc.*,
    313 B.R. 565 (S.D.N.Y. 2004)...................................................................................... 93

*Breed v. Ins. Co. of N. Am.*,
    385 N.E.2d 1280 (N.Y. 1978) ...................................................................................... 85

*Broder v. Cablevision Sys. Corp.*,
    329 F. Supp. 2d 551 (S.D.N.Y. 2004)........................................................................... 80

*Clearmont Prop., LLC v. Eisner*,
    872 N.Y.S.2d 725 (N.Y. App. Div. 2009) ...................................................................... 80

*Columbia Artists Mgmt., LLC v. Alvarez*,
    No. 08 CIV 11254 LBS, 2010 WL 5396097 (S.D.N.Y. Dec. 23, 2010) .................... 86, 87

*Consarc Corp. v. Marine Midland Bank, N.A.*,
    996 F.2d 568 (2d Cir. 1993)......................................................................................... 81

*Contemporary Mission, Inc. v. Famous Music Corp.*,
    557 F.2d 918 (2d Cir. 1977)..................................................................................... 89, 90

*DeLorenzo v. Bac Agency, Inc.*,
    681 N.Y.S.2d 846 (N.Y. App. Div. 1998) ...................................................................... 92

*DiFolco v. MSNBC Cable L.L.C.*,
    831 F. Supp. 2d 634 (S.D.N.Y. 2011)........................................................................... 93

*DLJ Mortg. Capital Inc. v. Home Loan Corp.*,
    667 F. Supp. 2d 368 (S.D.N.Y. 2009)............................................................. 82

*Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*,
    No. 08CIV.1558(EMB)(THK), 2009 WL 6067017 (S.D.N.Y. Dec. 18, 2009) ............... 91

*Eaton v. Reich*,
    179 N.E. 385 (N.Y. 1932)............................................................................. 95

*Entis v. Atl. Wire & Cable Corp.*,
    335 F.2d 759 (2d Cir. 1964).......................................................................... 89

*ESPN, Inc. v. Office of Comm'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999)............................................................. 88

*FCS Advisors, Inc. v. Fair Finance Co.*,
    No. 07 Civ. 6456(DC), 2009 WL 1403869 (S.D.N.Y. May 19, 2009)....................... 86, 90

*Freund v. Wash. Square Press, Inc.*,
    314 N.E.2d 419 (N.Y. 1974).......................................................................... 89

*Holt v. Feigenbaum*,
    419 N.E.2d 332 (N.Y. 1981).......................................................................... 81

*India.com, Inc. v. Dalal*,
    412 F.3d 315 (2d Cir. 2005).......................................................................... 85, 86

*Indu Craft, Inc. v. Bank of Baroda*,
    47 F.3d 490 (2d Cir. 1995)............................................................................ 90

*Island Fed. Credit Union v. Hillside Auto Mall, Inc.*,
    937 N.Y.S.2d 87 (N.Y. App. Div. 2012) ........................................................ 88

*Jamil v. Solar Power Inc.*,
    230 F. Supp. 3d 271 (S.D.N.Y. 2017)............................................................. 89

*Koury v. Xcellence, Inc.*,
    649 F. Supp. 2d 127 (S.D.N.Y. 2009).......................................................... 93, 94

*Laham v. Chambi*,
    753 N.Y.S.2d 34 (N.Y. App. Div. 2002) ........................................................ 81

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003).......................................................................... 87

*McPike v. Zero-Gravity Holdings, Inc.*,
    280 F. Supp. 3d 800 (E.D. Va. 2017) ............................................................ 80

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ........................................................................ *passim*

*MHR Capital Partners LP v. Presstek, Inc.*,
    912 N.E.2d 43 (N.Y. 2009) ................................................................................. 82

*Mionis v. Bank Julius Baer & Co.*,
    749 N.Y.S.2d 497 (N.Y. App. Div. 2002) ................................................... 85, 87

*Morales Elec. Contracting, Inc. v. Siemens Bldg. Techs., Inc.*,
    No. 09-CV-2743 ADS ETB, 2012 WL 3779410 (E.D.N.Y. Aug. 30, 2012) ................... 87

*New York v. United Parcel Serv., Inc.*,
    253 F. Supp. 3d 583 (S.D.N.Y. 2017) ................................................................ 89

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015) ................................................................. 83

*O'Connor v. Sleasman*,
    830 N.Y.S.2d 377 (N.Y. App. Div. 2007) ................................................... 93, 94

*O'Shanter Res., Inc. v. Niagara Mohawk Power Corp.*,
    915 F. Supp. 560 (W.D.N.Y. 1996) ............................................................. 93, 94

*Parker v. Webster County Coal, LLC*,
    529 S.W.3d 759 (Ky. 2017) ........................................................................ *passim*

*Patsis v. Nicolia*,
    992 N.Y.S.2d 349 (N.Y. App. Div. 2014) ................................................... 85, 87

*Paxi, LLC v. Shiseido Ams. Corp.*,
    636 F. Supp. 2d 275 (S.D.N.Y. 2009) ................................................................ 80

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016) ............................................................................. 90

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*,
    991 F.2d 42 (2d Cir. 1993) ............................................................................... 80

*Rich-Haven Motor Sales, Inc. v. Nat'l Bank of N.Y. City*,
    558 N.Y.S.2d 91 (N.Y. App. Div. 1990) ........................................................... 91

*Saria v. Mass. Mut. Life Ins. Co.*,
    228 F.R.D. 536 (S.D. W.Va. 2005) .................................................................... 91

*Sharma v. Skaarup Ship Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990) ...................................................................... *passim*

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003)................................................................. 85

*Stevens v. Publicis, S.A.*,
  854 N.Y.S.2d 690 (N.Y. App. Div. 2008) .......................................... 83

*Tenavision, Inc. v. Neuman*,
  379 N.E.2d 1166 (N.Y. 1978)............................................................. 93

*Terminal Cent., Inc. v. Henry Modell & Co.*,
  628 N.Y.S.2d 56 (N.Y. App. Div. 1995) ............................................ 88

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007)......................................................... *passim*

*Verzani v. Costco Wholesale Corp.*,
  641 F. Supp. 2d 291 (S.D.N.Y. 2009)................................................. 86

*VIA Design Architects, PC v. U.S. Dev. Co., LLC*,
  No. 2:13CV555, 2014 WL 5685550 (E.D. Va. Nov. 14, 2014) .......... 81

*Wakeman v. Wheeler & Milson Mfg. Co.*,
  4 N.E. 264 (N.Y. 1886)...................................................................... 89

*Washington v. Kellwood Co.*,
  No. 05-CV-10034 (SN), 2016 WL 3920348 (S.D.N.Y. July 15, 2016) ..................... 89, 92

*Watson v. E.S. Sutton, Inc.*,
  No. 02 CIV. 2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) ...................... 91

*Williamson v. Delsener*,
  874 N.Y.S.2d 41 (N.Y. App. Div. 2009) ............................................ 83

**Statutes**

KRS 342.730....................................................................................... 78

42 U.S.C. § 301................................................................................... 78

**Other Authorities**

Restatement (Second) of Contracts (1981)...................................... 82, 93

Plaintiff/counterclaim-defendant Black Diamond Commercial Finance, LLC ("BDCF,"

and with Black Diamond Capital Management, LLC, "Black Diamond"), by its attorneys

McGuireWoods LLP and Covington & Burling LLP, respectfully submits these Proposed

Findings of Fact and Conclusions of Law.

## SUMMARY

1.        The evidence admitted at trial proves that Defendants Virginia Conservation

Legacy Fund, Inc. ("VCLF") and ERP Compliant Fuels, LLC ("ERP," and with VCLF,

"Defendants") breached their contractual obligations to Black Diamond.  The breach directly

damaged Black Diamond by depriving it of assets, interest income, and fees and expenses valued

in excess of $67 million.

2.        On September 21, 2015, VCLF, ERP, and Black Diamond signed a commitment

letter (the "Commitment Letter"), pursuant to which Black Diamond agreed to provide VCLF

and ERP with up to $25 million in financing to fund an anticipated transaction with Patriot Coal

Corporation and certain of its subsidiaries (collectively, "Patriot"), subject to various conditions

set forth in the Commitment Letter.  (PX 40.)  The transaction with Patriot had been

memorialized in an asset purchase agreement between VCLF, ERP, and Patriot, dated August

16, 2015 (the "August 16 APA").  (PX 15.)

3.        In exchange for Black Diamond's commitment, VCLF and ERP agreed to an

exclusivity provision, pursuant to which they agreed not: (i) to solicit or accept any alternative

financing to "facilitat[e]" their transaction with Patriot for the term of the Commitment Letter, or

(ii) to close a transaction with Patriot for the assets at issue without providing Black Diamond

with certain equity interests.  (PX 40, at BDCF-00028159.)

4.        VCLF and ERP breached the Commitment Letter in two key respects.  First,

VCLF and ERP breached the Commitment Letter by soliciting and closing upon alternative

financing to "facilitat[e]" their transaction with Patriot.  As ERP's Jason McCoy testified, he

repeatedly solicited alternative financing to facilitate the closing of the VCLF-Patriot transaction

after the Commitment Letter was executed.  (6/8/18 Tr. (McCoy, J.) 218:13-18; *id.* at 220:4-17;

*id.* at 221:2-15; *id.* at 224:7-18; *id.* at 225:10-15; *id.* at 225:22-23; *id.* at 226:11-227:3.)  More

broadly, on at least two occasions, the evidence plainly shows that Mr. McCoy solicited parties

to serve as the principal sources of financing for the VCLF-Patriot transaction, replacing Black

Diamond as the principal source of funding.  (PX 66; PX 264; DX AS; 6/8/18 Tr. (McCoy, J.)

235:4-8.)  VCLF and ERP ultimately accepted alternative financing from Patriot and the United

Mine Workers of America (the "UWMA") to close the transaction with Patriot.  (PX 221; PX

301; 6/12/18 Tr. (Clarke) 92:12-17; *id.* at 92:21-24; *id.* at 197:4-12.)

   5. Second, VCLF and ERP breached the Commitment Letter by closing their

transaction with Patriot without providing Black Diamond with the promised equity interests.

(6/5/18 Tr. (Ehrlich) 128:1-7; *id.* (Harris) at 181:14-25; 6/8/18 Tr. (Deckoff) 77:6-7.)  Instead,

VCLF and ERP retained for themselves those equity interests, which, at the time of Defendants'

breach, were estimated to increase VCLF and ERP's asset base by more than $6 million.  (PX

208; DX EG; DX FN; 6/12/18 Tr. (Clarke) 196:22-197:3.)

   6. VCLF and ERP have defended their actions by claiming that Black Diamond

repudiated the Commitment Letter before they breached it.  Specifically, VCLF and ERP claim

that Black Diamond repudiated the Commitment Letter by proposing new financing terms on

October 23, 2015, in a series of emails between Black Diamond's Hugo Gravenhorst, and

VCLF's Tom Clarke.  (PX 111; PX 113; PX 115; PX 116.)  This argument is without legal or

factual merit.

7.      To be clear, by signing the Commitment Letter, Black Diamond committed to fund the deal set forth in the August 16 APA, as modified through the date of the Commitment Letter.  (PX 40, at BDCF-00028157; *id.* at -158.)  After the Commitment Letter was signed — and without Black Diamond's consent — VCLF and ERP negotiated draft modifications to the August 16 APA with Patriot that were detrimental to VCLF and ERP.  (PX 49; PX 326; PX 327; 6/4/18 Tr. (Ehrlich) 194:3-18; *id.* at 203:10-14; 6/5/18 Tr. (Harris) 151:12-21; 6/8/18 Tr. (Deckoff) 33:17-34:2; 6/12/18 Tr. (Clarke) 120:20-23.)  Black Diamond was under no obligation to fund this proposed modified transaction, although it was willing — and attempted — to negotiate a new financing arrangement for a proposed modified APA.  (6/5/18 Tr. (Harris) 164:3-23; 6/8/18 Tr. (Deckoff) 31:9-11; *id.* at 88:19-21.)  In the midst of negotiating new terms, however, VCLF and ERP abruptly cut off negotiations with Black Diamond and closed their deal with Patriot with other financing.  (PX 158; PX 183; PX 221; PX 282; PX 296; PX 299; PX 349; 6/12/18 Tr. (Clarke) 92:12-17; *id.* at 92:21-24; *id.* at 197:4-12.)

8.      Black Diamond's conduct was not — and could not have been — a repudiation of the Commitment Letter because the new financing terms that Black Diamond proposed on October 23 related solely to the proposed modified asset purchase agreement that VCLF, ERP, and Patriot negotiated without Black Diamond's consent.  (*See, e.g.*, PX 111.)  It is undisputed that Black Diamond never refused to perform under the Commitment Letter and fund the transaction set forth in the August 16 APA as it existed as of September 21, 2015 — the only transaction for which BD had agreed — and was contractually committed — to provide financing.  (PX 181; 6/5/18 Tr. (Ehrlich) 5:14-16; *id.* at 6:15-18; *id.* at 7:8-16; *id.* at 131:5-16; *id.* (Harris) at 164:24-25; *id.* at 173:7-13; 6/8/18 Tr. (Deckoff) 48:20-49:2; 6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke) 87:13-19.)  It is likewise undisputed that Black

Diamond never refused to negotiate over new financing terms in connection with a modified

asset purchase agreement.  To the contrary, as VCLF's own CEO conceded, Black Diamond

"never did stop negotiating."  (6/12/18 Tr. (Clarke) 190:14.)  Instead, as noted above, Defendants

chose to terminate negotiations.

9.      VCLF and ERP's breach entitles Black Diamond to at least $67 million in

damages, including more than $61 million in connection with VCLF and ERP's failure to deliver

the promised equity interests.  This damages figure is supported by VCLF and ERP's

interrogatory responses as well as the testimony of Black Diamond's expert witness, Robert

Briscoe.  (PX 249; PX 261.)

10.      In response, VCLF and ERP argue that Black Diamond is not entitled to damages

because events that transpired after the breach of the Commitment Letter — particularly, VCLF

and ERP's inability to negotiate a deal to monetize the surplus workers' compensation collateral

they acquired from Patriot — demonstrate that Black Diamond's interests were actually worth

less.  This argument is unavailing.

11.      Under New York law, contract damages are measured at the time of breach,

*Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990), and "events subsequent

to the breach . . . may neither offset nor enhance general damages," *Merrill Lynch & Co. v.*

*Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007).  The post-breach events that VCLF

and ERP emphasize — namely, Defendants' struggle to monetize HealthCo — are insufficient to

call Black Diamond's damages into question.  As the record evidence demonstrates, VCLF and

ERP were unable to monetize HealthCo for several reasons not applicable to Black Diamond,

including because VCLF and ERP had insufficient capital to provide replacement letters of credit

and because they proposed monetization strategies that conflicted with applicable state law.  (PX

401, at 10-11; PX 402, at 4-7; 6/6/18 Tr. (Briscoe) 119:20-120:3; *id.* at 135:25-136:12; *id.* at

138:17-139:1; 6/13/18 Tr. (Spragg) 217:12-218:3; *id.* at 223:18-21.)  Indeed, regulators

repeatedly told VCLF, ERP, and Patriot that they would execute a monetization transaction,

provided that such a transaction accorded with applicable law.  (PX 401, at 10-11; PX 402, at 4;

PX 403, at 16; *id.* at 23.)  VCLF, ERP, and Patriot never proposed such a transaction.  (6/13/18

Tr. (Spragg) 196:11-15; *id.* at 198:7-10; *id.* at 217:8-11; *id.* at 222:8-14.)  Thus, Defendants'

evidence speaks only to Defendants' failed efforts to successfully monetize the surplus collateral,

not to the inherent value of that surplus or Black Diamond's ability to monetize it.

12.     For all of these reasons, judgment should be entered in Black Diamond's favor

for $67,167,680.03, plus interest.

## PROPOSED FINDINGS OF FACT

### I.     Background

13.     Black Diamond Capital Management, LLC ("BDCM") is an asset management

firm that manages various financial vehicles, including a hedge fund and control

distressed/private equity investments.  (6/4/18 Tr. (Ehrlich) 56:15-22.)  BDCM was founded in

1994 by Stephen H. Deckoff, who serves as BDCM's managing principal.  (*Id.* at 57:9; 6/8/18

Tr. (Deckoff) 5:22-23.)

14.     BDCM is a sophisticated financial entity.  BDCM currently manages over $8

billion in assets, ██████████████████████████.  (6/4/18 Tr. (Ehrlich) 57:10-11; 6/8/18 Tr.

(Deckoff) 6:21-25; *id.* at 22:25-23:6.)  BDCM is creditworthy and debt-free.  (6/8/18 Tr.

(Deckoff) 22:23-25.)  It has ready access to credit markets, including a standing undrawn $50

million credit line that can be used for letters of credit.  (*Id.* at 19:25-20:21.)

15.     BDCM has substantial experience in the coal industry.  BDCM has been involved

in multiple deals involving coal companies, including deals with Pinnacle Oaks, Murray Energy,

Arch Coal, and Alpha Natural Resources.  (6/8/18 Tr. (Deckoff) 7:17-25.)

16.     BDCM has substantial experience and familiarity with workers' compensation

programs.  BDCM has been involved in multiple transactions involving the monetization of

surplus workers' compensation collateral, including successful monetizations of at least seven

workers' compensation programs.  (6/4/18 Tr. (Ehrlich) 67:16-17; 6/8/18 Tr. (Deckoff) 15:15-

16:13.)  In addition to its experience with monetization, BDCM owns an insurance company

licensed to insure workers' compensation liabilities.  (6/8/18 Tr. (Deckoff) 23:15-24:2.)

17.     BDCF is an affiliate of BDCM.  (6/4/18 Tr. (Ehrlich) 57:17-20.)  BDCF is Black

Diamond's "loan origination arm."  (6/5/18 Tr. (Ehrlich) 72:13-14.)  It is responsible for

originating and administering loans on behalf of the Black Diamond group.  (6/4/18 Tr. (Ehrlich)

57:20-21.)  Mr. Deckoff is an owner of BDCF.  (*Id.* at 57:22-23.)

18.     VCLF is a Virginia nonstock corporation.  (Joint Stipulation of Uncontroverted

Facts (Dkt. No. 271) ("Unconverted Facts"), ¶ 2.)  Thomas M. Clarke is the chief executive

officer of VCLF.  (6/11/18 Tr. (Clarke) 278:8-9.)

19.     ERP is a Virginia limited liability company created for the purpose of

consummating VCLF's acquisition of certain assets and assumption of certain liabilities from

Patriot.  (Uncontroverted Facts, ¶ 3.)  ERP is jointly owned by VCLF and Iron Management,

LLC ("Iron Management").  (PX 249, at VCLF-00000006.)  Ken McCoy is the chief executive

officer of ERP and a member of Iron Management.  (6/13/18 Tr. (McCoy, K.) 67:10-11; PX 249,

at VCLF-00000006.)  Jason McCoy is a senior vice-president of ERP and a member of Iron

Management.  (6/8/18 Tr. (McCoy, J.) 149:1-3; PX 249, at VCLF-00000006.)  Mr. Clarke is a

managing member of ERP.  (PX 249, at VCLF-00000006.)

## II.    Patriot, VCLF, and ERP Execute an Asset Purchase Agreement.

20.    On May 12, 2015, Patriot filed a voluntary petition for bankruptcy under Chapter

11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern

District of Virginia.  (*See* Voluntary Pet., *In re Patriot Coal Corp.*, Case No. 15-32450 (Bankr.

E.D. Va.) (Dkt. No. 1).)

21.    Pursuant to its plan of reorganization, Patriot sought to sell substantially all of its

assets and liabilities.  (PX 334.)

22.    On August 16, 2015, VCLF and ERP entered into an asset purchase agreement

with Patriot to buy certain of Patriot's assets and liabilities, including coal mines and equipment,

workers' compensation assets and liabilities, and mine-reclamation assets and liabilities (the

"August 16 APA").  (PX 15; *see also* Uncontroverted Facts, ¶ 5; 6/4/18 Tr. (Ehrlich) 63:20-64:7;

6/11/18 Tr. (Clarke) 286:17-287:18; *id.* at 289:10-14.)

23.    Among the assets and liabilities that VCLF and ERP contracted to purchase were

the assets and liabilities associated with the Federal Mine No. 2, an operating coal mine outside

of Morgantown, West Virginia (the "Federal Mine").  (PX 15, §§ 2.01 & 2.03; 6/8/18 Tr.

(McCoy, J.) 150:11-13; 6/11/18 Tr. (Clarke) 292:19-22.)  VCLF and ERP also contracted to

purchase certain of the assets and liabilities associated with Patriot's workers' compensation

program.  (PX 15, §§ 2.01(q) & 2.03(f).)   Specifically, VCLF and ERP contracted to purchase

Patriot's traumatic injury and state black lung liabilities as well as the collateral, then in the form

of letters of credit, that secured those liabilities.  (*Id.* §§ 2.01(q), 2.03(f), 2.04(f).)

24.    The collateral that VCLF and ERP contracted to purchase was set forth in

Schedule 1.01(a)(vii) of the August 16 APA.  (PX 15, § 2.01(q); *id.* at pgs. 409-10 of 1070.)

-7-

Patriot warranted that the value of this collateral was $168,995,445, and that the value of the liabilities that the collateral secured was $108,478,658.  (PX 15, §§ 3.18 & 3.19; *see also id.* at pgs. 409-10 of 1070.)

25.    The August 16 APA did not require VCLF and ERP to pay any money for the assets and liabilities to be purchased.  (6/4/18 Tr. (Ehrlich) 199:13-18 ("[VCLF and ERP] were putting in zero cash."); 6/11/18 Tr. (Clarke) 293:13-14 ("[T]he initial August 16th asset purchase agreement did not have cash being paid at closing.").)

26.    The August 16 APA required the parties to close on or before January 31, 2016. (PX 15, § 11.01(b).)

## III.    VCLF and ERP Needed Financing to Obtain the Assets and Liabilities Described in the August 16 APA.

A.    *VCLF and ERP Needed Financing to Place a Bid for the Assets and Liabilities Described in the August 16 APA.*

27.    The sale of the assets and liabilities described in the August 16 APA was "subject to higher and better bids, including a potential auction."  (PX 15, § 5.07(c).)

28.    The Bidding Procedures Order governed the process for bidding on Patriot's assets and liabilities.  (PX 15, § 5.07(c); *see also* PX 333.)  As is relevant here, the Bidding Procedures Order specified that:

> Any Bidder must have, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, the *necessary financial capacity* to consummate the proposed transactions required by its Bid.  Each Bid must also include, by the Bid Deadline, *committed financing*, documented to the Debtors' reasonable satisfaction . . . that demonstrates the Bidder has received *sufficient debt and/or equity funding commitments* to satisfy the Bidder's Purchase Price and other obligations under its Bid . . . .

(PX 333, at Ex. 1, pg. 7 (emphasis added).)

29.    At trial, VCLF and ERP argued that they were not subject to the requirements of the Bidding Procedures Order because they had been named as the "Federal Stalking Horse

Bidder," and thus they were automatically qualified to bid for Patriot's assets.  The Bidding

Procedures Order, however, expressly provided that any bids placed by the Federal Stalking

Horse Bidder would be deemed "Winning Bid[s]" only if they "otherwise satisfie[d] all of the

Bid Conditions in the Bidding Procedures [Order]." (PX 333, at pg. 7, ¶ 7.)  This includes the

requirement that bidders have committed financing.  Indeed, the requirements that "*[a]ny*

*Bidder*" have the financial capacity to consummate the proposed transaction with Patriot and that

"*[e]ach Bid*" have committed financing were without qualification.  (*Id.* at Ex. 1, pg. 7 (emphasis

added).)

      30.     In all events, at the time of the auction and as late as the dates of their depositions,

VCLF and ERP's witnesses believed that they needed to have committed financing in order to

place a bid for and win Patriot's assets and liabilities.  (6/11/18 Tr. (Murphy) 194:2-7 ("We

needed a signed commitment letter prior to the auction."); 6/12/18 Tr. (Clarke) 76:18-19 ("I -- I

believe it was a requirement of our financing where our bid be financed.").)  Indeed, in advance

of the auction, Patriot's chief restructuring officer, Ray Dombrowski, repeatedly asked VCLF

and ERP to show that they had committed financing.  (PX 24; PX 505; 6/7/18 Tr. (Potter) 160:2-

5 ("Q.  And Patriot is asking, and will continue, and does continue to ask with regard to VCLF's

financing and viability over time, correct?  A.  It never stopped."); 6/12/18 Tr. (Clarke) 77:20-22

("Certainly, Mr. Dombrowski and I, Bob Bennett and Mike Day and I, talked about the financing

on a regular basis.").)

      B.     *VCLF and ERP Needed Financing to Acquire the Assets and Liabilities Described*
         *in the August 16 APA.*

      31.     Irrespective of whether they needed committed financing to *place a bid* for the

assets and liabilities described in the August 16 APA, VCLF and ERP needed committed

financing in order to *acquire* such assets and liabilities.  (6/11/18 Tr. (Murphy) 190:23-191:1.)

32.     By its terms, the August 16 APA was terminable to the extent that VCLF and

ERP did not "demonstrate[] the financial wherewithal to own and operate the Purchased Assets

and perform the Assumed Liabilities, as demonstrated by one or more written, binding

commitments for equity and debt financing, on or prior to October 9, 2015." (PX 15,

§ 11.01(m).)  Patriot's obligation to close the transaction was also contingent on VCLF and ERP

"obtain[ing] sufficient financing and/or credit support . . . to consummate the transactions

contemplated [by the August 16 APA]." (*Id.*, § 10.03(g).)

33.     VCLF and ERP would not have been able to close their transaction with Patriot

without committed financing. (6/11/18 (Murphy) Tr. 105:5-11 ("It was very, very important that

VCLF find capital to complete this deal, given that VCLF is a nonprofit organization with no

balance sheet and no liquidity, to be able to close the transaction. So, therefore, we had to find

third-party commercial financing to be able to fund the transaction we're seeking to close."); *id.*

at 190:23-191:1 ("[VCLF and ERP] needed a third party to — to provide the capital to be able to

close and subsequently[] fund working capital for the business that they wanted to acquire.").)

## IV.    VCLF and ERP Are Unable to Acquire Financing from Any Party Other than Black Diamond.

34.     In June 2015, VCLF retained Teneo Restructuring ("Teneo") to assist with

obtaining financing in connection with its contemplated transaction with Patriot. (PX 8, at

VCLF-00023305.)

35.     Beginning in August 2015, Teneo solicited financing from third-party investors

on behalf of VCLF and ERP. (6/11/18 Tr. (Murphy) 109:5-14.)

36.     When soliciting financing, Teneo provided potential investors with a "teaser,"

which was a "one-page marketing document that . . . outline[d] and [gave] a quick snapshot" of

VCLF and ERP's transaction with Patriot — "a summary of what [VCLF and ERP were] trying to accomplish." (6/11/18 Tr. (Murphy) 107:18-21.)

37.    The teaser that Teneo circulated to potential investors stated that VCLF and ERP were "looking to raise $20 million to $40 million" in connection with their transaction with Patriot. (PX 16, at TEN0013130.) The teaser further specified that financing "[could] be structured in a variety of securities/facilities including, but not limited to": (i) an "[a]sset backed revolver"; (ii) "[p]roven reserves financing"; (iii) "[i]nventory and AR financing"; (iv) a "[f]irst-lien term loan"; or (v) a "[s]ale to lease-back of mining equipment." (*Id.*) VCLF and ERP included this array of financing options in their teaser because they did not want to "exclud[e] certain lenders simply because [they] were being too narrow in terms of the types of securities that [they] would eventually conclude with." (6/11/18 Tr. (Murphy) 201:19-22.) VCLF and ERP were "open to receiving financing in a variety of structures, including, but not limited to, those listed in [the teaser]." (*Id.* at 201:7-202:2; *id.* at 202:19-21 ("Q. So again, you weren't only open to a fifteen-million-dollar ABL and a ten-million-dollar term loan, correct? A. We're open to all proposals.").)

38.    Teneo reached out to 60 to 70 potential inventors about providing financing to VCLF and ERP. (6/11/18 Tr. (Murphy) 109:18-25.) Of those 60 to 70 investors, only 10 to 15 agreed to sign a nondisclosure agreement that would allow them to receive "restricted" information about the VCLF-Patriot transaction. (*Id.* at 111:21-24.) After receiving the restricted information, none of the potential investors (other than Black Diamond) agreed to provide financing to VCLF and ERP. (*Id.* at 114:19-22.)

39.    Black Diamond was the only investor to come "forward and submit[] a term sheet to provide financing for VCLF to close on its transaction with Patriot."  (6/11/18 Tr. (Murphy) 115:19-24.)

**V.    Black Diamond Agrees to Provide Financing to VCLF and ERP.**

40.    On August 24, 2015, Teneo's Brendan Murphy emailed Black Diamond's Paul Laud to "pass along" an "opportunity" to provide financing to VCLF and ERP in connection with their transaction with Patriot.  (PX 16.)  Mr. Murphy's email contained the "same . . . stock language" that Teneo used when soliciting financing from the "other sixty or seventy parties" that Teneo contacted in connection with the VCLF-Patriot transaction.  (6/11/18 Tr. (Murphy) 200:21-201:6.)  Like Teneo's other solicitations, Mr. Murphy's email indicated that VCLF and ERP were "looking to raise $20 million to $40 million" and that such financing could "be structured in a variety of securities/facilities," including an asset-based loan or a receivables purchase facility.  (PX 16.)

41.    Mr. Laud forwarded Mr. Murphy's email to Black Diamond's Richard Ehrlich. (PX 312; 6/4/18 Tr. (Ehrlich) 60:6-8.)  Mr. Laud indicated that if the opportunity was "of interest" to Black Diamond, Mr. Ehrlich should contact Mr. Murphy "directly."  (PX 312.)

42.    Upon receiving Mr. Laud's email, Mr. Ehrlich contacted Mr. Murphy for more information.  (6/4/18 Tr. (Ehrlich) 61:17-23.)  In response to this inquiry, Mr. Murphy forwarded Mr. Ehrlich a presentation titled "ERP Compliant Fuels, LLC," dated August 27, 2015.  (PX 271; 6/4/18 Tr. (Ehrlich) 61:20-23.)

43.    The presentation that Mr. Murphy forwarded provided a "summary" of the contemplated transaction between and among VCLF, ERP, and Patriot.  (PX 271, at BDCF-00018031.)  Specifically, the presentation indicated that VCLF and ERP aimed to acquire,

among other things, the "'Federal' . . . mining complex[]" and certain of the assets and liabilities associated with Patriot's workers' compensation program. (*Id.*)

44.    With respect to the workers' compensation program, the presentation represented that the value of Patriot's workers' compensation liabilities was $108 million and that these liabilities were secured by "Cash Collateral" valued at approximately $169 million. (PX 271, at BDCF-00018032; 6/4/18 Tr. (Ehrlich) 69:22-70:12.)  In other words, the presentation represented that Patriot's workers' compensation program was over-secured by approximately $61 million. (PX 271, at BDCF-00018032; 6/4/18 Tr. (Ehrlich) 70:4-12.)  VCLF and ERP indicated that they planned to monetize Patriot's surplus collateral by purchasing a "Loss Portfolio Transfer ('LPT') insurance policy." (PX 271, at BDCF-00018032.)  After purchasing such a policy, Patriot's surplus collateral would be "available [to] ERP." (*Id.*)

45.    In addition to information about Patriot's workers' compensation program, the presentation provided information about the Federal Mine, including financial projections. (PX 271, at BDCF-00018039; 6/4/18 Tr. (Ehrlich) 72:18-73:2.)  Specifically, the presentation projected that, in the "[b]ase [c]ase" scenario, the Federal Mine would have EBITDA of $33,874,000 in 2016 and anticipated cash flow of $15,819,100. (PX 271, at BDCF-00018039; 6/4/18 Tr. (Ehrlich) 73:6-13.)  By 2019, the Federal Mine was projected to generate $111,428,425 in free cash flow. (PX 271, at BDCF-00018039.)

46.    In addition to the presentation provided by Mr. Murphy, Mr. Ehrlich reviewed the August 16 APA. (6/4/18 Tr. (Ehrlich) 75:5-13.)

47.    After receiving the materials from Mr. Murphy, Mr. Ehrlich contacted Teneo to set up a meeting. (6/4/18 Tr. (Ehrlich) 61:17-19.)

48.     On Sunday, September 13, 2015, Messrs. Ehrlich, Deckoff, Clarke, Murphy, and Ken McCoy met in Teneo's offices to discuss a possible financing deal between and among VCLF, ERP, and Black Diamond.  (PX 314; PX 315; 6/4/18 Tr. (Ehrlich) 74:7-9; *id.* at 74:19-22; 6/11/18 Tr. (Murphy) 124:24-125:4.)  During the meeting, the parties engaged in "substantive" discussions about VCLF and ERP's business plan, including VCLF and ERP's plan for developing the Federal Mine.  (6/8/18 Tr. (Deckoff) 10:4-14; 6/11/18 Tr. (Murphy) 125:21-25.) The parties also discussed the nature of Black Diamond's business.  (6/8/18 Tr. (Deckoff) 10:4-8.)  According to Mr. Murphy, Black Diamond "had clearly done their homework before showing up at the meeting."  (6/11/18 Tr. (Murphy) 125:24-25; *see also* 6/13/18 Tr. (McCoy, K.) 74:12-24 ("Steve, particularly, very articulate, you could tell very quickly he was bright, he was experienced.").)

49.     At the end of the meeting, Messrs. Ehrlich and Deckoff indicated that they would "probably send [VCLF and ERP] a term sheet."  (6/4/18 Tr. (Ehrlich) 74:17-18.)  On September 20, 2015 — just a week after meeting with VCLF and ERP — Black Diamond sent VCLF and ERP a draft commitment letter for their review.  (DX N.)

## VI.     The Commitment Letter

### A.     *Execution*

50.     Black Diamond, VCLF, and ERP executed the Commitment Letter on September 21, 2015.  (PX 40, at BDCF-00028161.)

51.     Mr. Deckoff signed the Commitment Letter on behalf of Black Diamond, and Mr. Clarke signed the Commitment Letter on behalf of VCLF and ERP.  (PX 40, at BDCF-00028161.)

52.     The Commitment Letter was a valid, enforceable agreement.  (*See, e.g.*, Answer & Counterclaim (Dkt. No. 3-68), pg. 15, ¶ 61 ("Defendants . . . admit that the Commitment

Letter, as executed September 21, 2015, was a valid and enforceable contract."); *id.* at pg. 30,

¶ 48 ("The Commitment Letter is a valid and enforceable contract.").)

53.    Nobody forced VCLF and ERP to accept the Commitment Letter's terms.
(6/11/18 Tr. (Murphy) 203:24-204:1; *id.* at 204:12-14.)

    *B.    Commitment*

54.    By signing the Commitment Letter, Black Diamond committed "to provide VCLF

with asset based loans and/or term loans in the aggregate principal amount of $25,000,000.00

(the 'Commitment')," subject to the conditions set forth in the Commitment Letter.  (PX 40, at

BDCF-00028157.)

55.    Contrary to the testimony of Mr. Clarke and others, the Commitment Letter did

not entitle VCLF and ERP to $25 million at closing.  (6/4/18 Tr. (Ehrlich) 79:8-10.)  Instead, the

amount that VCLF and ERP could draw under the Commitment Letter was governed by a

"formula," which "would look at accounts receivables and inventory" to determine the amount

that VCLF and ERP could borrow.  (*Id.* at 79:8-21; *see also* PX 40, at BDCF-00028163 ("The

Borrowing Base shall be comprised of Eligible Coal Inventory and Eligible Accounts Receivable

(each to be defined).  The advance rate against Eligible Accounts Receivable shall be 80%.  The

advance rate against Eligible Coal Inventory shall be (a) 80% during the first calendar year

following the Closing Date, and (b) 50% thereafter.").)  Thus, if coal inventory or accounts

receivable were to be less than anticipated, the amount that would be available for borrowing

under the Commitment Letter's credit facility would be reduced.  (6/4/18 Tr. (Ehrlich) 79:13-17.)

56.    The Commitment Letter also did not allocate how much of Black Diamond's

commitment would be in the form of a term loan, and how much in the form of an asset-based

loan.  (6/11/18 Tr. (Clarke) 311:7-9 ("We had not agreed or determined yet between the parties,

what the allocation would be between the two loans . . . ."); 6/12/18 Tr. (Clarke) 133:2-3 ("[W]e

-15-

had never agreed, on the commitment letter date of September 21st, how to allocate the twenty-five million.").)

57.     Thus, nothing in the Commitment Letter entitled VCLF and ERP to any particular amount — and certainly not $10 million — at closing.  (PX 40; 6/13/18 Tr. (McCoy, K.) 144:21-24 ("Q.  Sir, show me a single contractual commitment in this case, or refer me to it, that says [Black Diamond is] obligated to give you ten million dollars at closing.  Can you show me that?  A.  No, sir.").)

*C.      Consideration*

58.     In exchange for its financing commitment, Black Diamond was to receive certain payments and equity interests.  Specifically, Black Diamond was to receive:

    a.   interest payments on the loan;

    b.   fees and expenses, including reasonable attorneys' fees; and

    c.   equity interests in companies to be formed by VCLF and ERP, including:

        i.   a 40% interest in "Federal Intermediate HoldCo" ("HoldCo"), a company to be formed for the purpose of acquiring a 75% interest in the Federal Mine; and

        ii.  a 90% interest in "HealthCo," a company to be formed for the purpose of owning the assets and liabilities associated with Patriot's workers' compensation program.

(PX 40, at BDCF-00028163-64 & BDCF-00028166.)

*D.      Conditions*

59.     Black Diamond's financing commitment related solely to the transaction set forth in the "VCLF APA."  (PX 40, at BDCF-00028157; 6/8/18 Tr. (Deckoff) 31:12-17 ("[T]he commitment letter that we gave was based on a specific deal. . . .  And when we put the deal together, it was based off of that signed APA.").)  The "VCLF APA" was defined in the Commitment Letter as the August 16 APA "as amended, modified or supplemented prior to the

date hereof," *i.e.* September 21, 2015.  (*Id.* at at BDCF-00028157; 6/5/18 Tr. (Harris) 141:15-

142:20; *id.* at 142:9-12.)  If VCLF, ERP, and Patriot modified the August 16 APA after

September 21, Black Diamond would not be required to fund the transaction set forth in that

modified agreement.  (6/5/18 Tr. (Harris) 142:16-19; *id.* at 171:3-6; 6/11/18 Tr. (Murphy) 207:5-

7 ("[C]onceptually, if there was a major change to the transaction, Black Diamond should not

have to agree to fund what they proposed to do.").)

60.    Black Diamond's performance under the Commitment Letter was expressly

conditioned on the consummation of the transaction described in the August 16 APA, as

amended before September 21.  (PX 40, at BDCF-00028158.)  Specifically, the Commitment

Letter provided that "[t]he Commitment and other undertakings hereunder are subject to . . . the

entry of a final, non-appealable order of the United States Bankruptcy Court for the Eastern

District of Virginia, Richmond Division, authorizing and approving the VCLF APA [as defined

in the Commitment Letter]."  (*Id.*)  Black Diamond's performance was further conditioned on

"the approval and consummation of a transaction for the Excluded Assets (as defined in the

VCLF APA) in form and substance acceptable to Lender."  (*Id.* at BDCF-00028164.)

61.    Black Diamond's financing commitment was subject to other conditions,

including: (a) "the simultaneous consummation of the transactions contemplated by the VCLF

APA"; (b) "the absence of any event or circumstance that has had or is reasonably likely to have

a material adverse effect on VCLF"; and (c) the "completion of Lender's business and legal due

diligence."  (PX 40, at BDCF-00028158 & -164.)

62.    VCLF and ERP understood that Black Diamond had not authorized them to

execute any deal of their choosing with Patriot, no matter the terms.  (6/11/18 Tr. (Murphy)

204:15-17 ("Q.  Okay.  Now, Mr. Murphy, in your experience, lenders don't write a blank check,

do they?  A.  No.  I wish they did.").)  Instead, VCLF and ERP understood that Black Diamond

had agreed to finance only the August 16 APA, as amended or modified before September 21.

(*Id.* at 206:20-207:13.)

       *E.*    *Exclusivity*

      63.      In exchange for Black Diamond's financing commitment, the parties agreed to an

exclusivity provision (the "Exclusivity Provision"), which restricted VCLF and ERP's ability to

solicit alternative financing or close their transaction with Patriot without providing Black

Diamond with the promised consideration.  (PX 40, at BDCF-00028159.)

      64.      Specifically, pursuant to the Exclusivity Provision, VCLF and ERP agreed that

they would not:

      a.     "solicit or accept an offer by any person other than Black Diamond of any debt or
           equity financing for the purpose of facilitating in any manner the consummation
           of the transactions contemplated by the VCLF APA"; or

      b.     "submit or pursue any offer for all or any material portion of the Purchased Assets
           (as defined in the VCLF APA) in conjunction with any other person or entity
           other than Black Diamond and its affiliates, or that does not provide for the
           receipt by Black Diamond of the Equity Interests contemplated by the Term
           Sheet."

(PX 40, at BDCF-00028159.)

      65.      Thus, in exchange for Black Diamond's commitment to fund the transaction then

set forth in the August 16 APA on the terms set forth in the Commitment Letter — which

commitment VCLF and ERP needed in order to move forward and to acquire the rights to the

Patriot assets — VCLF and ERP agreed (i) not to solicit alternative sources of financing, and (ii)

not to do *any* deal for the assets that were the subject of the August 16 APA without providing

the Equity Interests to Black Diamond.

      66.      VCLF and ERP's obligations under the Exclusivity Provision attached at signing.

(PX 40, at BDCF-00028159.)  The language of the Exclusivity Provision expressly provides that

"*upon acceptance of this Commitment* [VCLF] shall not" solicit alternative financing or close its

transaction with Patriot without providing Black Diamond with the equity interests.  (*Id.*

(emphasis added); *see also* 6/5/18 Tr. (Harris) 147:17-21.)  Indeed, the Exclusivity Provision

would serve no functional purpose, rendering it mere surplusage, if its restrictions on solicitation

did not attach at signing.  (6/5/18 Tr. (Harris) 147:24-148:6 ("Well, almost by definition, an

exclusivity provision only makes sense if it attaches immediately because that commences the

period within which the lender is going to be doing its work . . . .  To attach it at a later point

would effectively provide the very shopping period, if you will, that the exclusivity provision is

intended to avoid.").)

      *F.    Merger and Modification Clauses*

      67.    The Commitment Letter contained a merger clause, pursuant to which "VCLF

acknowlede[d] that this Commitment Letter is the only agreement between VCLF, on the one

hand, and the Lenders and their affiliates, on the other hand, with respect to the Senior Secured

Facilities (as defined in the Term Sheet) and sets forth the entire understanding of the parties

with respect to the subject matter thereof."  (PX 40, at BDCF-00028160.)

      68.    The Commitment Letter also placed restrictions on amendments to the letter,

specifying that the Commitment Letter "may not be amended or any provision hereof waived or

modified except by an instrument in writing signed by the party against whom enforcement of

the same is sought."  (PX 40, at BDCF-00028160.)

      *G.    VCLF and ERP's Performance*

      69.    VCLF and ERP's obligations under the Exclusivity Provision were not contingent

on the satisfaction of the Commitment Letter's conditions to closing.

      70.    As an initial matter, VCLF and ERP never raised "failure of a condition

precedent" as an affirmative defense, (*see* Answer & Counterclaim (Dkt. No. 3-68), at pgs. 16-

17), and thus, they have waived any argument that their obligations under the Exclusivity

Provision were excused by virtue of a failure of one of the Commitment Letter's conditions to

closing.

71.    More importantly, although the Commitment Letter refers to "[t]he Commitment

and other undertakings" being subject to certain conditions, (PX 40, at BDCF-00028158), such

language relates solely "to the commitments and undertakings of the lender," not VCLF and

ERP.  (6/5/18 Tr. (Harris) 238:4-6.)  The Exclusivity Provision expressly provides that its

obligations attach "*upon acceptance of this Commitment*," which refutes any suggestion that

those obligations were subject to other, later conditions.  (PX 40, at BDCF-00028159 (emphasis

added).)

72.    VCLF and ERP's alternative reading of the Commitment Letter is not

commercially reasonable.  (6/5/18 Tr. (Harris) 238:4-6.)  For example, if VCLF and ERP's

obligations under the Exclusivity Provision did not attach until the conditions to closing were

satisfied, it would mean that VCLF and ERP could solicit alternative financing and/or give away

the equity interests promised to Black Diamond at any point prior to the "consummation of the

transactions contemplated by the VCLF APA."  (PX 40, at BDCF-00028158.)  The Exclusivity

Provision, however, was designed to *restrict* Defendants' ability to solicit alternative financing

and encumber the equity interests before closing, and thus VCLF and ERP's reading of the

Commitment Letter would render the Exclusivity Provision meaningless.  (*Id.* at BDCF-

00028159; 6/5/18 Tr. (Harris) 148:8-149:17; *id.* at 241:9-242:21; 6/11/18 Tr. (Murphy) 209:2-11

(". . . And so [Black Diamond was] extremely concerned that we would [solicit alternative

financing], hence the exclusivity provision.  But more importantly, [Black Diamond] wanted to

drive home the fact that if we went out to Knighthead, or we went out to Coronado, or we went

out to some third-party capital provider that gave us better terms, [Black Diamond] would still

receive the ninety percent in HoldCo [sic] and the thirty percent in Federal Mining Company.

Q.  And that was your understanding of what this [Exclusivity Provision] provided for, correct?

A.  It does, yes.").)

73.    VCLF and ERP's reading of the Commitment Letter would also create incentives

for VCLF and ERP to breach the Commitment Letter.  For example, one of the conditions to

closing in the Commitment Letter is "the absence of any event or circumstance that has had or is

reasonably likely to have a material adverse effect on VCLF" or ERP.  (PX 40, at BDCF-

00028158.)  Under their reading of the Commitment Letter, VCLF and ERP could engineer a

"material adverse effect" — say, by ceding certain assets described in the August 16 APA to

Patriot — and use this "adverse effect" to excuse their non-performance under the Commitment

Letter.  (6/5/18 Tr. (Harris) 244:9-245:3.)

74.    In addition, VCLF and ERP's reading of the Commitment Letter would have

denied Black Diamond the opportunity to waive any conditions to closing.  Under the

Commitment Letter, Black Diamond was entitled to waive or excuse any conditions to closing

that had not been satisfied.  (6/5/18 Tr. (Ehrlich) 125:25-126:3; *id.* (Harris) at 237:10-14.)

Allowing VCLF and ERP to unilaterally decide that the Commitment Letter's conditions will fail

— and thereby relieve themselves of their obligations — would deny Black Diamond the

opportunity to waive the conditions to closing.

75.    Finally, both Mr. Clarke and Defendants' financial advisor, Mr. Murphy,

understood that the Exclusivity Provision attached at signing and was not subject to other

conditions.  (6/11/18 Tr. (Murphy) 209:2-11; 6/12/18 Tr. (Clarke) 96:2-97:2.)  Mr. Clarke's

testimony on direct examination that he believed the obligations of the Exclusivity Provision

were subject to other conditions is not credible in light of his prior deposition testimony, and his admission on cross-examination, that absent a repudiation of the Commitment Letter by Black Diamond, Defendants' failure to have delivered the Equity Interests to Black Diamond would have violated the Exclusivity Provision.  (6/12/18 Tr. (Clarke) 96:2-97:2; 6/13/18 Tr. (Clarke) 44:1-17.)

## VII.    The Termination Date of the Commitment Letter is Extended.

76.    By the terms of the Commitment Letter, Black Diamond's commitment was due to "terminate at 5:00 p.m., New York City time, on October 8, 2015," if the Bankruptcy Court had not yet entered a final, non-appealable order authorizing and approving the August 16 APA. (PX 40, at BDCF-00028158.)

77.    On October 7, 2015, the parties modified the Commitment Letter by agreeing in a signed writing to extend its termination date by 30 days, *i.e.*, until November 9, 2015.  (PX 53; DX AG; 6/4/18 Tr. (Ehrlich) 88:14-89:5; 6/5/18 Tr. (Harris) 192:7-193:4; 6/11/18 Tr. (Clarke) 340:24-341:4; 6/12/18 Tr. (Clarke) 90:21-91:4.)

78.    The parties effected this modification by email.  (6/4/18 Tr. (Ehrlich) 88:14-19; 6/11/18 Tr. (Clarke) 340:24-341:4; 6/12/18 Tr. (Clarke) 90:21-91:4.)  Both Messrs. Clarke and Ehrlich affixed their email signatures to emails agreeing to extend the Commitment Letter's termination date.  (PX 53; 6/12/18 Tr. (Clarke) 91:3-4.)

79.    Other than this extension of the termination date, the Commitment Letter was never modified, and no provision of the Commitment Letter was ever waived.  (6/5/18 Tr. (Harris) 210:2-8; 6/11/18 Tr. (Clarke) 341:5-11; *see also* Answer & Counterclaim (Dkt. No. 3-68), pg. 30, ¶ 48.)

## VIII.    Patriot and Old Republic Insurance Company Execute a Settlement Agreement.

80.    On September 21, 2015 — the same day that VCLF, ERP, and Black Diamond executed the Commitment Letter — Patriot filed a motion seeking approval of a settlement agreement between Patriot and the Old Republic Insurance Company ("Old Republic").  (PX 41.)  This agreement provided for the settlement of Patriot's letter of credit with Old Republic, which secured certain of Patriot's workers' compensation liabilities.  (*Id.*, ¶ 10.)  Pursuant to the agreement, Old Republic agreed to cover these workers' compensation liabilities and return $8,060,310.80 in surplus collateral to Patriot.  (*Id.*)

81.    Under the terms of the August 16 APA, VCLF and ERP were entitled to this surplus collateral.  (PX 15, § 2.01(q); *id.* at pgs. 409-10 of 1070; 6/11/18 Tr. (Clarke) 322:15-20.)  Patriot's settlement agreement with Old Republic did not disturb this arrangement.  To the contrary, the settlement agreement specified that any surplus collateral returned to Patriot would be "held for the benefit of Virginia Conservation Legacy Fund, Inc. ('VCLF') as contemplated by its asset purchase agreement with [Patriot]."  (PX 41, ¶ 11; 6/5/18 Tr. (Ehrlich) 21:16-23:19.)

82.    The Bankruptcy Court entered an order approving the settlement agreement on October 13, 2015.  (PX 65.)

## IX.    Black Diamond Works to Close the Transaction.

83.    After September 21, 2015, Black Diamond immediately began conducting due diligence on the VCLF-Patriot transaction.  (6/12/18 Tr. (Clarke) 115:24-25 ("Black Diamond's due diligence was ongoing from, you know, the minute we met.").)

84.    During the four-week period between the signing of the Commitment Letter and its breach by VCLF and ERP, Black Diamond's due diligence included:

      a.    reviewing Patriot's historical financial information and other documents provided by Patriot, (6/4/18 Tr. (Ehrlich) 108:16-25);

b. retaining a mining consultant to review VCLF's mine plan and assess whether the projections that VCLF and ERP provided were achievable, (PX 280; PX 325; 6/4/18 Tr. (Ehrlich) 89:14-16; *id.* at 90:6-16; *id.* at 91:3-92:6; *id.* at 93:2-11; *id.* at 95:15-96:2; 6/8/18 Tr. (Deckoff) 27:8-18);

c. visiting the Federal Mine, (6/4/18 Tr. (Ehrlich) 90:10-16; 6/8/18 Tr. (Deckoff) 27:18-21);

d. reviewing actuarial reports concerning the projected value of Patriot's workers' compensation liabilities, (PX 1; PX 2; PX 3; PX 5; PX 6; PX 7; 6/4/18 Tr. (Ehrlich) 96:5-18; *id.* at 97:6-98:10; *id.* at 101:17-102:10; *id.* at 102:24-104:13; *id.* at 107:13-108:9);

e. retaining insurance brokers and actuaries to review and analyze these reports, (PX 274; PX 281; 6/4/18 Tr. (Ehrlich) 89:17-24; *id.* at 96:18-24; *id.* at 97:3-98:8; *id.* at 103:16-17; *id.* at 105:24-106:5);

f. evaluating VCLF and ERP's financial projections, models, and business plans, (PX 284; PX 294; 6/4/18 Tr. (Ehrlich) 109:6-10; 6/8/18 Tr. (Deckoff) 28:2-8);

g. meeting with VCLF, ERP, and Teneo numerous times, (6/4/18 Tr. (Ehrlich) 73:14-20; 6/5/18 Tr. (Ehrlich) 41:21-23; 6/7/18 Tr. (Potter) 214:7-25); and

h. reviewing the proposed corporate structure of the VCLF/ERP complex, (6/5/18 Tr. (Harris) 154:25-155:3).

85.    VCLF and ERP were impressed with the level of Black Diamond's due diligence. (6/12/18 Tr. (Clarke) 116:3-9 ("Q.  And in fact, you were impressed by the level of due diligence that Black Diamond performed, weren't you?  A. . . . We were very impressed.").)

86.    Black Diamond's "due diligence kept right up until [October] 23[, 2015]." (6/12/18 Tr. (Clarke) 116:1-2.)

87.    In addition to due diligence, Black Diamond engaged the law firm of Schulte, Roth & Zabel LLP ("Schulte") to perform the legal work necessary to close its transaction with VCLF and ERP.  (6/5/18 Tr. (Harris) 137:1-4; *id.* at 137:16-23; *id.* at 153:10-154:8.)  Schulte diligently worked toward closing.  (*Id.* at 165:17-22.)  For example, Schulte negotiated a settlement with AIG, "pursuant to which AIG recognized [HealthCo] as the beneficiary of any

residual interest in funds that had been deposited to secure [Patriot's] worker's compensation

obligations." (*Id.* at 154:1-8.)  Schulte also "put together a corporate structure for the various

entities that were being created, map[ped] out how the equity would be held, [and] look[ed] into

[various] tax issues." (*Id.* at 154:25-155:3.)

**X.    VCLF and ERP Solicit Alternative Financing in Breach of the Commitment Letter.**

88.    Shortly after VCLF and ERP signed the Commitment Letter, ERP's Jason McCoy

began soliciting alternative financing in violation of the Commitment Letter's Exclusivity

Provision.  (*See, e.g.*, PX 45; PX 52; PX 66; PX 68; PX 151; PX 264.)

89.    On September 22, 2015, the day after the Commitment Letter was signed, Mr.

McCoy emailed Frank Wendt to request a "short term loan[]" in the amount of $150,000.  (PX

45.)  In his email to Mr. Wendt, Mr. McCoy stated that he needed the loan to "pay[] for all of the

coal related expenses" in connection with the VCLF-Patriot transaction, including "sending

individuals up to evaluate the mines, doing sampling, [and] evaluating employees." (*Id.*)  Mr.

McCoy promised to guarantee Mr. Wendt's loan with the breakup fee that VCLF and ERP would

earn if the VCLF-Patriot transaction did not close.  (*Id.*)

90.    On September 25, 2015, four days after the Commitment Letter was signed, Mr.

McCoy emailed Tom Darden, stating:  "The Black Diamond Capital group is really taking us to

the cleaners on this — *I'd much rather see cherokee get this money as opposed to Black

Diamond*.  My father is around all weekend too if you would like to get together and hear from

him about this venture." (PX 264 (emphasis added).)

91.    At trial, Mr. McCoy testified that this email related to post-closing "takeout"

financing, but such testimony is simply not credible.  (6/8/18 Tr. (McCoy, J.) 231:17-232:1.)  As

Mr. McCoy himself acknowledged, (i) he repeatedly solicited closing financing from Mr. Darden

as an alternative to Black Diamond before VCLF and ERP signed the Commitment Letter on

September 21, and (ii) Mr. McCoy's September 25 email soliciting financing from Mr. Darden uses language that is virtually identical to those pre-September 21 solicitations.  (PX 21; PX 26; 6/8/18 Tr. (McCoy, J.) 227:5-229:8.)  In fact, Mr. McCoy concedes that there would have been no way for Mr. Darden to tell from his September 25 email that he was soliciting post-closing financing, as opposed to closing financing.  (6/8/18 Tr. (McCoy, J.) 235:4-8.)  This amounts to an admission that, on its face, his September 25 email seeks the same financing that Mr. McCoy had previously sought from Mr. Darden.  Mr. McCoy's testimony that he intended something else in his heart does not change the plain, objective meaning of his solicitation.

92.     Mr. McCoy's testimony regarding this email also is not credible given that he falsely stated in the email that VCLF and ERP "ha[d] not officially signed anything with Black Diamond," when, in fact, VCLF and ERP had signed the Commitment Letter on September 21 — and Mr. McCoy knew as much.  (PX 264; 6/8/18 Tr. (McCoy, J.) 159:1-14.)  This falsehood speaks to Mr. McCoy's honesty.  While Mr. McCoy claimed at trial that this was a "poor choice of words" and that he meant only that Defendants had not yet closed on the financing, that testimony cannot be reconciled with the plain language of the email.

93.     This false statement in the email also supports the conclusion that Mr. McCoy was soliciting closing financing.  Mr. McCoy admitted at trial that non-solicitation or "no shop" provisions of the type set forth in the Exclusivity Provision are common and that he expected Mr. Darden, who is financially sophisticated, to know as much.  (6/8/18 Tr. (McCoy, J.) 233:12-234:4.)  It is thus reasonable to infer that Mr. McCoy falsely stated that Defendants had not yet "signed anything" with Black Diamond precisely because (i) he was soliciting alternative financing to close the Patriot transaction, and (ii) he wanted Mr. Darden to believe that Defendants were not yet prohibited from doing so.  In fact, it is difficult to conceive of any other

reason for Mr. McCoy to have lied to Mr. Darden about whether Defendants had already signed

with Black Diamond.

94.     On October 2, 2015, Mr. McCoy emailed David Williams and Michael Johnson

about providing a loan in exchange for equity in ERP.  (PX 52.)  Mr. McCoy initially testified

that this email reflected a solicitation for a personal loan, (6/8/18 Tr. (McCoy, J.) 214:12-14; *id.*

at 215:3-5), but when pressed, Mr. McCoy conceded that he solicited the loan in order to fund

due diligence on the VCLF-Patriot transaction, (*id.* at 218:13-18; *id.* at 220:15-17; *id.* at 221:9-

15.)  In his email to Messrs. Williams and Johnson, Mr. McCoy stated that "the 1 thing that

could throw . . . off [the requested loan] is the terms from Black Diamond."  (PX 52.)  This

appears to be a reference to the Commitment Letter's Exclusivity Provision, which prohibits

VCLF and ERP from soliciting alternative financing or closing the transaction with Patriot

without providing Black Diamond the promised equity interests.  (PX 40, at BDCF-00021859.)

Mr. McCoy's proposal to Messrs. Williams and Johnson — which would have provided them

with equity interests in the Federal Mine in exchange for a loan that would assist VCLF and ERP

in closing the VCLF-Patriot transaction — ran afoul of both provisions.

95.     On Thursday, October 15, 2015, Messrs. Clarke and Ken McCoy planned to meet

with Black Diamond to "request some up front money" to assist with closing with the VCLF-

Patriot transaction.  (PX 68; 6/8/18 Tr. (McCoy, J.) at 244:6-18.)  In anticipation of that meeting,

VCLF and ERP solicited alternative financing in the event that Black Diamond would not agree

to advance any funds under the Commitment Letter.

96.     On October 12, 2015 — three days before Messrs. Clarke and Ken McCoy's

meeting with Black Diamond — VCLF and ERP's counsel Patrick Potter urged Mr. Clarke to

consider abandoning his agreement with Black Diamond and procure financing from another

source. (DX AS, at VCLF-000174713.)  Specifically, Mr. Potter told Mr. Clarke that he should

"consider drawing an appropriate line in the sand asap.  If, as you say, you have 5 other parties

willing to do their [*i.e.*, Black Diamond's] deal, then you will have to rush like mad to get that

done.  And, after this week, it really won't be possible to close by the 26th with someone else."

(*Id.*)  Mr. Clarke responded:  "We will make it abundantly clear at 9:00 AM in Greenwich on

Thursday" — *i.e.*, October 15.  (*Id.* at VCLF-000174172.)   "We do not have 5 backups.  We

have Mercuria Energy Group."  (*Id.*)  At trial, Mr. Clarke acknowledged that Mr. Potter was

urging him to solicit alternative closing financing in his email, (6/12/18 Tr. (Clarke) 105:17-22),

yet Mr. Clarke nonetheless testified that his reference to "Mercuria" as a "backup" financier did

not relate to closing financing, (*id.* at 108:23-109:4.)  This explanation lacks credibility, both

because it would make Mr. Clarke's reference to Mercuria a total non-sequitur, and in light of

other evidence regarding Mercuria

   97.    On October 14, 2015 — one day before Messrs. Clarke and Ken McCoy's

meeting with Black Diamond — Jason McCoy sent a text message to Mr. Clarke and his father.

(PX 66.)  In his text message, Mr. McCoy stated:  "Mike Loreman from Mercuria just called me.

They are very eager to get involved with us.  If Black Diamond gives us problems tomorrow he

wanted to assure me that they could act fast. . . .   They can also be the source to take out BD as

they will be cheaper money."  (*Id.*)  At trial, Mr. McCoy testified that that this text message did

not refer to closing financing, but rather to Mercuria's ability to assure Black Diamond of

VCLF's ability to sell coal.  (6/8/18 Tr. (McCoy, J.) 240:11-241:6.)  This testimony is not

credible in light of Defendants' plan for the upcoming meeting concerning which Black

Diamond might give Defendants "problems," *i.e.*, requesting from Black Diamond an "advance

[of] funds . . . under the commitment letter . . . for the purpose of . . . working towards closing."

(6/8/18 Tr. 244:6-18.)  Mr. McCoy's testimony is also inconsistent with Mr. Clarke's reference

to Mercuria as a "backup" *financier* just two days earlier.  (DX AS, at VCLF-000174172.)

98.     On October 14, 2015 — the same day that he sent his text message to Messrs.

Clarke and Ken McCoy — Jason McCoy emailed Gary Chamblee about extending a loan to

VCLF and ERP.  (PX 68.)  Mr. McCoy reiterated:  "On Thursday — we are meeting with Black

Diamond to make sure everything is a go and requesting some up front money to put into our

account so that we can go ahead and start making the transitions and be prepared for the Oct 26

take over."  (*Id.*)  The items that Mr. McCoy sought to finance included "setting up the

Workman's comp, setting up health plans, setting up the pay roll services — etc."  (*Id.*)  Mr.

McCoy told Mr. Chamblee that if Black Diamond would not provide this "up front money,"

VCLF and ERP would "need . . . roughly $1 MM to line up those items . . . to be prepared for

Oct 26."  (*Id.*)  The items that Mr. McCoy listed were necessary to put VCLF and ERP "in a

position to be able to close on the transaction with Patriot."  (6/8/18 Tr. (McCoy, J.) 225:10-15.)

Indeed, Mr. McCoy testified that he planned to use Mr. Chamblee's financing to "continue

working towards closing the transaction with Patriot."  (*Id.* at 226:11-227:3.)

99.     On October 23, 2015, Mr. McCoy emailed Michael Loreman of Mercuria at 7:47

in the morning.  (PX 151.)  In his email to Mr. Loreman, Mr. McCoy stated:  "Mike[,] Things are

going 100mph — please let me know at your earliest convenience when you can get on a call

with us this morning to discuss this patriot transaction and us working with you — we may need

to speed this up if possible."  (*Id.*)  At trial, Mr. McCoy testified that he told Mr. Loreman that he

needed to "speed this up" because October 23 was "game day," *i.e.*, the day that VCLF and

Patriot planned to close their transaction, and Defendants would want to work with Mercuria

post-closing.  (6/8/18 Tr. (McCoy, J.) 247:11-15; *id.* at 247:17-248:12; *id.* at 249:13-16.)  Once

again, this testimony is not credible.  First, VCLF and Patriot did not plan to close their

transaction on October 23.  (*Id.* at 247:16-17.)  Second, Mr. McCoy sent his email to Mr.

Loreman mere hours after VCLF and ERP's counsel, Patrick Potter, reported that Patriot had

asked whether VCLF "could get out of the Black Diamond commitment."  (PX 106.)

**XI.    The Bankruptcy Court Confirms Patriot's Plan of Reorganization.**

100.    On October 9, 2015, the Bankruptcy Court entered an order confirming Patriot's

fourth amended joint plan of reorganization (the "Confirmation Order").  (PX 334.)

101.    Pursuant to the Confirmation Order, the Bankruptcy Court approved the "VCLF

APA,"  which the Confirmation Order defined as the August 16 APA "as amended,

supplemented, or modified *from time to time*."  (PX 334, ¶¶  122, 26 (emphasis added).)  The

Commitment Letter, by contrast, defined the "VCLF APA" as the August 16 APA "as amended,

modified or supplemented *prior to the date hereof*."  (PX 40, at BDCF-00028157 (emphasis

added).)  The Confirmation Order thus approved the August 16 APA in its then-current form, as

well as any subsequent modifications of the August 16 APA.  As noted above, however, to the

extent Defendants and Patriot chose to modify the August 16 APA, Black Diamond had no

obligation to finance the modified transaction.

102.    The Confirmation Order also referenced the proceeds of the Old Republic letter of

credit.  (PX 334, ¶ 159.)  Specifically, the Confirmation Order acknowledged that Patriot and

Old Republic had executed a settlement agreement, pursuant to which Old Republic drew down

the Old Republic letter of credit and applied part of the proceeds to Patriot's workers'

compensation liabilities.  (*Id.*)  Consistent with the settlement agreement, the Confirmation Order

specified that Patriot "[had] the authority to keep the [surplus] proceeds from the [Old Republic]

Settlement . . . as property of the Estate for, among other things, any costs incident to the

Debtors' emergence from chapter 11."  (*Id.*)

103.    At trial, VCLF and ERP appeared to argue that the Court's Confirmation Order somehow prevented VCLF, ERP, and Patriot from consummating the transaction embodied in the August 16 APA.  In particular, VCLF and ERP appeared to argue that because the Confirmation Order permitted Patriot to retain the proceeds of the Old Republic letter of credit — which had been promised to VCLF and ERP under the August 16 APA — the deal reflected in the August 16 APA was unachievable.  This is not true.  Under the Confirmation Order, Patriot had the right — but not the obligation — to retain the Old Republic proceeds.  (PX 334, ¶ 159 ("[T]he Debtors[] have the authority to keep the proceeds from the [Old Republic] Settlement . . . .).)  The Confirmation Order did not relieve Patriot of its contractual obligations under the August 16 APA, pursuant to which VCLF and ERP — not Patriot — were to obtain the Old Republic proceeds.  (PX 15, § 2.01(q); *id.* at pgs. 409-10 of 1070); 6/11/18 Tr. (Clarke) 322:16-20.)

104.    Nor did the Confirmation Order amend or waive any provision of the Commitment Letter.  (PX 40, at BDCF-00028157; *see* 6/5/18 Tr. (Harris) 210:2-8; 6/11/18 Tr. (Clarke) 341:5-11; *see also* Answer & Counterclaim (Dkt. No. 3-68), pg. 30, ¶ 48.)  The Commitment Letter "[could] not be amended or any provision . . . waived or modified except by an instrument in writing signed by the party against whom enforcement of the same is sought." (PX 40, at BDCF-00028160.)  The Confirmation Order effected no such written waiver or modification.

## XII.    Black Diamond Learns of Changes to VCLF and ERP's Business Plan.

105.    After the execution of the Commitment Letter, Black Diamond learned of meaningful changes to VCLF and ERP's business plan from that presented to Black Diamond in

the lead-up to the signing of the Commitment Letter. (6/4/18 Tr. (Ehrlich) 182:10-183:14; *id.* at

186:25-187:24; *id.* at 189:1-18; 6/8/18 Tr. (Deckoff) 28:9-29:9.)

     A.    *Coal Inventory*

    106.   After signing the Commitment Letter, Black Diamond learned that Patriot would

be providing VCLF and ERP with significantly less coal inventory at closing than was originally

promised. (6/4/18 Tr. (Ehrlich) 183:8-14.)

    107.   Under the August 16 APA, Patriot agreed to provide VCLF and ERP with ten

days' worth of coal inventory. (PX 15, § 5.01(iv); 6/4/18 Tr. (Ehrlich) 179:25-180:16.) Mr.

Clarke and Patriot represented that this sum equaled more than 100,000 tons of coal. (PX 324;

6/4/18 Tr. (Ehrlich) 180:22-181:4; *id.* at 182:10-183:7; 6/11/18 Tr. (Murphy) 118:8-17; *id.* at

120:2-9.)

    108.   After the Commitment Letter was executed, Patriot indicated that it would be

providing VCLF and ERP with substantially less coal inventory at closing — between 30,000

and 70,000 tons of coal. (PX 290; PX 360; 6/4/18 Tr. (Ehrlich) 183:8-185:10.)

    109.   The reduction in coal inventory was concerning to both Black Diamond and

VCLF. (6/4/18 Tr. (Ehrlich) 184:24-185:10; 6/11/18 Tr. (Clarke) 336:9-11.) The amount of coal

inventory that VCLF and ERP were to receive from Patriot was "critical" to the companies'

operation. (6/12/18 Tr. (Clarke) 117:22-24.) Coal inventory can be quickly converted into cash,

and thus reducing the amount of coal provided at closing impacted VCLF and ERP's liquidity.

(6/12/18 Tr. (Clarke) 117:22-118:3; 6/13/18 Tr. (McCoy, K.) 86:9-21.) In addition, Black

Diamond's financing commitment was tied to the amount of coal inventory that VCLF and ERP

received. (PX 40, at BDCF-00028163; 6/4/18 Tr. (Ehrlich) 181:19-182:9.) Reducing the

amount of inventory impacted the companies' ability to borrow under Black Diamond's

commitment, further reducing their liquidity. (6/4/18 Tr. (Ehrlich) 182:4-9.)

B.    *Longwall*

110.    Black Diamond also learned after signing the Commitment Letter that VCLF and
ERP would be responsible for a longwall move that was originally contemplated to be completed
by Patriot.  (6/4/18 Tr. (Ehrlich) 187:8-20; 6/8/18 Tr. (Deckoff) 28:9-29:4.)

111.    Specifically, Black Diamond learned that Patriot had slowed production at the
Federal Mine so that a longwall move originally scheduled for September 2015 was now due to
be completed in November 2015 — *i.e.*, *after* Patriot and Defendants planned to close on their
transaction.  (PX 56; PX 59; 6/4/18 Tr. (Ehrlich) 187:8-20; 6/8/18 Tr. (Deckoff) 113:1-24;
6/13/18 Tr. (McCoy, K.) 132:21-23.)  The effect of this slowdown was to shift responsibility for
the longwall move from Patriot to VCLF and ERP.  (6/4/18 Tr. (Ehrlich) 187:16-20; 6/8/18 Tr.
(Deckoff) 28:11-29:4.)

112.    Shifting responsibility for the longwall move impacted VCLF and ERP's
profitability.  (6/5/18 Tr. (Ehrlich) 33:12-15; 6/8/18 Tr. (Deckoff) 114:3-17; 6/13/18 Tr. (Clarke)
18:10-15.)  Moving a longwall costs anywhere between $3 and $5 million and can halt
production at a mine for weeks.  (6/4/18 Tr. (Ehrlich) 186:21-24; *id.* at 187:2-10; 6/8/18 Tr.
(Deckoff) 29:10-16; *id.* at 114:6-8; 6/13/18 Tr. (McCoy, K.) 94:6-13.)  Shifting responsibility for
the longwall move increased VCLF and ERP's expenses and inhibited their ability to produce
coal (and thus generate cash) for a significant period of time.  (6/4/18 Tr. (Ehrlich) 187:21-24;
6/8/18 Tr. (Deckoff) 29:10-16.)

C.    *Bula Baptist Church*

113.    Finally, Black Diamond learned that ERP's mining plan interfered with property
owned by the Bula Baptist Church, which sat atop the Federal Mine.  (6/4/18 Tr. (Ehrlich) 189:1-
18; 6/8/18 Tr. (Deckoff) 29:5-9.)  To mine coal effectively, VCLF and ERP would need to

-33-

purchase or pay for the relocation of the church.  (PX 283; 6/4/18 Tr. (Ehrlich) 189:1-18; 6/8/18

Tr. (Deckoff) 29:5-9; 6/13/18 Tr. (McCoy, K.) 80:10-15.)

114.    Patriot did not have a contract with the Bula Baptist Church.  (PX 283; 6/13/18

Tr. (McCoy, K.) 81:20-23.)  This meant that VCLF and ERP would have to pay the expenses

related to purchasing and/or moving the church, further reducing the mine's profitability.  (PX

283; 6/4/18 Tr. (Ehrlich) 189:15-18; *id.* at 190:2-23.)

## XIII.   VCLF, ERP, and Patriot Agree in Principle to Changes to the August 16 APA without Black Diamond's Knowledge or Consent.

115.    In addition to the changes to VCLF and ERP's business plan, Black Diamond

learned that VCLF, ERP, and Patriot had agreed in principle to material changes to the August

16 APA after the parties executed the Commitment Letter.  (PX 49; PX 326; PX 327; 6/5/18 Tr.

(Harris) 151:12-21; 6/8/18 Tr. (Deckoff) 33:17-34:2; 6/12/18 Tr. (Clarke) 120:20-23.)

116.    Specifically, VCLF, ERP, and Patriot agreed in principle to amend the August 16

APA such that:

> a.   VCLF and ERP would relinquish their right to the proceeds of the Old Republic letter of credit, which totaled $8,060,310.80, (PX 327, at BDCF-00049807, § 2.04(o); PX 41, ¶ 10; 6/4/18 Tr. (Ehrlich) 201:16-202:6; 6/7/18 Tr. (Potter) 216:12-217:6; 6/11/18 Tr. (Clarke) 322:15-20; *id.* at 323:15-16); and

> b.   VCLF and ERP would pay Patriot $10 million at closing — an amount not contemplated under the August 16 APA, (PX 326, at BDCF-00044273, § 2.06(a); PX 327, at BDCF-00049809, § 2.06(a); 6/4/18 Tr. (Ehrlich) 199:2-9; *id.* at 199:13-16; *id.* at 202:9-22).

117.    VCLF, ERP, and Patriot agreed in principle to modify the August 16 APA

without Black Diamond's knowledge or consent.  (6/4/18 Tr. (Ehrlich) 194:3-18; *id.* at 203:15-

20; 6/12/18 Tr. (Clarke) 120:20-23.)  Indeed, the first time that Black Diamond learned that there

might be changes to the August 16 APA was on September 26, 2015 — five days after the

execution of the Commitment Letter, when Mr. Potter emailed Black Diamond's counsel and

stated:

> We are trying to move things forward on the deal, which [has] changed
> substantially (eg by adding multiple subsidiaries, taking different assets and
> liabilities, etc), from the fairly simple transaction in our original APA.  We have
> taken some cuts at amending the APA, and I think we will need BD's input on
> that.

(PX 49; 6/5/18 Tr. (Harris) 151:12-16.)

118.    Black Diamond had not agreed to fund an asset purchase agreement that was

"substantially" different from the August 16 APA.  (6/8/18 Tr. (Deckoff) 88:19-21; 6/11/18 Tr.

(Murphy) 204:15-17; *id.* at 207:5-7.)  To the contrary, Black Diamond had agreed to fund only

the August 16 APA, "as amended, modified, or supplemented prior to the date [of the

Commitment Letter]."  (PX 40, at BDCF-00028157; 6/8/18 Tr. 88:19-21.)

119.    Although Mr. Potter notified Black Diamond of "substantial[]" proposed changes

to the August 16 APA on September 26, VCLF and ERP did not send a draft modified asset

purchase agreement to Black Diamond until October 12, 2015, more than two weeks later, 21

days after the Commitment Letter had been signed, and only 14 days before the transaction's

anticipated closing date.  (PX 326; 6/4/18 Tr. (Ehrlich) 197:17-198:17; *id.* at 211:8-9.)

120.    VCLF and ERP sent a further revised draft of the modified asset purchase

agreement to Black Diamond on October 15, 2015.  (PX 327.)  VCLF and ERP sent Black

Diamond this further revised draft only 11 days before the anticipated closing date.  (6/4/18 Tr.

(Ehrlich) 211:8-9.)

**XIV.  Black Diamond Proposes Changes to the Draft Modified Asset Purchase Agreement.**

121.    Although Black Diamond was not required to fund a modified asset purchase

agreement between VCLF, ERP, and Patriot, Black Diamond was "open-minded" about funding

a modified agreement, assuming that the parties could agree on terms.  (6/8/18 Tr. (Deckoff)

31:9-12; *see also* 6/5/18 Tr. (Harris) 164:3-23; 6/8/18 Tr. (Deckoff) 40:5-12; *id.* at 60:22-25.)

122.    Within one day of receiving the revised draft of the modified asset purchase

agreement, Black Diamond met with members of VCLF, ERP, Teneo, and Pillsbury in Black

Diamond's offices in Greenwich, Connecticut.  (6/7/18 Tr. (Potter) 212:13-213:24; *id.* at 214:7-

25; 6/12/18 Tr. (Clarke) 121:3-5; *id.* at 122:5-10.)  During these meetings, Black Diamond

proposed changes to the draft modified asset purchase agreement.  (PX 289; 6/4/18 Tr. (Ehrlich)

203:21-204:10; *id.* at 204:14-205:7; 6/12/18 Tr. (Clarke) 99:6-12.)  The changes that Black

Diamond proposed were beneficial to VCLF and ERP.  (6/4/18 Tr. (Ehrlich) 205:2-7; 6/12/18 Tr.

(Clarke) 122:11-14.)

123.    VCLF and ERP submitted a revised draft of the modified asset purchase

agreement to Patriot on October 21, 2015.  (PX 289; 6/4/18 Tr. (Ehrlich) 210:25-211:2; 6/7/18

Tr. (Potter) 112:12-17.)  The revised draft incorporated changes proposed by Black Diamond and

agreed to by VCLF and ERP.  (6/7/18 Tr. (Potter) 113:13-15; 6/12/18 Tr. (Clarke) 123:3-5.)

124.    On October 22, 2015, Patriot rejected Black Diamond's changes to the draft

modified asset purchase agreement.  (PX 304; DX BF; 6/4/18 Tr. (Ehrlich) 210:23-24; 6/5/18 Tr.

(Harris) 159:25-160:4; 6/7/18 Tr. (Potter) 113:16-22.)  Patriot stated that Black Diamond's

proposed changes were "'commercially unreasonable,' a 'non-starter,' and K&E [Patriot's

counsel] won't ever work from it."  (DX BF.)  Indeed, upon receiving Black Diamond's

proposed changes, Patriot asked Pillsbury whether VCLF and ERP "could get out of the Black

Diamond commitment."  (*Id.*; 6/7/18 Tr. (Potter) 116:2-8.)

125.    Patriot, VCLF, and Black Diamond never agreed on a modified asset purchase

agreement.  (6/4/18 Tr. (Ehrlich) 231:2-8; 6/5/18 Tr. (Harris) 152:16-153:1; 6/12/18 Tr. (Clarke)

86:1-16.)

126.    The only executed asset purchase agreement in effect before the closing of the

VCLF-Patriot transaction was the August 16 APA.  (PX 15; PX 220; 6/5/18 Tr. (Ehrlich) 79:11-

12; 6/7/18 Tr. 257:19-258:9.)

**XV.    Six Days Before the Anticipated Closing, VCLF and ERP Finally Provide Black
Diamond with Updated Financial Models.**

127.    On October 20, 2015 — while the parties were negotiating changes to the draft

modified asset purchase agreement, and just six days before the transaction's anticipated closing

date — VCLF and ERP provided Black Diamond with an updated financial model.  (PX 284;

6/4/18 Tr. (Ehrlich) 111:11-20.)

128.    VCLF and ERP had not provided Black Diamond with an updated financial

model since September 21, 2015, despite Black Diamond's repeated requests for such a model.

(6/4/18 Tr. (Ehrlich) 111:11-23; *id.* at 174:11-19.)

129.    The model (and other information) that Black Diamond had been provided before

October 20 was "simplified" in nature and did not "incorporate[] assumptions necessary to make

a determination as to whether . . . lending to [VCLF and ERP] was reasonable or not."  (6/4/18

Tr. (Ehrlich) 111:13-20.)  The updated model that VCLF and ERP provided on October 20 was

the first to contain the "assumptions necessary" for Black Diamond to make a lending decision.

(*Id.*)

130.    The updated model that Black Diamond received on October 20 reflected

financial projections for the Federal Mine that were materially lower than those reflected in the

business model that Black Diamond had received before the Commitment Letter was signed.

-37-

(*Compare* PX 284 *with* PX 313, at BDCF-00018290.)  For example, the business plan that Black

Diamond received before September 21 projected EBITDA for the Federal Mine of $33,858,000

in 2016 and free cash flow of $15,950,000.  (PX 313, at BDCF-0018290; 6/4/18 Tr. (Ehrlich)

116:5-14.)  The financial model that Black Diamond received on October 20, however, projected

EBIDTA for the Federal Mine of only $9,841,500 in 2016 and free cash flow of *negative*

$4,635,900.  (PX 284; 6/4/18 Tr. (Ehrlich) 115:13-16.)  The revised financial model did not

provide cash flow projections for years after 2016.  (PX 284.)

131.    At trial, VCLF and ERP pointed to an October 11, 2015 email from Teneo's

Zachary Messenger, which attached a "13 Week Cash Budget" for the Federal Mine, as evidence

that they *had* provided Black Diamond with updated financial models, including as to the

Federal Mine, prior to October 20.  (DX FR; 6/11/18 Tr. (Murphy) 267:20-270:12.)  But that

document contained *no* financial projections for fiscal year 2016, let alone subsequent fiscal

years.  (DX FR; 6/11/18  Tr. (Murphy) 273:22-25.)  Accordingly, it is uncontroverted that the

first time that Black Diamond was provided with updated financial projections for the Federal

Mine for year-end 2016 was on October 20, 2015 — just six days before the VCLF-Patriot

transaction was scheduled to close.

132.    In sum, less than a week before VCLF, ERP, and Patriot contemplated closing the

VCLF-Patriot transaction, Black Diamond learned that VCLF, ERP, and Patriot's proposed

changes to the August 16 APA resulted in a $20 million reduction in VCLF and ERP's free cash

flow in 2016, transforming the Federal Mine from a profitable entity to an unprofitable one.

(*Compare* PX 284 *with* PX 313, at BDCF-00018290.)  In response, Black Diamond proposed

changes to the draft modified asset purchase agreement in order to make its terms more favorable

to VCLF and ERP.  (6/4/18 Tr. (Ehrlich) 205:2-7; 6/12/18 Tr. (Clarke) 122:11-14.)  But when

these changes were presented to Patriot, Patriot rejected them.  (PX 304; DX BF; 6/4/18 Tr.

(Ehrlich) 210:23-24; 6/5/18 Tr. (Harris) 159:25-160:4; 6/7/18 Tr. (Potter) 113:16-22.)  Indeed,

Patriot refused to even work off of the draft asset purchase agreement that reflected Black

Diamond's changes.  (DX BF.)

**XVI.   Messrs. Ehrlich and Clarke Discuss Changes to Black Diamond's Financing
Commitment.**

133.     In light of the changes to the August 16 APA that were being discussed during the

week of October 19, 2015, Messrs. Ehrlich and Clarke discussed changes to Black Diamond's

financing commitment on October 22 and 23.  (6/4/18 Tr. (Ehrlich) 212:15-213:6; 6/5/18 Tr.

(Ehrlich) 5:2-13; 6/12/18 Tr. (Clarke) 127:21-132:14; *id.* at 134:23-135:9; *id.* at 136:4-23; *id.* at

137:1-11.)

134.     The proposed changes related solely to the terms pursuant to which Black

Diamond would finance the transaction set forth in the draft modified asset purchase agreement

that VCLF and ERP presented to Patriot on October 21, *not* the August 16 APA.  (PX 111; PX

113; PX 115; PX 116.)

135.     VCLF and ERP point to these discussions as evidence of Black Diamond's

supposed repudiation of the Commitment Letter.  This argument is a red herring.  As discussed

above, the Commitment Letter related solely to the deal embodied in the August 16 APA, "as

amended, modified or supplemented prior to [September 21, 2015]."  (PX 40, at BDCF-

00028157-58; 6/8/18 Tr. (Deckoff) 31:12-17.)  And VCLF and ERP's witnesses concede that

Black Diamond never refused to fund the August 16 APA on the terms set forth in the

Commitment Letter.  (6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke)

87:13-19; *id.* at 98:2-18; *id.* at 100:24-101:22.)  Indeed, VCLF and ERP's witnesses concede that

they never *asked* Black Diamond to fund the August 16 APA on the terms set forth in the

Commitment Letter.  (6/7/18 Tr. (Potter) 151:22-152:3; 6/12/18 Tr. (Clarke) 98:2-18; *id.* at

101:12-15.)  Accordingly, the parties' discussions of October 22 and 23 regarding the terms on

which Black Diamond would finance the transaction in a new, different agreement between

Defendants and Patriot — which Black Diamond had no contractual obligation to do (PX 40, at

BDCF-00028158; 6/11/18 Tr. (Murphy) 207:5-7) — cannot establish that Black Diamond

repudiated a contractual obligation.

> A.    *Messrs. Ehrlich and Clarke Discuss Changes to Black Diamond's Financing
> Commitment on October 22, 2015.*

136.    Messrs. Ehrlich and Clarke had at least five phone calls on October 22 about

proposed changes to Black Diamond's financing terms in connection with a new proposed

transaction between Defendants and Patriot.  (PX 253, lines 185, 193, 204, 212, 216; 6/4/18 Tr.

(Ehrlich) 215:20-217:23; 6/12/18 Tr. (Clarke) 127:21-128:5.)  During these calls, Messrs.

Ehrlich and Clarke discussed the following modifications to Black Diamond's financing

commitment:

> a.   a shift from an asset-based loan to a receivables purchase facility, (6/4/18 Tr.
> (Ehrlich) 213:7-214:22; 6/12/18 Tr. (Clarke) 132:7-10);
>
> b.   a reduction in the face amount of Black Diamond's financing, from $25 million to
> $20 million, (6/4/18 Tr. (Ehrlich) 214:23-215:13; 6/12/18 Tr. (Clarke) 136:5-12);
>
> c.   a delayed draw on the term loan, (6/12/18 Tr. (Clarke) 148:9-149:1);
>
> d.   a personal guarantee from Mr. Clarke, (6/12/18 Tr. (Clarke) 137:4-11); and
>
> e.   financial covenants, (6/4/18 Tr. (Ehrlich) 233:21-24).

137.    During these calls, Mr. Clarke stated that the financing terms that Mr. Ehrlich

proposed were "fine."  (6/4/18 Tr. (Ehrlich) 218:1-17.)  Specifically, and as he admitted at trial,

Mr. Clarke was:

> a.   "willing to consider" and "actually liked" a receivables purchase facility, (6/12/18
> Tr. (Clarke) 132:11-14; *id.* at 135:3-9);

b. "willing to accept" a reduction in the face amount of Black Diamond's financing commitment, (6/12/18 Tr. (Clarke) 136:13-23);

c. "open to the possibility of a personal guarantee," (6/12/18 Tr. (Clarke) 167:1-4; *see also id.* at 137:4-11); and

d. not "all that concerned about the financial covenants," (6/12/18 Tr. (Clarke) 139:18-142:4).

138.    Indeed, Mr. Clarke offered to provide a personal guarantee.  (6/4/18 Tr. (Ehrlich) 227:20-228:4; *id.* at 228:14-17.)

139.    Mr. Clarke did not express any negativity about Mr. Ehrlich's proposal.  (6/4/18 Tr. (Ehrlich) 218:10-17 ("Q.  Tell me something.  Did [Mr. Clarke] express any negativity about [the receivables purchase facility]?  A.  I don't recall any negativity regarding the receivables . . . facility. . . .  Q.  Was there anything in that conversation that led you to believe he was rejecting your proposals?  A.  No, not at all.").)

*B.    Teneo Runs Financial Models on October 22, 2015 Reflecting Modified Financing Terms.*

140.    After speaking with Mr. Ehrlich, Mr. Clarke directed Teneo to run financial models reflecting the terms discussed with Mr. Ehrlich.  (6/11/18 Tr. (Murphy) 151:12-152:5.)

141.    On October 22, 2015, Teneo ran a revised financial model reflecting:

a. a shift from an asset-based loan to a receivables purchase facility;

b. a delayed draw on the term loan; and

c. financial covenants.

(DX BK.)

C.    *Messrs. Ehrlich and Clarke Discuss the New Financing Terms on October 23, 2015.*

142.    At 7:01 a.m. on October 23, Mr. Clarke sent Mr. Ehrlich an email attaching a financial model.  (PX 109.)  The financial model reflected the terms that Messrs. Ehrlich and Clarke discussed the night before, including a receivables purchase facility.  (*Id.*)

143.    In the body of his email, Mr. Clarke wrote:  "You are right…we have an abundance of cash in Q4.  I am going to write up a couple of thoughts on structure."  (PX 109.)

144.    The financial model that Mr. Clarke attached to his email showed that if VCLF received a $2.5 million term loan at closing, the Federal Mine would be able to meet all of its closing costs and retain a positive cash balance of $2.5 million.  (PX 109.)  By year end, the Federal Mine would have a positive cash balance of $23,006,406.64.  (*Id.*)

145.    At 7:04 a.m., Mr. Clarke sent a second email to Mr. Ehrlich, attaching the same model that he circulated at 7:01 a.m.  (PX 125.)  In the body of his email, Mr. Clarke wrote: "Updated for 'Receivables Purchase Facility', Penn Virginia proposal, $5,000,000 Term Loan (2 fundings) and $5,000,000 equity proposal."  (*Id.*)

146.    Mr. Clarke said nothing about any purported need for additional cash at closing in either his 7:01 a.m. or 7:04 a.m. emails.  (PX 109; PX 125; 6/12/18 Tr. (Clarke) 158:5-21; *id.* at 161:23-162:1.)  He also did not say that the terms proposed by Black Diamond were not acceptable.

147.    Messrs. Clarke and Ehrlich spoke by phone at 8:47 a.m.  (PX 253, line 272; 6/4/18 Tr. (Ehrlich) 221:2-22; 6/12/18 Tr. (Clarke) 162:6-21.)  On this call, Mr. Ehrlich told Mr. Clarke that he would be receiving an email from Hugo Gravenhorst, a BDCF employee, memorializing the terms that Messrs. Ehrlich and Clarke had discussed the night before.  (6/5/18 Tr. (Ehrlich) 68:12-21; 6/12/18 Tr. (Clarke) 169:8-10.)

-42-

148.     At 10:24 a.m., Mr. Gravenhorst sent an email to Mr. Clarke with the subject line:

"Summary of ERP Facilities."  (PX 111.)  Mr. Gravenhorst's email reflected the terms that

Messrs. Ehrlich and Clarke discussed on October 22.  (*Id.*)  Specifically, the email reflected:

> a.   VCLF and ERP's receipt of a receivables purchase facility, with a purchase
>       capacity up to $15 million, (*id.*, § 1.e);
>
> b.   VCLF and ERP's receipt of a $5 million term loan, (*id.*, § 2.m);
>
> c.   a delayed draw on the term loan, until after VCLF and ERP completed the
>       longwall move, (*id.*, § 2.r);
>
> d.   a personal guarantee from Mr. Clarke, (*id.*, §§ 1.j & 2.u); and
>
> e.   financial covenants, (*id.*, § 2.t).

Each of these terms corresponded to things that Mr. Clarke was "open to" on October 22.

(6/12/18 Tr. (Clarke) 132:11-14; *id.* at 135:3-9; *id.* at 136:13-23; *id.* at 137:4-11; *id.* at 138:16-

142:4; *id.* at 167:1-4.)

149.     The terms reflected in Mr. Gravenhorst's email related solely to the "draft revised

APA dated October 21, 2015, that [Black Diamond] previously approved."  (PX 111, at BDCF-

00076338.)  Nowhere in Mr. Gravenhorst's email did Black Diamond refuse to fund the August

16 APA on the terms set forth in the Commitment Letter.  (*Id.*)

150.     Mr. Gravenhorst's email asked Mr. Clarke to "confirm by email that [he]

approve[d] and agree[d] to these changes."  (PX 111, at BDCF-00076338.)

151.     Messrs. Ehrlich and Clarke discussed Mr. Gravenhorst's email by phone.  (PX

253 lines 283, 284, 296, 299, 305; 6/4/18 Tr. (Ehrlich) 231:9-233:12; 6/12/18 Tr. (Clarke)

167:12-168:15.)  Messrs. Ehrlich and Clarke had at least five phone calls about the email

between 10:24 a.m. and 1:20 p.m.  (PX 253 lines 283, 284, 296, 299, 305.)

152.    During these calls, Mr. Clarke requested changes to Black Diamond's financing

terms.  (6/4/18 Tr. (Ehrlich) 233:4-12.)  Specifically, Mr. Clarke requested a larger term loan and

cash at closing.  (*Id.* at 233:25-234:4.)

153.    Black Diamond agreed to these changes.  (6/4/18 Tr. (Ehrlich) 234:19-23; *id.* at

236:3-4; 6/12/18 Tr. (Clarke) 170:24-171:3; *id.* at 171:18-20.)

154.    At 1:20 p.m., Mr. Gravenhorst sent Mr. Clarke a second email.  (PX 113.)  Mr.

Gravenhorst's 1:20 p.m. email reflected the changes that Mr. Clarke discussed with Mr. Ehrlich

by phone.  (*Id.*; 6/4/18 Tr. (Ehrlich) 234:19-23; *id.* at 236:3-4.)  Specifically, Mr. Gravenhorst's

email increased the amount of Black Diamond's term loan and provided VCLF and ERP with

$2.5 million in cash at closing.  (PX 113, at §§ 2.c & 2.h; 6/4/18 Tr. (Ehrlich) 234:19-23; *id.* at

236:3-4.)  This was the same amount of cash at closing that was reflected in the model that Mr.

Clarke had attached to his email to Mr. Ehrlich earlier that day saying "[y]ou are right."  (PX

109.)

155.    Although Mr. Gravenhorst's email provided cash at closing, it proposed

restrictions on VCLF's ability to use that cash for a period of time.  (PX 113, at § 2.*l*.)

Specifically, Mr. Gravenhorst's email stated that only $1.5 million of the $2.5 million in cash

provided at closing could be used to pay "legal expense[s]" until "the Term Loan commitment

has been reduced to $5mm."  (*Id.*)  Of this sum, $1 million could be paid to Pillsbury, and $0.5

million could be paid to Schulte.  (*Id.*)  Black Diamond proposed this restriction to ensure that

VCLF and ERP had sufficient cash at closing to operate the Federal Mine.  (6/8/18 Tr. (Deckoff)

38:14-39:9.)

156.    Once again, the terms reflected in Mr. Gravenhorst's email related solely to the

"draft revised APA dated October 21, 2015."  (PX 113, at BDCF-00076458.)

157.    After Mr. Gravenhorst's 1:20 p.m. email, Messrs. Ehrlich and Clarke spoke by

phone.  (PX 253, line 315; 6/4/18 Tr. (Ehrlich) 238:20-240:3; 6/12/18 Tr. (Clarke) 173:9-11.)

During the call, negotiations continued, and Mr. Clarke asked for additional funds to pay his

attorneys.  (6/4/18 Tr. (Ehrlich) 239:17-240:3.)

158.    Black Diamond agreed to this change.  (6/4/18 Tr. (Ehrlich) 240:4-241:5.)

159.    At 2:04 p.m., Mr. Gravenhorst sent Mr. Clarke a third email.  (PX 115.)  Mr.

Gravenhorst's 2:04 p.m. email increased the amount of cash that could be used to pay "legal

expense[s]" at closing, from $1.5 million to $2.5 million.  (*Id.*, § 2.*l*.)

160.    Mr. Gravenhorst sent Mr. Clarke a fourth email at 2:18 p.m.  (PX 116.)  Mr.

Gravenhorst's 2:18 p.m. email clarified that VCLF and ERP could pay their attorneys up to $2

million at closing, up from the $1.5 million allowed in the 1:20 p.m. email.  (*Id.*, § 2.*l*; 6/4/18 Tr.

(Ehrlich) 241:14-22; 6/12/18 Tr. (Clarke) 8-20; *id.* at 176:1-177:23; *id.* at 179:15-180:6.)  Half a

million dollars would continue to go towards Black Diamond's legal expenses.  (PX 116, § 2.*l*.)

161.    Messrs. Ehrlich and Clarke spoke by phone again at 5:20 p.m.  (PX 253, line 388;

6/4/18 Tr. (Ehrlich) 245:19-246:12.)  On the call, Mr. Clarke stated that he needed to talk to his

business partners.  (6/4/18 Tr. (Ehrlich) 242:10-243:4.)  Mr. Ehrlich told Mr. Clarke to let Black

Diamond "know what [they] can do.  We're here [and] we want to get this done."  (*Id.* at 242:22-

243:1.)

## XVII.  VCLF and ERP Call Off the Financing Transaction with Patriot.

162.    At 1:00 p.m. on October 23, Mr. Clarke forwarded Mr. Gravenhorst's 10:24 a.m.

email to Ken and Jason McCoy.  (DX CE.)

163.    After receiving Mr. Clarke's email, Ken McCoy stated: "I don't like this deal one

bit.  There are many risks in coal mining.  [Black Diamond] wants all the reward and zero risks

even to your personal guarantee.  I don't trust them."  (DX CE.)

164.    Around 1:00 p.m. on October 23, Ken McCoy had a telephone call with VCLF's counsel, Mr. Potter.  (6/7/18 Tr. (Potter) 118:9-12; *id.* at 119:1-4.)  During that call, Mr. McCoy stated that "he was not prepared to go forward with Black Diamond anymore." (*Id.* at 118:13-16; *see also id.* at 130:20-24.)

165.    At 3:10 p.m. on October 23, Mr. Clarke forwarded Mr. Gravenhorst's 2:18 p.m. email to Mr. Potter and others.  (DX CF.)

166.    After receiving Mr. Clarke's email, Mr. Potter responded:  "Total Non Starter. This is DEAD!!  No one can believe Pillsbury will work on closing this."  (DX CF; 6/7/18 Tr. (Potter) 118:5-8.)  Five minutes later, Mr. Potter continued:  "But if there is a way to keep them [Black Diamond] on the hook to increase their legal fees before we cut them loose I would like to explore it." (DX CG; 6/7/18 Tr. (Potter) 124:9-15.)

167.    When Messrs. McCoy and Potter made these statements, they did not have full information about Mr. Clarke's interactions with Black Diamond.  Specifically, they did not know that:

a.    Mr. Clarke had been negotiating with Black Diamond continuously since mid-day on October 22;

b.    Mr. Clarke told Mr. Ehrlich that he was "willing to consider" many of the changes reflected in Mr. Gravenhorst's emails;

c.    Mr. Clarke had offered a personal guarantee;

d.    Mr. Gravenhorst had sent multiple emails to Mr. Clarke on October 23, which incrementally revised the proposed financing terms at Mr. Clarke's request; and

e.    Black Diamond's proposed financing terms became more favorable to VCLF over the course of the day.

(DX DH; DX DI; DX DM; PX 188; 6/4/18 Tr. (Ehrlich) 227:20-228:4; *id.* at 228:14-17; 6/7/18 Tr. (Potter) 135:14-20; *id.* at 137:3-7; *id.* at 138:19-25; *id.* at 139:13-19; *id.* at 139:22-140:6; *id.*

at 141:16-143:6; *id.* at 144:16-145:8; 6/13/18 Tr. (McCoy, K.) 139:9-11; *id.* at 140:15-17; *id.* at 142:2-4.)

168.    At approximately 4:00 p.m. on October 23, Messrs. Clarke, Ken McCoy, Jason McCoy, Potter, Murphy, and others had a conference call about Mr. Gravenhorst's emails. (6/7/18 Tr. (Potter) 140:4-6; *id.* at 234:17-22; 6/11/18 Tr. (Murphy) 174:20-175:16; 6/12/18 Tr. (Clarke) 192:12-193:1.)  During the call, Defendants decided to stop negotiating with Black Diamond.  (6/12/18 Tr. (Clarke) 194:5-10 ("And the decision was made; . . . [w]e decided to terminate the negotiations."); *see also* 6/13/18 Tr. (McCoy, K.) 120:4-12.)  It is undisputed that Black Diamond never stopped negotiating.  (6/12/18 Tr. (Clarke) 190:14 ("Black Diamond never did stop negotiating.").)

169.    Notwithstanding Defendants' decision to stop negotiating, Messrs. McCoy and Potter were concerned that Mr. Clarke would "agree to something" with Black Diamond. (6/7/18 Tr. (Potter) 119:7-23; *id.* at 123:4-11; 6/13/18 Tr. (McCoy, K.) 118:3-12; *id.* at 118:19-119:2.)  At 5:28 p.m., Ken McCoy emailed Mr. Potter and said that he wanted to "follow [Mr. Potter's] lead across the finish line."  (DX CI.)  Mr. Potter responded:  "There is a force at work here.  Honestly, I was going to call you. . . .  The message I was going to call and say is that BD will try to suck Tom back into this.  We can't let that happen.  We won't."  (*Id.*)

170.    Mr. Potter instructed Messrs. Clarke, Ken McCoy, Jason McCoy, and Murphy not to respond to any further calls and emails from Black Diamond.  (6/11/18 Tr. (Murphy) 258:12-259:8; 6/12/18 Tr. (Clarke) 192:1-17; *id.* at 194:23-24.)  Mr. Potter's instruction was designed to prevent any deal from being negotiated and "increase [Black Diamond's] legal fees before [VCLF and ERP] cut them loose."  (DX CG; 6/7/18 Tr. (Potter) 124:9-15.)

**XVIII. Black Diamond Did Not "Jam" VCLF and ERP.**

171.    VCLF and ERP characterize Mr. Ehrlich's initial proposal to VCLF on October

22 and Mr. Gravenhorst's emails to Mr. Clarke on October 23 as a "jam job."  (6/11/18 Tr.

(Murphy) 171:10-172:9.)  This characterization, however, overlooks two key facts.

172.    First, the characterization overlooks the events that took place during the ten days

immediately preceding October 22, 2015, during which:

> a.   VCLF and ERP presented Black Diamond with a radically different draft asset
>      purchase agreement, which contemplated, among other things, VCLF and ERP
>      relinquishing more than $8 million in cash promised to them under the August 16
>      APA and paying Patriot an additional $10 million for the assets at issue, (PX 326,
>      at BDCF-00044273, § 2.06(a); PX 327, at BDCF-00049807, § 2.04(o); *id.* at
>      BDCF-00049809, § 2.06(a); PX 41, ¶ 10; 6/4/18 Tr. (Ehrlich) 199:2-9; *id.* at
>      199:13-16; *id.* at 201:16-202:22; 6/7/18 Tr. (Potter) 216:12-217:6; 6/11/8 Tr.
>      (Clarke) 322:15-20; *id.* at 323:15-16);
>
> b.   VCLF and ERP presented Black Diamond with an updated financial model,
>      which reflected materially different financial projections for the Federal Mine,
>      including a $20 million reduction in the Federal Mine's free cash flow in 2016
>      (*compare* PX 284 *with* PX 313, at BDCF-00018290); and
>
> c.   VCLF and ERP informed Black Diamond of material changes to their business
>      plan, including a reduction in the amount of coal inventory they were to receive at
>      closing, responsibility for a longwall move to be completed shortly after closing,
>      and an obligation to purchase or move a church sitting atop the Federal Mine,
>      which interfered with ERP's mining plan, (6/4/18 Tr. (Ehrlich) 182:10-183:14; *id.*
>      at 186:25-187:24; *id.* at 189:1-18; 6/8/18 Tr. (Deckoff) 28:9-29:9.)

173.    Second, Black Diamond had no obligation of any kind to fund a proposed

modified asset purchase agreement.  (PX 40, at BDCF-00028157; 6/8/18 Tr. (Deckoff) 31:12-

17.)  To the contrary, Black Diamond's obligations under the Commitment Letter related solely

to the deal embodied in the August 16 APA, not any other deal.  (PX 40, at BDCF-00028157-

58.)  VCLF and ERP's witnesses testified that Black Diamond knew of proposed changes to the

August 16 APA in advance of October 22, but that cannot alter the simple and straightforward

fact that Black Diamond had no financing obligation with respect to a modified asset purchase

agreement.  To the extent that VCLF and ERP complain about the timing of the parties'

negotiations over the terms pursuant to which Black Diamond would fund a different deal than

the one that was the subject of the Commitment Letter, Defendants have only themselves to

blame for not seeking to negotiate new terms with Black Diamond sooner.

## XIX.   Black Diamond Repeatedly Reaches Out to VCLF and ERP to Continue Negotiations.

174.    Throughout the day on October 24 and 25, 2015, Black Diamond repeatedly

reached out to VCLF and ERP to discuss the financing terms that Black Diamond proposed on

October 23.  (PX 158; PX 183; PX 296; PX 299; PX 349; 6/4/18 Tr. (Ehrlich) 243:19-245:15;

6/8/18 Tr. (Deckoff) 44:13-23; *id.* at 46:9-48:8; 6/12/18 Tr. (Clarke) 30:8-15; *id.* at 191:7-13.)

175.    No one affiliated with VCLF or ERP responded to Black Diamond's calls, emails,

or text messages.  (PX 349; 6/4/18 Tr. (Ehrlich) 243:5-20; *id.* at 245:12-15; 6/8/18 Tr. (Deckoff)

44:13-23; *id.* at 48:2-8; 6/11/18 Tr. (Murphy) 186:8-14; *id.* at 258:7-259:8; 6/12/18 Tr. (Clarke)

30:16-20.)

176.    Mr. Murphy testified that this radio silence was at the instruction of counsel.

(6/11/18 Tr. (Murphy) 258:22-259:8 ("Q.  Was there a specific reason why you weren't calling

people back at Black Diamond before you got the instruction from Mr. [Keary] to call him back?

. . . A.  So I received legal advice not to call him back.  Q.  Had you been directed not to call

him back?  A.  I had received legal advice not to call him back.").)

## XX.   VCLF and ERP Secure Alternative Financing from Patriot and the UMWA.

177.    Between October 23 and 25, 2015, VCLF and ERP sought financing from various

individuals and entities in order to close the VCLF-Patriot transaction.  (PX 137; PX 151; PX

163; PX 167; PX 203; PX 209; PX 212; PX 270; DX CP; 6/8/18 Tr. (McCoy, J.) 196:7-199:19;

*id.* at 246:16- 250:3; *id.* at 253:5-255:6; *id.* at 255:9-258:19; *id.* at 261:24-262:13; 6/11/18 Tr.

(Murphy) 178:1-179:2; 6/12/18 Tr. (Clarke) 31:18-32:9; *id.* at 195:16-23.)

179.    At 8:54 p.m. on October 23, Mr. Potter emailed Ross Kwasteniet, counsel for

Patriot, and asked for Patriot's help in securing alternative financing.  (PX 124; 6/7/18 Tr.

(Potter) 127:3-128:5.)  Specifically, Mr. Potter wrote:

> While we have the BD deal and can close with an eye towards taking them out
> later, its [sic] too rich as you pointed out.  But it has other bad features, including
> Tom's personal guaranty.  Obviously, we are exploring all reasonable
> opportunities and alternatives. . . . I emphasized getting an[] APA done this
> weekend.  Everyone gets it.  It would be easier to finalize and sign if BD is out of
> the picture.  Anything you can do to help would be appreciated.  We would all
> love to see this go in a direction other than BD . . . .

(PX 124.)

179.    On Saturday, October 24, 2015, VCLF and ERP reached agreements in principle

with Patriot and the UMWA to provide alternative financing to facilitate the closing of the

VCLF-Patriot transaction.  (PX 175; PX 301; PX 221; PX 180, at BDCF-00077262; 6/7/18 Tr.

(Potter) 126:13-127:2; 6/12/18 Tr. (Clarke) 197:4-12.)

180.    In particular, Patriot agreed to provide a $5 million loan to VCLF and ERP to

enable them to close the VCLF-Patriot transaction.  (PX 301; 6/12/18 Tr. (Clarke) 197:4-6; *id.* at

197:13-22.)  In exchange for its loan, Patriot would receive interest income as well as

distributions from ERP Settlement, LLC ("ERP Settlement"), the entity the parties also referred

to as HealthCo.  (PX 301; 6/12/18 Tr. (Clarke) 199:17-200:7.)

181.    The UMWA agreed to provide $10 million in equity financing to VCLF and ERP

to enable them to close the VCLF-Patriot transaction.  (PX 221; 6/12/18 Tr. (Clarke) 197:7-12.)

In exchange for its financing, the UMWA would receive a 20% interest in the Federal Mine and

preferred shares in ERP Settlement.  (PX 221, at VCLF-00160295.)  The UMWA's preferred

shares would entitle it to distributions from ERP Settlement.  (*Id.* at VCLF-00160295-96;
6/12/18 Tr. (Clarke) 200:7-9.)

182.    VCLF and ERP's internal analysis indicated that they believed that their deal with

Patriot and the UMWA would be more advantageous to them than their deal with Black

Diamond.  (PX 208; DX EG; DX FN; 6/12/18 Tr. (Clarke) 195:24-196:5; *id.* at 196:22-197:3.)

Specifically, on October 26, 2015, Mr. Murphy circulated a spreadsheet titled

"Patriot_HealthCo_Analysis_7pm." (PX 208; DX EG; DX FN.)  The spreadsheet showed the

projected distributions that VCLF and ERP would receive from HealthCo under their"[n]ew

[d]eal" with Patriot and the UMWA, as compared to their "[o]ld [d]eal" with Black Diamond.

(PX 208; DX EG; DX FN.)  Mr. Murphy's spreadsheet reflected that, under the "[o]ld [d]eal,"

VCLF would receive $5.1 million in HealthCo distributions, but under the "[n]ew [d]eal," VCLF

and ERP would receive $11.575 million in distributions — an increase of nearly $6.5 million.

(PX 208; DX EG; DX FN; 6/12/18 Tr. (Clarke) 196:22-197:3.)

183.    In sum, the uncontroverted evidence shows that (i) Defendants and Patriot agreed

in principle to change the terms of their transaction from those that Black Diamond had

contractually committed to finance; (ii) Defendants sought and procured financing to close on

this alternative transaction from sources other than Black Diamond, and in fact chose to stop

negotiating with Black Diamond over such financing; and (iii) Defendants' internally projected

that the alternative financing that they negotiated would be materially advantageous to them as

compared to the financing terms set forth in the Commitment Letter.

**XXI.  Mr. Potter Writes a Letter Accusing Black Diamond of Repudiation — Without Knowing about Black Diamond's Negotiations with Mr. Clarke.**

184.     After VCLF and ERP secured agreements in principle with Patriot and the

UMWA to provide closing financing, Mr. Potter began drafting a letter to Black Diamond

accusing it of repudiating the Commitment Letter.  (6/7/18 Tr. (Potter) 131:5-13.)

185.     Mr. Potter circulated a draft of his letter at 10:53 a.m. on October 25, 2015 — two

days after VCLF and ERP had cut off negotiations with Black Diamond.  (PX 186.)

186.     As a basis for repudiation, Mr. Potter cited Mr. Gravenhorst's October 23 email

from "approximately 2:20 p.m."  (PX 186, at VCLF-00183517.)  Mr. Potter's draft letter did not

reference any of the other emails that Mr. Gravenhorst sent on October 23.  (*Id.*; 6/7/18 Tr.

(Potter) 133:6-17.)

187.     After receiving Mr. Potter's draft letter, Mr. Clarke wrote:  "Patrick, I have some

comments and additional facts."  (DX DF; 6/12/18 Tr. (Clarke) 182:10-183:10.)

188.     Mr. Clarke then began forwarding Mr. Potter the other emails that Mr.

Gravenhorst sent on October 23.  (DX DH; DX DI; DX DM; PX 188; 6/7/18 Tr. (Potter) 134:15-

139:1.)  Before receiving these emails, Mr. Potter did not know that Mr. Gravenhorst had sent

more than one email.  (6/7/18 Tr. (Potter) 135:17-20; *id.* at 141:16-21; *id.* at 144:16-19.)

189.     In response to Mr. Clarke's emails, Mr. Potter asked:

 a. "What is this and why am I just now getting it?  What's the difference from the 2pm?," (DX DH; 6/7/18 Tr. (Potter) 135:14-20);

 b. "What's going on?," (DX DI; 6/7/18 Tr. (Potter) 137:3-7);

 c. "They sent us 4 different proposals during the day on Friday?  This is just unamanageable [sic]," (DX DM, at VCLF-00183652; 6/7/18 Tr. (Potter) 138:19-139:1).

190.      In response to Mr. Potter's emails, Mr. Clarke stated that he had been "trying to

negotiate while they [Black Diamond] were sending updates."  (DX DM, at VCLF-00183652.)

Before receiving Mr. Clarke's email, Mr. Potter did not know that Mr. Clarke had been negotiating with Black Diamond about the terms of Mr. Gravenhorst's emails. (6/7/18 Tr. (Clarke) 141:22-143:6.) Indeed, Mr. Potter did not know that Mr. Clarke had been speaking to Black Diamond at all. (*Id.* at 145:1-3.)

191.    In response to Mr. Clarke's email, Mr. Potter asked: "Did you respond to any by email? . . . Did you verbally agree to anything? From Friday morning to our first crisis call with the team, did you speak with anyone at BD about these 4 emails from them? Are they going to come back and say that you facilitated these proposals or agreed to portions of the terms?" (DX DM, VCLF-00183652; 6/7/18 Tr. (Potter) 139:13-140:6.) Obviously, ongoing negotiations would be inconsistent with Mr. Potter's newly formed "repudiation" theory.

192.    Mr. Clarke responded by describing his negotiations with Black Diamond in more detail. (DX DM, at VCLF-00183651.) Specifically, Mr. Clarke stated: "I kept pushing Rich on the telephone to fund the $10 million up front. He went up to $2.5 million with $2 million for PL [Pillsbury Law]. I wanted to see how far he would go in order to present our team with the options. Then Ken weighed in that he has lost trust regardless." (*Id.*; 6/12/18 Tr. (Clarke) 179:15-180:17.)

193.    Before receiving Mr. Clarke's email, Mr. Potter did not know that Mr. Clarke had been "pushing" Black Diamond to see "how far [it] would go." (6/7/18 Tr. (Potter) 141:22-143:6.) Nor did Mr. Potter know that Black Diamond had changed its financing proposal over the course of October 23 to make its terms more favorable to VCLF and ERP. (*Id.* at 144:20-25.)

194.    Notwithstanding the new information showing continuous negotiations that

*Defendants*, not Black Diamond, terminated, Mr. Potter did not reassess his decision to send

Black Diamond a letter accusing it of repudiation.  (PX 297; 6/7/18 Tr. (Potter) 148:10-12.)

**XXII.  VCLF and ERP Falsely Accuse Black Diamond of Repudiation.**

195.    At 3:41 p.m. on October 25, 2015, Mr. Potter sent Schulte's Adam Harris a letter

accusing Black Diamond of "anticipatorily breaching or otherwise repudiating the Commitment

Letter."  (PX 297, at BDCF-00077219 & -234; 6/7/18 Tr. (Potter) 148:10-12.)

196.    As "evidence" of repudiation, Mr. Potter cited the emails that Mr. Gravenhorst

sent on October 23 as well as Black Diamond's failure to provide definitive loan documentation.

(PX 297, at BDCF-00077233-34.)  Mr. Potter's letter, however, does not accurately reflect the

parties' course of conduct.

a.    As noted above, Mr. Gravenhorst's emails related solely to the draft modified
asset purchase agreement that VCLF and ERP presented to Patriot on October 21,
*not* the August 16 APA that Black Diamond had agreed to fund pursuant to the
Commitment Letter.  (PX 111; PX 113; PX 115; PX 116.)  Black Diamond had
no contractual obligation to fund a modified asset purchase agreement, (PX 40, at
BDCF-00028158), and thus Mr. Gravenhorst's emails cannot amount to
repudiation.

b.    Mr. Potter's letter also mischaracterizes Black Diamond's work on loan
documentation.  As Mr. Harris testified at trial, Black Diamond believed that it
would have made little sense to provide draft loan documentation before the terms
of VCLF and ERP's transaction with Patriot were finally settled and due diligence
was complete.  (6/5/18 Tr. (Harris) 156:1-4.)  As explained above, VCLF and
ERP did not provide Black Diamond with the proposed revised terms of their deal
with Patriot until October 12, 2015, and those terms were still in flux as of
October 23.  In any event, contrary to Mr. Potter's assertion, Schulte had begun
drafting loan documentation before October 23.  (6/5/18 Tr. (Harris) 218:6-19.)

197.    Mr. Potter's letter asked "Black Diamond [to] advise VCLF as to whether [it]

intend[ed] to close tomorrow [*i.e.*, October 26] under the BD Commitment (without

modification), and under the original form of APA acceptable to Patriot as modified during the

course of the confirmation process and last Thursday's negotiations (*not* the version tendered by

Black Diamond to VCLF on Wednesday evening)." (PX 297, at BDCF-00077234 (emphasis in

original).) The letter thus asked Black Diamond to provide the same financing for the new

transaction negotiated between Defendants and Patriot that Black Diamond had agreed to in the

Commitment Letter to provide for the transaction set forth in the August 16 APA.

198.    Black Diamond had never agreed to fund the "original form of APA acceptable to

Patriot *as modified during the course of the confirmation process and last Thursday's

negotiations*." (PX 40 (emphasis added); 6/5/18 Tr. (Ehrlich) 5:17-6:14; *id.* (Harris) at 166:9-25;

6/8/18 Tr. (Deckoff) 88:19-21.) Indeed, Black Diamond had not even seen the draft agreement

to which Mr. Potter was referring. (6/5/18 Tr. (Ehrlich) 5:17-6:14; *id.* (Harris) at 166:9-167:7;

6/7/18 Tr. (Potter) 149:19-150:9.)

199.    At 6:21 p.m. on October 25, Mr. Harris responded to Mr. Potter's letter. (PX 179;

DX DD; 6/5/18 Tr. (Harris) 219:23-220:3.)

200.    In his email to Mr. Potter, Mr. Harris clarified that Black Diamond was prepared

to consummate a financing transaction in connection with the draft modified asset purchase

agreement on the terms set forth in Mr. Gravenhorst's emails, which "for the avoidance of

doubt" had been "vetted" with Mr. Clarke. (PX 179; 6/5/18 Tr. (Harris) 167:11-168:11.) To the

extent that there were open business terms, Mr. Harris stated that Black Diamond was "ready,

willing and able to address them through continued good faith negotiations." (PX 179.)

201.    Mr. Harris did not expressly reference the Commitment Letter in his 6:21 p.m.

email. (PX 179.) This was because Mr. Potter's letter concerned only the terms on which Black

Diamond would fund "the new deal that [VCLF] had cut with Patriot." (6/5/18 Tr. (Harris)

168:12-24; 6/7/18 Tr. (Potter) 149:19-150:4; *id.* at 151:22-152:3.) Indeed, Defendants concede

that they never asked — and Black Diamond never refused — to fund the August 16 APA

pursuant to the terms set forth in the Commitment Letter.  (6/7/18 Tr. (Potter) 151:22-152:3; *see also* 6/12/18 Tr. (Clarke) 98:2-18; *id.* at 101:12-15.)

202.    Mr. Potter responded to Mr. Harris's email at 8:43 p.m.  (PX 180.)

203.    Mr. Potter stated that Mr. Harris's "email confirms that Black Diamond is not prepared to close on the terms contained in the September 21, 2015 Commitment Letter, the only agreement between Black Diamond and VCLF."  (PX 180, at BDCF-00077262.)  This statement was not true, however.  As Defendants conceded at trial, Mr. Potter had not asked Black Diamond to close on the terms of the Commitment Letter, which were limited to financing the transaction set forth in the August 16 APA as it existed on September 21, 2015.  (6/7/18 Tr. (Potter) 151:22-152:3; 6/12/18 Tr. (Clarke) 98:2-18; *id.* at 101:12-15.)  And Black Diamond had never said it would not close on those terms.  (6/5/18 Tr. (Ehrlich) 5:14-16; *id.* at 6:15-18; *id.* at 7:8-16; *id.* (Harris) at 131:5-16; *id.* at 164:24-25; *id.* at 173:7-13; 6/8/18 Tr. (Deckoff) 48:20-49:2; 6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke) 87:13-19.)  Mr. Potter further stated that VCLF "has no choice but to accept an alternative financing commitment which was presented to VCLF late last night by Patriot after we responsibly reported to the company the risk of non-closure due to the proposals sent to VCLF by Mr. Galvenhorst [sic] on Friday."  (PX 180, at BDCF-00077262.)

204.    Mr. Harris responded to Mr. Potter's 8:43 p.m. letter at 11:34 p.m.  (PX 181; 6/5/18 Tr. (Harris) 173:23-174:2.)

205.    In his email to Mr. Potter, Mr. Harris stated that Black Diamond was prepared to consummate a financing transaction based upon:

      a.    "the terms of the September 21st Commitment Letter, which in turn was based upon the Asset Purchase Agreement executed by VCLF and Patriot on August 16, 2015";

    b.   "Mr. Gravenhorst's emails to VCLF on Friday," which in turn were based on a
"change[d] . . . Asset Purchase Agreement"; or

    c.   based upon any other "acceptable resolution of any remaining business issues so
as to permit VCLF to promptly consummate its transaction with Patriot."

(PX 181; 6/5/18 Tr. (Harris) 173:23-174:19.)

206.    No one affiliated with VCLF or ERP responded to Mr. Harris's 11:34 p.m. email.

(6/5/18 Tr. (Harris) 175:2-4.)

## XXIII. VCLF and ERP Close Their Transaction with Patriot without Providing Black Diamond with the Equity Interests.

207.    VCLF and ERP closed their transaction with Patriot on October 27, 2015.  (PX

388; 6/11/18 Tr. (Clarke) 309:18-19; 6/12/18 Tr. (Clarke) 32:18-22.)

208.    VCLF and ERP closed their transaction with Patriot with financing from Patriot

and the UMWA.  (PX 221; PX 301; 6/12/18 Tr. (Clarke) 92:12-17; *id.* at 92:21-24; *id.* at 197:4-

12.)

209.    VCLF and ERP closed their transaction with Patriot without providing Black

Diamond with the promised Equity Interests.  (6/5/18 Tr. (Ehrlich) 128:1-7; *id.* (Harris) at

181:14-25; 6/8/18 Tr. (Deckoff) 77:6-7.)

## XXIV. Black Diamond Did Not Repudiate the Commitment Letter.

210.    Black Diamond did not repudiate the Commitment Letter.  (6/5/18 Tr. (Ehrlich)

4:22-5:16; *id.* (Harris) at 163:25:165:3.)

211.    At no point following the execution of the Commitment Letter did VCLF and

ERP ever ask Black Diamond to fund the August 16 APA on the terms set forth in the

Commitment Letter.  (6/7/18 Tr. (Potter) 151:22-152:3 ("Q. . . . [A]t no point, following the

execution of the commitment letter, did you ever ask Black Diamond to provide financing on the

terms set forth in the commitment letter in connection with the transaction embodied in the

August 16th APA as it existed as of September 21st, correct?  A.  As it existed as of September

21st, that's correct."); 6/12/18 Tr. (Clarke) 98:2-18 ("Q.  You never asked Black Diamond to

close and provide the financing . . . set forth in the commitment letter, in connection with VCLF

closing on the transaction set forth in the APA between VCLF and Patriot, as amended as of

September 21st, 2015, did you? . . . A.  I didn't ask [Black Diamond] to close on the August 16th

asset purchase agreement, no."); *id.* at 101:12-15 ("So no, I didn't go to [Black Diamond],

verbally or in writing, and say, please close the transaction on the terms of the commitment

letter, based on the August 16th commitment letter — August 16th asset purchase agreement

. . . .").)

212.    Indeed, Black Diamond never refused to fund the August 16 APA on the terms set

forth in the Commitment Letter.  (PX 181; 6/5/18 Tr. (Ehrlich) 5:14-16; *id.* at 6:15-18; *id.* at 7:8-

16; *id.* (Harris) at 131:5-16; *id.* at 164:24-25; *id.* at 173:7-13; 6/8/18 Tr. (Deckoff) 48:20-49:2;

6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke) 87:13-19.)

213.    Black Diamond never refused to fund a modified asset purchase agreement.  (PX

181; 6/5/18 Tr. (Ehrlich) 5:7-13; 6/8/18 Tr. (Deckoff) 34:3-16; *id.* at 38:8-13; *id.* at 60:19-25.)

214.    Black Diamond never refused to continue negotiations regarding the terms on

which it would finance a modified asset purchase agreement.  (PX 181; 6/5/18 Tr. (Ehrlich)

5:14-16; 6/8/18 Tr. (Deckoff) 40:2-4; *id.* at 54:16-18; 6/12/18 Tr. (Clarke) 190:14 ("Black

Diamond never did stop negotiating.").)

215.    Black Diamond never said that the financing terms that it proposed on October 22

and 23, 2015 were the "best that [it] could do."  (6/5/18 Tr. (Ehrlich) 73:8-12; 6/8/18 Tr.

(Deckoff) 40:2-4; *id.* at 54:16-18.)

216.   As an initial matter, whether or not Black Diamond indicated that the terms that it proposed on October 22 and 23, 2015 were the "best that [it] could do" is immaterial, as those financing terms related solely to the *new* deal that VCLF, ERP, and Patriot negotiated after the Commitment Letter was signed, not the August 16 APA, which Black Diamond committed to finance pursuant to the Commitment Letter.  (*See, e.g.*, PX 111; PX 113; PX 115; PX 116.)

217.   Moreover, Mr. Clarke's testimony that Mr. Ehrlich told him in an October 22 phone call that terms that Black Diamond proposed were the "best that [it] could do" is not credible.  (6/12/18 Tr. (Clarke) 181:3-12.)  First, Mr. Clarke never stated in any of the many contemporaneous emails that he sent between October 23 and 25 that Black Diamond had told him that its proposed financing terms were the best that it could do.  (PX 109; PX 125; PX 133; PX 188; PX 194; DX DF; DX DH; DX DI.)  Second, Mr. Clarke testified that he could not remember the words that Mr. Ehrlich used when he supposedly told Mr. Clarke that Black Diamond would not continue negotiations over financing terms, (6/12/18 Tr. (Clarke) 181:3-12), and Mr. Clarke's testimony directly conflicts with that of Mr. Ehrlich, who testified that he never offered financing terms on a "take it or leave it" basis, (6/5/18 Tr. (Ehrlich) 73:8-12).  In any event, even if Mr. Ehrlich stated on October 22 that Black Diamond's proposed financing terms were the "best that [it] could do," it was obvious to Mr. Clarke that Black Diamond's proposal was *not* its final offer.  Indeed, the very next day, Black Diamond provided better financing terms to VCLF and ERP, including by increasing the amount of the term loan and providing VCLF with more cash at closing.  (PX 111; PX 113; PX 115; PX 116; 6/4/18 Tr. 235:6-11.)

218.   At trial, Messrs. Clarke and Ken McCoy also testified that Black Diamond repudiated the Commitment Letter by refusing to provide VCLF and ERP with $10 million in cash at closing.  (6/11/18 Tr. (Clarke) 343:20-23; 6/12/18 Tr. (Clarke) 92:10-11; *id.* at 163:19-

-59-

22; 6/13/18 Tr. (McCoy, K.) 142:10-12.)  Mr. Clarke further testified that he repeatedly told Mr.

Ehrlich that he needed $10 million in cash, and that he would not do a deal with Black Diamond

unless he received this $10 million.  (6/11/18 Tr. (Clarke) 335:1-3 ("I told him at a minimum, we

had to have the ten million term loan."); 6/12/18 Tr. (Clarke) 19:9-12 ("I repeatedly indicated

that without cash at closing — the original committed, at a minimum, ten million dollars of cash

at closing — the transaction simply would not work."); *id.* at 28:14-17 ("[A]ll of Thursday and

early Friday morning was spent on trying to convince [Mr. Ehrlich] to fund the ten million under

the commitment letter up front."); *id.* at 135:16-22 ("So I was focused on cash at closing.  So

even if Mr. Ehrlich had said, I'm going to give you a fifty-million term loan but it had delayed

funding, it would have been inadequate. . . .  I've got to have at least ten million; ten million at

closing.  Ten million at closing."); *id.* at 148:13-18 ("So the concept of the reduction — the

concept of the receivables purchase facility going to fifteen, and the term loan going to five, was

a nonstarter for me.  It was a no. . . .  We needed ten million dollars."); *id.* at 156:15-16 ("I can't

do anything less than ten million.").)

219.   VCLF and ERP were never entitled to $10 million in cash at closing under the

Commitment Letter, however.  The Commitment Letter makes no reference to any funding

amount at closing and never allocated the amount of Black Diamond's financing commitment

between a term loan and an asset-based loan.  (PX 40; 6/12/18 Tr. (Clarke) 133:2-3; 6/13/18 Tr.

(Clarke) 55:11-19; 6/13/18 Tr. (McCoy, K.) 144:21-24 ("Q.  Sir, show me a single contractual

commitment in this case, or refer me to it, that says [Black Diamond is] obligated to give you ten

million dollars at closing.  Can you show me that?  A.  No sir.").)

**XXV.  Black Diamond Suffered Damages as a Result of VCLF and ERP's Breach of the Commitment Letter.**

220.    Black Diamond suffered damages as a result of VCLF and ERP's breach of the Commitment Letter.  (*See, e.g.*, 6/4/18 Tr. (Ehrlich) 80:2-11; 6/5/18 Tr. (Ehrlich) 9:5-9; *id.* (Harris) at 128:1-7; *id.* at 177:11-178:4.)  In particular, Black Diamond suffered: (i) lost interest income; (ii) unpaid fees and expenses; and (iii) damages related to VCLF and ERP's failure to provide Black Diamond with the promised equity interests in HoldCo and HealthCo.

*A.    VCLF and ERP's Breach of the Commitment Letter Resulted in Black Diamond's Loss of More than $5 Million in Interest Income.*

221.    Under the Commitment Letter, Black Diamond was entitled to receive interest income on the loans that it extended to VCLF and ERP.  (PX 40, at BDCF-00028163-64; 6/5/18 Tr. (Ehrlich) 9:5-9; *id.* at 9:20-21.)  The interest rates specified in the Commitment Letter were: (i) 17% per annum for the first year of the loans' duration; and (ii) 12% per annum for the next two years.  (PX 40, at BDCF-00028163-64; 6/5/18 Tr. 9:13-15.)  The loans' maturity date was three years from the date of Black Diamond's initial funding.  (PX 40, at BDCF-00028162.)

222.    Over the loans' duration, Black Diamond would have earned at least $5 million in interest income.  (6/5/18 Tr. (Ehrlich) 9:5-21.)  Mr. Ehrlich calculated this figure by assuming that: (i) VCLF and ERP would borrow $14.5 million under the Commitment Letter, and (ii) VCLF and ERP would repay their loans in two and a half years.  (*Id.* at 9:10-21.)  These assumptions are conservative, as: (i) the face amount of Black Diamond's financing commitment was $25 million, and (ii) the loans' specified duration was three years.  (PX 40, at BDCF-00028157; *id.* at BDCF-00028162-64.)  If VCLF and ERP borrowed the full $25 million under the Commitment Letter and repaid their loans in three years, Black Diamond would have earned interest income substantially in excess of $5 million.

223.    Defendants neither called Mr. Ehrlich's calculation into question at trial, nor introduced a competing or conflicting calculation of Black Diamond's lost interest income.

> **B.    VCLF and ERP Were Required to Reimburse Black Diamond for the Attorneys' Fees that Black Diamond Incurred in Connection with Its Financing Transaction with VCLF and ERP.**

224.    Under the Commitment Letter, VCLF and ERP were required to reimburse Black Diamond for "all out of pocket fees and expenses (including the reasonable fees and expenses of counsel) incurred in connection with the preparation, negotiation, execution and delivery of the Loan Facility Documentation and the consummation of the transactions contemplated thereby." (PX 40, at BDCF-00028166.)

225.    Black Diamond incurred attorneys' fees in connection with the consummation of its financing transaction with VCLF and ERP.  (6/5/18 Tr. (Harris) 177:3-6.)  Specifically, Black Diamond incurred attorneys' fees in connection with, among other things, drafting the Commitment Letter; facilitating HealthCo's assumption of Patriot's workers' compensation collateral; devising a corporate structure; assessing tax issues; and preparing loan documentation. (DX AN; DX ER; 6/5/18 Tr. (Harris) 177:3-178:4; *id.* at 154:1-8; *id.* at 154:25-155:7; *id.* at 165:17-18.)

226.    Black Diamond's attorneys' fees totaled $286,000.  (DX AN; DX ER; 6/5/18 Tr. (Harris) 178:1-4.)

> **C.    VCLF and ERP Were Required to Provide Black Diamond with an Equity Interest in HoldCo, Which Equity Interest Had a Value of $26,666,784.65 as of October 26, 2015.**

227.    Under the Commitment Letter, Black Diamond was to receive a 40% interest in HoldCo, a holding company to be formed to "acquire a 75% interest in ERP Federal Mining Complex, LLC (the entity that owns (or will own) the assets and liabilities associated with the Federal Mine Complex . . .)."  (PX 40, at BDCF-00028166.)  Black Diamond's 40% interest in

HoldCo thus would have provided it a 30% interest (40% of 75%) in the Federal Mine.  (6/4/18 Tr. (Ehrlich) 80:2-11.)

228.    VCLF and ERP were required to provide Black Diamond with the promised equity interest in HoldCo regardless of whether they took financing from Black Diamond.  (PX 40, at BDCF-00028159; 6/5/18 Tr. (Harris) 227:15-18.)  Indeed, Mr. Clarke acknowledged at trial that VCLF and ERP would violate the Commitment Letter if they closed their transaction with Patriot without providing Black Diamond with the promised equity interests, as long as Black Diamond did not repudiate the Commitment Letter.  (6/12/18 Tr. (Clarke) 96:16-97:2; 6/13/18 Tr. (Clarke) 44:1-17.)

229.    Defendants' own documents show that the Federal Mine had a value of $88,889,282.16 as of October 25, 2015, the approximate date of their breach of the Commitment Letter.  (PX 249, at 15-16; *id.* at Ex. B.)  This figure is derived from VCLF and ERP's responses to Black Diamond's interrogatories, pursuant to which Black Diamond requested that VCLF and ERP "[i]dentify the value of the Federal Mine Complex on October 25, 2015 . . . and provide the basis for [that] value."  (*Id.* at 15.)  In response to this interrogatory, VCLF and ERP stated that "information responsive to" the request "is set forth in" the attached "Unaudited Condensed Balance Sheet of ERP Federal Mining Complex, LLC, as of October 27, 2015."  (*Id.* at 16.)  The attached balance sheet listed the Federal Mine's members' capital as $88,889,282.16.  (*Id.* at Ex. B.)  As Mr. Clarke acknowledged at trial, members' capital is the only way to determine a company's value based on the company's balance sheet.  (6/12/18 Tr. (Clarke) 202:13-16; *id.* at 205:10-23.)

230.    Mr. Clarke signed VCLF and ERP's interrogatory responses under penalty of perjury.  (PX 249, at 22; 6/12/18 Tr. (Clarke) 211:15-19.)  In doing so, Mr. Clarke attested that

the interrogatory responses were "true to the best of [his] knowledge, information and belief."

(PX 249, at 22.)

231.    Based on VCLF and ERP's interrogatory responses, Black Diamond's 30%

interest in the Federal Mine had a value of $26,666,784.65 on October 25, 2015.

> D.    *VCLF and ERP Were Required to Provide Black Diamond with an Equity Interest in HealthCo, Which Equity Interest Had a Value of at Least $35,220,895.38 as of October 26, 2015.*

> 1.    Black Diamond Was Entitled to an Equity Interest in HealthCo.

232.    Under the Commitment Letter, Black Diamond was to receive a 90% interest in

HealthCo, an entity to be created to "acquire the assets and liabilities associated with the

workers' compensation programs currently administered by Patriot Coal Corporation and its

affiliates."  (PX 40, at BDCF-00028166.)

233.    VCLF and ERP were required to provide Black Diamond with the promised

equity interest in HealthCo regardless of whether they took financing from Black Diamond.  (PX

40, at BDCF-00028159; 6/5/18 Tr. (Harris) 227:15-18.)  Indeed, Mr. Clarke acknowledged at

trial that VCLF and ERP would violate the Commitment Letter if they closed their transaction

with Patriot without providing Black Diamond with the promised equity interests, as long as

Black Diamond did not repudiate the Commitment Letter.  (6/12/18 Tr. (Clarke) 96:16-97:2;

6/13/18 Tr.(Clarke) 44:1-17.)

> 2.    VCLF and ERP Assigned a Value of $52,156,854.68 to Black Diamond's Interest in HealthCo as of October 25, 2015.

234.    Defendants' own documents show that HealthCo had a value of $57,952,060.76

as of October 25, 2015.  (PX 249, at 16; *id.* at Ex. D.)  This figure is derived from VCLF and

ERP's responses to Black Diamond's interrogatories, pursuant to which Black Diamond

requested that VCLF and ERP "[i]dentify the value of the assets and liabilities associated with

-64-

the worker's compensation programs previously administered by Patriot on October 25, 2015 . . .

and provide the basis for [that] value." (*Id.* at 16.)  In response to this interrogatory, VCLF and

ERP stated that "information responsive to" the request "is set forth in" the attached "Unaudited

Condensed Balance Sheet of ERP Settlement, LLC, as of October 27, 2015." (*Id.*)  The attached

balance sheet listed the total members' capital in ERP Settlement as $57,952,060.76.  (*Id.* at Ex.

D.)  As Mr. Clarke acknowledged at trial, members' capital is the only way to determine a

company's value based on the company's balance sheet.  (6/12/18 Tr. (Clarke) 202:13-16; *id.* at

205:10-23.)

235.    Mr. Clarke signed VCLF and ERP's interrogatory responses under penalty of

perjury.  (PX 249, at 22; 6/12/18 Tr. (Clarke) 211:15-19.)  In doing so, Mr. Clarke attested that

the interrogatory responses were "true to the best of [his] knowledge, information and belief."

(PX 249, at 22.)

236.    Based on VCLF and ERP's interrogatory responses, Black Diamond's 90%

interest in HealthCo had a value of $52,156,854.68 on October 25, 2015.

3.    Black Diamond's Expert Assigned a Value of $35,220,895.38 to Black
Diamond's Interest in HealthCo as of October 26, 2015.

237.    Black Diamond retained damages expert Robert K. Briscoe to perform a valuation

of HealthCo's assets and liabilities as of or around October 26, 2015.  (PX 261, at 5.)

238.    Mr. Briscoe is a principal of Milliman, Inc. ("Milliman"), one of the world's

largest providers of actuarial and related products and services.  (PX 261, at 3; Qualifications of

Robert K. Briscoe Pursuant to Local Rule 9017-1(B) (Dkt. No. 391) ("Qualifications"), at 2.)

Mr. Briscoe holds the Workers' Compensation Professional ("WCP") designation of the

American Society of Workers' Compensation Professionals ("AMComp"), and is a member of

the board of directors of AMComp.  (PX 261, at 3; Qualifications, at 2; 6/6/18 Tr. (Briscoe)
29:11-16.)

239.    Mr. Briscoe has over 40 years' experience in the national workers' compensation
field.  (PX 261, at 3; Qualifications, at 2.)  He has advised "[m]any hundreds" of coal clients in
connection with their workers' compensation liabilities, including most of the largest U.S. coal
operators and a large sampling of second- and third-rank coal producers.  (PX 261, at 3; 6/6/18
Tr. (Briscoe) 31:23-25.)  Mr. Briscoe's experience with analyzing coal operators' workers'
compensation liabilities includes analyzing individual workers' compensation claims, including
occupational disease ("OD") claims; calculating funding models; and valuing traumatic injury
and OD liabilities.  (PX 261, at 3-4; Qualifications, at 3-6; 6/6/18 Tr. (Briscoe) 30:15-31:25.)  He
has valued "tens of thousands" of traumatic injury claims over the course of his career as well as
"many thousands" of state and federal black lung claims.  (6/6/18 Tr. (Briscoe) 30:15-31:7.)

240.    VCLF and ERP "don't dispute that Mr. Briscoe is an expert actuary on liabilities
and workers' compensation liabilities."  (6/6/18 Tr. (Briscoe) 16:20-22.)

241.    To calculate the value of HealthCo's assets and liabilities as of October 26, 2015,
Mr. Briscoe performed three tasks.

242.    First, Mr. Briscoe reviewed actuarial reports prepared by Oliver Wyman and
Milliman, which valued Patriot's traumatic injury and black lung liabilities as of year-end 2014
and 2015.  (PX 261, at 5; *id.* at 7-11; *id.* at 14-15; *see also* PX 7; PX 245; PX 248; DX FK;
6/6/18 Tr. (Briscoe) 81:20-82:4; *id.* at 82:20-84:13.)  These reports were prepared in the normal
course of business to establish Patriot's "balance-sheet liabilities."  (6/6/18 Tr. 84:14-17; *id.* at
85:12-18.)  Mr. Briscoe determined that both the Oliver Wyman and Milliman reports used
"absolutely standard" actuarial methods to project Patriot's workers' compensation liabilities.

(6/6/18 Tr. 90:24-25; *see also* PX 7; PX 245; PX 248; PX 261, at 7-8; *id.* at 13-15; DX FK;

6/6/18 Tr. (Briscoe) 90:12-91:14.)  Mr. Briscoe did not "disagree with the use of any of [the

methods]" that Oliver Wyman and Milliman used, although he noted that some of the methods

used by Oliver Wyman were "obviously conservative" in nature.  (6/6/18 Tr. (Briscoe) 91:16-

92:16.)  Based on the use of such conservative approaches, Mr. Briscoe determined that the

Oliver Wyman reports reflected a "reasonable but conservative" estimate of Patriot's traumatic

injury liabilities.  (*Id.* at 92:17-20.)

243.    Second, after determining the reasonableness of the estimates reflected in the

Oliver Wyman and Milliman reports, Mr. Briscoe made adjustments to the reports' calculations

in order to determine the present value of Patriot's projected liabilities as of October 26, 2015.

(PX 261, at 11-12; *id.* at 15; *id.* at App'x A & B; *see also* DX FK.)  Mr. Briscoe determined that

the present value of Patriot's traumatic injury liabilities as of October 26 was $98,848,565, and

the present value of Patriot's state black lung liabilities was $24,080,371.  (PX 261, at 12, 15;

6/6/18 Tr. (Briscoe) 93:5-22; *id.* at 95:11-14; *id.* at 101:12-102:3; *see also* DX FK.)

244.    Third, Mr. Briscoe calculated the value of the surplus collateral associated with

Patriot's workers' compensation programs as of October 26, 2015.  (PX 261, at 15-19; *see also*

DX FK.)  To calculate the surplus collateral, Mr. Briscoe compared the amount of the letters of

credit that VCLF and ERP assumed pursuant to the asset purchase agreement, dated October 27,

2015 (the "October 27 APA"), to the value of the liabilities secured by those letters of credit.

(PX 261, at 15-19; PX 220, §§ 2.01(q), 2.03(e), 2.05(f), 2.04(o) & 9.02; *id.* at VCLF-00102444-

45; PX 41, ¶ 10; 6/6/18 Tr. (Briscoe) 102:6-106:25.)  Comparing the amount of the letters of

credit assumed by VCLF and ERP to the value of the liabilities they secured, Mr. Briscoe

determined that the surplus collateral associated with Patriot's workers' compensation program as of October 26, 2015 was $39,134,328.20.  (PX 261, at 19; 6/6/18 Tr. (Briscoe) 106:18-25.)

245.    Black Diamond's 90% interest in this surplus collateral was $35,220,895.38.

4.    Black Diamond Had the Ability and Experience to Monetize the HealthCo's Surplus Collateral.

246.    Black Diamond's expert, Mr. Briscoe, determined that the surplus collateral held by HealthCo on or around October 26, 2015 could have been monetized by a sophisticated financial actor.  (PX 261, at 21-22; 6/6/18 Tr. (Briscoe) 114:3-119:4.)  Mr. Briscoe's determination was based on his significant experience monetizing surplus workers' compensation collateral on behalf of his clients.  As Mr. Briscoe testified, over the course of his career, he has participated in "[m]any dozens" of meetings with state regulators to negotiate the release of surplus collateral, and he has assisted clients in preparing for those meetings, including by advising on the necessary requirements for presentations to state regulators and clients' security requirements under state law.  (6/6/18 Tr. (Briscoe) 37:21-38:23; *see also* Qualifications, at 5-6.)  In addition to his participation in direct negotiations, Mr. Briscoe has been a part of "at least fifty if not a hundred" teams that have worked to secure the release of surplus collateral through loss portfolio transfers ("LPTs").  (PX 261, at 21; 6/6/18 Tr. (Briscoe) 39:17-21; *id.* at 114:22-115:10.)  Finally, Mr. Briscoe has advised clients on monetization strategies involving replacement letters of credit.  (6/6/18 Tr. (Briscoe) 40:11-25.)  Mr. Briscoe is working with three clients who are in the process of replacing letters of credit in order to realize collateral surpluses.  (*Id.*; *id.* at 41:11-21.)

247.    Based on his experience, Mr. Briscoe determined that HealthCo's surplus collateral could have been monetized through at least three monetization strategies.  (PX 261, at 21-22; 6/6/18 Tr. (Briscoe) 114:3-119:4.)

-68-

a. First, HealthCo's surplus collateral could have been monetized by swapping out the letters of credit securing Patriot's workers' compensation liabilities for letters of credit secured by less than full deposits of cash. (PX 261, at 21; 6/6/18 Tr. (Briscoe) 117:16-118:17.) In reaching this conclusion, Mr. Briscoe assumed, based on his professional expertise and recent trends in the coal industry, that Patriot's workers' compensation liabilities were secured by letters of credit backed by full (or almost full) deposits of cash. (PX 261, at 20-21; 6/6/18 Tr. (Briscoe) 176:3-13.) This strategy could be effectuated as easily as sending a state regulatory authority or large deductible insurance company an acceptable replacement letter of credit. (PX 261, at 21.)

b. Second, a party could have monetized HealthCo's surplus collateral by effectuating a Lost Portfolio Transfer, or LPT, transaction. (PX 261, at 21; 6/6/18 Tr. (Briscoe) 114:18-117:15.) An LPT occurs when an insurer or reinsurer agrees to assume and accept another insurer's existing and future liabilities through the transfer of the insurer's loss reserves. (PX 261, at 21; 6/6/18 Tr. (Briscoe) 114:22-115:2; *id.* at 119:20-120:3.) Assuming that the new insurer accepts a lesser amount of security to insure the liabilities, surplus collateral will be released. (PX 261, at 21; 6/6/18 Tr. (Briscoe) 115:3-7; *see also* 6/4/18 Tr. (Ehrlich) 66:10-19; *id.* at 68:25-69:14.) LPTs occur frequently across the casualty insurance industry, including with respect to workers' compensation. (PX 261, at 21.)

c. Finally, a party could have negotiated with state regulators and large deductible insurance companies to secure the release of surplus collateral. (PX 261, at 21-22; 6/6/18 Tr. (Briscoe) 114:3-17.) In Mr. Briscoe's experience, most state regulators (with the exception of Kentucky) are willing to negotiate with sophisticated parties about whether a downward adjustment to posted security is warranted. (PX 261, at 21-22.) Large deductible insurance companies are also amenable to releasing collateral. (*Id.*, at 22.)

248.   Each of Mr. Briscoe's monetization strategies could have been realized in a matter of weeks or months. (6/6/18 Tr. (Briscoe) 121:1-24.)

249.   Black Diamond has the financial wherewithal to effectuate Mr. Briscoe's strategies.

a. Black Diamond currently manages over $8 billion in assets, ███████████
████████. (6/4/18 Tr. (Ehrlich) 57:10-13; 6/8/18 Tr. (Deckoff) 6:21-25; *id.* at 22:25-30:6.) This places Black Diamond "toward the upper tier of entities that [Mr. Briscoe] has worked with in terms of financial capital." (6/6/18 Tr. (Briscoe) 120:20-25.) In Mr. Briscoe's opinion, Black Diamond has the asset base required to effectuate the monetization strategies he describes. (*Id.* at 118:23-119:13; *id.* at 158:20-22.)

-69-

b. Black Diamond has ready access to credit markets, including letters of credit. (6/8/18 Tr. (Deckoff) 19:25-20:7.) For example, Black Diamond has an unsecured line of credit with JPMorgan Chase, pursuant to which Black Diamond can draw letters of credit up to $50 million within 24 hours, without the need to post security. (*Id.* at 20:4-21; *id.* at 21:24-22:1; *id.* at 124:12-14.) If Black Diamond wishes to obtain letters of credit in excess of $50 million, it can do so by posting security with a lending institution. (*Id.* at 21:21-22:18; *id.* at 23:7-14.) Black Diamond is creditworthy and debt-free, which means that Black Diamond can obtain letters of credit by posting security well below the face amount of the letters of credit sought. (*Id.* at 22:23-23:3; *see also* 6/4/18 Tr. (Ehrlich) 68:7-12.)

c. Black Diamond is regularly approached by entities seeking to effectuate an LPT transaction. (6/8/18 Tr. (Deckoff) 24:3-12; *id.* at 122:3-14.) Indeed, Black Diamond owns an insurance company that is licensed to insure workers' compensation liabilities, which means that Black Diamond has the capacity to self-insure the workers' compensation liabilities at issue here. (*Id.* at 17:20-24; *id.* at 23:15-24:2.)

250.    Black Diamond also could have allowed HealthCo to "self-monetize." (6/8/18 Tr. (Deckoff) 17:25-18:8; *see also* 6/7/18 (Briscoe) 62:11-17.) HealthCo's liabilities would eventually "pay themselves off," thereby "extinguish[ing] the liabilities." (6/8/18 Tr. (Deckoff) 17:7-11.) After HealthCo's liabilities are extinguished, any surplus collateral would be returned to HealthCo, and by extension, Black Diamond. (*Id.*) Black Diamond has successfully monetized eight workers' compensation programs through a self-monetization strategy. (*Id.* at 15:19-16:13.)

E.    *VCLF and ERP's Purported "Evidence" of Black Diamond's Inability to Monetize HealthCo's Surplus Collateral Is Unpersuasive.*

1.    VCLF and ERP Have Offered No Credible Evidence that the Letters of Credit Securing Patriot's Workers' Compensation Liabilities Were Drawn Down before October 26, 2015 or that any Such Draw Down Affected the Value of HealthCo.

251.    VCLF and ERP purport to present evidence that Black Diamond would not have been able to monetize HealthCo's surplus collateral for the full amount identified by Mr. Briscoe, because certain of the letters of credit that secured Patriot's workers' compensation

liabilities were drawn down and converted to cash before October 27, 2015.  The "evidence"

presented at trial, however, shows no such thing.

252.    As an initial matter, the fact that HealthCo's letters of credit may have been

converted to cash before October 27 would not have affected any party's ability to monetize the

surplus collateral.  (6/7/18 Tr. (Briscoe) 52:3-10; 6/5/18 Tr. (Ehrlich) 10:2-12.)  As Mr. Briscoe

testified, "[c]ash is cash.  A letter of credit is just one form of cash.  The fact that [the letters of

credit] were drawn down still leaves the cash on the table."  (6/7/18 Tr. (Briscoe) 52:3-10; *see

also* 6/5/18 Tr. (Ehrlich) 10:2-12.)  Mr. Briscoe is the sole expert in the case, and VCLF and ERP

have not offered any expert testimony or other evidence to rebut Mr. Briscoe's opinion.

253.    Indeed, the evidence offered at trial refutes VCLF and ERP's position.  For

example, Mr. Deckoff testified that Black Diamond has experience monetizing workers'

compensation programs, and it has successfully monetized programs in which the letters of credit

have been drawn.  (6/8/18 Tr. (Deckoff) 136:1-11 ("The insurers drew the letter of credit, so the

insurers now had the cash.  We ended up getting control of those assets.  And then after we got

control of those assets, we negotiated with the insurance companies.").)

254.    VCLF's witnesses offered similar testimony.  For example, Daniel Spragg, a

managing director at Alvarez & Marsal who led negotiations between Patriot and the

Commonwealth of Kentucky concerning an LPT transaction, testified that Kentucky regulators

repeatedly expressed a willingness to execute an LPT transaction with Patriot, notwithstanding

that Kentucky had drawn down Patriot's letter of credit.  (6/13/18 Tr. (Spragg) 225:22-226:12

("Q.  . . . And notwithstanding . . . the drawdown of the LCs, Kentucky still expressed a

willingness to enter into an LPT transaction if its requirements were met, right?  A.  Yes."); *see

also* PX 401, at 11 ("The Commissioner is willing to consider a loss portfolio transfer."); PX

402, at 4 ("[T]he Guaranty Fund does not reject the concept of a Loss Portfolio Transfer,

provided that it contains certain necessary elements discussed in more detail below."); PX 403, at

16 ("[W]e are supportive of an LPT."); *id.* at 23 ("[A]t the outset let me say that the Department

and the Commissioner have zero objection to a true LPT transaction.").)

255.    Even if a letter of credit's conversion to cash were relevant to the monetization

process, VCLF and ERP have failed to offer any reliable evidence that Patriot's letters of credit

were drawn down before October 27, 2015.

256.    There is no documentary evidence showing that any of Patriot's letters of credit

were drawn.  In fact, the documentary evidence indicates precisely the opposite.  (*See, e.g.*, PX

220, at Schedule 1.01(a)(vii) (listing letters of credit to be assumed by VCLF and ERP); PX 218,

at Schedule C (assigning letters of credit to ERP Settlement and specifying list of letters of credit

assumed); PX 313, at BDCF-00018283 (specifying that "Patriot has collateral of $169 million to

fulfill its workers compensation obligations").)

257.    There is a similar lack of testimonial evidence.  Mr. Clarke, for example,

purported to testify that AIG drew down all but one of the letters of credit that it issued to Patriot

before October 27.  On cross-examination, however, he admitted that he had no personal

knowledge of any such draw downs.  (6/12/18 Tr. (Clarke) 212:25-214:13.)  Charles Ebetino, an

ERP vice president who previously worked for Patriot, similarly testified that he "[did not] know

a hundred percent whether [Patriot's letters of credit] were [drawn] or not" before October 27.

(6/4/18 Tr. (Ebetino) 140:7-16; *see also id.* at 166:18-21 ("Q. . . . [I]s there any letter of credit

on this list where you can tell me the expiration date and can state with certainty that it had

expired prior to October 27th?  A.  No.").)

-72-

258.    Mr. Ebetino did recall a draw down of one of Patriot's letters of credit posted with the State of Illinois.  (6/4/18 Tr. (Ebetino) 124:24-127:13; *id.* at 132:19-134:17.)  In particular, Mr. Ebetino recalled that Patriot sent a notice to Illinois regulators in the fall of 2015 indicating that "it was no longer going to make payments" on Illinois workers' compensation claims.  (*Id.* at 126:7-13; *id.* at 127:7-9.)  Mr. Ebetino, however, "[did not] recall the exact date" that Patriot sent its notice to the State of Illinois nor did he recall the date on which Illinois supposedly drew down Patriot's letter of credit.  (*Id.* at 127:7-13; *id.* at 132:19-135:6.)  There is thus no evidence in the record that this draw down occurred prior to Defendants' breach.

259.    Notwithstanding the ambiguity surrounding the date on which Illinois drew down Patriot's letter of credit, and notwithstanding the lack of evidence that such a draw down would preclude VCLF, ERP, and Black Diamond from monetizing the surplus collateral, Mr. Briscoe undertook to calculate HealthCo's surplus collateral, excluding the Illinois letter of credit. (6/7/18 Tr. (Briscoe) 52:11-55:12.)  After removing the letter of credit and associated liabilities, Mr. Briscoe determined that HealthCo had a value of $35,779,725 as of October 26, 2015, meaning that Black Diamond's 90% interest in HealthCo had a value of $32,201,100.  (*Id.* at 54:23-55:9.)  This represents a $3,019,795 reduction in value from the damages figure discussed above.

2.    Patriot's Failure to Monetize Patriot's Kentucky Collateral for More than $1,001,000 Is Not Evidence of the Value of the Collateral or That Black Diamond Would Similarly Have Been Unable to Monetize that Collateral.

260.    In June 2017, Patriot reached a settlement with the Commonwealth of Kentucky, pursuant to which Patriot sold its contingent right to certain surplus collateral held by Kentucky for $1,001,000.  (DX FE; DX FG.)  Contrary to VCLF and ERP's assertion, this sale price does not establish that HealthCo's value as of October 26, 2015 was limited to $1,001,000.

261.    The evidence adduced at trial shows the following:

-73-

a.  On November 2, 2015, Patriot defaulted on its workers' compensation obligations
    in Kentucky. (PX 400, at 3-4; 6/13/18 Tr. (Spragg) 224:25-225:7.) Because of
    Patriot's default, the Commissioner of Kentucky's Department of Workers'
    Claims called the letter of credit securing Patriot's workers' compensation
    liabilities and, per Kentucky law, transferred the proceeds to the Kentucky Coal
    Employers' Self-Insurance Guaranty Fund. (PX 400, at 2-4; 6/13/18 Tr. (Spragg)
    224:25-225:7.)

b.  At the time of Patriot's default, it was believed that Patriot's Kentucky workers'
    compensation liabilities were over-collateralized by more than $9 million.
    (6/13/18 Tr. (Spragg) 212:12-19.)

c.  In November or December 2015, Patriot retained Alvarez & Marsal to coordinate
    efforts to monetize Patriot's workers' compensation collateral. (6/13/18 Tr.
    (Spragg) 172:19-25.) Daniel Spragg, a managing director at Alvarez & Marsal,
    led the monetization effort. (*Id.* at 167:22-168:8; *id.* at 173:1-7.)

d.  Alvarez & Marsal negotiated with Kentucky regulators over the release of surplus
    collateral. (6/13/18 Tr. (Spragg) 173:3-7.) In negotiating with Kentucky, Alvarez
    & Marsal was singularly focused on executing an LPT transaction. (*Id.* at 226:22-
    227:6.) Alvarez & Marsal did not pursue any other monetization strategies, such
    as swapping out Patriot's letter of credit. (*Id.*)

e.  Kentucky law specifies certain requirements for an LPT transaction, including
    unlimited insurance coverage. (PX 401, at 10-11; PX 402, at 4-7; PX 415;
    6/13/18 Tr. (Spragg) 215 22-24; *id.* at 217:12-15; *id.* at 217:23-25.) In June or
    July 2016, Kentucky regulators provided Alvarez & Marsal with a list of these
    requirements. (PX 415; 6/13/18 Tr. (Spragg) 216:4-20.) Kentucky repeatedly
    told Alvarez & Marsal that it was willing to complete an LPT transaction with
    Patriot so long as the transaction complied with Kentucky law. (PX 401, at 11;
    PX 402, at 4; PX 403, at 16, 23; 6/13/18 Tr. (Spragg) 193:11-16; *id.* at 226:3-20.)

f.  Alvarez & Marsal presented two LPT proposals to Kentucky regulators: one in
    conjunction with Berkshire Hathaway and the other in conjunction with Randall
    & Quilter. (PX 416; PX 417; 6/13/18 Tr. (Spragg) 189:11-13; *id.* at 198:21-25;
    *id.* at 222:8-14.)

g.  Neither of these proposals complied with Kentucky law. (PX 401, at 10-11; PX
    402, at 4-7; 6/13/18 Tr. (Spragg) 217:8-218:3; *id.* at 222:23-223:9; *id.* at 223:18-
    21.)

h.  Kentucky rejected both proposals. (6/13/18 Tr. (Spragg) 193:17-20; *id.* at 223:22-
    224:17.)

i.  Patriot filed a lawsuit against various Kentucky regulators in December 2016 in
    an attempt to recover its surplus collateral. (PX 400; DX FT.)

-74-

j.  On June 8, 2017, Patriot and Kentucky settled their dispute. (DX FT.) Kentucky agreed to pay Patriot $1,001,000 for Patriot's "rights and interests in any contingent future surplus workers' compensation security . . . , free and clear of all liens, claims, and interests." (DX FE, at 2; *see also* DX FG.) The Bankruptcy Court approved the sale on June 27, 2017. (DX FG, at 8-9; 6/13/18 Tr. (Spragg) 207:16-19.)

262.    Notwithstanding the Bankruptcy Court's approval of the sale, it is inappropriate to draw the inference, based on the sale, that HealthCo was worth no more than $1,001,000 as of October 26, 2015. Such an inference is unreasonable for at least two reasons.

263.    First, Patriot's ability to monetize HealthCo's surplus collateral is not representative of the ability of a better-capitalized entity, such as Black Diamond, to monetize the collateral. As Black Diamond's expert, Mr. Briscoe, testified, a party's ability to implement successfully a monetization strategy is heavily dependent on that party's access to capital. (6/6/18 Tr. (Briscoe) 119:20-120:3.) For example, without access to sufficient capital, a party would struggle to swap out letters of credit or execute an LPT transaction. (*Id.* ("For the collateral to be assumed by another party, you have to be able to pay for that, and to buy an insurance policy, if it's an [LPT.] [Y]ou're going to have to be able to negotiate a letter of credit in the same amount but at a lower security rate. That takes capital. That takes cash.").)

264.    Black Diamond and Patriot are not similarly situated with respect to their access to capital.

a.  Black Diamond is an asset management firm with over $8 billion in assets under management, ███████████████████. (6/4/18 Tr. (Ehrlich) 57:10-11; 6/8/18 Tr. (Deckoff) 6:21-25; *id.* at 22:25-30:6.) Given its significant capitalization, Black Diamond can secure letters of credit for cents on the dollar. (6/8/18 Tr. (Deckoff) at 22:23-25.) Indeed, Black Diamond can secure letters of credit up to $50 million on 24 hours' notice, without the need to post security. (*Id.* at 20:4-21; *id.* at 21:24-22:1.)

b.  Patriot was a bankrupt coal corporation. (6/4/18 Tr. (Ebetino) 121:20-21; 6/11/18 Tr. (Clarke) 282:3-6.) Patriot sold substantially all of its assets in October 2015,

after which it sought to liquidate any remaining assets.  (PX 334.)  As of late 2015, Patriot had little, if any, access to cash.  (6/4/18 Tr. (Ebetino) 122:8-123:2; 6/7/18 Tr. (Potter) 186:15-21.)  Given its inability to meet its workers' compensation obligations, Patriot lost its self-insurance authority in Kentucky as of November 2, 2015.  (PX 400, at 3.)

265.    Second, Patriot was unable to execute an LPT transaction with Kentucky because

Patriot failed to propose a transaction that complied with Kentucky law.  (PX 401, at 10-11; PX

402, at 4-7; 6/13/18 Tr. (Spragg) 217:8-218:14; *id.* at 222:8-14; *id.* at 224:7-17.)

266.    The LPT transactions that Patriot presented to Kentucky violated Kentucky law

insofar as they:

    a.    did not meet the requirement that the liability of the self-insured or the replacement insurance policy be unlimited in nature, (PX 401, at 10-11; PX 402, at 5-6; 6/6/18 Tr. (Briscoe) 135:25-136:12; 6/13/18 Tr. (Spragg) 217:12-18; *id.* at 223:18-21);

    b.    did not meet the requirement that an LPT cover all diseases, including traumatic injuries and black lung diseases, (PX 401, at 10-11; PX 402, at 4; 6/13/18 Tr. (Spragg) 217:23-218:3);

    c.    did not meet the requirement that the LPT cover incurred but not reported claims, (PX 401, at 11; PX 402, at 4); and

    d.    did not involve policies of insurance (as distinguished from "reinsurance" policies), (PX 402, at 5-6; 6/6/18 Tr. (Briscoe)138:17-139:1).

267.    Patriot's ability to execute an LPT transaction was further hampered by the fact

that:

    a.    Patriot refused to provide its actuarial reviews to Kentucky regulators, despite repeated requests from the regulators with whom Patriot was negotiating, (PX 402, at 2; 6/13/18 Tr. (Spragg) 220:2-221:2);

    b.    Kentucky regulators believed that Patriot's actuarial reviews were inaccurate, (PX 402, at 2-3; 6/13/18 Tr. (Spragg) 221:3-12); and

    c.    Patriot assumed an unnecessarily "confrontational tone" with regulators during negotiations, (PX 402, at 1; 6/13/18 Tr. (Spragg) 219:19-220).

268. Notwithstanding these deficiencies, Kentucky regulators repeatedly informed Patriot that they were willing to consider an LPT transaction that complied with Kentucky law. (PX 401, at 11 ("The Commissioner is willing to consider a loss portfolio transfer."); PX 402, at 4 ("[T]he Guaranty Fund does not reject the concept of a Loss Portfolio Transfer, provided that it contains certain necessary elements discussed in more detail below."); PX 403, at 16 ("[W]e are supportive of an LPT."); *id.* at 23 ("[A]t the outset let me say that the Department and the Commissioner have zero objection to a true LPT transaction.").)

269. In fact, Kentucky has agreed to execute LPTs with other coal companies when the LPTs comply with state law. (6/7/18 Tr. (Briscoe) 58:9-15.) For example, in May 2017, Kentucky approved an LPT transaction, pursuant to which a major coal producer transferred its self-insurance obligations to a reinsurance company in exchange for a premium payment. (6/11/18 Tr. (Logan) 30:12-31:25; *id.* at 27:12-14.) The LPT transaction complied with Kentucky law and allowed the coal manufacturer to realize $10 million in surplus collateral. (*Id.* at 25:16-26:18; *id.* at 30:12-31:25; *id.* at 36:19-25; *id.* at 72:20-24.)

270. In Mr. Briscoe's expert opinion, had Patriot been better capitalized and had it presented an LPT proposal that complied with Kentucky law, more than $1,001,000 could have been realized from the sale of Patriot's contingent right to surplus collateral. (6/7/18 Tr. (Briscoe) 57:15-18; *see also* 6/6/18 Tr. (Briscoe) 144:22-145:10.)

271. In short, Patriot's inability to execute a monetization transaction with the State of Kentucky, and its $1 million lawsuit settlement, is evidence of neither Black Diamond's ability to have monetized that collateral absent Defendants' breach, nor the value of the collateral at the time of breach.

3.      The *Parker* Decision Does Not Affect Black Diamond's Damages.

272.     The Kentucky Supreme Court issued a decision in *Parker v. Webster County Coal, LLC*, 529 S.W.3d 759 (Ky. 2017) on April 27, 2017, eighteen months after VCLF and ERP breached the Commitment Letter.  *See* 529 S.W.3d at 579.  In *Parker*, the Court determined that KRS 342.730(4), which prohibits injured workers from obtaining workers' compensation benefits after they qualify for old-age retirement benefits under the Social Security Act, 42 U.S.C. § 301, was unconstitutional insofar as it impermissibly discriminated among groups of injured older workers.  *See* 529 S.W.3d at 769; (6/6/18 Tr. (Briscoe) 146:4-12).

273.     Contrary to VCLF and ERP's suggestion, the *Parker* decision does not have a material impact on the value of HealthCo's liabilities.  As an initial matter, the decision was issued 17 months after Defendants' breach of the Commitment Letter, and thus it has no effect on HealthCo's value as of the date of breach.  Moreover, Mr. Briscoe testified that in his expert opinion, the *Parker* decision would have a minimal impact on HealthCo's value, even on a going-forward basis.  Specifically, Mr. Briscoe testified that he had conducted an analysis of *Parker*'s impact on another client's workers' compensation liabilities, and determined that *Parker* did not have a "material or significant" effect on those liabilities.   (6/6/18 Tr. (Briscoe) 146:22-147:5; *see also* 6/7/18 Tr. (Briscoe) 24:8-18.)  Because Patriot's claims are similar to those of Mr. Briscoe's other clients, Mr. Briscoe determined that *Parker* would similarly have a minimal effect on the value of Patriot's workers' compensation liabilities.  (*Id.*)  VCLF and ERP have not introduced any expert testimony to rebut Mr. Briscoe's opinion.

## XXVI. The Federal Mine Closes.

274.    After VCLF and ERP closed their transaction with Patriot, the Federal Mine "started doing pretty well," and in fact, "broke . . . production records in terms for daily production." (6/13/18 Tr. (McCoy, K.) 122:8-12.)

275.    Shortly after the transaction closed, however, the U.S. coal market "went into a freefall" and "[t]he demand for thermal coal in the United States . . . declined precipitously." (6/13/18 Tr. (McCoy, K.) 122:12-13; 6/12/18 Tr. (Clarke) 44:24-45:1.)

276.    In September 2017, ERP idled the Federal Mine due to "geological conditions" and "roof falls." (PX 507; 6/13/18 Tr. (McCoy, K.) 146:18-148:11.)  No documentary evidence supports the claim that the Federal Mine closed due to Black Diamond's failure to provide financing.

277.    In the spring of 2018, VCLF and ERP sold the assets and liabilities associated with Federal Mine to Phoenix Energy for $500,000. (6/12/18 Tr. (Clarke) 47:8-12; *id.* at 212:16-24; *id.* at 217:14-19.)  Mr. Clarke testified that the value of the liabilities assumed by the buyer was approximately $8 million, which would mean the value of the assets assumed was approximately $8.5 million. (*Id.* at 218:1-14.)

278.    The subsequent performance of the Federal Mine following Defendants' breach is irrelevant to determination of Black Diamond's damages.  It is worth noting, however, that according to Defendants' interrogatory responses, even a year after the breach, the mine had a value of $42,944,134.37. (PX 249, at 15-16; *id.* at Ex. C.)

## PROPOSED CONCLUSIONS OF LAW

**I.     VCLF and ERP Have Breached Contractual Obligations Owed to Black Diamond
under the Commitment Letter.**

279.    Black Diamond's breach of contract claim is governed by New York law, as

provided for in the Commitment Letter's choice of law provision.  (*See* PX 40, at BDCF-

00028166); *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 806 n.5 (E.D. Va.

2017) ("Under Virginia law, contractual choice-of-law provisions are dispositive on the question

of what substantive law applies to a given cause of action.").

280.    The elements of breach of contract in New York are: "(1) formation of a contract

between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform;

and (4) resulting damage."  *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 725 (N.Y. App.

Div. 2009) (internal quotation marks and citation omitted); *see also Paxi, LLC v. Shiseido Ams.

Corp.*, 636 F. Supp. 2d 275, 281-82 (S.D.N.Y. 2009) (applying New York law).

281.    The evidence presented at trial establishes that Black Diamond has satisfied each

of these elements.

*A.      The Commitment Letter Is a Binding, Enforceable Agreement.*

282.    "For a contract to be valid under New York law, there must be an offer,

acceptance, and consideration."  *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556

(S.D.N.Y. 2004).

283.    The "offer and acceptance" requirement is satisfied as long as the parties have

signed a written contract.  *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de

Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) ("Under New York law, in the absence of fraud or

other wrongful conduct, a party who signs a written contract is conclusively presumed to know

its contents and to assent to them, and he is therefore bound by its terms and conditions.").

284.    Consideration exists as long as a contract confers "a benefit to the promisor or a detriment to the promisee." *Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981).  Under New York law, the "exchange [of] promises is sufficient to create a binding contract." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 570 (2d Cir. 1993).  Courts shall not inquire into the adequacy of consideration.  *See Apfel v. Prudential-Bache Sec., Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) ("[A]dequacy of consideration is not a proper subject for judicial scrutiny."); *Laham v. Chambi*, 753 N.Y.S.2d 34, 35 (N.Y. App. Div. 2002) (same).

285.    The Commitment Letter is a valid and enforceable agreement:

   a.   VCLF, ERP, and Black Diamond each freely signed the Commitment Letter, thereby manifesting their intent to accept its terms.  (PX 40, at BDCF-00028161; 6/11/18 Tr. (Murphy) 203:24-204:3; *id.* at 204:12-14.)

   b.   The Commitment Letter was supported by mutual consideration.  Black Diamond committed to provide up to $25 million in financing to VCLF and ERP, which was a prerequisite under the August 16 APA for obtaining Patriot's assets and liabilities.  (PX 40, at BDCF-00028157; PX 15, §§ 10.03(g), 11.01(m); 6/11/18 Tr. (Murphy) 105:1-106:3; *id.* at 190:22-191:1.)

286.    Indeed, VCLF and ERP have admitted that "[t]he Commitment Letter is a valid and enforceable contract."  (Answer & Counterclaim (Dkt. No. 3-68), pg. 30, ¶ 48).  VCLF and ERP's admission is dispositive with respect to this element of the breach of contract claim.  *See, e.g.*, *VIA Design Architects, PC v. U.S. Dev. Co., LLC*, No. 2:13CV555, 2014 WL 5685550, at *5 (E.D. Va. Nov. 14, 2014) ("Under federal law, an unequivocal assertion of fact made in a pleading, such as answer or counterclaim, constitutes a 'judicial admission' that generally binds the party making such statement throughout the remainder of the proceeding.").

   B.    *Black Diamond Performed under the Commitment Letter.*

287.    Black Diamond satisfied its performance obligations under the Commitment Letter.

288.    Under New York law, a plaintiff asserting a breach of contract claim need only

perform its contractual obligations to the extent that its performance is "due." *DLJ Mortg.*

*Capital Inc. v. Home Loan Corp.*, 667 F. Supp. 2d 368, 368 (S.D.N.Y. 2009).  "Performance of a

duty subject to a condition [precedent] cannot become due unless the condition occurs or its non-

occurrence is excused."  Restatement (Second) of Contracts § 225 (1981); *see also MHR Capital*

*Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009) ("[A] condition precedent is an act

or event, other than a lapse of time, which, unless the condition is excused, must occur before a

duty to perform a promise in the agreement arises.") (internal quotation marks and citation

omitted).

289.    As of the date of VCLF and ERP's breach of the Commitment Letter, Black

Diamond's performance was never required under the terms of the Commitment Letter.  (6/7/18

Tr. (Potter) 151:22-152:3; 6/12/18 Tr. (Clarke) 98:2-18.)  Moreover, a number of the

Commitment Letter's conditions to closing had not yet occurred, including the "consummation

of a transaction for the Excluded Assets (as defined in the VCLF APA) in form and substance

acceptable to Lender."  (PX 40, at BDCF-00028158, BDCF-00028164; 6/11/18 Tr. (Clarke)

309:18-19; 6/12/18 Tr. (Clarke) 32:18-22.)

C.    *Black Diamond, VCLF, and ERP Extended the Termination Date of the*
      *Commitment Letter.*

290.    By the terms of the Commitment Letter, Black Diamond's commitment was due

to "terminate at 5:00 p.m., New York City time, on October 8, 2015," if the Bankruptcy Court

had not yet entered a final non-appealable order authorizing and approving the August 16 APA.

(PX 40, at BDCF-00028158.)

291.    On October 7, 2015, the parties modified the Commitment Letter by agreeing

over email to extend the Commitment Letter's termination date by 30 days, *i.e.*, until November

9, 2015.  (PX 53; DX AG.)  Messrs. Clarke and Ehrlich effectuated this modification by

exchanging signed emails agreeing to extend the Commitment Letter's termination date.  (PX 53;

6/12/18 Tr. (Clarke) 91:3-4.)  This exchange of emails complied with the Commitment Letter's

requirement that any modifications to the letter be effectuated through a "signed writing."  *See*

*Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (N.Y. App. Div. 2008) ("Bloom's name at the

end of his email constituted a 'signed writing' and satisfied the requirement of § 13(d) of the

employment agreement that any modifications be signed by all parties."); *see also Williamson v.*

*Delsener*, 874 N.Y.S.2d 41, 41 (N.Y. App. Div. 2009) ("The e-mails exchanged between

counsel, which contained their printed names at the end, constitute signed writings.").

Accordingly, the email exchange between Messrs. Ehrlich and Clarke on October 7 modified the

Commitment Letter.  *See Stevens*, 854 N.Y.S.2d at 692; (*see also* 6/12/18 Tr. (Clarke) 90:21-24

("Q.  And Exhibit 53 is the email exchange by which you agree with Black Diamond to extend

that October 8th deadline that we just referred to, correct?  A.  Yes.").)

       D.    *VCLF and ERP Breached the Commitment Letter.*

          1.    VCLF and ERP Solicited Alternative Financing and Closed Their
                Transaction with Patriot without Providing Black Diamond with the
                <u>Promised Equity Interests, in Violation of the Exclusivity Provision.</u>

292.    VCLF and ERP breached the Commitment Letter.

293.    "It is beyond cavil that the failure of a party to perform its obligations under a

valid and binding contract constitutes a breach and entitles the other contractually bound party to

damages which arose out of the breach."  *See Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112

F. Supp. 3d 83, 97 (S.D.N.Y. 2015).

294.    Pursuant to the Commitment Letter's Exclusivity Provision, VCLF and ERP were

each expressly prohibited from:

a. "solicit[ing] or accept[ing] an offer by any person other than Black Diamond of any debt or equity financing for the purpose of facilitating in any manner the consummation of the transactions contemplated by the VCLF APA," and

b. "submit[ting] or pursu[ing] any offer for all or any material portion of the Purchased Assets (as defined in the VCLF APA) in conjunction with any other person or entity other than Black Diamond and its affiliates, or that does not provide for the receipt by Black Diamond of the Equity Interests contemplated by the Term Sheet."

(PX 40, at BDCF-00028159.)

295.    The parties' obligations under the Exclusivity Provision were never modified or waived.  (6/5/18 Tr. (Harris) 210:2-8; 6/11/18 Tr. (Clarke) 341:5-11; *see also* Answer & Counterclaim (Dkt. No. 3-68), pg. 30, ¶ 48.)

296.    VCLF and ERP breached the Exclusivity Provision by soliciting alternative financing for the purpose of "facilitating" the consummation of the VCLF-Patriot transaction. (PX 45; PX 52; PX 66; PX 68; PX 137; PX 151; PX 163; PX 167; PX 175; PX 203; PX 212; PX 264; PX 270; PX 301; PX 221; DX CP; 6/7/18 Tr. (Potter) 126:13-127:2; 6/8/18 Tr. (McCoy, J.) 196:7-199:19; *id.* at 218:13-18; *id.* at 220:4-7; *id.* at 221:2-15; *id.* at 224:7-18; *id.* at 225:10-15; *id.* at 225:22-23; *id.* at 226:11-227:3; *id.* at 246:16-249:20; *id.* at 250:2-3; *id.* at 253:5-255:6; *id.* at 255:9-258:19; *id.* at 261:24-262:13; 6/11/18 Tr. (Murphy) 178:1-6; *id.* at 178:20-179:2; 6/12/18 Tr. (Clarke) 31:18-32:9; *id.* at 195:16-23; *id.* at 197:4-12.)  At a minimum, it is undisputed that Defendants solicited alternative financing from Patriot and the United Mine Workers Association to consummate their transaction with Patriot.

297.    VCLF and ERP also breached the Exclusivity Provision by closing their transaction with Patriot without providing Black Diamond with the promised equity interests. (6/5/18 Tr. (Ehrlich) 128:1-7; *id.* (Harris) at 181:14-25; 6/8/18 Tr. (Deckoff) 77:6-7.)

2.      VCLF and ERP's Obligations under the Exclusivity Provision Attached at
        <u>Signing.</u>

298.    VCLF and ERP's obligations under the Exclusivity Provision attached at signing.

299.    By its express terms, the Exclusivity Provision states that "upon *acceptance* of
this Commitment," VCLF and ERP "hereby . . . agree[]" not to solicit or accept alternative
financing or to close their transaction with Patriot without providing Black Diamond with the
promised equity interests.  (PX 40, at BDCF-00028159 (emphasis added).)  Under New York
law, contracts must be interpreted "so as to give effect to the intention of the parties *as expressed
in the unequivocal language employed.*"  *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282
(N.Y. 1978) (internal quotation marks and citation omitted).  "[A] written agreement that is
complete, clear[,] and unambiguous on its face must be enforced according to the plain meaning
of its terms."  *Patsis v. Nicolia*, 992 N.Y.S.2d 349, 350 (N.Y. App. Div. 2014).

300.    Interpreting the Exclusivity Provision in a manner that does not provide for the
attachment of VCLF and ERP's obligations at signing would be nonsensical and commercially
unreasonable.  The Exclusivity Provision restricts VCLF and ERP's ability to solicit alternative
financing before closing and to close their transaction with Patriot without providing Black
Diamond with the promised equity interests.  (6/5/18 Tr. (Harris) 149:8-17; *id.* at 242:3-12.)
Were these obligations to attach at some point after signing, the Exclusivity Provision would be
meaningless.  (*Id.* at 149:8-17.)  Under New York law, "an interpretation of a contract that has
the effect of rendering at least one clause superfluous or meaningless . . . [should] be avoided if
possible."  *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) (internal
quotation marks and citation omitted).  Instead, New York courts "are obliged to interpret a
contract so as to give meaning to all of its terms."  *Mionis v. Bank Julius Baer & Co.*, 749
N.Y.S.2d 497, 502 (N.Y. App. Div. 2002); *see also India.com, Inc. v. Dalal*, 412 F.3d 315, 323

(2d Cir. 2005) ("[R]easonable effort must be made to harmonize all of [a contract's] terms.");
*Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009) ("[T]he court may not read the agreement to make any of its terms meaningless, or construe its language to render particular provisions 'mere surplusage.'") (citation omitted).

301.    Faced with similar facts, courts applying New York law have held that a party's solicitation of alternative financing before closing constitutes a breach.  *See, e.g.*, *FCS Advisors, Inc. v. Fair Finance Co.*, No. 07 Civ. 6456(DC), 2009 WL 1403869, at *8 (S.D.N.Y. May 19, 2009) (holding that defendant breached commitment letter's exclusivity provision by negotiating over alternative financing with third party while commitment letter's pre-closing exclusivity provision was in effect).

> 3.    VCLF and ERP Were Never Relieved of Their Obligations under the Commitment Letter.

302.    VCLF and ERP were not relieved of their obligations under the Exclusivity Provision due to the failure (or potential failure) of one or more conditions to closing set forth in the Commitment Letter.

303.    As an initial matter, VCLF and ERP have waived this defense.  "In New York, failure of a condition precedent is an affirmative defense," which "must be pleaded specifically and with particularity."  *Columbia Artists Mgmt., LLC v. Alvarez*, No. 08 CIV 11254 LBS, 2010 WL 5396097, at *6 (S.D.N.Y. Dec. 23, 2010); *see also 1199 Hous. Corp. v. Int'l Fidelity Ins. Co.*, 788 N.Y.S.2d 88, 90 (N.Y. App. Div. 2005) ("[T]he burden to plead specifically and with particularity that any condition precedent has not been fulfilled rests on the party resisting enforcement of the contract.").  VCLF and ERP never pleaded the failure of a condition precedent as an affirmative defense, and never raised it before trial, including in their summary judgment briefs.  (Answer & Counterclaim (Dkt. No. 3-68), at pg. 16-17; Mem. of Law in Supp.

of Mot. for Partial Summary J. (Dkt. No. 138); Reply in Further Supp. of Mot. for Partial

Summary J. (Dkt. No. 185); Mem. of Law in Opp'n to Mot. for Partial Summary J. (Dkt. No.

230).)  They are thus barred from raising it now.  *See, e.g.*, *Columbia Artists*, 2010 WL 5396097,

at *6 (holding that defendants waived failure-of-condition-precedent defense by failing to raise it

in timely manner); *Morales Elec. Contracting, Inc. v. Siemens Bldg. Techs., Inc.*, No. 09-CV-

2743 ADS ETB, 2012 WL 3779410, at *2 (E.D.N.Y. Aug. 30, 2012) (same).

304.    Even if it had not been waived, the defense is unavailing.  The conditions to

closing set forth in the Commitment Letter are conditions to Black Diamond's performance, not

VCLF and ERP's.  (6/5/18 Tr. (Harris) 238:4-6; *see also* PX 40, at BDCF-00028158.)  To

construe the Commitment Letter differently — that is, to hold that VCLF and ERP's obligations

under the Exclusivity Provision were subject to the Commitment Letter's conditions to closing

— would be to render the Exclusivity Provision meaningless, as it would permit VCLF and ERP

to solicit alternative financing prior to closing — precisely the conduct that the Exclusivity

Provision was designed to prevent.  (6/5/18 Tr. (Harris) 149:8-17; *id.* at 242:3-12.)  Courts

applying New York law must interpret contracts "so as to give meaning to all of [their] terms."

*Mionis*, 749 N.Y.S.2d at 502; *see also Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir.

2003) (rejecting party's interpretation of contract because it would "render contract provisions

meaningless or superfluous"); *Air China Ltd. v. Li*, No. 07 CIV 11128 LTS DFE, 2008 WL

754450, at *2 (S.D.N.Y. Mar. 17, 2008 ("The Court has an obligation to interpret the contract

with regard to all of its provisions, and to interpret it in a way in which no provision is rendered

meaningless."); *Patsis*, 992 N.Y.S.2d at 351 (rejecting defendant's interpretation of contract

because it "renders [contract's] terms meaningless").  Accordingly, Defendants' interpretation of

the Commitment Letter, which would render the obligations of the Exclusivity Provision

illusory, must be rejected.

305.    Additionally, the failure (or potential failure) of a condition precedent does not

excuse VCLF or ERP's performance because Black Diamond was entitled to waive any

conditions to closing while the Commitment Letter was in effect.  *See ESPN, Inc. v. Office of*

*Comm'r of Baseball*, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999) ("[A] party may, by words or

conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted

for [its] benefit.") (internal quotation marks and citation omitted).  Given Black Diamond's right

to waive conditions to closing, VCLF and ERP could not unilaterally decide that a condition to

closing would fail and thereby relieve themselves of their contractual duties.

   E.    *Black Diamond Was Damaged by VCLF and ERP's Breach.*

306.    Under New York law, "a breaching party is liable for all direct and proximate

damages which result from the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,

487 F.3d 89, 110 (2d Cir. 2007).

307.    For breach of contract claims, "an award of damages should place the plaintiff in

the same position as he or she would have been in if the contract had not been breached." *Island*

*Fed. Credit Union v. Hillside Auto Mall, Inc.*, 937 N.Y.S.2d 87, 89 (N.Y. App. Div.  2012)

(internal quotation marks and citation omitted).  "Absent a special provision of law or

contractual limitation, it is a basic tenet of the law of damages that where there has been a

violation of a contractual obligation the injured party is entitled to fair and just compensation

commensurate with his loss." *Terminal Cent., Inc. v. Henry Modell & Co.*, 628, N.Y.S.2d 56, 59

(N.Y. App. Div. 1995) (citations omitted).

308.    Contract damages are calculated as of the time of breach. *Sharma v. Skaarup*

*Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) ("It is a fundamental proposition of contract

law, including that of New York, that the loss caused by a breach is determined as of the time of breach."). When calculating damages, "a court looks to the value of the asset 'at the time of breach,' and freezes damages at that moment in time." *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *14 (S.D.N.Y. July 15, 2016), *aff'd* 714 F. App'x 35 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2029 (2018). "[E]vents subsequent to the breach, viewed in hindsight, may neither offset nor enhance [] general damages." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007).

309.    In a breach of contract case, a plaintiff must prove its damages with "reasonabl[e] certain[ty]." *Tractebel*, 487 F.3d at 110 (quoting *Wakeman v. Wheeler & Milson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)). "Certainty" in this context, however, "refers to the *fact* of damage, not the amount." *Id.*; *see also Merrill Lynch*, 500 F.3d at 185 ("[Plaintiff] is required to show with reasonable certainty the fact of damage, not its amount."). "[U]nder the long-standing New York rule, when the existence of damage is certain, and the only uncertainty is to amount, the plaintiff will not be denied a recovery of substantial damages." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977).

310.    To establish the amount of contract damages, "[t]he plaintiff need only show a 'stable foundation for a reasonable estimate'" of the damages incurred as a result of a defendant's breach of contract. *Id.* (quoting *Freund v. Wash. Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974)). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964). Instead, any "method [that] reasonably approximates" damages satisfies the plaintiff's obligations under New York law. *Jamil v. Solar Power Inc.*, 230 F. Supp. 3d 271, 276 (S.D.N.Y. 2017). "To the extent certain variables must be assumed in

order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented

that undermines the basis for the assumption." *Tractebel*, 487 F.3d at 112.

311.    Provided the plaintiff makes a threshold showing, "the burden of uncertainty as to

the amount of damages is [placed] upon the wrongdoer," not the plaintiff. *Contemporary*

*Mission*, 557 F.2d at 926; *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir.

1995) ("The wrongdoer must shoulder the burden of the uncertainty regarding the amount of

damages.")  "Doubts [about the amount of damages] are generally resolved against the party in

breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).

312.    Black Diamond has satisfied its burden under New York law to show a "stable

foundation" for its damages calculation. *Contemporary Mission*, 557 F.2d at 926.

     a.   Black Diamond has established with reasonable certainty that it lost at least
$5,000,000 in interest income to which it was entitled under the Commitment
Letter.  (6/5/18 Tr. (Ehrlich) 9:5-21.)  Mr. Ehrlich calculated this sum based on
the assumption that VCLF and ERP would borrow substantially less than the
maximum allowed under the Commitment Letter and repay their loans before the
maturity date.  (*Id.*)  Accordingly, Mr. Ehrlich's calculation of lost interest income
is conservative in nature. *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d
583, 697 (S.D.N.Y. 2017) ("[T]he fact-finder may determine the amount of
damages within a certain range, and when damages are at some ascertainable
amount below an upper limit, that upper limit will be taken as the proper
amount.") (internal quotation marks and citation omitted).

     b.   Black Diamond has established that VCLF and ERP failed to reimburse it for
$280,000 in fees and expenses to which it was entitled under the Commitment
Letter.  (PX 40, at BDCF-00028166.)  This amount was established by Mr.
Harris's testimony as well as Schulte's legal bills.  (DX AN; DX ER; 6/5/18 Tr.
(Harris) 178:1-4); *see FCS Advisors*, 2009 WL 1403869, at *11 (awarding
plaintiff due diligence expenses in connection with defendant's breach of letter of
intent).

     c.   Black Diamond has established that it was damaged by VCLF and ERP's failure
to provide it with the promised equity interest in HoldCo, which totaled
$26,666,794.65 as of the date of VCLF and ERP's breach.  (PX 249.)  This
amount was established by VCLF and ERP's answers to Black Diamond's
interrogatories, which, in turn, attached company balance sheets for the Federal
Mine and stated that "information responsive to" Black Diamond's request about

the "value of the Federal Mine Complex" was "set forth" in those balance sheets. (*Id.* at 15-16.). Courts have relied on precisely such evidence in assigning a value to damages. *See, e.g.*, *Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*, No. 08CIV.1558(EMB)(THK), 2009 WL 6067017, at *10 (S.D.N.Y. Dec. 18, 2009) (relying on interrogatory responses to support damages calculation); *Rich-Haven Motor Sales, Inc. v. Nat'l Bank of N.Y. City*, 558 N.Y.S.2d 91, 93-94 (N.Y. App. Div. 1990) (endorsing use of financial statements to calculate value of car dealership); *see generally Saria v. Mass. Mut. Life Ins. Co.*, 228 F.R.D. 536, 538 (S.D. W.Va. 2005) ("[I]f interrogatory responses are used at trial, they are nothing short of testimony.").

d.    Black Diamond has also established that it was damaged by VCLF and ERP's failure to provide it with the promised equity interest in HealthCo, which totaled $52,156,854.68 as of the date of VCLF and ERP's breach. (PX 249.) As with the interest in HoldCo, this amount was established by VCLF and ERP's answers to Black Diamond's interrogatories, which attached company balance sheets for ERP Settlement, the entity the parties also refer to as HealthCo, and stated that "information responsive" to Black Diamond's request about the "assets and liabilities associated with [HealthCo]" was "set forth" in those balance sheets. (*Id.* at 16.)

e.    In the alternative, Black Diamond has established that it was damaged by VCLF and ERP's failure to provide it with an equity interest in HealthCo, which totaled $35,220,895.38 as of the date of VCLF and ERP's breach. (PX 261.) This amount was established by the analysis of Black Diamond's damages expert, Mr. Briscoe, who reviewed actuarial analyses of Patriot's workers' compensation liabilities and determined, based on his professional experience, that Patriot's surplus workers' compensation collateral could be monetized. *See, e.g.*, *Watson v. E.S. Sutton, Inc.*, No. 02 CIV. 2739 (KMW), 2005 WL 2170659, at **1, 16 (S.D.N.Y. Sept. 6, 2005) (holding that damages award was "well-supported by the evidence at trial" when based on "expert testimony and a detailed expert report based on . . . actuarial tools accepted and relied upon in economics.").

313.    Because Black Diamond has put forth a "stable foundation for a reasonable estimate of damages," VCLF and ERP have the burden of showing that Black Diamond's damages figure is "speculative, possible, and imaginary." *Tractebel*, 487 F.3d at 110 (internal quotation marks omitted). VCLF and ERP have failed to meet this burden.

a.    VCLF and ERP attempted to establish that certain of the letters of credit securing Patriot's workers' compensation liabilities were drawn before the date of their breach, thereby reducing the value of Black Diamond's interest in HealthCo. This has no bearing on Black Diamond's damages, for two reasons. First, there is no admissible evidence that the letters of credit were drawn before the date of breach.

Mr. Clarke, for example, testified that he had no personal knowledge of any drawing down of letters of credit, (6/12/18 Tr. (Clarke) 37:16-38:18; *id.* at 213:1-214:13), and Mr. Ebetino could not provide a date on which any letters of credit were drawn, (6/4/18 Tr. (Ebetino) 140:7-16; *see also id.* at 166:18-21).  Second, and more importantly, the evidence admitted at trial establishes that even if the letters of credit were drawn before VCLF and ERP breached the Commitment Letter, it would not affect Black Diamond's ability to monetize HealthCo.  (6/5/18 Tr. (Ehrlich) 10:2-12; 6/7/18 Tr. (Briscoe) 52:3-10; 6/8/18 Tr. (Deckoff) 136:1-11; 6/13/18 (Spragg) Tr. 225:22-226:12.)

b.  Patriot's inability to execute an LPT transaction with the Commonwealth of Kentucky does not bear on Black Diamond's damages.  Patriot's efforts to monetize its Kentucky collateral all post-date VCLF and ERP's breach, and thus they are irrelevant to the damages analysis.  (PX 401; PX 402; PX 416; PX 417; 6/13/18 Tr. (Spragg) 172:19-25); *Sharma*, 916 F.2d at 825; *Washington*, 2016 WL 3920348, at *14; *Merrill Lynch*, 500 F.3d at 185.  Moreover, the evidence admitted at trial establishes that Patriot's efforts to monetize the Kentucky collateral suffered from fatal flaws that were unique to Patriot, including Patriot's lack of adequate capital and failure to propose an LPT transaction that complied with Kentucky law.  (PX 401, at 10-11; PX 402, at 4-7; 6/6/18 Tr. (Briscoe) 119:20-120:3; 6/13/18 Tr. (Spragg) 217:8-218:3; *id.* at 222:8-14; *id.* at 224:7-17.)

c.  The *Parker* decision does not affect the amount of Black Diamond's damages.  The *Parker* decision post-dates VCLF and ERP's breach of the Commitment Letter, and thus it is irrelevant to the damages analysis.  *See* 529 S.W.3d at 759; *see also Sharma*, 916 F.2d at 825; *Washington*, 2016 WL 3920348, at *14; *Merrill Lynch*, 500 F.3d at 185.  Moreover, Black Diamond's expert witness provided unrebutted expert testimony that *Parker*'s holding does not materially increase Patriot's workers' compensation liabilities.  (6/6/18 Tr. (Briscoe) 146:17-147:5; 6/7/18 Tr. (Briscoe) 24:8-18.)

314.    Based on the above, Black Diamond is entitled to at least $67,167,680.03, plus interest, in damages.

## II.    Black Diamond Did Not Repudiate the Commitment Letter.

315.    VCLF and ERP have failed to show that Black Diamond repudiated the Commitment Letter.

316.    Under New York law, repudiation occurs only when a "party has indicated an unqualified and clear refusal not to perform with respect to the entire contract."  *DeLorenzo v. Bac Agency, Inc.*, 681 N.Y.S.2d 846, 848 (N.Y. App. Div. 1998).

317.    The burden to establish repudiation is high and rests on the party who has asserted

it.  *In re Bradlees Stores, Inc.*, 313 B.R. 565, 574 (S.D.N.Y. 2004).  Repudiation "is based on an

objective, not subjective standard."  *DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 642

(S.D.N.Y. 2011) (citing Restatement (Second) of Contracts § 250, cmt. b (1981)). (At trial,

Defendants' counsel represented to the Court that a party's "subjective understanding" of events

"is relevant to the question of whether there's been a repudiation."  (6/8/18 Tr. (Schlenger)

184:19-23.)  In their summary judgment papers, however, Defendants argued precisely the

opposite, conceding that "[t]he law is clear . . . that whether Plaintiff repudiated the contract is

based on an objective, not a subjective standard."  (Mem. of Law in Opp'n to Mot. for Partial

Summary J. (Dkt. No. 230), at pg. 12 (quoting *DiFolco*, 731 F. Supp. 2d at 642)).)

318.    Repudiation must be "positive and unequivocal."  *Tenavision, Inc. v. Neuman*,

379 N.E.2d 1166, 1168 (N.Y. 1978).  To show repudiation, a party must offer evidence of

"repeated insistence on extracontractual terms; repeated, definite and absolute expressions of an

unwillingness to perform; use of language such as 'termination,' which conveys finality; or

conduct by the allegedly repudiating party that has rendered performance impractical or

impossible."  *In re Best Payphones, Inc.*, 432 B.R. 46, 56 (S.D.N.Y. 2010).

319.    A request to modify contract terms does not constitute repudiation, unless coupled

with an absolute refusal to perform if the request is not granted.  *Koury v. Xcellence, Inc.*, 649 F.

Supp. 2d 127, 134 (S.D.N.Y. 2009) ("To constitute an anticipatory breach based on a request for

a modification of terms, the request must be coupled with an absolute refusal to perform unless

the request is granted."); *O'Shanter Res., Inc. v. Niagara Mohawk Power Corp.*, 915 F. Supp.

560, 568 (W.D.N.Y. 1996) ("[A] demand for more than the contract calls for is not in itself a

repudiation."); *O'Connor v. Sleasman*, 830 N.Y.S.2d 377, 379 (N.Y. App. Div. 2007) ("[A]

demand for performance on terms that go beyond the contract is not a repudiation . . . unless it is coupled with a threat of nonperformance if those terms are not accepted.").

320.    VCLF and ERP have failed to meet their burden of showing that Black Diamond repudiated the Commitment Letter.

   a.   Black Diamond did not repudiate the Commitment Letter because it is undisputed that Black Diamond never refused to provide financing in connection with the August 16 APA on the terms set forth in the Commitment Letter.  (PX 181; 6/5/18 Tr. (Ehrlich) 5:14-16; *id.* at 7:8-16; *id.* at 131:5-16; *id.* (Harris) at 164:24-25; *id.* at 174:7-13; 6/8/18 Tr. (Deckoff) 48:20-49:2; 6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke) 87:13-19.)  This was the only agreement between the parties.

   b.   The negotiations between Black Diamond, VCLF, and ERP on October 22 and 23, 2015 cannot constitute repudiation because those negotiations related to a *modified* asset purchase agreement that Black Diamond had no contractual obligation to fund.  (PX 111; PX 113; PX 115; PX 116; 6/7/18 Tr. (Potter) 151:22-152:3; 6/12/18 Tr. (Clarke) 98:2-18.)  In any event, proposals to modify a contract do not constitute repudiation.  *Koury*, 649 F. Supp. 2d at 134; *O'Shanter*, 915 F. Supp. at 568; *O'Connor*, 830 N.Y.S.2d at 379.

   c.   Black Diamond never ceased negotiations over new financing terms in connection with a modified asset purchase agreement.  To the contrary, Mr. Clarke admitted that "Black Diamond never did stop negotiating."  (6/12/18 Tr. (Clarke) 190:14.)

## III.    VCLF and ERP's Counterclaim Is Meritless.

321.    VCLF and ERP's counterclaim for breach of contract is meritless.

322.    Black Diamond did not breach the Commitment Letter for the reasons stated above.  Specifically:

   a.   Black Diamond's financing commitment under the Commitment Letter related solely to the August 16 APA, "as amended, modified or supplemented prior to [September 21, 2015]."  (PX 40, at BDCF-00028157; *see also* 6/8/18 Tr. (Deckoff) 31:12-17.)  Black Diamond never refused to provide financing in connection with the August 16 APA on the terms set forth in the Commitment Letter.  (PX 181; 6/5/18 Tr. (Ehrlich) 5:14-16; *id.* at 6:15-18; *id.* at 7:8-16; *id.* at 131:5-16; *id.* (Harris) at 164:24-25; *id.* at 173:7-13; 6/8/18 Tr. (Deckoff) 48:20-49:2; 6/11/18 Tr. (Murphy) 238:20-25; *id.* at 239:21-23; 6/12/18 Tr. (Clarke) 87:13-19.)

b.  The modified financing terms that Black Diamond proposed on October 22 and 23, 2015 related only to the *modified* asset purchase agreement that VCLF, ERP, and Patriot negotiated after the Commitment Letter was executed.  (PX 111; PX 113; PX 115; PX 116; 6/7/18 Tr. (Potter) 151:22-152:3; 6/12/18 Tr. (Clarke) 98:2-18.)  Black Diamond never agreed to VCLF, ERP, and Patriot's modifications to the asset purchase agreement, and Black Diamond had no obligation to fund a modified asset purchase agreement.  (6/4/18 Tr. (Ehrlich) 194:3-18; *id.* at 203:15-20; 6/5/18 Tr. (Harris) 171:3-6; 6/8/18 Tr. 207:5-7; 6/12/18 Tr. (Clarke) 120:20-23.)

323.     VCLF and ERP's counterclaim also fails because they have failed to prove any damages associated with their claim.

324.     VCLF and ERP have not proven any general damages resulting from Black Diamond's failure to extend financing.  Under New York law, "a breach of contract to make a loan, standing by itself, involves no legal damage." *Avalon Constr. Corp. v. Kirch Holding Co.*, 175 N.E. 651, 652 (N.Y. 1931).  This is because, although a borrower may receive funds pursuant to a lending agreement, it is "saddled with an obligation of exactly equal amount, so that the profit of the contract would be nothing." *Id.* at 652-53; *see also Eaton v. Reich*, 179 N.E. 385, 387 (N.Y. 1932) ("It is elementary that a breach of contract to make a loan . . . involves no legal damage.") (internal quotation marks and citation omitted).

325.     VCLF and ERP have also failed to prove consequential damages in connection with Black Diamond's failure to extend financing, including lost profits. *Tractebel*, 487 F.3d at 109 ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.").  As a threshold matter, consequential damages "must be plead with particularity" in New York, and VCLF and ERP's Answer and Counterclaim does not mention lost profits or any other consequential damages. *Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026(WHP), 2002 WL 24305, at *6 (S.D.N.Y. Jan. 8, 2002); (Answer & Counterclaim (Dkt. No. 3-68), at pg. 16-17).

326.    Moreover, nothing in the evidentiary record establishes that VCLF and ERP suffered lost profits as a result of Black Diamond's failure to provide financing.  Although Messrs. Clarke and McCoy testified that Black Diamond's failure to provide financing resulted in the failure of the Federal Mine, this testimony is not credible.  (6/12/18 Tr. (Clarke) 45:8-21; 6/13/18 Tr. (McCoy, K.) 121:25-123:7.)  Mr. McCoy, for example, testified that after closing, "the [Federal] mine started doing pretty well," and in fact, "broke . . . production records in terms of daily production."  (6/13/18 Tr. (McCoy, K.) 122:8-12.)  This indicates that VCLF and ERP's ability to mine coal was not impeded by a lack of financing.  Similarly, Mr. McCoy gave an interview to a trade publication in September 2017, during which he stated that the Federal Mine's financial difficulties were the result of "geological conditions" and "roof falls," not a lack of financing.  (PX 507; 6/13/18 Tr. (McCoy, K.) 146:18-148:11; *see also id.* at 156:14-15 (describing his statement as "one hundred percent accurate and honest").)  Finally, Messrs. Clarke and McCoy testified that the coal market "went into a freefall" after the VCLF-Patriot transaction closed, materially impacting their business plan.  (6/13/18 Tr. (McCoy, K.) 122:12-13; *see also* 6/12/18 Tr. (Clarke) 44:24-45:1 ("Q.  Did you have an understanding of why the mine shut down?  A.  The demand for thermal coal in the United States has declined precipitously.").)

Dated:  July 27, 2018
Richmond, Virginia

Respectfully submitted,

By: */s/ John H. Maddock III*

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41044)
McGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1178
Facsimile: (804) 698-2186
Email: dhayes@mcguirewoods.com
        jmaddock@mcguirewoods.com

C. William Phillips (admitted *pro hac vice*)
Jonathan M. Sperling (admitted *pro hac vice*)
David W. Haller (admitted *pro hac vice*)
Micaela R. McMurrough (admitted *pro hac
vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone: (212) 841-1000
Facsimile: (212) 841-1010
Email: cphillips@cov.com
        jsperling@cov.com
        dhaller@cov.com
        mmcmurrough@cov.com

*Counsel to Black Diamond Commercial
Finance, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, I caused the foregoing *Proposed Findings of Fact and Conclusions of Law* to be filed with and uploaded to this Court's CM/ECF system, which will send filing to all CM/ECF participants, and on the following parties by email:

William M. Sullivan, Jr. (wsullivan@pillsburylaw.com)
Joshua I. Schlenger (joshua.schlenger@pillsburylaw.com)
Samuel S. Cavior (samuel.cavior@pillsburylaw.com)
Andrew M. Troop (andrew.troop@pillsburylaw.com)
Patrick J. Potter (patrick.potter@pillsburylaw.com)

*/s/ John H. Maddock III*_____
John H. Maddock III