# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>PATRIOT COAL CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-32450 (KLP)<br><br>Jointly Administered |
| BLACK DIAMOND COMMERCIAL FINANCE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA CONSERVATION LEGACY FUND, INC. and ERP COMPLIANT FUELS, LLC,<br><br>Defendants. | |
| VIRGINIA CONSERVATION LEGACY FUND, INC. and ERP COMPLIANT FUELS, LLC,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>BLACK DIAMOND COMMERCIAL FINANCE, LLC,<br><br>Counterclaim-Defendant. | Adv. Proc. No. 16-03105 (KLP) |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

4833-1306-9934

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ........................................................................................................ 1

I.     THE PARTIES ........................................................................................................ 1

     A.     VCLF ............................................................................................................ 1

             1.     Virginia Conservation Legacy Fund, Inc. ...................................... 1

             2.     ERP Compliant Fuels, LLC ......................................................... 2

     B.     Black Diamond ............................................................................................ 3

II.     THE PATRIOT CASE ........................................................................................... 3

     A.     Patriot Files Its Chapter 11 Petitions in May 2015 ................................. 3

     B.     VCLF Takes Steps to Acquire the Noncore Patriot Assets and
            Assume More than $400 Million in Environmental and Employee-
            Related Liabilities ...................................................................................... 4

III.     THE VCLF-PATRIOT TRANSACTION .......................................................... 6

     A.     The August 16, 2015 APA .......................................................................... 6

     B.     Black Diamond's Prior Familiarity with the Patriot Assets and
            Liabilities ................................................................................................... 7

     C.     VCLF is Designated the Stalking Horse for the Noncore Patriot
            Assets ......................................................................................................... 8

     D.     VCLF Searches for Financing for the VCLF-Patriot Transaction .......... 9

IV.     BLACK DIAMOND TRIES TO COMPETE WITH VCLF FOR THE
     NONCORE ASSETS ............................................................................................. 9

     A.     Black Diamond's Competing Bid for Certain Noncore Assets .............. 9

     B.     Black Diamond and VCLF Meet .............................................................. 10

     C.     The Day After Black Diamond and VCLF Meet, Black Diamond
            Urges Patriot Not to Proceed with the VCLF-Patriot Transaction ...... 12

V.     THE COMMITMENT LETTER ....................................................................... 14

i

A.    Black Diamond E-mailed the First and Only Pre-Execution Draft of the Commitment Letter to VCLF the Night Before the Anticipated Signing ........................................................... 14

B.    The Events of September 21, 2015 ....................................................... 16

C.    The Terms of the Commitment Letter ................................................. 18

VI.   PATRIOT'S FINANCIAL SITUATION DETERIORATES, NECESSITATING CHANGES TO THE VCLF-PATRIOT TRANSACTION ................................................................................. 25

A.    Patriot Was Expected to Run Out of Cash No Later than the End of October 2015, and Undertook Efforts to Reserve Cash ...................................... 25

1.    Patriot Fails to Monetize the Peabody-Illinois L/C ................................... 26

2.    Patriot Settles with Old Republic, Monetizing the Old Republic Letter of Credit for the Benefit of Patriot, Not VCLF ................................................................................. 29

B.    VCLF Promptly Informs Black Diamond After the Execution of the Commitment Letter that Patriot's Deteriorating Financial Situation Necessitates Changes to the 8/16 APA .................................. 30

VII.  BLACK DIAMOND SEEKS TO EXTEND THE TERM OF THE COMMITMENT LETTER .......................................................................... 34

VIII. THE CONFIRMATION HEARINGS AND ORDER IN THE PATRIOT CASE .................................................................................................. 35

IX.   VCLF DID NOT SOLICIT ALTERNATIVE CLOSING FINANCING AT ANY POINT BETWEEN SEPTEMBER 21 AND OCTOBER 23, 2015 ................................................................................................. 39

X.    BLACK DIAMOND DOES NOT BEGIN LEGAL WORK ON THE VCLF-PATRIOT TRANSACTION UNTIL MID-OCTOBER 2015 ............................... 44

XI.   THE EVENTS OF OCTOBER 22 AND 23, 2015 .......................................... 51

XII.  THE LAWSUIT AND THE CLOSING OF THE VCLF-PATRIOT TRANSACTION .................................................................................. 67

CONCLUSIONS OF LAW .................................................................................. 69

I.    JURISDICTION ................................................................................. 69

4833-1306-9934

II.    LEGAL STANDARDS GOVERNING CLAIMS OF BREACH OF
       CONTRACT ................................................................................................ 69

       A.    Substantive Governing Law................................................................. 69

       B.    Elements of Claim for Breach of Contract Under New York Law...................... 69

       C.    Burden of Proof on Claim for Breach of Contract Under New York
             Law .................................................................................................. 70

       D.    Ambiguities to be Resolved Against the Drafter (Black Diamond) .................... 70

III.   ELEMENT #1:  EXISTENCE OF A CONTRACT ......................................... 72

       A.    The Commitment Letter Was a Binding Contract Between Black
             Diamond and VCLF........................................................................... 72

       B.    Resolution of the Parties' Competing Interpretations of the
             Exclusivity Undertaking Section of the Commitment Letter ............................ 72

             1.    Black Diamond Was Not Automatically Entitled to the
                   Equity Interests Merely By Signing the Commitment
                   Letter, Without Further Performance........................................... 72

             2.    The Commitment Letter Did Not Get VCLF Into Any
                   Auction.................................................................................... 78

             3.    The Non-Solicitation Clause Prohibited VCLF Only from
                   Soliciting Closing or Transactional Financing, Not Take-
                   Out or any Other Form of Financing ........................................ 82

       C.    The Commitment Letter Was Subject to Conditions Subsequent
             that Failed.......................................................................................... 87

             1.    The Commitment Letter's Conditions Applied Equally to
                   VCLF's and Black Diamond's Undertakings ............................. 88

             2.    The Conditions Section Created Conditions Subsequent to
                   VCLF's Undertakings ............................................................... 90

             3.    The Parties Were Relieved of All of Their Performance
                   Obligations Under the Commitment Letter No Later than
                   October 9, 2015 ....................................................................... 91

                   a.    The Parties Agree That Condition (b) Failed:  The
                         8/16 APA Was Never Approved by the Court.............................. 91

4833-1306-9934

b.      The Parties Agree That Condition (d) Failed:  A
                Material Adverse Change Occurred to VCLF
                Following the Signing of the Commitment Letter ....................... 96

IV.    ELEMENT #2:  BREACH OF THE CONTRACT ....................................... 100

       A.     Estoppel/Waiver............................................................................... 100

              1.      Black Diamond's Estoppel Argument ................................... 101

              2.      VCLF's Estoppel and Implied Waiver Arguments................. 105

                      a.      Implied Waiver ....................................................... 105

                      b.      Equitable Estoppel ................................................. 108

                              (i)     The $25 Million Commitment Applied to the VCLF
                                      APA Ultimately Closed on by Patriot and VCLF.......... 109

                              (ii)    Black Diamond Was to Provide $10 Million in Term
                                      Loan Financing to VCLF at Closing Under the
                                      Commitment Letter......................................... 111

       B.     Black Diamond Repudiated the Commitment Letter......................... 115

              1.      New York Legal Standards on Repudiation ......................... 115

              2.      On the Eve of the Scheduled Closing, Black Diamond
                      Repudiated the Commitment Letter by Demanding
                      Materially Different Terms, on a Take-it-or-Leave-It Basis ................. 120

              3.      The Contemporaneous Perception of All of VCLF's
                      Representatives Was that Black Diamond's Words and
                      Conduct Constituted Repudiation ......................................... 125

              4.      Black Diamond's Counsel Confirmed on October 25, 2015,
                      that the Gravenhorst E-mails Were a Take-it-or-Leave-It
                      Demand .............................................................................. 126

       C.     VCLF Did Not Breach the Non-Solicitation Clause Clause............... 127

V.     ELEMENT #3:  RESULTING DAMAGES.................................................... 129

       A.     Black Diamond Has Failed to Prove Damages on Any Component
              of Its Breach of Contract Claim...................................................... 129

              1.      General Legal Principles Governing Damages Under New
                      York Law ............................................................................ 129

4833-1306-9934

2.      Black Diamond Failed to Prove Damages Arising From
        Any Alleged Solicitation of Financing .................................................... 130

3.      Black Diamond's Claim for Lost Interest Fails ..................................... 131

4.      Black Diamond's Claim for Damages in Connection with
        the Equity Interests Fails ........................................................................ 136

        a.      General Legal Principles Applicable to Valuing
                Equity Interests for Damages Purposes ...................................... 136

        b.      Equity in ERP Settlement ("HealthCo") ..................................... 139

                (i)     Mr. Briscoe's Opinion Testimony is Unreliable and
                        Does Not Sustain Black Diamond's Damages Claim ..... 139

                (ii)    Black Diamond's Fact Witnesses Did Not Furnish the
                        Factual Predicates for Mr. Briscoe's Unfounded
                        Assumptions ................................................................... 149

                (iii)   Events Subsequent to October 26, 2015 Confirm that
                        Any Hoped-For Value in ERP Settlement Was Always
                        Speculative .................................................................... 152

                        (A)     Kentucky ............................................................ 153

                        (B)     West Virginia ..................................................... 157

                        (C)     AIG ..................................................................... 158

        c.      Equity in the Federal 2 Mine ...................................................... 160

5.      Black Diamond's Claim for Reimbursement of Attorneys'
        Fees Fails ................................................................................................ 168

B.      VCLF Has Established Damages on Its Counterclaim ...................................... 172

CONCLUSION ................................................................................................................ 177

v

# **TABLE OF AUTHORITIES**

**Page(s)**

Cases

*151 W. Assocs. v. Printsiples Fabric Corp.*,
    61 N.Y.2d 732 (1984) ...........................................................................71

*300 E. 34th St. Co. v. Habeeb*,
    248 A.D.2d 50 (1st Dep't 1997) ...........................................................70

*Acosta v. Vinoskey*,
    No. 6:16-CV-00062, F. Supp. 3d,
    2018 WL 1806589 (W.D. Va. Apr. 17, 2018) .......................................140

*Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*,
    No. 09 CV 01796(GBD),
    2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012) .......................................104

*AG Properties of Kingston, LLC v. Besicorp-Empire Dev. Co., LLC*,
    14 A.D.3d 971 (3d Dep't 2005) ...........................................................120

*Aiello v. Burns Int'l Sec. Servs. Corp.*,
    110 A.D.3d 234 (1st Dep't 2013) .......................................103, 104, 105

*AM Cosmetics, Inc. v. Solomon*,
    67 F. Supp. 2d 312 (S.D.N.Y. 1999)....................................................120

*Argonaut P'ship, L.P. v. Grupo Sidek, S.A. de C.V.*,
    No. 96 Civ. 1967 (MBM),
    1996 U.S. Dist. LEXIS 15925 (S.D.N.Y. Oct. 24, 1996) ....................116

*Audio MPEG, Inc. v. Dell Inc.*,
    272 F. Supp. 3d 813 (E.D. Va. 2017) ...........................................70, 71

*Bd. of Ed., Half Follow Hills Cent. Sch. Dist. No. 5 v. Statewide Vending Corp.*,
    84 A.D.2d 754 (2d Dep't 1981), *order aff'd*, 58 N.Y.2d 718 (1982) ....................91

*Matter of Beautisha B.*,
    115 A.D.3d 854 (2d Dep't 2014) ...........................................................70

*In re Becker*,
    407 F.3d 89 (2d Cir. 2005)...................................................................109

*Broadway Photoplay Co. v. World Film Corp.*,
    225 N.Y. 104 (1919) ...........................................................................130

4833-1306-9934

*BT Triple Crown Merger Co. v. Citigroup Global Mkts., Inc.*,
   19 Misc. 3d 1129(A), (Sup. Ct., N.Y. Cty. 2008) .......................................................119, 125

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
   371 F. Supp. 2d 510 (S.D.N.Y. 2005) .................................................................................135

*Matter of Cont'l Airlines, Inc.*,
   125 B.R. 415 (Bankr. D. Del. 1991) ...................................................................................165

*Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*,
   191 F. Supp. 3d 312 (S.D.N.Y. 2016) ................................................................136, 137, 167

*Matter of Cromwell Towers Redevelopment Co. v. City of Yonkers*,
   41 N.Y.2d 1 (1976) ..............................................................................................................77

*De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*,
   243 N.Y. 283 (1926) ....................................................................................................116, 120

*Deicher v. City of Evansville, Wis.*,
   545 F.3d 537 (7th Cir. 2008) ...............................................................................................101

*Dice v. Inwood Hills Condo.*,
   237 A.D.2d 403 (2d Dep't 1997) .........................................................................................103

*DiFolco v. MSNBC Cable L.L.C.*,
   831 F. Supp. 2d 634 (S.D.N.Y. 2011) .................................................................................116

*In re Direxion Shares ETF Tr.*,
   No. 09 Civ. 8011 (KBF),
   2012 WL 717967 (S.D.N.Y. Mar. 6, 2012) .........................................................................102

*E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*,
   795 F.2d 329 (4th Cir. 1986) ........................................................................................139, 140

*Exxon Co. v. Sofec, Inc.*,
   517 U.S. 830 (1996) .............................................................................................................129

*Freund v. Wash. Square Press, Inc.*,
   34 N.Y.2d 379 (1974) ..........................................................................................................129

*Glendale LLC v. AMCO Ins. Co.*,
   No. 3:11–cv–3–RJC–DCK,
   2012 WL 3025122 (W.D.N.C. July 24, 2012) .....................................................................176

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*,
   74 A.D.3d 413 (1st Dep't 2010) .....................................................................................76, 77

4833-1306-9934

*Grogan v. Garner*,
  498 U.S. 279 (1991) ...................................................................................................70

*Grp. 1 Auto., Inc. v. Country Imported Car Corp.*,
  No. 07-CV-1454(RRM)(WDW),
  2012 WL 11955634 (E.D.N.Y. Aug. 15, 2012) ....................................................120

*Haber v. Gutmann*,
  64 A.D.3d 1106 (3d Dep't 2009) ...........................................................................137

*Heller v. Pope*,
  250 N.Y. 132 (1928) ...............................................................................................77

*Hosp. Auth. of Rockdale Cty. v. GS Cap. Partners V Fund LP*,
  No. 09 CIV. 8716 PAC,
  2013 WL 840851 (S.D.N.Y. Mar. 6, 2013) ...........................................................118

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*,
  92 N.Y.2d 989 (1998) ............................................................................................116

*Israel Cancer Research Fund, Inc. v. Harvey & Gloria Kaylie Found., Inc.*,
  33 Misc. 3d 1237(A), (Sup. Ct., N.Y. Cty. 2011) .................................................117

*Jackson v. United States*,
  No. 4:16-cv-03219-RBH,
  2018 WL 1755503 (D.S.C. Apr. 12, 2018) ............................................................140

*Kain Dev., LLC v. Krause Properties, LLC*,
  130 A.D.3d 1229 (3d Dep't 2015) .........................................................................115

*Kelly Capital, LLC v. S & M Brands, Inc.*,
  873 F. Supp. 2d 659 (E.D. Va. 2012) .............................................................116, 117

*Kelly v. Bensen*,
  151 A.D.3d 1312 (3d Dep't 2017) .........................................................................130

*Kenford Co. v. County of Erie*,
  67 N.Y.2d 257 (1986) .............................................................................129, 130, 137

*Kenyon & Kenyon v. Logany, LLC*,
  33 A.D.3d 538 (1st Dep't 2006) ............................................................................103

*Kosakow v. New Rochelle Radiology Assocs.*,
  274 F.3d 706 (2d Cir. 2001) ..................................................................................109

*LaCombe v. A–T–O, Inc.*,
  679 F.2d 431 (5th Cir.1982) ..................................................................................176

4833-1306-9934

*Lightbox Ventures, LLC v. 3rd Home Ltd.*,
    No. 16cv2379(DLC),
    2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017)....................................................137

*Lincoln Nat'l Life Ins. Co. v. NCR Corp.*,
    603 F. Supp. 1393 (N.D. Ind. 1994) ........................................................134, 135

*Long Is. R. R. Co. v. Northville Indus. Corp.*,
    41 N.Y.2d 455 (1977) ..................................................................................115

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007)............................................................135

*Mereminsky v. Mereminsky*,
    20 Misc. 2d 21 (N.Y. App. Term. 1959).............................................................91

*Mindel v. Image Point Prods., Inc.*,
    725 F. Supp. 189 (S.D.N.Y. 1989)..........................................................119, 120

*In re Mirena IUD Prod. Liab. Litig.*,
    202 F. Supp. 3d 304 (S.D.N.Y. 2016),
    *aff'd*, 713 F. App'x 11 (2d Cir. 2017), *cert. denied sub nom. Mirena MDL v.*
    *Bayer Healthcare Pharm., Inc.*, 138 S. Ct. 1299 (2018) ..............................165, 166

*Mometal Structures, Inc. v. T.A. Ahern Contractors Corp.*,
    No. 09-CV-2791 (MKB),
    2013 WL 764717 (E.D.N.Y. Feb. 28, 2013)......................................................116

*MyGallons LLC v. U.S. Bancorp*,
    521 F. App'x 297 (4th Cir. 2013) .................................................................140

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
    392 F.3d 520 (2d Cir. 2004)...............................................................69, 72, 129

*Natt v. White Sands Condo.*,
    95 A.D.3d 848 (2d Dep't 2012) .....................................................................71

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
    92 N.Y.2d 458 (1998) ..................................................................................116

*Parker v. Webster Cty. Coal, LLC (Dotiki Mine)*,
    529 S.W.3d 759 (Ky. 2017), *reh'g denied* (Nov. 2, 2017) ..................................155

*In re Patriot Coal Corp. (Black Diamond Comm. Fin., LLC v. Va. Conservation*
    *Legacy Fund, Inc.)*,
    Adv. Pro. No. 16-03105-KLP,
    2016 WL 5360950 (Bankr. E.D. Va. Sept. 23, 2016).........................................69, 70

4833-1306-9934

*PBM Nutritionals, LLC v. Dornoch Ltd.*,
    667 F. Supp. 2d 621 (E.D. Va. 2009) ...................................................................71

*Perry v. Scruggs*,
    17 F. App'x 81 (4th Cir. 2001) .........................................................................140

*Photopaint Techs., LLC v. Smartlens Corp.*,
    335 F.3d 152 (2d Cir. 2003 ...............................................................................71

*Proper v. State Farm Mut. Auto. Ins. Co.*,
    63 A.D.3d 1486 (3d Dep't 2009) ......................................................................130

*QK Healthcare, Inc. v. InSource, Inc.*,
    108 A.D.3d 56 (2d Dep't 2013) .................................................................115, 116

*In re Randall's Island Family Golf Ctrs., Inc.*,
    261 B.R. 96 (Bankr. S.D.N.Y. 2001),
    *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002) ...............................................................119

*REA Express, Inc. v. Interway Corp.*,
    538 F.2d 953 (2d Cir. 1976)..............................................................................116

*Rhodes v. Davis*,
    628 F. App'x 787 (2d Cir. 2015) ................................................................117, 118

*Rinaldi & Sons, Inc. v. Wells Fargo Alarm Serv., Inc.*,
    39 N.Y.2d 191 (1976).........................................................................................70

*Rio Grande Oil Co. v. Pankey*,
    50 Ariz. 529 (1937)...................................................................................172, 173

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).................................................................................101

*S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley, Tex.*,
    614 F.2d 1056 (5th Cir. 1980) ...........................................................................176

*In re Sandy Hills*, LLC,
    No. 12-74482 (DTE),
    2014 WL 953840 (Bankr. E.D.N.Y. Mar. 10, 2014) ...........................169, 170, 171

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000)...............................................................................130

*Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*,
    686 F. Supp. 1015 (S.D.N.Y. 1988)....................................................................120

x

*Siberius, Inc. v. M.V. Amilla*,
    880 F.2d 662 (2d Cir. 1989) ........................................................................102

*Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*,
    No. 1:08cv955 (JCC),
    2009 U.S. Dist. LEXIS 76043, 2009 WL 2762146 (E.D. Va. 2009)...................134

*Simon & Son Upholstery, Inc. v. 601 W. Assocs., LLC*,
    268 A.D.2d 359 (1st Dep't 2000) ................................................................103

*SMD Software, Inc. v. EMove, Inc.*,
    945 F. Supp. 2d 628 (E.D.N.C. 2013)...........................................................140

*In re Solutia Inc.*,
    379 B.R. 473 (Bankr. S.D.N.Y. 2007) ..........................................................135

*Sperry v. Barggren*,
    523 F.2d 708 (7th Cir. 1975) ..............................................................163, 165

*SPI Commc'ns v. WTZA-TV Assocs. Ltd. P'ship*,
    229 A.D.2d 644 (3d Dep't 1996) .......................................................115, 117

*In re Spreadbury*,
    No. ADV. 09-1254,
    2010 WL 2998907 (Bankr. E.D. Va. July 27, 2010) .......................................163

*SSP Capital Partners, LLC v. Mandala, LLC*,
    715 F. Supp. 2d 443 (S.D.N.Y. 2009).....................................................71, 134

*Strough v. Conley*,
    257 A.D. 1057 (3d Dep't 1939) ..................................................................137

*Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*,
    791 F. Supp. 401 (S.D.N.Y. 1991)...............................................................132

*Tillage Commodities Fund, L.P. v. SS&C Tech., Inc.*,
    151 A.D.3d 607 (1st Dep't 2017) ................................................................130

*Town Sports Intl., LLC v. Ajilon Sols.*,
    112 A.D.3d 409 (1st Dep't 2013) ................................................................129

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) .......................................................................139

*Tzu Wei Chen Food Co. v. Chia-Chi Enters., Inc.*,
    73 F.3d 379 (Fed. Cir. 1995).......................................................................165

4833-1306-9934

*United States v. 68.94 Acres of Land,*
   918 F .2d 389 (3d Cir.1990)........................................................176

*United States v. Mandanici,*
   205 F.3d 519 (2d Cir. 2000)........................................................70

*United States v. Perkins,*
   470 F.3d 150 (4th Cir. 2006) ..............................................133, 134

*In re Vebeliunas,*
   332 F.3d 85 (2d Cir. 2003)........................................................109

*Veltri v. Bldg. Serv. 32 b-J Pension Fund,*
   393 F.3d 318 (2d Cir. 2004)......................................................109

*Wakeman v. Wheeler & Wilson Mfg. Co.,*
   101 N.Y. 205 (1886) ................................................................129

*Washington v. Kellwood Co.,*
   No. 05-CV-10034 (SN),
   2016 WL 3920348 (S.D.N.Y. July 15, 2016) ............................130

*Wecare Holdings, LLC v. Bedminister Int'l Ltd.,*
   No. 08-CV-6213,
   2009 WL 604877 (W.D.N.Y. Mar. 9, 2009)...............................117

*Wilmington Savings Fund Soc'y, FSB v. Cash Am. Int'l, Inc.,*
   No. 15-CV-5027 (JMF),
   2016 WL 5092594 (S.D.N.Y. Sept. 19, 2016) ...........................135

*Zinkand v. Brown,*
   478 F.3d 634 (4th Cir. 2007) ............................................102, 103

## Statutes and Codes

United States Code
   Title 28, section 157..................................................................69
   Title 28, section 1334................................................................69

## Rules and Regulations

Federal Rules of Bankruptcy Procedure
   Rule 7052 ...................................................................................1

Federal Rules of Civil Procedure
   Rule 26 .....................................................................................161

Federal Rules of Evidence

    Rule 201 ................................................................................................................101

    Rule 701 ................................................................................................................176

    Rule 702 ........................................................................................................140, 176

## Other Authorities

Black's Law Dictionary (2d ed.), *available at*

    http://nfpcar.org/Archive/Blacks_Law/Black's%20Law%20Dictionary.pdf.........................74

Black's Law Dictionary (10th ed. 2014).........................................................................83

4833-1306-9934

**KEITH L. PHILLIPS, United States Bankruptcy Judge**

The Court held an eight-day trial in this adversary proceeding from June 4 through June 13, 2018.  The Court's findings of fact and conclusions of law are as set forth below.

## FINDINGS OF FACT[1]

I.    **THE PARTIES**

    A.    **VCLF**

        1.    **Virginia Conservation Legacy Fund, Inc.**

1.    Virginia Conservation Legacy Fund, Inc. ("Virginia Conservation Legacy Fund") is a Virginia nonstock corporation.  Joint Stip. of Uncontroverted Facts ("Facts Stip.") ¶ 2, ECF Doc. No. 291.  It is "a charitable 501(c)(3) organization" that is "registered as a land trust in the Commonwealth of Virginia."  6/11 Tr. 276:22-25 (Clarke direct).[2]

2.    The purpose of Virginia Conservation Legacy Fund is to "protect and conserve land."  6/11 Tr. 276:25 (Clarke direct).  Consistent with this mission, Virginia Conservation Legacy Fund has a "unique part of [its] business where [it] support[s] . . . all mining and also energy companies and their safety and environmental management services."  *Id.* 277:4-7 (Clarke direct).  In particular, for the past four years, Virginia Conservation Legacy Fund has been "help[ing] coal mining companies manage their environmental services," and "work[ing] with state and federal regulators to help companies maintain compliance."  6/11 Tr. 277:4-14 (Clarke direct).  Virginia Conservation Legacy Fund was the first to use "the process of bundling carbon credits from reforestation and forestry products . . . with the sale of coal and trying to reduce the expected carbon emissions of the coal"—a process Mr. Clarke named "Compliant

---

[1]  Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. *See* Fed. R. Bankr. P. 7052.

[2]  The Court utilizes the following citation convention in these Findings of Fact and Conclusions of Law to cite to the transcripts of the trial:  "[month/day] Tr. xx:yy-xx:yy ([last name of witness] [direct/cross/redirect/recross])."

4833-1306-9934

Fuels." *Id.* 280:16-281:14.  In connection with its assumption of liabilities and acquisition of

assets from Patriot Coal Corporation (collectively with its affiliates, "Patriot"), Virginia

Conservation Legacy Fund agreed that any recovery it might receive on its equity in any of these

assets would be reinvested in the environment.  6/11 Tr. 287:19-288:9 (Clarke direct).

3.       Virginia Conservation Legacy Fund also owns Thomas Jefferson's Natural

Bridge, which it leases to the Commonwealth of Virginia for approximately $1 per year as a state

park.  6/11 Tr. 276:25-277:4 (Clarke direct).  Virginia Conservation Legacy Fund purchased the

Natural Bridge "because it was being subdivided and going to be developed, and [Virginia

Conservation Legacy Fund] wanted to turn it into a state park and a national park." *Id.* 278:1-5

(Clarke direct).  Virginia Conservation Legacy Fund turned the Natural Bridge into a state and

national park two years ago, and it is now preserved in perpetuity as a historical landmark. *Id.*

278:5-7 (Clarke direct).

4.       The chief executive officer of Virginia Conservation Legacy Fund is Thomas

Clarke.  6/11 Tr. 278:8-9 (Clarke direct).  Mr. Clarke is "responsible for the day-to-day

governance activities of [Virginia Conservation Legacy Fund]," directing a management team

"in the areas of land conservation and . . . environmental management." *Id.* 278:10-15 (Clarke

direct).

5.       As a nonprofit organization, no individual (including Mr. Clarke) has an

ownership interest in Virginia Conservation Legacy Fund.  6/11 Tr. 278:16-17 (Clarke direct).

## 2.       **ERP Compliant Fuels, LLC**

6.       ERP Compliant Fuels, LLC ("ERP," and together with Virginia Conservation

Legacy Fund, "VCLF") is a Virginia limited liability company created for the purpose of

consummating VCLF's acquisition of certain assets and assumption of certain liabilities from

debtor Patriot in *In re Patriot Coal Corporation*, Chapter 11 Case No. 15-32450 (Bankr. E.D.

4833-1306-9934

Va.) (KLP) (the "Patriot Case"); *i.e.*, the transaction giving rise to the instant lawsuit.  Facts Stip.

¶ 3.

### B.      Black Diamond

7.      Plaintiff/counterclaim-defendant Black Diamond Commercial Finance, LLC

("BDCF," and together with VCLF, the "Parties," and each individually, a "Party") is a

Delaware limited liability company that does business in Greenwich, Connecticut, and Lake

Forest, Illinois.  Facts Stip. ¶ 1.  BDCF is owned by Stephen Deckoff and is "responsible for

originating loans and administering loans."  6/4 Tr. 57:17-23 (Ehrlich direct).

8.      BDCF "is an affiliate of Black Diamond Capital Management" ("BDCM," and

together with BDCF, "Black Diamond").  6/4 Tr. 57:19-20 (Ehrlich direct).  BDCM "is an asset

management firm" that manages different types of vehicles, including a hedge fund and a

distressed private equity fund.  *Id.* 56:15-22 (Ehrlich direct).  Mr. Deckoff founded BDCM and

today serves as its managing principal and majority owner.  *Id.* 56:23-57:9 (Ehrlich direct).

9.      Though Black Diamond claims to manage approximately $8 billion in assets, its

████████████████████████████████████████████████████  *See* 6/8 Tr.

6:4-5, 22:25-23:3 (Deckoff direct).

## II.      THE PATRIOT CASE

### A.      Patriot Files Its Chapter 11 Petitions in May 2015

10.      On May 12, 2015, Patriot Coal Corporation and certain affiliates filed voluntary

chapter 11 petitions in this Court, commencing the Patriot Case.  Facts Stip. ¶ 4.  Patriot's

proposed reorganization plan when it entered chapter 11 was to sell its profitable working non-

union mines and associated equipment to Blackhawk Mining, LLC ("Blackhawk"), and to

abandon its non-working mines, its unionized mines and nearly all of its environmental and

3

workers' compensation liabilities. *See* Main Case, ECF Doc. No. 200 (6/2/15 Debtors' Mot.

¶ 5).

**B.    VCLF Takes Steps to Acquire the Noncore Patriot Assets and Assume More than $400 Million in Environmental and Employee-Related Liabilities**

11.    Mr. Clarke attended the first-day hearings in the Patriot Case, as well as most, if

not all, of the ensuing hearings.  6/11 Tr. 281:21 (Clarke direct).  At trial, Mr. Clarke explained

how VCLF came to be interested in the Patriot Case:

> . . . We had been working maybe about maybe seven, eight months
> prior to the Patriot bankruptcy.  We'd been working with
> Department of Interior and the Environmental Protection Agency
> on a very large environmental problem at Southern Coal
> Corporation.  We had an outstanding track record of addressing
> their outstanding deficiencies, and we were sort of invited to help
> them brainstorm about what would happen with the abandoned
> assets, or what Patriot called the noncore assets.
>
> There really wasn't a solution for them, and we wanted to try to
> figure out a way to establish a plan to be able to manage those
> assets and avoid the states and the federal government assuming
> that responsibility.

*Id.* 278:18-279:7.

12.    Shortly after the commencement of the Patriot Case, VCLF decided it would

attempt to acquire the Patriot noncore assets—including the Federal 2 Mine, a longwall thermal

coal mine in Morgantown, West Virginia—and assume more than $400 million in environmental

and employee-related Patriot liabilities in furtherance of its mission.  *See* 6/11 Tr. 279:17-24,

281:15-282:2 (Clarke direct).  But, as Mr. Clarke explained, VCLF needed to overcome strong

resistance by other stakeholders in the Patriot Case:

> Q.  Tell us specifically about the uphill battle that you faced in the
> early stages.
>
> A.  Sure.  You know, I mean, we immediately had support with the
> Environmental Protection Agency, Department of Justice, the
> Department of Interior.  And we did have very strong support from

4

4833-1306-9934

> the United Mine Workers [of America (the "UMWA")]. We were hoping to save about 600 UMWA positions, both at Federal and in the reclamation work.
>
> But the coal company itself, and all the professional advisors to the coal company, I think, were very skeptical. You know, the biggest questions that always came up were well, who's actually going to run the coal company, and where are you going to get your money?
>
> You know, we were putting VCLF at risk. I mean, you know, we entered into the agreement. We guaranteed things. So we had tens of millions of dollars at risk in the transaction, but we didn't have any cash available at closing, so we had to convince people that we – we actually had coal mining expertise and money.

*Id.* 282:13-283:5.

13.    To address this resistance, VCLF "almost immediately" retained Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") as legal counsel in the Patriot Case in late May 2015. 6/11 Tr. 283:9-12, 283:23-284:4 (Clarke direct). Shortly thereafter, in early June 2015, VCLF retained Teneo Restructuring ("Teneo") as its investment banker. *Id.* 283:12-13, 284:5-9 (Clarke direct). The hiring of these professionals helped reassure Patriot and other stakeholders in the Patriot Case that VCLF was a serious player intent on closing a transaction with Patriot. *Id.* 283:6-19 (Clarke direct).

14.    Mr. Clarke also knew that to make his proposal credible, he needed to have experienced coal operators as partners. To this end, Teneo introduced Mr. Clarke to Kenneth McCoy and Jason McCoy in late July 2015. 6/11 Tr. 284:10-285:17 (Clarke direct); 6/8 Tr. 149:10-150:7 (J. McCoy direct); 6/13 Tr. 64:19-66:11 (K. McCoy direct). Mr. Ken McCoy had forty-three years of experience in the coal industry, with extensive experience in mine management. 6/13 Tr. 57:17-64:16 (K. McCoy direct). Mr. Jason McCoy brought financial expertise to the transaction. 6/8 Tr. 150:18-23 (J. McCoy direct).

4833-1306-9934

15.     On August 5, 2015, Messrs. Clarke, Ken McCoy, and Jason McCoy met for approximately four hours at Mr. Ken McCoy's farm in Jonesville, Virginia.  6/8 Tr. 152:2-24 (J. McCoy direct).  At the conclusion of that meeting, Messrs. Clarke, Ken McCoy, and Jason McCoy agreed to become partners to acquire and manage the Federal 2 Mine through ERP.  *Id.* 153:9-25 (J. McCoy direct).

## III.   THE VCLF-PATRIOT TRANSACTION

### A.     The August 16, 2015 APA

16.     In August 2015, VCLF and Patriot agreed on a transaction whereby VCLF would acquire the noncore Patriot assets (including the Federal 2 Mine) and assume more than $400 million worth of Patriot's environmental and employee-related liabilities (the "VCLF-Patriot transaction").

17.     The VCLF-Patriot transaction was memorialized in an asset purchase agreement ("VCLF APA").  VCLF and Patriot entered into the first iteration of the VCLF APA on August 16, 2015 (the "8/16 APA").  *See* Ex. 15 (8/16 APA).

18.     The 8/16 APA provided that any of its provisions could be amended or waived to the extent that "such amendment or waiver is in writing and is signed."  Ex. 15 (8/16 APA) § 12.03(a), at 60.

19.     The 8/16 APA also provided that "this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval."  Ex. 15 (8/16 APA) § 7.07, at 45.

20.     Under the 8/16 APA, VCLF was to assume, *inter alia*, "all Workers' Compensation Liabilities of Sellers or any of their respective Affiliates or any of their respective predecessors, whenever arising."  Ex. 15 (8/16 APA) § 2.03(f).  Together with these liabilities, the 8/16 APA provided that VCLF would also acquire rights to the collateral that had originally

4833-1306-9934

been posted in the form of letters of credit.  *Id.*, Sched. 1.01(a)(vii).  (This bundle of liabilities

with corresponding collateral shall be referred to hereinafter as the "W/C Package.")

21.    One of the workers' compensation letters of credit included in the W/C Package

under the 8/16 APA was a letter of credit issued by Bank of America for the benefit of Old

Republic Insurance Company ("Old Republic"), in the face amount of $14,805,712 (the "Old

Republic L/C").  *See* Ex. 15 (8/16 APA), Sched. 1.01(a)(vii).  Pursuant to the 8/16 APA, VCLF

was to receive approximately $8 million in cash proceeds from Old Republic's settlement with

Patriot over workers' compensation related liabilities, which had been secured by the Old

Republic L/C.  *See* 6/11 Tr. 322:9-20 (Clarke direct) ("In the asset purchase agreement dated the

16th of August, what happened is that we were to be the beneficiary, VCLF, ERP of 8 million

dollars of settlement money that was related to workers' compensation and black lung.  8 million

dollars for the account of VCLF.").

> ### B.    **Black Diamond's Prior Familiarity with the Patriot Assets and Liabilities**

22.    Prior to the commencement of the Patriot Case, Black Diamond had been part of a

syndicate of lenders to Patriot, through a so-called "Letter of Credit Facility."  *See* 6/4 Tr. 59:18-

19 (Ehrlich direct) ("[W]e were a lender to Patriot Coal.  Black Diamond had held loans of

Patriot Coal.").

23.    In this capacity, ███████████████████████████████████████████

████████████████████████████████████████████████████████████ Ehrlich Dep.

Tr.[3] 46:22-47:10, 48:13-49:7, 49:10-50:3, 50:13-51:10, 51:18-52:4.  Likewise, Black Diamond

---

[3]  The citation convention "[name] Dep. Tr.," as used herein, refers to the designated deposition testimony admitted
into evidence in this adversary proceeding by agreement of the Parties.  *See* Stip. Entering into Evid. Unopposed
Dep. Designations & Counter-Designations, ECF Doc. No. 396.

4833-1306-9934

had █████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* 52:5-12.

24.     As Black Diamond's founder and principal Stephen Deckoff testified, Black

Diamond's membership in the Letter of Credit Facility also afforded it real-time information

regarding the W/C Package:

> [W]e had that view [about excess value in the W/C Package prior
> to September 13, 2015] because we were a lender in Patriot's
> letter-of-credit facility, and the letters of credit that were issued
> under our letter-of-credit facility went to back up the workers'
> compensation.  So we were very familiar with the workers'
> compensation assets.  We were one of the letter of credit providers.

*See* 6/8 Tr. 15:2-10 (Deckoff direct).  Thus, Black Diamond's witnesses at trial admitted that

Black Diamond learned well before September 2015 that letters of credit in the W/C Package

had been drawn by the beneficiaries (mostly state authorities) and converted to cash as a result of

the commencement of the Patriot Case.  *See* 6/5 Tr. 98:18-20 (Ehrlich cross) ("[W]e knew that

the LCs were drawn upon because we were lenders to the LC facility, so we knew they took the

cash.  We knew who – we knew who it went to."); 6/8 Tr. 15:10-14 (Deckoff direct) ("And when

Patriot filed for bankruptcy and the letters of credits [*sic*] got drawn, which basically then

became cash that collateralized the workers' comps, that was money that got drawn from us

because we own – we were providing letter of credits [*sic*].").

### C.     VCLF is Designated the Stalking Horse for the Noncore Patriot Assets

25.     On June 25, 2015, this Court entered a Bidding Procedures Order for the Patriot

Case, setting forth procedures for parties to bid on the core and noncore Patriot assets.  Ex. 333.

Blackhawk was the "stalking horse" bidder for the core Patriot assets.

26.     Subsequently (though prior to September 4, 2015, the scheduled date for the

submission of any competing bids and any required auctions), VCLF was named the Federal

Stalking Horse Bidder, with special stalking horse protections.  *See* Ex. FQ, 9/1/15 VCLF Bid

Protections Order.

27.     While the Bidding Procedures Order specified procedures for potential auctions of

the core and noncore assets, it did not say that those auctions were required.  Rather, the Bidding

Procedures Order specified that the auctions would occur only "[i]f one or more Qualified Bids

(in addition to the Blackhawk Bid and Federal Stalking Horse Bid, if any) are received by the

Bid Deadline in connection with either the Blackhawk Sale or the Federal Sale."  Ex. 333 at 32

of 63.

### D.     VCLF Searches for Financing for the VCLF-Patriot Transaction

28.     Between July and September 2015, VCLF—through its financial advisor Teneo—

tried to obtain third-party financing to enable VCLF to consummate the VCLF-Patriot

transaction and provide working capital for the Federal 2 Mine after closing.  6/11 Tr. 109:15-17

(Murphy direct).  After compiling a list of approximately 60-70 candidates to provide financing,

Teneo reached out to potential financiers in early August 2015.  *Id.* 109:9-25 (Murphy direct).

While approximately 10-15 potential financiers signed nondisclosure agreements to obtain

additional information about the opportunity, none of the candidates on Teneo's list ultimately

agreed to provide financing.  *Id.* 111:3-115:7 (Murphy direct).

## IV.   BLACK DIAMOND TRIES TO COMPETE WITH VCLF FOR THE NONCORE ASSETS

### A.     Black Diamond's Competing Bid for Certain Noncore Assets

29.     Following the commencement of the Patriot Case, Black Diamond sought to

obtain for itself the rights to the W/C Package in two different ways.

30.     *First*, in August 2015, prior to the bid deadline, Black Diamond submitted a $40

million non-qualifying bid for substantially the same noncore assets that VCLF sought to

4833-1306-9934

acquire.  6/11 Tr. 307:25-309:13 (Clarke direct); Ex. P (9/20/15 e-mail from B. Murphy to Teneo

team) ("Two bids have been submitted for our assets (us, and Black Diamond). . . . We have not

seen Black Diamond's revised bid for our assets, but last term sheet was $40M (cash).").  On or

after the September 4, 2015 bidding deadline, Patriot determined that Black Diamond's offer did

not qualify.[4]  Because no other party submitted a qualifying bid by the September 4, 2015

bidding deadline for the noncore assets, VCLF was named winning bidder for the acquisition of

the noncore assets and assumption of the $400 million in environmental and employee-related

liabilities, and no auction for these assets was ever held.

31.     *Second*, knowing that VCLF had signed an asset purchase agreement with Patriot

for, *inter alia*, the W/C Package (and that VCLF was the stalking horse for these assets), when

asked, Black Diamond explored ways to insert itself into the VCLF-Patriot transaction by

serving as a source of financing for VCLF because it was very interested in the W/C Package.

*See infra* Findings of Fact ¶¶ 32-40.

### B.     Black Diamond and VCLF Meet

32.     After not obtaining financing from anyone on its list of 60-70 candidates, Teneo

received a suggestion in or about late August 2015 to reach out to Black Diamond as a potential

source of financing for the VCLF-Patriot transaction.  6/11 Tr. 300:2-8 (Clarke direct); *id.* 116:3-

20 (Murphy direct).

33.     After being contacted by Teneo, Black Diamond promptly agreed to meet with

VCLF about the VCLF-Patriot transaction.  As Black Diamond's Richard Ehrlich testified, "we

had experience with mining and mining assets.  We were interested in Federal.  *But we were*

---

[4]    Black Diamond never challenged Patriot's determination that its bid was non-qualifying before this Court, and
because there is no evidence that Black Diamond challenged this determination outside of this Court, the Court
finds that Black Diamond accepted that its bid was non-qualifying.

4833-1306-9934

*particularly interested in the health care, the workers' comp programs*." 6/4 Tr. 64:8-12

(Ehrlich direct) (emphasis added).

34.    Black Diamond's Mr. Deckoff similarly testified that, even before the possibility

of doing a transaction with VCLF arose, Black Diamond had formed a view that there was value

in the W/C Package, and wanted to obtain an ownership interest in it:

> We were interested in the workers' compensation assets.  We
> thought there was a lot of value in the workers' compensation
> assets.  *We thought there was tremendous value in the workers'
> compensation assets before we took the meeting with Tom. . . .*

6/8 Tr. 14:13-16 (Deckoff direct) (emphasis added).

35.    Indeed, Black Diamond was so interested that they set up their first meeting with

VCLF for a Sunday—September 13, 2015—at Teneo's offices in New York City.  The

representatives for Black Diamond included Stephen Deckoff and Richard Ehrlich.  The

representatives for VCLF were Tom Clarke and Ken McCoy, as well as Brendan Murphy of

Teneo.  *See* 6/11 Tr. 122:6-125:8 (Murphy direct).

36.    The purpose of the September 13, 2015 meeting was for Black Diamond and

VCLF to explore the possibility of Black Diamond providing financing to VCLF for the VCLF-

Patriot transaction.  6/11 Tr. 125:9-20 (Murphy direct).

37.    At the meeting, which lasted for a few hours, "the Black Diamond professionals

said, look, we're not going to give you the cheapest paper out there, but we'll give you an

opportunity to take us out." *Id.* 120:9-24 (Murphy direct).  Black Diamond noted that it would

be willing to lend to VCLF at a 17% interest rate.  *See* Ex. P (9/20/15 e-mail from B. Murphy to

Teneo team) ("Black Diamond is the only party willing to provide us financing, at <u>extremely</u>

onerous terms. . . . Terms include ABL and Term pricing at 12% + 5% PIK [paid in kind], and

giving up huge equity ownership.") (emphasis in original).  At trial, Mr. Deckoff of Black

11

Diamond conceded that the 17% interest rate was "attractive" to Black Diamond.  6/8 Tr. 14:21-22 (Deckoff direct) ("I think the interest rates we had were attractive").

38.    The Black Diamond representatives "were very clear in the meeting that [the W/C Package] was something that [they] were interested in and [they] thought there was value in." 6/8 Tr. 14:16-18 (Deckoff direct).

39.    Mr. Ehrlich of Black Diamond, who attended the September 13, 2015 meeting, testified that Black Diamond "left thinking that there was something to do[,] and we – I recall saying, you know, we're interested and we'll – you know, we'll probably send you a term sheet." 6/4 Tr. 74:10-18 (Ehrlich direct).

40.    VCLF left this meeting optimistic that Black Diamond would fund the VCLF-Patriot transaction.  *See* 6/11 Tr. 301:4-22 (Clarke direct) ("I mean, you know, for me it was, you know, we'd been working five months.  And, you know, if we didn't have financing, we didn't have a transaction.  And, you know, this was – this was a great gift, to find somebody that wanted to lend to coal.  So we were very excited."); 6/13 Tr. 74:12-24 (K. McCoy direct) ("Q. What was your impression of Black Diamond from this meeting?  A.  I was excited.  I was really excited, because up to this point we had been unsuccessful. . . . [W]e saw potentially a partner here that we could really make some inroads in the coal industry in a big way.  So we were very, very excited.").

**C.    The Day After Black Diamond and VCLF Meet, Black Diamond Urges Patriot Not to Proceed with the VCLF-Patriot Transaction**

41.    Unbeknownst to VCLF, on September 14, 2015—the day after Black Diamond and VCLF met for the first time—Black Diamond sent a letter to Patriot, urging Patriot *not* to proceed with the VCLF-Patriot transaction (for the noncore assets) and the contemplated transaction with Blackhawk (for the core assets), but rather to proceed with a competing cash bid

4833-1306-9934

from Coronado for the core assets and to accept Black Diamond's own non-qualified bid for the noncore assets. *See* Ex. H (9/14/15 letter from S. Deckoff to Patriot counsel S. Hessler).

42.    At trial, Mr. Deckoff admitted that Black Diamond sent this letter to Patriot to "protest[ ] certain assets going to VCLF under the APA." 6/8 Tr. 106:2-4 (Deckoff cross). Mr. Deckoff further conceded that it is "absolutely correct" that he "didn't consider that the VCLF Patriot APA would be something that would maximize Black Diamond's return as a member of the LC facility . . . ." *Id.* 106:5-8.

43.    In an effort to persuade Patriot not to proceed with the VCLF-Patriot transaction, Black Diamond complained in its September 14, 2015 letter that VCLF had not yet obtained financing: " . . . VCLF has to date been unable to procure the financing they need in order to consummate the VCLF Transaction." Ex. H, at BDCF-00018389; 6/8 Tr. 107:2-6 (Deckoff cross) ("That's what the letter says."). On cross-examination, however, Mr. Deckoff reluctantly acknowledged that the letter did "not disclose that [Black Diamond was] in active negotiations with VCLF's principals and [was] actually considering providing financing to VCLF." 6/8 Tr. 107:7-11 (Deckoff cross). Likewise, Mr. Deckoff has no recollection of telling Mr. Clarke that, even though Black Diamond left VCLF with the impression at their September 13 meeting that it would fund VCLF, he would be sending a letter to Patriot's counsel the next day "criticizing the VCLF transaction . . . for lack of a financing commitment." *Id.* 107:12-17.

44.    In that same September 14, 2015 letter to Patriot's counsel, Mr. Deckoff separately touted Black Diamond's own $40 million bid for assets not included in the Coronado proposal, and urged that it be adopted in conjunction with the Coronado transaction. *See* 6/8 Tr. 108:12-18 (Deckoff cross); Ex. H, at BDCF-00018389 ("The Coronado transaction provides significant benefits and opportunities for the Debtors and their creditors to maximize value while

13

minimizing continuing costs.  *In addition, the Debtors have been provided with an offer by us for* *$40 million in cash for certain of the assets not included in the Coronado transaction.*") (emphasis added).

45.    The "assets not included in the Coronado transaction," as Mr. Deckoff admits, "definitely would be some of" the same "assets that VCLF was interested in," 6/8 Tr. 108:24-109:2 (Deckoff cross), particularly the W/C Package, which Black Diamond referred to as "HealthCo."  *See id.* 109:19-110:2 (Deckoff cross) ("[T]he assets not included in the Coronado transaction] certainly included the workers' compensation, because we always thought that was a valuable asset, and we always thought that it was wrong for that asset to be basically given to VCLF when VCLF wasn't paying any consideration for it. . . .").[5]

46.    By September 20, 2015, VCLF's financial advisor Brendan Murphy, of Teneo, realized that, in light of the fact that Black Diamond was both contemplating providing financing for the VCLF-Patriot transaction while simultaneously driving an alternative, non-qualified bid for many of the same assets on which VCLF was bidding, "Black Diamond was trying to play a lot of different sides of the transaction."  6/11 Tr. 133:8-17 (Murphy direct, discussing Ex. P).

## V.    THE COMMITMENT LETTER

### A.    Black Diamond E-mailed the First and Only Pre-Execution Draft of the Commitment Letter to VCLF the Night Before the Anticipated Signing

47.    It appears to this Court that Black Diamond waited until after its attempts to derail the VCLF-Patriot transaction failed to send VCLF a draft of a commitment letter and term sheet, doing so on Sunday evening, September 20, 2015.  *See* Ex. N (9/20/15 e-mail from R. Ehrlich to T. Clarke, attaching draft commitment letter); 6/11 Tr. 304:18-306:19 (Clarke direct).

---

[5]  It is, at the very least, ironic, and likely, an insurmountable legal obstacle to its claims here, that Black Diamond is contending that it should now get the value of the W/C Collateral for effectively no consideration at all.

14

48.     Black Diamond did not task its attorney, Adam Harris of Schulte, with drafting a commitment letter until the afternoon of Sunday, September 20, 2015.  *See* 6/5 Tr. 138:12-22 (Harris direct) ("[Q.  W]hen were you first contacted by Black Diamond to begin your drafting of that commitment letter.  A.  That would have been Sunday afternoon, September 20th. . . . I remember the circumstances of the call that I received from Rich Ehrlich at Black Diamond, and the fact that I had to immediately go back to my apartment and start working into the evening to put a commitment letter together so it would be ready for the next day.").

49.     Black Diamond and Mr. Harris single-handedly drafted the commitment letter. *See* 6/5 Tr. 37:25-38:1 (Ehrlich cross) ("Q.  Black Diamond drafted the commitment letter, is that right?  A.  That is correct."); *id.* 190:15-16 (Harris cross) ("Q.  I want to move to the commitment letter.  And you testified that you drafted the commitment letter; is that right? A.  That's correct.").

50.     There were no significant changes made to the commitment letter between the September 20, 2015, 8:29 p.m. e-mailed draft and the final executed version.  *Compare* Ex. N (draft commitment letter) *with* Ex. S (final commitment letter).

51.     In his September 20, 2015, 8:29 p.m. e-mail to Mr. Clarke attaching the first and only pre-execution draft of the commitment letter, Black Diamond's Richard Ehrlich copied his own counsel, Adam Harris of Schulte Roth & Zabel LLP ("Schulte"), as well as Black Diamond's Steve Deckoff, Les Meier, and Rashid Lattouf.  *See* Ex. N.  He did not, however, copy VCLF's professionals—the attorneys of Pillsbury and the financial advisors of Teneo—on the transmission.  *See id.*  Black Diamond's attorney, Mr. Harris, could not recall "any discussion with anyone at Pillsbury or anyone else in the VCLF legal team regarding the terms of the

15

4833-1306-9934

commitment letter," other than brief, in-person conversations the following morning.  6/5 Tr.

228:2-12 (Harris cross).

52.     The unrebutted testimony was that "there was very little negotiation with respect

to the commitment letter."  6/11 Tr. 267:8-15 (Murphy direct).

**B.     The Events of September 21, 2015**

53.     On September 21, 2015, an auction took place in the Patriot Case at the offices of

Patriot's counsel, Kirkland & Ellis LLP ("Kirkland"), in New York City.  Only the core assets

for which Blackhawk and Coronado submitted bids were being auctioned.  The assets and

liabilities subject to the 8/16 APA between Patriot and VCLF were not the subject of any auction

at Kirkland's office on that, or any other, day.

54.     Prior to that auction, representatives of Black Diamond and VCLF met at Teneo's

offices (also in New York City in the same building as Kirkland).

55.     Later during the day on September 21, 2015, Black Diamond executed a

commitment letter with VCLF (the "Commitment Letter").  *See* Ex. S; Facts Stip. ¶ 6.  Stephen

Deckoff, representing Black Diamond, and Tom Clarke, representing VCLF, executed the

Commitment Letter.  Facts Stip ¶ 7.

56.     During trial, different witnesses had different recollections of when during the day

of September 21, 2015, the Commitment Letter was signed by the Parties.  While Mr. Ehrlich,

Mr. Harris, and Mr. Deckoff maintained that it was signed the morning of September 21, 2015,

Mr. Potter testified that the Commitment Letter was signed "in the afternoon"—*i.e.*, after the

auction already started.  6/7 Tr. 184:13-17 (Potter direct).  Mr. Clarke similarly recalled that

"[he] signed [the Commitment Letter] first," then "Mr. Deckoff signed" in a "conference room"

at Kirkland's offices—and not Teneo's offices, where the Parties had met that morning prior to

the Blackhawk/Coronado auction.  6/11 Tr. 310:15-25 (Clarke direct).  The evidence presented is

16

insufficient for the Court to be able to conclude, as Black Diamond contends, that it is more likely than not that the Commitment Letter was signed before the start of the Blackhawk/Coronado auction.

57.    While Black Diamond's witnesses claimed at trial that the execution of the Commitment Letter was a prerequisite for VCLF "participating" in some alleged auction, no Black Diamond witness could point to any such requirement in the Bidding Procedures Order or otherwise. *See, e.g.*, 6/8 Tr. 94:15-95:11 (Deckoff cross) ("[M]y understanding was that they had to have a commitment letter, or they had to have financing before the auction began. But as I said, I – someone told me that. *I never read the Court's orders regarding the auction.*") (emphasis added); 6/5 Tr. 248:4-11 (Harris cross) (Mr. Harris had "no personal knowledge" of any purported requirement that VCLF have committed financing in place prior to the Blackhawk auction).

58.    Rather, the Court credits the testimony of VCLF's Tom Clarke that VCLF was not participating in any auction, but rather observing the Blackhawk/Coronado auction. VCLF attended that auction to answer questions, given the interrelationship between the VCLF-Patriot transaction and the Blackhawk transaction. *See* 6/11 Tr. 307:25-308:13 (Clarke direct) ("[T]he auction was cancelled for VCLF. . . . We were at the auction as an observer and because the transactions between the core and the non-core [assets] were integrated together."). Mr. Clarke also noted that negotiations took place between Blackhawk and VCLF on the sidelines of the auction "about the allocation of excluded and non-excluded assets." *Id.* 308:14-16.

59.    The Court also credits Mr. Clarke's testimony regarding a statement Mr. Deckoff made immediately after they signed the Commitment Letter, "just as the ink was drying," regarding Black Diamond's intent to perform. 6/11 Tr. 310:25-1, 324:5-9 (Clarke direct).

17

Specifically, Mr. Deckoff told Mr. Clarke that "the commitment letter wasn't valid if Coronado

won the transaction." 6/11 Tr. 324:10-14 (Clarke direct).  Mr. Clarke understood Mr. Deckoff to

mean that "he wouldn't perform or fund under the commitment letter if Coronado won the

transaction." *Id.* 324:15-18.  Mr. Clarke recalls being shocked that Mr. Deckoff made such a

statement:

> I – you know, it was a shock to me.  You know, it was a pretty –
> pretty significant event that we are executing a commitment.
> We're going to be married.  We're going to be partners.  And when
> he made that statement, it was a shock.  I started thinking, why
> would he say that?  What is he saying?  He left the room
> immediately after making that statement and then later, as I was
> doing my research, I realized that he was a member – he had
> purchased some of the bank debt in the letter of credit facility, the
> Barclays Bank, Deutsche Bank facility and he was – and these are
> my words but he was trying to manipulate the auction, that if
> Coronado won, you know, he didn't need VCLF because
> Coronado had a different group of excluded assets and he wanted
> that group of excluded assets himself.

6/11 Tr. 324:19-325:9 (Clarke direct).

60.     Importantly, at trial, Mr. Deckoff did not deny that he made this statement to Mr.

Clarke; he simply could not recall.  *See* 6/8 Tr. 112:8-12 (Deckoff cross) ("Q.  Isn't it true that

moments after signing the commitment letter, Mr. Deckoff, you told Mr. Clarke that if Coronado

won the bid, you would not be performing under the commitment letter.  Do you remember that?

A.  I don't rem – I don't recall that at all . . . .").  Accordingly, Mr. Clarke's account is

uncontroverted.

## C.     The Terms of the Commitment Letter

61.     In the Commitment Letter, Black Diamond "commit[ted] to provide VCLF with

asset based loans and/or term loans in the aggregate principal amount of $25,000,000 (the

'Commitment')."  Ex. S, at BDCF-00028000.  This funding Commitment, under the

Commitment Letter, was "on the terms and conditions set forth in the 'Summary of Principal

18

Terms and Conditions' attached [t]hereto as Exhibit A (the '<u>Term Sheet</u>'), and as otherwise set

forth in the definitive Loan Facility Documentation (as defined in the Term Sheet)." *Id.*

62.     "Loan Facility Documentation" was defined in the Term Sheet as "the definitive

documentation with respect to the ABL Facility or the Term Loan Facility."  Ex. S, at BDCF-

0028005.  "ABL Facility" and "Term Loan Facility" are defined in the Term Sheet, respectively,

as "[a] term loan credit facility . . . and an asset based credit facility . . . in an aggregate principal

amount of $25,000,000."  *Id.*  The Term Sheet refers to the ABL Facility and the Term Loan

Facility, collectively, as the "Senior Secured Facilities."  *Id.*

63.     The evidence shows that both Black Diamond and VCLF understood that, under

the Commitment Letter, Black Diamond was required to provide VCLF at least $10 million in

term loan financing on the date of the closing of the VCLF-Patriot transaction.

64.     For example, Black Diamond's Mr. Ehrlich acknowledged this $10 million term

loan requirement at multiple times during trial.  *See, e.g.*, 6/4 Tr. 223:23-224:1 (Ehrlich direct)

(on October 23, 2015, Black Diamond "reduced" the term loan facility "from *ten million* to five

million") (emphasis added); 6/5 Tr. 83:13-19 (Ehrlich cross) ("Q.  Under the commitment letter,

VCLF would have been able to access twenty-five million in an asset-based loan and term loans,

correct?  A.  The Commitment Letter says what it says.  *Q.  Previously, Black Diamond agreed*

*to extend VCLF a ten-million-dollar term loan, right?  A.  That sounds correct.*") (emphasis

added); *id.* 135:3-5 (Ehrlich recross) ("Q.  And the original commitment letter allowed for ten

million dollars of a term loan at closing?  A.  Okay.").

65.     Similarly, Mr. Clarke understood that Black Diamond would be funding $10

million at closing. 6/11 Tr. 343:20-21 (Clarke direct) ("we needed ten million dollars on the term

loan *as committed* on the day of closing") (emphasis added); 6/12 Tr. 24:2-5 (Clarke direct)

4833-1306-9934

("Had the term loan been ten million dollars, funded at closing, the receivable-based facility at fifteen, to me, [that] would have satisfied all of the terms and conditions of the commitment letter . . . ."); *accord* 6/13 Tr. 154:23-155:3 (K. McCoy redirect) ("Q.  You have a basis for an understanding, as you testified, that you thought there would be ten million dollars at closing, isn't that right?  A.  Yes, I probably got that from Tom because Tom was having daily discussions with Steve and Rich Ehrlich.  That's more where I got my information.").

66.     Accordingly, it makes perfect sense that, until Black Diamond unilaterally demanded new financing terms on October 22-23, 2015, and VCLF began to model the negative effects of Black Diamond's demand (*see infra* Findings of Fact ¶¶ 162-63), the $10 million minimum amount for the term loan was consistently reflected in communications between VCLF and Black Diamond after execution of the Commitment Letter.  *See, e.g.*, Ex. BK (10/22/15 e-mail from B. Murphy to T. Clarke, memorializing conversation with R. Lattouf of Black Diamond) (referencing "$10M Term Loan at close" under the terms of the Commitment Letter).

67.     The Commitment Letter contains no provision requiring that Black Diamond advance any financing to VCLF before closing the VCLF-Patriot transaction (*see* Ex. S), and the Parties understood that Black Diamond was subject to no such requirement.  *See, e.g.*, 6/8 Tr. 267:21-24 (J. McCoy redirect) ("I don't think" there was a requirement of Black Diamond in the Commitment Letter "to advance any portion of the twenty-five million dollar financing ahead of the closing date").

68.     The purpose of the Commitment was for "(a) paying certain fees, costs and expenses in connection with the consummation of the transactions contemplated by the VCLF APA, and (b) providing VCLF with working capital from and after the consummation of such transactions."  Ex. S, at BDCF-00028000.

20

69.    "VCLF APA" was defined in the Commitment Letter as the 8/16 APA, "as amended, modified or supplemented prior to the date hereof"—*i.e.*, prior to September 21, 2015. *See id.*

70.    The Commitment Letter specified that the "consideration" for Black Diamond's execution and delivery of the Commitment was a portion of a "break-up fee" that VCLF would be paid by Patriot if Patriot did not sell the noncore assets to VCLF:[6]

> VCLF has advised that pursuant to an order of the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, VCLF is entitled to payment of a 'break up fee' and expense reimbursement from Patriot Coal Corporation under certain circumstances.  By its execution of this Commitment letter, VCLF agrees that in the event it is entitled to receive payment of the break up fee, it will remit fifty percent (50%) of the amounts so received to Black Diamond.  In addition, in the event VCLF is entitled to receive payment of any expense reimbursement, it will remit to Black Diamond its ratable share of the amount so received. *The payments to Black Diamond hereunder shall be consideration for Black Diamond's execution and delivery of this Commitment.*

Ex. S, at BDCF-00028001 – 02 (emphasis added).

71.    The Commitment Letter further provided that "[t]he Commitment and other undertakings hereunder" were subject to five "[c]onditions":

> (a) the preparation, execution and delivery of definitive Loan Facility Documentation; (b) the entry of a final, non-appealable order of the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, authorizing and approving the VCLF APA (the 'Approval Order'); (c) the simultaneous consummation of the transactions contemplated by the VCLF APA, (d) the absence of any event or circumstance that

---

[6]   *See* Ex. 15 (8/16 APA) § 11.02(b) (if "this Agreement is terminated," and Patriot consummates an "Alternative Transaction," then Patriot shall pay to VCLF the "Break-Up Fee by wire transfer of immediately available funds concurrently with the consummation of such Alternative Transaction"); *id*. § 1.01 (page 321 of 1070) (defining "Alternative Transaction" as "(i) the filing of a plan of reorganization contemplating the sale or retention of all or any material portion of the Purchased Assets that is inconsistent with the terms of this Agreement or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of all or any material portion of the Purchased Assets (whether in one or a series of transactions)").

4833-1306-9934

> has had or is reasonably likely to have a material adverse effect on
> VCLF, and (e) the satisfaction of each of the conditions to closing
> set forth in the Loan Facility Documentation [collectively, the
> "Conditions"].

Ex. S, at BDCF-00028001.

72.    The Term Sheet set forth additional conditions to the closing of the financing

transaction contemplated by the Commitment Letter, although these substantially overlap with

the Conditions in the Commitment Letter itself:

> Conditions to Closing and Credit Extensions.  Closing of the
> Senior Secured Facilities and borrowings under the Senior Secured
> Facilities on the Closing Date [defined as the date of the initial
> funding of the Senior Secured Facilities], and each borrowing
> under the ABL Facility thereafter, will be subject to conditions that
> are usual and customary for facilities and transactions of this type,
> including completion of Lender's [Black Diamond's] business and
> legal due diligence; the approval and consummation of a
> transaction for the Excluded Assets (as defined in the VCLF APA)
> in form and substance acceptable to Lender; accuracy of
> representations and warranties; no event of default; the entry of a
> final, non-appealable order of the United States Bankruptcy Court
> for the Eastern District of Virginia, Richmond Division,
> authorizing and approving the VCLF APA; the simultaneous
> consummation of the transactions contemplated by the VCLF
> APA; the absence of any event or circumstance that has had or is
> reasonably likely to have a material adverse effect on VCLF; etc.

Ex. S, at BDCF-00028007.

73.    The Term Sheet provided that, upon the "Closing Date"—defined as the date of

the "initial funding" of the Senior Secured Facilities (id. at BDCF-00028005)—and as part of the

consummation of the ultimate financing transaction contemplated by the Commitment Letter,

VCLF would convey to Black Diamond certain equity interests (the "Equity Interests"):

Equity Interests:    On the Closing Date, Borrowers shall create a new
                     intermediate holding company to acquire a 75% interest in
                     ERP Federal Mining Complex, LLC ["ERP Federal Mining
                     Complex"] (the entity that owns (or will own) the assets
                     and liabilities associated with the Federal Mine Complex;
                     ("Federal Intermediate HoldCo").  Black Diamond shall

4833-1306-9934

> receive equity in Federal Intermediate HoldCo representing a 40% interest on a fully diluted basis.
>
> In addition, on the Closing Date[,] Borrowers [defined as VCLF] shall create a new entity to acquire the assets and liabilities associated with the workers' compensation programs currently administered by Patriot Coal Corporation and its affiliates ("HealthCo").  Black Diamond shall receive equity in HealthCo representing a 90% interest on a fully diluted basis.

Id. at BDCF-00028009.[7]

74.     It was the contemporaneous understanding of both VCLF's and Black Diamond's witnesses that Black Diamond would not be entitled to receive the Equity Interests under the Commitment Letter to the extent that it refused or otherwise failed to provide the financing called for by the Commitment Letter.  *See infra* Conclusions of Law § III.B.1.

75.     The Commitment Letter also imposed certain "exclusivity" undertakings on VCLF and Black Diamond, respectively (the "Exclusivity Undertakings Section").  With respect to VCLF, the Exclusivity Undertakings Section provided:

> VCLF hereby acknowledges and agrees that upon acceptance of this Commitment it shall not solicit or accept an offer by any person other than Black Diamond of any debt or equity financing for the purpose of facilitating in any manner *the consummation of the transactions contemplated by the VCLF APA* [the "Non-Solicitation Clause"].  In addition, VCLF acknowledges and agrees that it shall not submit or pursue any offer for all or any material portion of the Purchased Assets (as defined in the VCLF APA) in conjunction with any other person or entity other than Black Diamond and its affiliates, or that does not provide for the receipt

---

[7]   Virginia Conservation Legacy Fund, through an entity called ERP Environmental Fund, Inc. ("ERP Environmental"), also assumed various environmental cleanup and remediation obligations from Patriot, as well as rights to collateral or surety bonds that had been posted to secure Patriot's environmental liabilities as part of the VCLF-Patriot transaction.  6/12 Tr. 33:6-25 (Clarke direct).  Black Diamond has no claim in or to ERP Environmental, which is not directly or indirectly owned by HealthCo or ERP Federal Mining Complex.  *See* Ex. 211 (10/26/15 structure chart of VCLF-Patriot transaction), at page 3 (showing 100% direct ownership of ERP Environmental by VCLF); *see also* 6/8 Tr. 110:3-5 (Deckoff cross) (Black Diamond "never intended to take on the environmental liabilities").

4833-1306-9934

> by Black Diamond of the Equity Interests contemplated by the
> Term Sheet.

Ex. S, at BDCF-00028002 (emphasis added).

76.    Consistent with the use of the term "consummation," as well as with Black

Diamond's reassurance to VCLF at their initial September 13, 2015 meeting that VCLF could

take out Black Diamond's high-interest financing as soon as possible after the Closing Date (the

initial funding of the Senior Secured Facilities), it was the contemporaneous understanding of

VCLF's witnesses (as well as that of Black Diamond's attorney, Adam Harris) that VCLF was

allowed to look for financing prior to the consummation of the transactions contemplated by the

Commitment Letter so long as that financing was not acquisition financing, but rather financing

to "take out" or refinance Black Diamond's financing after closing.  *See infra* Conclusions of

Law § III.B.3.

77.    Consistent with a right to solicit "take out" financing, the Term Sheet explicitly

provided that VCLF could pay off Black Diamond's 17% financing at any time before its three-

year maturity, without premium or penalty:

Optional Prepayments:             The Borrower may voluntarily prepay Term Loans
                                  (together with accrued but unpaid interest thereon)
                                  under the Term Loan Facility in whole or in part at
                                  any time and from time to time (subject to
                                  minimum thresholds as set forth in the Loan Facility
                                  Documentation) without premium or penalty.  Any
                                  amounts prepaid under the Term Loan Facility may
                                  not be reborrowed.

Ex. S, at BDCF-00028007.

78.    Additionally, notwithstanding the Non-Solicitation Clause, Black Diamond

always knew that VCLF would be receiving "money to fund [the VCLF-Patriot] transaction," not

just from Black Diamond, but "potentially other sources."  *See* 6/5 Tr. 146:24-147:2 (Harris

direct) ("Q.  So all the money to fund this transaction, at the time of the commitment letter, was

24

coming from whom?  A.  It was coming from Black Diamond and potentially other sources.  But it was not coming from VCLF.").

79.     The Commitment Letter contains no provision stating that ambiguities in the agreement are not to be construed against Black Diamond, the drafting party, or that both Black Diamond and VCLF are to be considered co-equal "drafters" of the Commitment Letter for purposes of resolving ambiguities in the agreement.

## VI.   PATRIOT'S FINANCIAL SITUATION DETERIORATES, NECESSITATING CHANGES TO THE VCLF-PATRIOT TRANSACTION

### A.     Patriot Was Expected to Run Out of Cash No Later than the End of October 2015, and Undertook Efforts to Reserve Cash

80.     When Patriot filed for bankruptcy on May 12, 2015, it was being advised by the restructuring firm Alvarez & Marsal ("A&M"), "a[n] outside consulting firm that specializes in restructuring."  6/4 Tr. 121:17-122:2 (Ebetino direct).  It was a concern of the entire Patriot and A&M management team for Patriot "not to run out of cash before [Patriot] could get out" of bankruptcy.  *Id.* 122:8-12 (Ebetino direct).  When the Patriot Case was commenced on May 12, 2015, Patriot and A&M anticipated that Patriot could "run out of cash as early as September [2015]."  *Id.* 122:16-22 (Ebetino direct).

81.     From that point, "pretty much all of [Patriot's and A&M's] activities were centered around the bankruptcy and how to reserve cash, how to . . . make it through and come up with an exit strategy for bankruptcy."  6/4 Tr. 121:17-24 (Ebetino direct).  "Through a number of efforts, it [Patriot] . . . worked to be able to get through to possibly the end of October although it was very – very close."  *Id.* 122:16-22 (Ebetino direct).

82.     To reserve cash, Patriot engaged in a number of cost-saving and asset-monetization efforts.  As Charles Ebetino, Patriot's former senior vice president for corporate development, summarized at trial:

25

> [W]e were curtailing operations where it made sense.  We were
> looking through all the contracts in terms of whether we should
> reject contracts to save money – both sales and cost-type contracts.
> You know, *we looked through . . . all of our assets to see if assets
> could be sold or somehow monetized.*

6/4 Tr. 123:3-10 (Ebetino direct) (emphasis added).

83.     Among the assets that Patriot sought to monetize after the commencement of the

Patriot Case were any surplus collateral in the W/C Package.  Towards this end, Patriot focused

on monetizing excess collateral associated with two letters of credit in the W/C Package—(i) a

letter of credit posted by Patriot's predecessor, Peabody Coal Company ("Peabody"), in the face

amount of $8,495,603 (the "Peabody-Illinois L/C") to secure workers' compensation obligations

in the State of Illinois (*see* Ex. 15 (8/16 APA), Sched. 1.01(a)(vii); and (ii) the Old Republic L/C,

discussed *supra* Findings of Fact ¶ 21.

84.     As set forth below, while Patriot's effort to monetize the Peabody-Illinois L/C

failed, its effort to monetize the Old Republic L/C resulted in some success.  Both efforts,

however, had the effect of removing these letters of credit from the W/C Package so that, by

October 9, 2015, VCLF could not acquire any rights to them as part of the VCLF-Patriot

transaction.

### 1.     Patriot Fails to Monetize the Peabody-Illinois L/C

85.     In or about July or August 2015, Patriot had discussions with the State of Illinois

to see whether any surplus collateral corresponding to the Peabody-Illinois L/C could be

monetized for Patriot's benefit.  6/4 Tr. 127:2-6 (Ebetino direct).  Mr. Ebetino described the

guidance provided by the State of Illinois to Patriot to free up excess cash associated with the

Peabody-Illinois L/C:

> [W]e talked to [the State of Illinois] . . . about the situation
> there. . . . [O]ne of the things we looked at to make those
> determinations was our balance sheets versus the amount of cash

26

4833-1306-9934

collateral that was posted against the liabilities, to see what that delta was, and whether or not it would . . . have some potential for monetizing that cash at some point in time when – either on emergence or . . . whenever it could be, depending on the circumstances.

So we looked at the Illinois situation, and as a possible candidate to – to monetize – or that it had excess cash collateral.  Again my recollection, three-and-a-half to five million dollars was kind of a number we had . . . in our mind.  This was done sort of as the Old Republic situation was playing out.

. . .

Illinois told us that [a] loss portfolio transfer was not possible. . . . [E]very state's kind of a little different, so they indicated to us that in the situation in Illinois, Peabody Energy, because of its historic ownership – I think in part of Peabody Coal Company, had posted coming out of our first bankruptcy – well, had arranged to post letters of credit to a bonding company who posted bonds with the State of Illinois on Patriot's behalf.

So in order to monetize that situation, they – the State of Illinois indicated to Patriot that it would have to cease making payments, basically, or at least, you know, indicate formally that it was no longer going to make payments.  And then it would – then that would give Illinois the right to pull the bonds and access the cash collateral, or basically pull the bonds and turn it into cash.

If then it turned out that there was excess cash, it – you know, down the road – and they indicated to us that probably it would be two years down the road, but that it – where they would make an assessment.  I think that they were worried about new claims taking place that would potentially, you know, diminish the resources.  And they, of course, wouldn't return the cash right away.  But at any rate, they – they indicated to us that the first step was to – to give them a letter saying that we would no longer make the payments.

6/4 Tr. 124:24-126:23 (Ebetino direct).

86.    To monetize any excess value with respect to the Peabody-Illinois L/C, Patriot

undertook this "first step" of sending a letter to Illinois in the "August/September [2015] kind of

time frame," notifying that Patriot intended to stop paying workers' compensation obligations in

27

4833-1306-9934

Illinois.  6/4 Tr. 127:7-13 (Ebetino direct).  As a result, Illinois "turned to the surety company

and said they had thirty days to either . . . give them the cash or assume the liability, which was

their . . . option."  *Id.* 127:14-18 (Ebetino direct).

87.     Within the next thirty days (*see* 6/4 Tr. 134:24-135:2 (Ebetino direct)), the surety

company securing Patriot's Illinois workers' compensation liabilities turned to Peabody,

Patriot's predecessor (which had posted the Peabody-Illinois L/C in the first instance), and

offered Peabody the option of assuming Patriot's workers' compensation liabilities, which would

also have the effect of conveying to Peabody any rights to excess collateral associated with the

Peabody-Illinois L/C.  *See id.* 132:19-133:20 (Ebetino direct) (noting that he "saw some email

traffic where Peabody was reviewing whether or not to . . . assume that obligation," when

Peabody asked Patriot whether it was "no longer going to make Workers' Compensation

payments," Patriot sent a letter to Peabody confirming that it "planned to cease making

payments").

88.     In or about September 2015 (and, in any event "well before" the execution of the

Amended and Restated Asset Purchase Agreement between VCLF and Patriot, described *infra*

Findings of Fact ¶ 189), Peabody exercised its option to assume Patriot's Illinois workers'

compensation liabilities relieving Patriot of these liabilities.  *See* 6/4 Tr. 133:21-134:1, 134:24-

135:7 (Ebetino direct) (Illinois confirmed to Patriot "that Peabody was assuming those

obligations and so, therefore, . . . Patriot was off the hook").

89.     By assuming these liabilities, Peabody also assumed the rights to any excess

collateral with respect to the Peabody-Illinois L/C.  As a consequence, the Peabody-Illinois L/C

was effectively removed from the W/C Package and no longer available to Patriot or VCLF for a

monetization event.  *See* 6/4 Tr. 134:7-23 (Ebtetino direct) ("[W]e believed that their

4833-1306-9934

[Peabody's] assumption of the liabilities basically eliminated any opportunity for Patriot and/or

VCLF . . . to have access to the cash collateral" because "the only benefit to Patriot was they

were relieved of the liability itself, but no opportunity to access the excess cash collateral").

> **2.**     **Patriot Settles with Old Republic, Monetizing the Old Republic Letter of Credit for the Benefit of Patriot, Not VCLF**

90.     Within the same August/September 2015 time frame, Patriot reached a settlement

regarding the Old Republic L/C that produced some value.

91.     On September 21, 2015, Patriot filed a motion seeking approval of a settlement

agreement it had reached with Old Republic (referred to as "ORINSCO" in the motion), whereby

Patriot (not VCLF) would be paid the more than $8 million that VCLF expected to receive under

the 8/16, corresponding to excess collateral associated with the Old Republic L/C:

> Pursuant to the Settlement Agreement, among other things, (1)
> ORINSCO shall have an allowed claim against Patriot in the
> amount of $7,873,530.20 (the "Allowed Claim"), (2) the automatic
> stay shall be lifted, to the extent necessary, to allow ORINSCO to:
> (a) apply $6,745,401.20 of the Cash Deposit to the Allowed Claim
> and (b) offset the Other Security ($1,128,129.00) against its
> Allowed Claim, and *(3) within ten (10) business days of this Order
> becoming final and non-appealable, ORINSCO shall pay to Patriot
> $8,060,310.80 of the Cash Deposit*.

Ex. 41, at 2-4 (¶ 10) (italicized emphasis added).

92.     While the motion stated that it was "contemplated" that this returned Cash

Deposit would be held for VCLF's benefit, the operative portions of the motion sought that

"VCLF shall have no right whatsoever to collect any of such proceeds" until the date of the

closing of the transactions contemplated by the 8/16 APA.  *See* Ex. 41, at 4 (¶ 11).

93.     As explained further below, because Patriot's financial condition progressively

worsened, VCLF saw none of this Cash Deposit:  this Court's October 9, 2015, confirmation

order in the Patriot Case divested VCLF of more than $8 million in Old Republic funds (the "Old

4833-1306-9934

<u>Republic Proceeds</u>") and conveyed these funds to Patriot to pay its administrative claims upon

emergence. *See infra* Findings of Fact ¶¶ 116-18.

> **B.     VCLF Promptly Informs Black Diamond After the Execution of the Commitment Letter that Patriot's Deteriorating Financial Situation Necessitates Changes to the 8/16 APA**

94.     As of September 22, 2015, it "was common knowledge in [the] Chapter 11 case in

this courtroom that the Debtor had reported it was scheduled to run out of money perhaps sooner,

but certainly by the end of October of 2015."  6/7 Tr. 186:15-21 (Potter direct); *see also id.*

191:13-17 (Potter direct) ("Q.  To your understanding, was it also true that Patriot was running

out of money at this time [late September 2015]?  A.  Absolutely.  I – it was well known in this

courtroom and the Debtor did his [*sic*] job of keeping the court well apprised of its financial

status.").

95.     For this and other reasons, it was necessary that the VCLF-Patriot transaction

close by the end of October 2015.  *See* 6/7 Tr. 198:18-199:4 (Potter direct) ("There was

definitely a need for it to close by the end of October. . . . Number one, the company is going to

run out of money, and as a result, the case was susceptible to being converted to a Chapter 7,

and – and would have jeopardized the transactions that, at least for my client, were designed to

accomplish a lot of very laudable goals, including addressing environmental and workers'

compensation matters.").[8]

---

[8]  Other reasons why the VCLF-Patriot transaction needed to close by the end of October 2015 included the
precarious state of the Federal 2 Mine, as Mr. Potter explained at trial:

> [A]t some point, I don't recall when, the . . . Federal 2 Mine had been shut
> down, and the . . . ceiling was falling in where the longwall shearing was
> occurring.  And I'm not a coal miner, but I've learned enough from Mr. McCoy
> to know that's a bad thing, for purposes of trying to get the coal mine to the
> point where it's operating properly, sagely, and making an effort to turn it back
> to profitability. . . .

6/7 Tr. 199:5-15 (Potter direct).

4833-1306-9934

96.     In light of this pressing reality and a necessarily short timeline to closing, on

September 22, 2015, the day after the Commitment Letter was signed, VCLF's attorney Patrick

Potter e-mailed Black Diamond's attorney Adam Harris, asking "who from your shop we will be

working with to get the deal documented." Ex. Y.  Mr. Potter's purpose in sending this e-mail

"was to start reaching out to . . . the Schulte law firm, in particular Mr. Adam Harris, to try to get

our M&A people talking as soon as possible so that we could start a real . . . substantive

substantial negotiation process to make sure we get this thing done in a timely fashion.  We're

not pushed to the cliff and not able to close the transaction." 6/7 Tr. 185:1-7 (Potter direct).

97.     Mr. Harris responded the same day, September 22, 2015, that he "[n]eed[ed] to

get [his] team together," and that he would "let [Mr. Potter] know." Ex. Y.  Mr. Potter

understood Mr. Harris' response to mean that "he hadn't yet . . . put together a team to address

pushing to its closing." 6/7 Tr. 186:22-187:2 (Potter direct).

98.     By September 24, 2015, Mr. Potter had not heard back from Mr. Harris,

"[c]ertainly not by email," and as Mr. Potter recalls, not by phone either.  6/7 Tr. 188:8-11

(Potter direct).  Accordingly, that day, Mr. Potter e-mailed Mr. Harris again, in yet another

attempt "to engage him on getting a team together who would move forward with

documentation":[9]  "Adam – Can we get our respective M&A teams plugged in soon?"  Ex. AA.

As with his initial September 22, 2015 e-mail to Mr. Harris, Mr. Potter copied several different

Pillsbury attorneys on his September 24th e-mail to Mr. Harris, "[i]n the hopes of soliciting a

similar response from Mr. Harris, that he would copy his counterparts to the M&A, finance,

environmental, securities parts, [document] review[ ] and other types of matters that needed to be

addressed in a transaction." 6/7 Tr. 187:23-188:7 (Potter direct).  Mr. Harris did not respond to

---

[9]  6/7 Tr. 188:12-15 (Potter direct).

4833-1306-9934

this e-mail either.  *See id.* 188:16-19 (Potter direct) ("Q.  Do you recall whether or not Mr. Harris

responded to this email?  A.  I – no, these are pretty well documented and I don't have a present

recollection.").

99.     By September 26, 2015, Mr. Potter had not gotten a response from Mr. Harris for

four days.  Mr. Potter therefore wrote a longer e-mail to Mr. Harris, as a follow-on to Mr. Harris'

brief response from September 22, 2015, copying not only Pillsbury attorneys, but also the

VCLF business team:

> I hope this finds you well.
>
> We are trying to move things forward on the deal, *which changed substantially (eg by adding multiple subsidiaries, taking different assets and liabilities, etc), from the fairly simply transaction in our original APA.*
>
> We have *taken some cuts at amending the APA*, and I think *we will need BD's [Black Diamond's] input on that*.  And certainly we will need DB's [*sic*] input on organization, operating agreements, etc.
>
> Dave Baxter [a Pillsbury M&A attorney] and others are prepared to continue tackling this in anticipation of confirmation and eventual closing.  To that end, it would be great if you could connect him with your M+A folks by Monday so that we can make as much progress as possible prior to the confirmation hearing on October 5th.

Ex. 49, at SRZ-00000074 (emphasis added).

100.     Mr. Potter was giving Mr. Harris this level of detail because it was urgent that

Black Diamond and VCLF begin discussions regarding the final financing transaction, in light of

the impending confirmation hearing in the Patriot Case and the fact that the VCLF-Patriot

transaction needed to close within a matter of weeks:

> [I]n my mind, at the time, there was a lot of work that needed to be done by a lot of people in order to be in a position to get the plan confirmed.  I believe that at the time, I was thinking it would be nice to be able to tell the judge as much as we could about what this transaction would look like, and . . . more importantly, being

32

> able to eventually close the transaction and keep the commitment
> that we made to the estate, the other constituents [and] the court.

6/7 Tr. 191:25-192:10 (Potter direct).

101.    Despite this urgency, there is no evidence that Mr. Harris ever responded to Mr.

Potter's September 26, 2015 e-mail.  *See* 6/7 Tr. 192:21-193:3 (Potter direct) ("I don't believe I

got a reply email to this.  I don't ever recall my [*sic*] conversation with him about it.").

102.    On or about October 12, 2015, mere days after the confirmation hearings in the

Patriot Case and just two weeks from the anticipated closing, Mr. Harris explained to Mr. Potter

why he had been radio-silent in response to Mr. Potter's e-mails from September 22, 24, and 26,

2015:  "he had not yet been engaged by his client on this."  6/7 Tr. 193:4-9, 204:23-205:18

(Potter direct).

103.    Notwithstanding Mr. Harris' unresponsiveness, Black Diamond's witnesses at

trial admitted that Mr. Potter's September 26, 2015 e-mail put them on notice that the VCLF-

Patriot transaction was changing substantially from the 8/16 APA, and that VCLF needed Black

Diamond's engagement in the process of documenting both the Black Diamond financing

transaction, as well as the final documentation for the underlying VCLF-Patriot transaction.  *See*

6/5 Tr. 151:12-16 (Harris direct) (believes that "VCLF and Patriot proposed changes to the

APA . . . that is referred to in the commitment letter . . . fairly shortly after the auction – the

auction concluded [on September 22, 2015]"); *id.* 28:2-7 (Ehrlich cross) (" . . . I was certainly

aware on September 26th that there was a possibility that the APA may change, potentially

substantially."); *id.* 52:2-9 (Ehrlich cross) (Mr. Ehrlich knew "as of that early email from Patrick

Potter" on September 26, 2015 that "changes to the APA would be in play," and that "the point

of Patrick Potter's email was to specifically advise Black Diamond, so that Black Diamond

would be aware and in the know"); *accord* 6/8 Tr. 59:1-6 (Deckoff cross) (it "was communicated

4833-1306-9934

to [Black Diamond's] lawyer" that "VCLF's lawyer had communicated to him that substantial changes were being pursued with regard to the 8/16 APA," although Deckoff could not "tell you when it was communicated to our lawyer").

104.    Moreover, Mr. Harris conceded that he knew during this period in September that "the unchanged terms of the August 16th APA were not going to be the terms upon which [the] VCLF[-]Patriot transaction would or could close."  6/5 Tr. 235:17-20 (Harris cross).

## VII.   BLACK DIAMOND SEEKS TO EXTEND THE TERM OF THE COMMITMENT LETTER

105.    Despite Black Diamond's knowledge that the VCLF APA had changed "substantially," it did not change its desire to consummate a transaction with VCLF based on the terms of the Commitment Letter.

106.    The Commitment Letter provided that Black Diamond's Commitment would "terminate at 5:00 p.m., New York City time, on October 8, 2015 if the Approval Order has not been entered or, if timely entered, on October 23, 2015 if the Closing Date (as defined in the VCLF APA) shall not have occurred prior to such time."  Ex. S, at BDCF-28001.

107.    Due to delays in the Plan confirmation process, it became clear that the confirmation order (referred to as the "Approval Order" in the Commitment Letter) was not going to be entered by 5:00 p.m., New York City time, on October 8, 2015.

108.    Accordingly, on October 6, 2015, Black Diamond's Richard Ehrlich sent the following e-mail to VCLF's Tom Clarke, copying Black Diamond principals Stephen Deckoff and Les Meier, as well as Black Diamond's counsel Adam Harris (but, consistent with Black Diamond's practice throughout the short-lived Black Diamond-VCLF relationship, no one from Pillsbury):

> The Commitment Letter we executed dated September 21, 2015
> currently provides that the Commitment of the Lenders will

4833-1306-9934

terminate at 5:00 pm New York City time on October 8, 2015 if
the Approval Order has not been entered or, if timely entered, on
October 23, 2015 if the Closing Date (as defined in the VCLF
APA) shall not have occurred.  Given the delay in the confirmation
process, we believe it makes sense for the parties to agree to
extend each of these dates by 30 days (i.e., until November 9, 2015
and November 23, 2015, respectively).  Please confirm by reply
email that you are in agreement with this modification to the
Commitment Letter.

Ex. 322.

109.    On October 7, 2015, Mr. Clarke sent a "reply all" to Mr. Ehrlich, agreeing to

extend the term of the Commitment Letter, and noting that he would update Black Diamond on

the progress of the confirmation hearing due to start that day in the Patriot Case:  "Thank-you for

Black Diamond's continued commitment to our first transaction together!  We are in agreement

with the terms outlined in this email.  We will keep you posted on today's events."  Ex. AG, at

BDCF-00041379.

## VIII.   THE CONFIRMATION HEARINGS AND ORDER IN THE PATRIOT CASE

110.    The confirmation hearings in the Patriot Case took place October 7 – 9, 2015.  At

the conclusion of those hearings, on October 9, 2015, this Court entered the confirmation order

(the "Confirmation Order") approving Patriot's proposed chapter 11 plan (the "Plan").  Ex. 334.

111.    Black Diamond's counsel participated in the confirmation hearings, sometimes

vocally.  6/7 Tr. 200:4-10 (Potter direct) ("[Mr. Harris] did attend.  He attended by telephone and

was quite vocal, particularly at the end, and he . . . on behalf of his client, and the letter-of-credit-

facility was a substantial reason why we had the final telephonic hearing . . . on the Friday.").

112.    Mr. Harris, on behalf of Black Diamond, also had input into the language of the

Confirmation Order.  *See* 6/7 Tr. 200:10-14 (Potter direct) (" . . . There was a dispute between, I

think, the senior credit facility . . . and the facility in which Mr. Harris' client was invested; that's

4833-1306-9934

Black Diamond. *There was some dispute over language in the confirmation order that they required the Court to resolve, and the Court did.*") (emphasis added).

113.    Despite having a full opportunity to review, comment on, and object to provisions of the Confirmation Order, Black Diamond failed to object to certain provisions of the Confirmation Order that had bearing on the Commitment Letter.

114.    *First*, the Confirmation Order approved something called the "VCLF APA," which it defined as "the transaction contemplated by the asset purchase agreement among the Debtors and Virginia Conservation Legacy Fund and its affiliate (collectively, 'VCLF'), whereby VCLF agreed to acquire certain assets and assume certain liabilities excluded from the Blackhawk Transaction (as amended, supplemented, or modified *from time to time . . . .*").  Ex. 334, at 12 (¶ 26) (italicized emphasis added).

115.    The witnesses for both Black Diamond and VCLF all agreed that the Confirmation Order's "VCLF APA" was *not* the same as the "VCLF APA" referenced in the Commitment Letter, for the simple reason that the Commitment Letter's "VCLF APA" was the 8/16 APA, whereas the Confirmation Order's "VCLF APA" referred to any VCLF APA to which Patriot and VCLF would agree.[10]  *See, e.g.*, 6/4 Tr. 195:16-23 (Ehrlich direct) (the definition of "VCLF APA," as approved in the Confirmation Order, was "not" the "definition of the VCLF APA that was contained . . . in [the] commitment letter"); 6/5 Tr. 235:3-7 (Harris cross) (believes it is "correct" that "the bankruptcy court entered a confirmation order on October 9th, 2015, that differed from the APA executed on August 16th, 2015"); 6/7 Tr. 197:2-22 (Potter direct) (the definition of "VCLF APA" in the Commitment Letter is the VCLF APA "as

---

[10]  Indeed, Black Diamond's counsel promised in opening statements that the evidence would show that, "on October 9th, this Court did enter an order, and this order approved something called a VCLF APA," but "[w]hat the Court approved is not the APA that we [Black Diamond] agreed to fund."  6/4 Tr. 22:7-18 (Black Diamond opening statement).

amended, modified, or supplemented prior to" September 21, 2015, and "that's different from

the VCLF APA that was a part of the confirmation order").

116.    *Second*, and consistent with this Court's approval of a VCLF APA other than the

8/16 APA, the Confirmation Order approved Patriot's retention of the Old Republic Proceeds

(which were to become VCLF's property under the original 8/16 APA):

> In accordance with the settlement agreement between Old
> Republic Insurance Company and its affiliates (collectively,
> "ORINSCO") and the Debtors pursuant to an agreed Court order
> (the "ORINSCO Settlement"), the rights, interest, claims, and
> defenses of ORINSCO with respect to ORINSCO's ability to
> offset applicable prefunded losses, refunded program assessments,
> incurred loss retrospective premium returns, and tax assessment
> reimbursements against its Allowed Claim are reserved and
> preserved in their entirety.  *In accordance with the ORINSCO
> Settlement, the Debtors[ ] have the authority to keep the proceeds
> from the ORINSCO Settlement in their entirety as property of the
> Estate for, among other things, any costs incident to the Debtors'
> emergence from chapter 11.*

Ex. 334, at 62 ¶ 159 (italicized emphasis added).  As the emphasized language confirms, the

Confirmation Order went beyond the relief requested by Patriot in its September 21, 2015

motion to approve the Old Republic settlement (*see supra* Findings of Fact ¶¶ 90-93):  whereas

the motion stated that Patriot was merely to hold the Old Republic Proceeds in a segregated

account (to, potentially, be paid to VCLF after the closing of the VCLF-Patriot transaction), the

Confirmation Order went a step further and provided that these funds were now the property of

the Patriot estate, and that VCLF had no rights to them.

117.    As Mr. Clarke explained at trial, the retention of the Old Republic Proceeds by

Patriot was an emergency measure, developed on the sidelines of the confirmation hearing,

which was necessary to confirm the Plan, due to Patriot's continuously deteriorating cash

position in late September and October 2015:

> In the asset purchase agreement dated the 16th of August, what
> happened is that we were to be the beneficiary, VCLF, ERP of 8
> million dollars of settlement money that was related to workers'
> compensation and black lung. . . . Unfortunately, we were notified
> literally, you know, on the eve of the confirmation order . . .
> [P]atriot told us we're missing 18 million dollars.  We do not have
> 18 million; we can't go to the confirmation hearing; we can't
> confirm; and we will have to liquidate Patriot Coal Corporation.  It
> will be converted to a Chapter 7.  And UMWA said we will
> contribute 10 million dollars to the problem and that's where the
> 10 million dollars from the VE[B]A [Voluntary Employee Benefit
> Account] fund came from and they asked us if we would
> contribute 8 million dollars to the problem and we didn't see any
> other way.  It was serious.  They had gone to Judge Phillips, they
> had postponed the confirmation hearing, and, you know, we
> believed that if we had not done that, that in fact the case would
> not have occurred.  And so we relinquished the 8 million dollars in
> order to confirm the case.

6/11 Tr. 322:13-323:16 (Clarke direct).[11]

118.    At trial, both Black Diamond's and VCLF's witnesses expressed their

understanding that, in approving the diversion of the Old Republic Proceeds from VCLF to

Patriot, the Confirmation Order, in substance, modified the 8/16 APA.  *See, e.g.*, 6/4 Tr. 193:9-

194:25 (Ehrlich direct) (Patriot-Old Republic settlement approved in the Confirmation Order

took proceeds that belonged to VCLF under the 8/16 APA and gave them to Patriot; that "would

be a modification" of the 8/16 APA); 6/5 Tr. 90:3:-11 (Ehrlich cross) (admitting that

Confirmation Order ¶ 159 "says that that money [the Old Republic Proceeds] goes back to

Patriot"); 6/7 Tr. 264:6-11 (Potter cross) (the 8/16 APA "had an eight-million dollar hole put in it

as a result of the removal of Old Republic that was embodied in the Court's confirmation order

---

[11] *Accord* 6/7 Tr. 216:12-217:6 (Potter direct) ("a change occur[red] to the APA with regard to Old Republic":
"during the course of the confirmation hearing outside of the courtroom, . . . the debtor came to us . . . and said
that they do not have enough money to satisfy their obligations under Section 1129 of the Bankruptcy Code to
pay all of their administrative expenses . . . . [T]hey came to us and said look, here are your options; give us the
Old Republic money back, or don't give it back to us and we won't be able to confirm our plan and you won't be
able to accomplish the transaction that you wanted.").

4833-1306-9934

of October 9th."); 6/12 Tr. 86:6-9 (Clarke direct) ("Everybody knew the eight million dollars that

was our cash at VCLF to be received from Patriot on the effective date, on the closing date, was

no longer available under the Old Republic settlement."); *id.* 88:6-8 (Clarke cross) ("the events

and conditions in the August 16th asset purchase agreement were no longer valid [as of October

22, 2015], because we had the Old Republic, which is the most significant"); *id.* 98:7-11 (Clarke

cross) ("The asset purchase agreement of August 16th had already – as it existed, and amended,

on the 21st of September, had already been necessitated to be changed repeatedly, primarily for

the loss of the Old Republic money.").

119.    In addition, separate and apart from the Old Republic Proceeds, VCLF was also

forced to part with a $10 million equity investment that UMWA was to make to ERP (as

referenced by Mr. Clarke in the block quote in Findings of Fact ¶ 117 above).  This change

likewise took place on the sidelines of the confirmation hearing, and was necessary to the

approval of Patriot's Plan:

> [T]he initial August 16th asset purchase agreement did not have
> cash being paid at closing.  Subsequently, that was amended.  Our
> partners, the United Mine Workers of America, put in ten million
> dollars of equity, and we paid ten million dollars under the APA to
> Patriot Coal Corporation.  That was a change that occurred in early
> October in order to confirm.

6/11 Tr. 293:11-18 (Clarke direct).

## IX.    VCLF DID NOT SOLICIT ALTERNATIVE CLOSING FINANCING AT ANY POINT BETWEEN SEPTEMBER 21 AND OCTOBER 23, 2015[12]

120.    From execution of the Commitment Letter on September 21, 2015, until late in

the day on October 23, 2015, no representative of VCLF solicited or entertained any alternative

---

[12] At a March 21, 2017 oral argument in this adversary proceeding, Black Diamond's counsel asserted that the issue
of whether VCLF solicited alternative acquisition financing prior to October 23, 2015, was the only real issue in
this case, and maintained that documents withheld by VCLF on grounds of privilege contained a "smoking gun"
on this issue.  *See* 3/21/17 Hr'g Tr. 4:1-5 ("[MR. PHILLIPS:]  This lawsuit, as you'll remember, Your Honor,

offer to replace the closing or acquisition financing that Black Diamond was to provide under the

Commitment Letter.  *See, e.g.*, 6/7 Tr. 210:22-211:5 (Potter direct) ("I had no knowledge of Mr,

Clarke, Mr. Ken McCoy, Mr. Jason McCoy, or any other representative or investment bank or

anyone from Pillsbury reaching out to anyone prior to October 23rd, 2015, to come up with or

pursue or solicit alternative closing financing to Black Diamond."); 6/13 Tr. 84:20-24 (K.

McCoy direct) ("Q. Mr. McCoy, as you testify here today, are you aware of anyone from VCLF

or ERP looking for alternative financing to replace Black Diamond for purposes of closing

between September 21, 2015 and October 23rd, 2015?  We did not.").

121.    To the contrary, Messrs. Clarke, Ken McCoy, and Jason McCoy were intent on

and excited about consummating the financing transaction with Black Diamond, as set forth in

the Commitment Letter.  *See, e.g.*, 6/11 Tr. 314:23-315:3 (Clarke direct) (" . . . I mean to me it

was the perfect partnership.  I mean they [Black Diamond] were an 8 billion dollar fund.  They

knew what they were doing.  They wanted to do this. . . . [W]e absolutely did everything we

could to build a strong partnership with Black Diamond."); 6/13 Tr. 84:9-19 (K. McCoy direct)

(per the Exclusivity Undertakings Section in the Commitment Letter, "You're [Black Diamond]

now our partner.  We – we won't – we won't shop this.  You know, you're our one and only.");

---

asks the question of whether or not VCLF started looking for alternative financing to that committed to by my
client, Black Diamond, before the weekend in October, where they wrote us out of the blue and told us that we
anticipatorily repudiated.").  Yet, even after VCLF voluntarily produced almost 2,000 privileged documents to
moot Black Diamond's recurrent discovery motions, Black Diamond has failed to come forward with a single
"smoking gun" document on solicitation, as its counsel conceded during his examination of Mr. Potter at trial.
*See* 6/7 Tr. 121:2-10 (Potter cross) ("[Q. Y]ou've also signed papers that take the position that the documents
that your firm produced as a result of that [Black Diamond discovery] motion contain no smoking guns, haven't
you?  A.  Relative to evidence that anyone at my client or a representative of my client, after the signing of the
commitment letter with Black Diamond, solicited alternative financing prohibited by the commitment letter.
*Q. There may be other kinds of smoking guns in the documents, right? . . . .*") (emphasis added).  Having
reviewed the otherwise privileged documents that Black Diamond has submitted as "other kinds of smoking
guns," the Court finds none of them reflect, much less prove, a breach of the Commitment Letter by VCLF.  At
most, these documents reflect an understandable level of frustration by VCLF's professionals and VCLF in
response to Black Diamond's efforts to change lending terms and reduce and condition payment of expenses
incurred by VCLF on various factors.  *See, e.g.*, Ex. 4 (10/23/15 e-mail from P. Potter); Exs. 62-64 (10/13/15 e-
mail correspondence among P. Potter, T. Clarke, and A. Troop).

4833-1306-9934

*id.* 108:6-15 ("We had intentionally given them ninety percent of what Deckoff wanted in terms

of fifty million dollars.  We said, yeah, you can have that.  I wanted him to have that because I

wanted to have a good partner.  He was going to – now he's going to own thirty percent of – of

the Federal Mine.  We're partners.  This is not just an arm's-length you loan me money.  If

you're just loaning me money, get all you can get; that's pure capitalism.  But when you become

a partner, you move from one end – and you get over and now you're on the same side of the

table."); 6/8 Tr. 186:18-187:6 (J. McCoy direct) ("[W]e had a group [Black Diamond] who was

going to – could give us a twenty-five million dollar commitment.  The coal market was a tough

market, and the fact that they were going to step in with us and be partners with us on this

project, that meant a lot to me. . . . I trust them.  These are my partners.  Here we go.  Let's do

this.").

     122.    So confident were Messrs. Clarke, Ken McCoy, and Jason McCoy that Black

Diamond would honor its $25 million Commitment that they rebuffed warnings from Patriot's

chief restructuring officer, as well as their Pillsbury attorneys, that Black Diamond would pull its

financing at the last minute.  *See* 6/11 Tr. 338:7-15 (Clarke direct) ("Ray [Dombrowski, Patriot's

chief restructuring officer] had told me from day one he knew Black Diamond and he had said

from day one, they will not fund, they will not fund"); 6/8 Tr. 183:21-187:15 (J. McCoy direct)

(Beginning on "September the 21st," when VCLF "made the announcement of who our financial

partner was," "many members of the Patriot Group representing Patriot that were selling us that

project [including Mr. Dombrowski] questioned whether we really had our financing in place,"

and that "[p]art of that could have been because of the reputation or the history they had with

Black Diamond," but "other than hearing them just say it, I didn't really care what he had to say,

because we had our financing in place, and that block [*sic*] was checked. . . ."); 6/13 Tr. 89:8-13

4833-1306-9934

(K. McCoy direct) ("[Mr. Dombrowski would] say, you have financing[?] . . . and we said, yeah,

we – we have financing.  No you don't.  We said, yeah, absolutely, we have financing; we've got

a deal with – with Black Diamond.  He said, you know they're not going to perform.").

123.    Between September 21 and October 23, 2015, representatives of VCLF undertook

searches for only two kinds of financing, neither of which consisted of closing or acquisition

financing that would replace Black Diamond's Commitment—(i) post-closing inventory

financing from Mercuria Energy Group ("Mercuria"), which was the subject of discussions

between Jason McCoy and Michael Loreman of Mercuria, beginning on or about October 13,

2015 (which could be used to take out the Black Diamond debt),[13] and (ii) small personal loans

to Mr. Jason McCoy to defray certain pre-closing diligence and administrative costs for the

Federal 2 Mine that could not be paid on credit (and for which Black Diamond was not obligated

to advance any financing under the Commitment Letter)—not, for example, the several millions

of dollars that would have to be paid to Pillsbury and Teneo at closing.

124.    The potential Mercuria financing, by its terms, was only to be extended beginning

November 15, 2015, approximately three weeks after the anticipated closing of the VCLF-Patriot

transaction.  *See* Ex. AT (10/15/15 e-mail from M. Loreman of Mercuria to J. McCoy)

(specifying "Term" for "Offtake Agreement/Working Capital Finance Structure" as "November

15, 2015 – December 31, 2018").

125.    Given that any Mercuria financing would be based on coal inventory owned by

VCLF at the Federal 2 Mine, it could not have been extended prior to VCLF's acquisition of the

---

[13] As Mr. Clarke remarked to his counsel, Mr. Potter, in one of the privileged communications voluntarily produced by VCLF in this adversary proceeding to moot Black Diamond's repetitive discovery motions:  "We do not have 5 backups.  We have Mercuria Energy Group."  Ex. 62.  As the context of Mr. Clarke's remark makes clear, he was conveying to Mr. Potter:  "[T]he only people we were talking to, you know, was Mercuria and that was about post-closing financing.  It wasn't about closing the transaction."  6/11 Tr. 328:1-12 (Clarke direct).

4833-1306-9934

mine.  Loreman Dep. Tr. 117:17-20, 117:22 ("[Q.]  Now, would Mercuria have been able to

provide VCLF and ERP with inventory or receivables financing before VCLF and ERP took

control of the Federal mine?  A.  We would not have done that."); 6/11 Tr. 329:7-13 (Clarke

direct) ("Would it have even been possible for Mercuria's financing to have been provided

before the closing of the VCLF/Patriot transaction?  A.  No.  Q.  And again, that's because

Mercuria provides inventory of financing of assets owned, is that fair?  A.  That – that's

correct.").

126.    Prior to October 22, 2015, Mr. Clarke informed Messrs. Deckoff and Ehrlich of

Black Diamond that VCLF was looking into obtaining inventory financing from Mercuria to

repay Black Diamond in the post-closing period.  *See, e.g.*, 6/11 Tr. 319:2-14 (Clarke direct)

("So the one in particular was Mercuria and, you know, we had indicated that we were working

with Mercuria to do post-closing takeout financing. . . . [Mr. Deckoff's reaction to that was]

really very positively . . . . He was interested in being taken out."); 6/11 Tr. 328:13-25 (Clarke

direct) ("Black Diamond was providing the financing to close the transaction and then after it

closed, Steve and I and all of us, had had discussions about taking out the financing, the Black

Diamond financing and Mercuria was a co[al] sales company that provided financing. . . . So that

was our strategy to takeout.  It would have been much lower cost capital but it's what Black

Diamond had asked for also."); 6/12 Tr. 112:13-14 (Clarke cross) ("Steve Deckoff, Rich Ehrlich

knew about Mercuria; we told them about Mercuria.");  *see also infra* Conclusions of Law ¶ 50.

127.    Despite all the testimony, no financing transaction between VCLF and Mercuria

of any sort ever occurred.  *See infra* Conclusions of Law ¶ 155.  Consequently, and as discussed

*infra* Conclusions of Law § V.A.2, there is no causal connection between this alleged breach and

any alleged damages.

43

4833-1306-9934

128.    Likewise, during late September and October 2015, Mr. Jason McCoy informally
reached out to friends and family (particularly mentors of his who had suffered losses in the real
estate market) to see if they would be interested in extending him small personal loans to pay
promptly certain pre-closing expenses related to due diligence and setting up payroll and other
services at the Federal 2 Mine so that it could be operational on the day after the closing.  It was
Mr. Jason McCoy's understanding at the time that the Commitment Letter did not prohibit him
from "us[ing his] personal finances," "drawing down on [a] home equity [line]," "using an
existing line of credit," or "using a personal loan to pay for these pre-closing expenses."  6/8 Tr.
264:19-265:13 (J. McCoy redirect); *see also infra* Conclusions of Law ¶¶ 51, 148.

129.    None of these personal loans was of a magnitude that they would have overlapped
with or replaced Black Diamond's $25 million Commitment (none of which was going to be
advanced before the closing date, anticipated to be not earlier than October 26, 2015).  Also,
none of the potential personal loans were to pay the real and most significant closing costs of the
transaction—*i.e.*, the millions of dollars owed by VCLF to Teneo and Pillsbury.  *See infra*
Conclusions of Law ¶ 148.

130.    In any event, none of these contemplated personal loans to Mr. Jason McCoy was
ever consummated.  *See infra* Conclusions of Law ¶ 155.  Consequently, and as discussed *infra*
Conclusions of Law § V.A.2, there is also no causal connection between this alleged breach and
any alleged damages.

## X.    BLACK DIAMOND DOES NOT BEGIN LEGAL WORK ON THE VCLF-PATRIOT TRANSACTION UNTIL MID-OCTOBER 2015

131.    Despite learning from Mr. Potter on September 26, 2015, that the VCLF-Patriot
transaction had changed "substantially" from the 8/16 APA, Mr. Harris refrained from asking for
a copy of the most recent draft of the amended and restated VCLF APA until Friday, October 9,

44

2015, the last day of the confirmation hearing in the Patriot Case.  Mr. Potter promptly provided

Mr. Harris (as well as Mr. Ehrlich) with the latest draft of the amended and restated VCLF APA

the next business day, Monday, October 12, 2015.  *See* 6/7 Tr. 253:17-25 (Potter cross) ("I told

him [Mr. Harris] about the changes [to the VCLF APA] a couple of days later, after we signed it

[the Commitment Letter].  He didn't ask for it.  It's a matter of fact. . . . He sent an email I think

late on a Friday afternoon [October 9, 2015] and I got it to him first thing on Monday [October

12, 2015] or at some point on Monday.").

132.     Indeed, as a general matter, Mr. Potter "responded to every request that [Mr.

Harris] ever made of [him], which . . . were not very many."  6/7 Tr. 201:13-18 (Potter direct).

133.     In his cover e-mail to Mr. Harris and Mr. Ehrlich on October 12, 2015, attaching

the most recent draft of the amended and restated VCLF APA, Mr. Potter reiterated that time was

of the essence to finalize documentation regarding both the VCLF-Black Diamond financing

transaction and the underlying VCLF-Patriot transaction, yet no meaningful work had been

accomplished yet by Black Diamond:

> Adam and Richard –
>
> I believe this is the most recent exchange on the APA.
>
> As I said to Adam, we are hearing noise about meetings at Black
> Diamond this Thursday and Friday; Adam indicated that he was
> not yet aware of any such meetings.  In order to deploy our
> resources effectively, we need to know this sooner rather than
> later.  If the meetings are just business folks (without legal), I
> guess that i[s] fine.  *That said, today is the 12th and the closing is
> scheduled for the 26th, so we have a lot of documents to work
> through and finalize on both the BD loan and equity pieces*.
>
> Patrick

Ex. 326, at BDCF-00044230 (emphasis added).  With this last sentence, Mr. Potter was trying to

convey that the Parties needed "to get the lawyers . . . and to the extent necessary, the business

4833-1306-9934

people to get working on the transaction so that we can close in a timely fashion." 6/7 Tr.

206:10-14 (Potter direct). Indeed, highlighting the "substantial" changes that had been made to

the 8/16 APA (as referenced in Mr. Potter's September 26, 2015 e-mail, Ex. 49), Mr. Potter's

October 12, 2015 e-mail attached a redline comparison showing 1,553 changes between the 8/16

APA and the draft amended and restated VCLF APA, as of October 12, 2015. *See* Ex. 326, at

BDCF-00044331.

134.    Mr. Potter and Mr. Harris also had a call on October 12, 2015. 6/7 Tr. 204:23-

205:18 (Potter direct). It was during that call that Mr. Harris told Mr. Potter that "he didn't have

any authority to move forward on a transaction," *id.*, even though he and Black Diamond knew

that—as Mr. Potter noted in his October 12, 2015 e-mail, Ex. 326—the closing of the VCLF-

Patriot transaction was scheduled for October 26, 2015. *See, e.g.*, 6/4 Tr. 211:8-9 (Ehrlich

direct) (the "target date for closing" was "October 26th"); 6/5 Tr. 53:6-15 (Ehrlich cross) ("Q. . . .

You also testified that you understood that the closing between VCLF and Patriot was scheduled

for October 26th, right? A. *I did know that*. Q. And that would be Monday, October 26th, right?

A. Correct. Q. All right. And so the intervening days, between October 22nd, and October 26th

included a weekend, right? A. Correct.") (emphasis added); *id.* 181:6-8 (Harris) ("It's my

understanding that there were negotiations that were continuing on the Thursday and Friday

*preceding what was anticipated to be a Monday closing*.") (emphasis added).

135.    Despite this known time crunch, Black Diamond did not even discuss any to-be-

decided terms or final documentation for the Senior Secured Facilities with VCLF between

September 21 and October 22, 2015, and indisputably provided no draft loan documentation to

VCLF, at any time. *See, e.g.*, 6/5 Tr. 155:9-23 (Harris direct) (admits that Schulte's "financing

side . . . was probably lagging behind the other areas," and that he recalls "hearing comments

4833-1306-9934

from Pillsbury about expectations that the financing documents should already have been

prepared").

136.    Mr. Harris attested to the many kinds of documents that would have been required

to close the financing between Black Diamond and VCLF, but admitted that, to the extent

Schulte prepared drafts of *any* documentation—and he does not know for a fact that any drafts

were prepared—they were never circulated outside of Schulte, let alone to VCLF and Pillsbury:

> Q.  Now Mr. Harris, can you detail for us that for purpose of the
> type of loan transaction, acquisition financing that was
> contemplated by the 9/21 commitment letter, just what types of
> documentation counsel for the lender would be required to
> prepare?
>
> A.  *You would have a loan agreement, relevant security agreement
> would be the two principal documents that would be required.
> Then there would be ancillary documents and closing certificates,
> UCC financing statements.*  To the extent there's real estate that's
> being pledged, obviously you would need mortgages but in a deal
> like this, that would have been done post-closing, to the extent
> there were real estate assets being pledged.  That would be the
> general categories.
>
> Q.  To what extent was that documentation attempted or pursued
> from 9/21 through October 23?
>
> A.  My finance team, led by Kirby Chin, had begun working on the
> financing documents for the transaction and, you know, I *believe*
> internal drafts may have been produced.  *I can't say specifically. . .*
> .
>
> Q. . . . How much was prepared and by what date?
>
> A.  *I can't tell you the specific status of every single loan document*
> or every specific corporate document.  You focused on the loan
> documentation. . . .

6/5 Tr. 217:18-218:23 (Harris cross) (emphasis added).

137.    In contrast, and consistent with Black Diamond's primary, overriding interest in

obtaining equity in HealthCo, Schulte apparently performed some amount of work on corporate

4833-1306-9934

documentation and structure for HealthCo—or, as it would be called after the closing, ERP

Settlement, LLC ("ERP Settlement"), although no documentation was timely shared with VCLF

or its lawyers.

138.    Schulte and Black Diamond also negotiated and approved a stipulation with AIG,

the beneficiary of several letters of credit in the W/C Package, that precluded a monetization

event with respect to that collateral until January 2018, at the earliest.  *See* Ex. CB (10/23/15 e-

mail from AIG's counsel to Schulte, Black Diamond, and VCLF, attaching draft stipulation), at

BDCF-00076732 ("As consideration for this concession, ERP and its successors and assigns

shall not request a collateral adjustment or a close-out be conducted until a date after losses

valued as of December 31, 2017, are available.");[14] *see also* 6/5 Tr. 103:24-104:2 (Ehrlich cross)

("Q.  You did know, as of October 23, that VCLF was negotiating a stipulation with insurer AIG

that would prevent any monetization event for two years, correct?  A.  Correct."); 6/5 Tr. 183:17-

25 (Harris cross) ("My partner [at Schulte], Howard Epstein, familiarized himself with those

policies [in the W/C Package] and negotiated a stipulation, I believe a settlement with

AIG . . . .").

139.    The first "kick[-]off" call between the Pillsbury and Schulte attorneys did not take

place until October 16, 2015.  *See* 6/7 Tr. 206:16-207:6 (Potter direct); Ex. AU (calendar invite

for kick-off call).  The call lasted "in the half-an-hour range," and only "three or four people

from Schulte and a similar number from Pillsbury" participated.  6/7 Tr. 207:7-15 (Potter direct).

140.    On the October 16, 2015 kick-off call, the Schulte attorneys asked "a lot of . . .

fundamental basic questions about the transaction, due diligence that had been conducted on

workers' comp liabilities . . . . [I]t was more like a sort of meet-and-greet, this is the first time

---

[14] The as-filed version of the stipulation included this provision.  *See* Main Case, ECF Doc. No. 1801 (entered Nov. 11, 2015).

4833-1306-9934

we're talking, and they're trying to get their arms and heads around the transaction." 6/7 Tr.

207:16-23 (Potter direct); *see also id.* 208:1-5 (Potter direct) (Mr. Potter's impression of the

Schulte attorneys, based on these questions, was that "they were substantially behind the ball . . .

behind the curve").

141.    None of the Schulte attorneys raised any issue about the terms of the Commitment

Letter or the documentation of the final financing deal during the kick-off call, and no Schulte

attorneys discussed when that documentation might be forthcoming. *See* 6/7 Tr. 208:9-21

(Potter direct).

142.    Instead of focusing on definitive loan documentation, for the next five days, Black

Diamond and Schulte tried to drive material changes to the draft amended and restated VCLF

APA to Patriot's detriment.

143.    Knowing that Patriot would react negatively to many of Black Diamond's

proposed changes to the draft amended and restated VCLF APA, Mr. Potter had a call with the

Schulte attorneys on or about October 20, 2015, seeking assurance that VCLF could represent in

the transmittal to Patriot that, if Black Diamond's proposed changes to the then-current draft of

the VCLF APA were accepted by Patriot, Black Diamond would lend. During that call, Black

Diamond's attorneys indeed confirmed that VCLF "would be able to say to Patriot and its

lawyers that if you all accept this renegotiated asset purchase agreement between Black Diamond

and VCLF, that Black Diamond will fund the twenty-five million dollars." *See* 6/7 Tr. 217:19-

220:4 (Potter direct).

144.    Accordingly, in his draft of the cover letter to Patriot's counsel that he circulated

to Black Diamond on October 20, 2015, Mr. Potter included the following paragraph:

> Finally, we have consulted with Black Diamond Commercial
> Finance, LLC ('Black Diamond'), our source of exist [*sic*]

49

4833-1306-9934

> financing, who has agreed that it is prepared to fund consistent
> with its pre-existing commitment letter and to close on the
> transaction as embodied in the Amended and Restated APA.

Ex. AY, at PWSP-00063471.

145.    In a reply e-mail the next day, October 21, 2015, Mr. Harris directed that Mr.

Potter delete this paragraph.  *See* Ex. BB, at PWSP-00065859 ("Our only comment here is to

delete the paragraph referring to BD and it[s] readiness to finance.").

146.    By reply e-mail on October 21, 2015, Mr. Potter challenged Mr. Harris,

contending that the deletion of the paragraph regarding Black Diamond's readiness to finance

was inconsistent with the call the Schulte and Pillsbury attorneys had the day prior, where a

"coupling message" had been discussed—namely, that Patriot should accept the materially worse

terms that Black Diamond demanded in the draft amended and restated VCLF APA and Black

Diamond was prepared to fund consistent with the Commitment Letter.  *See* Ex. BB, at PWSP-

00065859.  The coupling message was important because Patriot already did not believe that

Black Diamond would fund.  *See supra* Findings of Fact ¶ 122.

147.    Though unknown to VCLF and Pillsbury at the time, Mr. Harris directed that the

paragraph be deleted because Black Diamond, in fact, was contemplating changing the terms of

VCLF's financing.  6/5 Tr. 158:1-7 (Harris direct) ("Well, [the reason Mr. Harris demanded the

paragraph stricken was] because this [draft amended and restated VCLF APA] is a completely

modified asset purchase agreement and, as a result, there were, to my understanding, discussions

that needed to be had between Black Diamond and VCLF regarding potential modifications to

the financing terms that would be associated with that should that new agreement be the one that

they were asking us to finance.").

4833-1306-9934

148.    Mr. Harris, however, did not tell Mr. Potter that, instead telling him only:

"Subject to client saying differently I think you can say that your lender has reviewed and

approved the form of APA you are sending them."  Ex. BB, at PWSP-00065859.

149.    Late at night on October 21, 2015, and without authority from Black Diamond to

do otherwise, Mr. Potter sent Patriot's counsel the cover letter accompanying Black Diamond's

draft amended and restated VCLF APA without any representation about Black Diamond being

committed or prepared to fund.  The draft amended and restated VCLF APA was sent to Patriot

by separate e-mail.  *See* Ex. 330.

## XI.    THE EVENTS OF OCTOBER 22 AND 23, 2015

150.    During the day on October 22, 2015, Patriot "resoundingly rejected" Black

Diamond's changes to the VCLF APA.  *See* 6/5 Tr. 159:25-160:4 (Harris direct) ("Q.  Okay.

Now, after this revised version of the APA was sent over to Kirkland on behalf of Patriot, do you

recall what happened to it?  A.  My recollection is that Patriot resoundingly rejected the vast

majority of the proposed changes that were in there.").

151.    Black Diamond learned on that same day, October 22, 2015, that Patriot rejected

Black Diamond's draft amended and restated VCLF APA.  *See* 6/4 Tr. 211:16-212:4 (Ehrlich

direct) (Patriot's reaction to Black Diamond's draft was, "they said no, no way," and this

response was communicated "[w]ithin a day" of its transmission, "[o]n Thursday, October

22nd").

152.    Separately, that same day, Black Diamond demanded that Messrs. Clarke and Ken

McCoy of VCLF meet with Patriot to recover $5 million in UMWA equity investment proceeds

that VCLF had previously relinquished to Patriot on the sidelines of the early October 2015

confirmation hearing.  *See* 6/11 Tr. 336:12-16 (Clarke direct) ("Steve [Deckoff] had asked, you

know, because of the Old Republic money being lost, if Ken and I would go back to Patriot Coal

4833-1306-9934

Corporation, which I believe we did on the 22nd, actually and, you know, convince them to

reduce the purchase price and let us keep five million dollars.").

153.    Messrs. Clarke and Ken McCoy succeeded in recovering this $5 million amount

from Patriot. *See* 6/11 Tr. 340:11-12 (Clarke direct) ("Q.  So you were successful in procuring

five million from them.  A.  We were successful.").

154.    At trial, Black Diamond's Mr. Ehrlich admitted that, prior to October 22, 2015,

Black Diamond never raised even the notion of changes to the terms of the Commitment Letter

with VCLF.  *See* 6/5 Tr. 52:17-25 (Ehrlich cross) ("Those conversations"—regarding

"substantive changes to the commitment letter"—"started on October 22nd.").  Mr. Harris had the

same recollection.  *See* 6/5 Tr. 210:2-8 (Harris cross) ("Q.  Now, are you aware of interactions

between Black Diamond and VCLF in connection with changes to the commitment letter that

predated October 22nd?  A.  Other than the agreement to extend certain dates . . . I am not aware

of any specific discussions regarding amendments or waivers to the commitment letter or the

term sheet prior to the 22nd.").

155.    Black Diamond knew, though, that "the closing between VCLF and Patriot was

scheduled for October 26th," which was a Monday, and that "the intervening days, between

October 22nd, and October 26th included a weekend."  6/5 Tr. 53:7-15 (Ehrlich cross).

156.    At approximately 5:30 p.m. on October 22, 2015, Mr. Ehrlich had a telephone call

with Mr. Clarke, in which he informed him that Black Diamond could not do the deal set forth in

the Commitment Letter.  Instead, he demanded new, materially different, and onerous terms.

Those terms included:

- A reduction of the term loan amount from $10 million to $5
  million, none of which could be drawn before December 2, 2015.
  *See* 6/5 Tr. 58:14-15 (Ehrlich cross) ("Q.  The term loan was
  reduced to zero at closing, correct?  In the initial iteration, yes.").

- Replacement of the asset-based loan facility with a receivables purchase facility, which would have likewise given VCLF $0 cash at closing, and would have provided Black Diamond with an effective rate of return of 44% on purchased receivables, rather than a 17% interest rate on amounts advanced under the terms of the Commitment Letter. *See, e.g.*, Ex. BP ("Rate of return – Each receivable will be purchased at a discount to face amount to provide at least an 18% internal rate of return (Required IRR). For receivables that have 30 days [*sic*] terms or less, the discount will be 1.5%. The discount rate will be increased for longer dated receivables to ensure that buyer [BDCF] receives the Required IRR. Discounts will be adjusted for actual experience, so if a counterparty delays payment on a receivable, the discount on future receivables from that counterparty will be increased to account for the delay.").

- New financial covenants that were not typical for financing transactions of this kind,[15] and that would have put VCLF in default immediately after closing, allowing Black Diamond to step in and assume control of the Federal 2 Mine,[16] and simply accept a 90% ownership interest in, and effective control over, HealthCo, without having to advance any (or, at least, any significant) amounts, as contemplated by the Commitment Letter. Indeed, Mr. Ehrlich conceded at trial that Black Diamond "would have maintained [its] equity interest in Healthco regardless of whether Tom Clark[e] succeeded," and that Black Diamond "did want Healthco." 6/5 Tr. 61:20-24 (Ehrlich cross).

- A personal guarantee of 50% of Black Diamond's projected internal rate of return by Mr. Clarke.

157.   As Mr. Ehrlich admitted at trial, these new terms were driven by Black Diamond for Black Diamond's benefit (to minimize its credit risk at the Federal 2 Mine), and were to the detriment of VCLF. In particular:

- With respect to the new provision that VCLF would not receive any portion of the term loan at closing, and the conditions to first credit extension, Mr. Ehrlich admitted that, "We put that condition

---

[15] *See* Gravenhorst Dep. Tr. 162:25-164:22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[16] *See* 6/5 Tr. 61:6-9 (Ehrlich cross) ("Q. That's right, Mr. Ehrlich, you would have had an equity interest in the federal mine whether Tom Clark[e] succeeded or not. You would have had an interest, isn't that right? A. That is correct.").

4833-1306-9934

in.  We wanted that condition put in."  6/5 Tr. 83:5-19 (Ehrlich cross); *see also* 6/4 Tr. 224:23-225:2, 225:19-24 (Ehrlich direct) ("the term loan was the riskier part of this financing and . . . we were structuring this facility to reduce our – to put the risk on VCLF and not Black Diamond").

- With respect to the new financial covenants, Mr. Ehrlich admitted that "[t]hese were covenants that we put into this term sheet"; that "VCLF was not asking from them"; and that "[t]hese were being driven by Black Diamond . . . Black Diamond wanted these covenants."  6/5 Tr. 81:24-82:5 (Ehrlich cross); *see also id.* 82:17-19 (the covenants were "something that . . . in the context of this term sheet we had requested").

158.    Mr. Ehrlich conceded at trial that he understood at the time that he was "rais[ing] substantive issues with Tom Clark[e] on Thursday night, October 22nd, before a scheduled Monday, October 26th closing."  6/5 Tr. 54:7-11 (Ehrlich cross).

159.    Mr. Clarke did not agree to Mr. Ehrlich's demand for new terms on the evening of October 22, 2015.  To the contrary, as Mr. Clarke memorialized in privileged communications with his attorneys only a few days later, he consistently urged Black Diamond to perform under the Commitment Letter, and tried to explain to Mr. Ehrlich why the new terms were not be feasible for VCLF.  *See* Ex. DM, at VCLF-00183651-52 (10/25/15 e-mails from T. Clarke to P. Potter) (confirming that he did not "verbally agree" to any of the modifications proposed by Black Diamond, but rather "was pushing Rich [Ehrlich] *to perform under the commitment*," and "kept pushing Rich on the telephone *to fund the $10 million up front*") (emphasis added).

160.    Indeed, Mr. Ehrlich at trial could not recall any specific words used by Mr. Clarke to manifest agreement, simply stating that he could recall no negativity on Mr. Clarke's part.  *See* 6/4 Tr. 218:1-17 (Ehrlich direct) ("Q. . . . What did he [Mr. Clarke] say?  A.  I – I don't remember his exact words.  Q.  Tell me something, did he express any negativity about it?  A.  I don't recall any negativity regarding the receivables for – to purchase the facility.").

161.    Mr. Ehrlich, however, admitted that Mr. Clarke "absolutely raised concerns" with

Black Diamond's modifications when Mr. Ehrlich presented them to him on October 22 and 23,

2015.  6/5 Tr. 64:21-65:2 (Ehrlich cross).  Importantly, Mr. Ehrlich acknowledged Mr. Clarke's

"specific concern [of] the lack of capital at closing" under Black Diamond's demanded

modifications.  Mr. Ehrlich merely couldn't "recall" whether Mr. Clarke was "concerned that he

wouldn't be able to run the mine, and wouldn't be able to deliver Healthco to [Black Diamond]

under the new modifications demanded by [Black Diamond]" on the night of October 22, 2015.

*Id.* 65:3-14 (Ehrlich cross).

162.    At Black Diamond's urging, Teneo modeled Black Diamond's new demands on

the evening of October 22, 2015.  *See* Ex. BK.  Teneo's modeling that evening and throughout

the day on October 23, 2015, confirmed that Black Diamond's new terms would leave the

Federal 2 Mine undercapitalized by more than $2 million immediately upon the closing of the

VCLF-Patriot transaction.  *See* Ex. BK (10/22/15 7:55 p.m. e-mail from B. Murphy to T. Clarke

and Z. Messenger, copying the rest of the Teneo team) ("[O]ur starting cash balance will be

negative $2.8M."); Ex. 131 (10/22/15, 11:05 p.m. e-mail from Z. Messenger to T. Clarke,

copying B. Murphy ("Attached is the updated model.  We are ~$1.4M short at closing.  Will

continue to build it out for more detail but wanted to circulate it as soon as possible.").  As Mr.

Murphy explained:

> . . . I knew based on the simple math that these assumptions were
> not going to work for us given it would create a negative cash
> balance at closing which means we couldn't even close the
> deal. . . . [B]y definition, we couldn't close a transaction with
> negative 2.8 million in cash; therefore, I knew something needed to
> change, some of these assumptions needed to change to make it
> work, to even make the model work.

6/11 Tr. 158:5-25 (Murphy direct); *see also id.* 162:5-22 (Murphy direct) (noting that Mr.

Messenger's modeling showing a $1.4 million shortfall was not inconsistent with Mr. Murphy's

initial estimate of a $2.8 million shortfall:  " . . . I think he was simply looking at and saying

here, optically, this is what it looks like so far and wanted to give you a heads up").

163.    Mr. Clarke himself conducted a "back-of-the-envelope" modeling on the morning

of October 23, 2015.  Based on this modeling, Mr. Clarke reiterated to Mr. Ehrlich by telephone

on October 23, 2015, that Black Diamond's new terms would leave the Federal 2 Mine

insufficiently capitalized at closing, and once again urged Black Diamond to perform under the

terms of the original Commitment Letter.

164.    Despite Mr. Clarke's having explained that Black Diamond's new terms were not

feasible, on October 23, 2015, Mr. Ehrlich instructed Hugo Gravenhorst of BDCF—an

individual who had no prior involvement with this transaction—to send Mr. Clarke four different

e-mails memorializing the "modif[ications]" that Black Diamond was demanding to the

Commitment Letter, at 10:24 a.m., 1:20 p.m., 2:04 p.m., and 2:18 p.m., respectively

(collectively, the "Gravenhorst E-mails").  *See* Ex. BP (10:24 a.m. e-mail); Ex. BT (1:20 p.m. e-

mail); Ex. BU (2:04 p.m. e-mail); Ex. BV (2:18 p.m. e-mail).

165.    Mr. Ehrlich did not direct Mr. Gravenhorst to copy any of VCLF's attorneys or

professionals (or even Mr. Clarke's business partners, Ken and Jason McCoy) on the

Gravenhorst E-mails—even though several of Black Diamond's business people and Black

Diamond's outside attorneys were copied on these transmissions.  *See* Exs. BO, BR, BS

(10/23/15 e-mails from R. Ehrlich to H. Gravenhorst, providing him the text and intended

recipients of the Gravenhorst E-mails).  Mr. Harris, Black Diamond's counsel, admitted it is "not

in [his] best practice" to omit a counterparty's attorney when it is known that the counterparty is

represented by counsel.  6/5 Tr. 201:6-23 (Harris cross) (conceding:  "What clients do, clients

do.").

4833-1306-9934

166.     In light of all the circumstances, as set forth above and further below, the Court concludes that Mr. Ehrlich intentionally omitted VCLF's attorneys (at Pillsbury) and financial advisors (at Teneo) from the Gravenhorst E-mails hoping that, as a result, they could not counsel Mr. Clarke to evaluate and reject Black Diamond's material modifications to the Commitment Letter.

167.     In addition to the terms conveyed by Mr. Ehrlich to Mr. Clarke by telephone on Thursday evening, October 22, 2015, the second, third, and fourth Gravenhorst E-mails also added provisions increasing the number of conditions to first credit extension, and imposing new limitations on VCLF's payment of professionals.  *See* Exs. BT, BU, BV.  With respect to the latter issue, Mr. Ehrlich admitted that it was Black Diamond, not Mr. Clarke, that wanted to limit the amount VCLF could pay its professionals:

> Q.  But Mr. Clarke was not trying to limit fees for professionals. That was what Black Diamond was doing, right?
>
> A.  If you're asking the limiting part of it, I would agree with you. We were trying to limit it, and Clarke was – and . . . Tom was trying to increase it.

6/5 Tr. 85:22-86:1 (Ehrlich cross).

168.     In telephone communications with Mr. Clarke on October 23, 2015, Mr. Ehrlich "had some colorful language about the professionals" to justify Black Diamond's demand that VCLF not pay them in full.  6/11 Tr. 345:17-346:9 (Clarke direct) (noting also that "Mr. Ehrlich was quite vocal about the professionals").  Mr. Clarke protested Mr. Ehrlich's demand in the strongest of terms:  "I told him that we had made commitments.  We were going to honor those commitments and that we would work with our professionals but I wasn't going to do what he asked me to do."  6/11 Tr. 346:7-13 (Clarke direct).

4833-1306-9934

169.    Though Mr. Gravenhorst was the one who transmitted the Gravenhorst E-mails to

Mr. Clarke, Mr. Gravenhorst did not draft them; rather, the primary drafter was Mr. Ehrlich. *See*

6/4 Tr. 223:2-8 (Ehrlich direct) ("Q.  Who drafted this email?  A.  I did, along with other Black

Diamond professionals and counsel"—"Adam Harris from Schulte" and "Steve Deckoff and

maybe others."). *But see* 6/5 Tr. 195:15-25 (Harris cross) ("I don't recall specifically having any

involvement in drafting the Gravenhorst emails. . . . I believe they were written by someone

inside of Black Diamond which may not have been Mr. Gravenhorst. . . . [I]t could have been

Mr. Ehrlich."); *id.* 211:3-9 (Harris cross) ("I don't recall having any discussions regarding . . .

the sending of these emails [the Gravenhorst E-mails] . . . prior to them being sent").

170.    Mr. Ehrlich admitted at trial that he "knew" as of October 23, 2015, "that Mr.

Clarke[e] had never met Mr. Gravenhorst" and that "Mr. Clark[e] did not know who Mr.

Gravenhorst was."  6/5 Tr. 68:6-21 (Ehrlich cross).

171.    Moreover, as Mr. Gravenhorst and other Black Diamond witnesses conceded, Mr.

Gravenhorst had no prior involvement in this transaction, and was only "parachuted" in (and

then "extracted") at the eleventh hour.  *See* Gravenhorst Dep. Tr. 259:2-4, 259:6-9, 259:11-17,

259:19-20 ██████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (emphasis added);

6/5 Tr. 196:24-197:21 (Harris cross) (not disputing that this was an instance of Mr. Gravenhorst

"parachute[ing] in at the last minute and tak[ing] no prior role in negotiations," and noting that

he has "had that experience with" Mr. Gravenhorst, where "he engages at the last hour, so to

speak, without having engaged in prior negotiations with a counterparty"); 6/8 Tr. 66:9-15

58

(Deckoff cross) ("Q.  To your knowledge, [Mr. Gravenhorst] had no participation or involvement in any negotiations between Black Diamond and VCLF, right?  A.  I don't know if that's true or not.  Q.  Well, *he was only parachuted into the deal* for regulatory reasons; isn't that true?  A. *For tax reasons*.  I don't know if tax reasons is regulatory reasons.") (emphasis added).

172.     Black Diamond has argued that it was necessary for Mr. Gravenhorst, an employee of BDCF, to be the one to send the Gravenhorst E-mails to Mr. Clarke, purportedly because Black Diamond's internal procedures allow only BDCF employees to transmit financing term sheets to outside parties.  Mr. Ehrlich, however, was forced to concede on cross examination that he—an employee of BDCM, not BDCF—was the one who sent Mr. Clarke drafts of commitment letter-related documents on September 20 and October 6, 2015, respectively, without involving Mr. Gravenhorst, and in violation of Black Diamond's purported procedures:

> Q. . . . [W]e've already established . . . that you were the one who sent Mr. Clark[e] the draft commitment letter back on the 8[:]29 [p.m.] evening of Sunday night, 9[/]20, correct? . . . You're sending the draft commitment letter, right?
>
> A.  Yes.
>
> Q.  And the draft commitment letter references a loan?
>
> A.  It does.
>
> Q.  And you're not affiliated with Black Diamond Commercial Finance, right?
>
> A.  I am not.
>
> Q.  All right.  Let's also talk about what we also established in connection with obtaining the extension.
>
> A.  Okay.
>
> Q.  You're the one who negotiated the extension of the term of the commitment letter, right?

4833-1306-9934

A.  I'm the one who sent Tom the request to extend that commitment letter.

. . .

Q.  You're interacting with Mr. Clark[e] for purposes of extending the commitment letter, correct?

A.  Correct.

Q.  All right.  And you're not a representative of Black Diamond Commercial Finance, right?

A.  I am not.  Steve Deckoff is the owner of Black Diamond Commercial Finance.  He's on both emails.

Q.  Yeah, but guess who's not on either of those emails?

A.  Hugo Gravenhorst.

6/5 Tr. 69:14-71:1 (Ehrlich cross).  Mr. Deckoff gave the same admissions.  *See* 6/8 Tr. 67:15-69:13 (Deckoff cross) (Mr. Ehrlich, not Mr. Gravenhorst, sent both (1) the draft commitment letter to VCLF on September 20, 2015, even though "this email relates to a commitment letter to be originated by Black Diamond Commercial Finance," and (2) the e-mail "extend[ing] the term of the 9/21 commitment letter," even though "he's not employed by BDCF").[17]

173.    This Court finds that it was unnecessary for Black Diamond to parachute Mr. Gravenhorst into the transaction and that its explanations for having done so are not credible. Accordingly, the Court infers, from the preponderance of the evidence before the Court, that Black Diamond brought Mr. Gravenhorst into this transaction solely to convey a sense of finality to Mr. Clarke at the eleventh hour—namely, that the terms of the Gravenhorst E-mails were the only terms on which Black Diamond was willing to lend to VCLF.  *See* 6/11 Tr. 347:7-10

---

[17] Notably, when confronted with these "unhelpful" facts at his deposition, all Mr. Deckoff could say in response was, ███████████████  Deckoff Dep. Tr. 253:11-254:19.  Mr. Deckoff's response confirms that Black Diamond's purported reason for inserting Mr. Gravenhorst into the process is a mere pretext, to mask Black Diamond's true intention of jamming VCLF with new, materially worse terms on the eve of closing.

4833-1306-9934

(Clarke direct) (Mr. Clarke's perception was that Mr. Gravenhorst "was in charge of, you know, *issuing the final, you know, terms of a transaction*. . . . [T]o me, it was sort of analogous to buying a car.  You know, you make the deal, then you have to go see the sales manager.") (emphasis added).

174.    Black Diamond also contends that the Gravenhorst E-mails reflect Mr. Clarke's agreement to new terms.  The Court finds to the contrary.

175.    *First*, the Gravenhorst E-mails themselves evidence no agreement by Mr. Clarke to the new terms demanded by Mr. Ehrlich.  *See* 6/5 Tr. 75:23-76:6 (Ehrlich cross) ("Q.  My question was you did not memorialize [in the first Gravenhorst E-mail] that he [Mr. Clarke] agreed orally or verbally anywhere in this email or in the succeeding Gravenhorst emails, right? . . . A.  In this email I do not say that Tom agreed to what we had talked about the night before.").

176.    *Second*, as noted above, following the transmission of each of these e-mails, Mr. Clarke renewed his objection to the terms, noting that VCLF could not sustain its management of the Patriot assets with $0 at closing.  *See* 6/12 Tr. 22:8-12 (Clarke direct) ("As a matter of fact, while these [Gravenhorst] emails were coming, you know, Rich and I were going through weekly cash flow sheets and I was continuing to try to indicate to him that, you know, none of these proposals worked.").  Mr. Ehrlich's response, however, was, "This is all we can do," and he declined to negotiate Black Diamond's new terms.  6/11 Tr. 335:6-10 (Clarke direct) ("[T]here was a series of discussions that we had.  I was modeling things and coming back to him but eventually, he said, you know, this is all we can do."); *id.* 347:11-21 (Clarke direct) ("I think it was really hard for Rich to tell me all of the things that he had to tell me.  And, you know, that's why, you know, we came to the point where he said this is the best we can do.  I

4833-1306-9934

mean, you know, Rich knew, we're accountants.  I mean, you know, he knew it wouldn't work."); *see also* 6/12 Tr. 25:13-20 (Clarke direct) ("Again, you know, we were not negotiating. He [Mr. Ehrlich] had orders, he was executing the orders.  I think he wanted to be sympathetic to where our position was, but he had no flexibility.  That's why he told me:  this is the best I can do.").

177.    *Third*, Mr. Clarke made one desperate last attempt to get Black Diamond to perform under the Commitment Letter during a telephone call at 5:20 p.m. on October 23, 2015; Mr. Ehrlich once again declined.  *See* Ex. 253 (T. Clarke phone records), line 390 (log of final 5:20 p.m. call between Messrs. Clarke and Ehrlich on October 23, 2015); 6/12 Tr. 21:4-7 (Clarke direct) (Mr. Ehrlich's "response was, you know – you know, this is the best I can do.  And I realized that he was being pushed in this area, and I . . . was sympathetic to him, . . . but I told him that it just would not work."); *cf.* 6/13 Tr. 45:18-25 (Clarke redirect) ("[C]ertainly, the mode that we were in [at that time of the day on October 23, 2015] is, you know, trying to consummate the commitment letter, that was the mode we were in.  There was no other purpose or intent.").

178.    At no point in Mr. Clarke's and Mr. Ehrlich's telephone discussions on October 22 and 23, 2015, did Mr. Ehrlich tell Mr. Clarke that the changes in the Gravenhorst E-mails had been necessitated by changes to the VCLF-Patriot APA.  Nor, as Mr. Ehrlich claimed at trial, did the Gravenhorst E-mails reflect Black Diamond insisting on the new terms because Patriot had rejected Black Diamond's October 21, 2015 draft amended and restated VCLF APA:  the Gravenhorst E-mails demand new terms and state explicitly that lending is conditioned on Patriot's *acceptance* of that draft.  *See, e.g.*, Ex. BP (10:24 a.m. Gravenhorst E-mail) ("Our commitment remains subject to VCLF and Patriot executing the draft revised APA dated October 21, 2015, that we previously approved.").

4833-1306-9934

179.    The Court also finds that Black Diamond's contention that, on October 22 and 23, 2015, Mr. Ehrlich advised Mr. Clarke that Black Diamond remained willing to close on the terms set forth in the Commitment Letter, lacks credibility given Mr. Ehrlich's concession on cross-examination that "the terms and provisions of the original 9/21 commitment letter [remained] the terms under which [Black Diamond] would actually loan" "may not have come up" in Mr. Ehrlich's conversations with Mr. Clarke.  *See* 6/5 Tr. 107:7-108:6 (Ehrlich cross).

180.    Based on the foregoing, the Court finds that Mr. Clarke and VCLF's other representatives sincerely and reasonably understood the Gravenhorst E-mails and Mr. Ehrlich's verbal statements on October 22 and 23, 2015, as a take-it-or-leave-it insistence on materially modified lending terms by Black Diamond, and that Black Diamond was unwilling to proceed on the basis of the Commitment Letter.  *See* 6/12 Tr. 84:1-5 (Clarke cross) ("They repudiated, in my words, the commitment letter.  And we were unable to close with them, although we were highly desirous of closing the transaction with them, as demonstrated by all of the communications and the efforts that went into closing."); 6/12 Tr. 87:4-11 (Clarke cross) ("I know that Black Diamond refused to close based on the terms of the commitment letter."); 6/12 Tr. 100:2-15 (Clarke cross) ("[O]n the 22nd and the 23rd, there was a refusal to fund any cash under the commitment letter on the closing date."); 6/13 Tr. 107:20-108:25 (K. McCoy direct) ("[T]he big thing is we needed money upfront.  We were looking for a term loan.  The term loan essentially went away . . . . And we needed money to close the deal and to finance the coal mine, and they were – were – they were backing out of it. . . . [T]hey repudiated, they walked away, the deal was through, we had nothing to do with these crooks."); 6/8 Tr. 183:16-20 (J. McCoy direct) ("See, on the 23rd we were expecting the money, but again, at the last minute, in the last hour, when it was eight-ball, no chance to turn back, the terms had changed, and we did not receive the

4833-1306-9934

money. . . ."); *id.* 195:20-22 (J. McCoy direct) ("By this point, 10:09 p.m. on October 23rd,

2015, . . . the financing from Black Diamond [had] fallen through"); *id.* 257:3-7 (J. McCoy

cross) ("Black Diamond's gone at this point [Monday, October 26, 2015].  I mean, . . . their

reputation caught up to them.  They bailed. . . . We don't have financing.  We can't close on a

project.  What are we going to do?  So I mean, there is no Black Diamond anymore.").

181.    Because Black Diamond had abandoned the Commitment Letter, beginning late

in the day on October 23, 2015, through Sunday afternoon, October 25, 2015, VCLF did not

communicate with or respond to Black Diamond, so that it could assess the significance of Black

Diamond's decision to abandon the Commitment Letter, and VCLF's options.

182.    This silence worried Black Diamond because, the Court finds, it was concerned

that it had pushed VCLF too hard through its demands for modified material lending terms that

would, among other things, have left ERP without any operating cash and required Mr. Clarke's

personal guaranty.  Periodically throughout the day on October 24, 2015, Mr. Ehrlich tried to

connect with Mr. Clarke, e-mailing him at one point, "We [Black Diamond] still have lawyers

working and are incurring legal expenses."  Ex. CL.  (The Court finds that this e-mail was, in

part, a ruse trying to guilt Mr. Clarke into responding, because, as Mr. Ehrlich was forced to

admit when confronted with Schulte's October 2015 invoice to Black Diamond, Schulte billed a

mere 1.1 hours on Saturday, October 24, 2015, none of it in connection with loan documentation.

*See* 6/5 Tr. 92:25-94:7 (Ehrlich cross); Ex. ER (Schulte October 2015 invoice)).  Black Diamond

(likely Mr. Deckoff) also went to extreme lengths to try to force communications with VCLF by

contacting the founder of Teneo and demanding a call with Mr. Murphy.  *See* 6/11 Tr. 184:21-

185:13 (Murphy direct) ("[E]ither Steve Deckoff or – or someone very senior at Black Diamond

had called Paul [Keary, the founder of Teneo] directly. . . . [A]nd that individual – whether it be Steve or someone else – told Paul to tell me to call them back.").

183.    On October 25, 2015, VCLF's counsel Patrick Potter wrote a letter to Black Diamond's counsel Adam Harris describing how Black Diamond had repudiated its obligations under the Commitment Letter through the sending of the Gravenhorst E-mails and other actions. *See* Ex. DQ.  Mr. Potter summed up Black Diamond's conduct as follows:

> Black Diamond's conduct permits no interpretation other than that it is anticipatorily breaching or otherwise repudiating the BD Commitment.  Reducing the amount of funds, demanding a personal guarantee, and otherwise adversely changing the terms on which Black Diamond will proceed is not a modification of the BD Commitment that VCLF can or will accept.  Black Diamond is proposing a fundamentally different (and materially worse for VCLF) financing, which is entirely inconsistent with the BD Commitment.  Indeed, the lack of any meaningful legal work to prepare for Monday's closing strongly suggests that Black Diamond concluded weeks ago not to proceed – I note that, as of the sending of this letter, Black Diamond and its counsel have not provided a single draft of any document, even though the closing is scheduled for tomorrow.

Ex. DQ, at VCLF-00088858.

184.    A few hours later, Mr. Harris replied by e-mail confirming that Black Diamond would not proceed under the Commitment Letter, but rather only on the new terms set forth in the Gravenhorst E-mails:  " . . . Black Diamond is prepared to proceed with consummation of the financing for VCLF *on the terms set forth in Mr. Gravenhorst's emails to Mr. Clarke from Friday, October* 23rd . . . ."  Ex. DD (emphasis added).

185.    At trial, Mr. Harris testified that his first e-mail in response to Mr. Potter's letter was intended to convey that Black Diamond was only prepared to fund under a VCLF APA other than the 8/16 APA "if they [VCLF] agreed on the financing terms that were outlined in Mr. Gravenhorst's emails of the 23rd."  6/5 Tr. 168:12-24 (Harris direct).  Although he suggested that

this first e-mail also confirmed Black Diamond's willingness to lend under the Commitment

Letter if VCLF and Patriot returned to the 8/16 APA, the Court finds that Mr. Ehrlich's first e-

mail on October 25 to Mr. Potter is devoid of any such statement, directly or by implication.

186.    While Mr. Harris sent two further pieces of correspondence to Mr. Potter—on

October 25 and 28, respectively (Exs. DX, EN)—purportedly offering to return to the

Commitment Letter if VCLF and Patriot returned to the 8/16 APA, those communications were

illusory because Black Diamond knew that the 8/16 APA was impossible to consummate by

October 25, 2015.  *See* 6/5 Tr. 235:17-20 (Harris cross) (Mr. Harris confirming he knew that, as

a result of the Court's October 9, 2015 Confirmation Order, "the unchanged terms of the August

16th APA were not going to be the terms upon which [the] VCLF Patriot transaction would or

could close."); *see also* 6/7 Tr. 241:4-18 (Potter direct) (Mr. Potter understood Mr. Harris'

second e-mail on October 25, 2015, Ex. DX, to mean that "they were willing to close on an asset

purchase agreement that was impossible to close on"); 6/7 Tr. 244:4-25 (Potter direct) (Mr.

Potter understood Mr. Harris' October 28, 2015 e-mail, Ex. EN, sent two days after Black

Diamond sued VCLF, to mean:  "the options were do an impossible transaction or do Mr.

Gravenhorst's transaction").

187.    The Court also finds it too much of a coincidence that, after stating unequivocally

that it intended to fund only on the terms in the Gravenhorst E-mails, Black Diamond offered to

"return" to the 8/16 APA for the first time very late October 25th just hours before Black

Diamond commenced this litigation, and for the second time on October 28th just days after this

litigation had been commenced.  The Court instead finds that it was more likely than not that

these communications were sent to create a paper trail to prop up Black Diamond's defense to

VCLF's allegations of repudiation.  The Court, therefore, gives these communications no weight

4833-1306-9934

in deciding below that, as a legal matter, Black Diamond repudiated the Commitment Letter on

October 23, 2015.

## XII.   THE LAWSUIT AND THE CLOSING OF THE VCLF-PATRIOT TRANSACTION

188.    On October 26, 2015, less than 24 hours after Mr. Potter sent his first letter

describing Black Diamond's repudiation to Mr. Harris, Black Diamond (having retained

different litigation counsel) commenced this lawsuit against VCLF in the Supreme Court of the

State of New York, County of New York, on October 26, 2015 (the "Lawsuit").  Black Diamond

commenced the Lawsuit by a summary procedure that did not require the preparation of a

complaint, but rather only a summons with notice.  Black Diamond subsequently filed a

complaint.  Facts Stip ¶ 8.

189.    On October 27, 2015, VCLF and Patriot closed the VCLF-Patriot transaction

without third-party financing from Black Diamond or any other party.  Specifically, VCLF

closed the transaction by obtaining a $1 million coal true-up from Patriot and the return of the

full $10 million UMWA equity investment that VCLF had previously relinquished to Patriot on

the sidelines of the confirmation hearing ($5 million of which was the $5 million that Mr. Ken

McCoy already recovered from Patriot on October 22nd, and the other $5 million of which would

have to be repaid to Patriot by ERP Settlement).  As Mr. Clarke recounted:

> . . . After we came to the conclusion on Friday [October 23, 2015]
> that Black Diamond was no longer willing to perform under its
> commitment letter, we notified the parties-in-interest.  We notified
> United Mine Workers of America, we notified Patriot Coal
> Corporation.  I fully expected them to be, you know, very negative
> about the situation.  I expected that we would be litigated against.
>
> But fortunately, you know, they came to our rescue, they wanted to
> help.  There were suggestions on their part on the coal inventory
> that was for Federal.  They did not have an adequate amount of
> coal inventory on hand.  They told us that there was a possibility
> that they might be able to pay us in cash at closing for the

4833-1306-9934

deficiency in the coal inventory.  That could generate a couple of million dollars.  And those conversations ultimately evolved to where they were willing to lend us five million dollars – not to give to us, but five million dollars.

That required the approval of the United Mine Workers of America and the agreement to make the repayment of the five million dollars from any proceeds from Healthco that would have occurred.  So, you know, there was no third-party financing, there was nobody that was going to, you know, miraculously appear with a moment's notice and fund us, you know, on Monday [October 26, 2015].  *But the debtor did work with us in order to provide the necessary resources to close the transaction.*

6/12 Tr. 31:17-32:17 (Clarke direct) (emphasis added).

190.    Accordingly, at closing, ERP Settlement (what had been referred to as "HealthCo" in the Commitment Letter) delivered a $5 million note to Patriot.  *See* Ex. EK (10/27/15 Promissory Note, Earnout Agreement and Security Agreement).  As discussed *infra* in the Conclusions of Law, this note gave Patriot's liquidating trust (the "PCC Liquidating Trust") the right to monetize the W/C Package until VCLF repaid the principal and any interest on note.  As a result, "if there are returns from ERP Settlement," those "proceeds need to go to pay off the note first," and there can be no "return to ERP Compliant Fuels while the note is outstanding."  6/13 Tr. 30:4-9 (Clarke redirect).  VCLF, however, has never made any payments on the note.  *See id.* 30:10-12 ("The[r]e have been no payments made under the note.").

191.    The Lawsuit was subsequently removed to the U.S. Bankruptcy Court for the Southern District of New York on November 12, 2015, and transferred to this Court on April 25, 2016.  Facts Stip. ¶ 9.

4833-1306-9934

## CONCLUSIONS OF LAW

**I.      JURISDICTION**

1.      This Court has subject matter jurisdiction over this adversary proceeding

pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).  *In re Patriot Coal Corp. (Black*

*Diamond Comm. Fin., LLC v. Va. Conservation Legacy Fund, Inc.)*, Adv. Pro. No. 16-03105-

KLP, 2016 WL 5360950, at *2 & n.4 (Bankr. E.D. Va. Sept. 23, 2016).

2.      This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(1).

Even if this adversary proceeding is not a core proceeding, the Parties have consented to this

Court entering final orders.  The Court provided the Parties the opportunity and a deadline of

November 14, 2016, to dispute this Court's ability to enter final orders, and ordered that the

failure to act would be "deemed to constitute consent to the entry of final orders by" this

Court in this adversary proceeding.  *See* 10/14/16 2d Am. Joint Proposed Scheduling Order

¶ 12, ECF Doc. No. 44.  Neither Party acted by (or since) this deadline.

**II.     LEGAL STANDARDS GOVERNING CLAIMS OF BREACH OF CONTRACT**

      **A.      Substantive Governing Law**

3.      The Commitment Letter, by its terms, "shall be governed by, and construed in

accordance with, the laws of the State of New York."  Ex. S, at BDCF-00028003; *see also*

*Black Diamond*, 2016 WL 5360950, at *4 (the Commitment Letter "contains a choice of law

provision requiring it to be interpreted in accordance with New York law").

4.      Accordingly, New York law governs Black Diamond's claim and VCLF's

counterclaim for breach of contract.

      **B.      Elements of Claim for Breach of Contract Under New York Law**

5.      "[T]o establish a prima facie case for breach of contract [under New York

law], a plaintiff must plead and prove:  (1) the existence of a contract; (2) a breach of that

contract; *and* (3) damages resulting from the breach."  *Nat'l Mkt. Share, Inc. v. Sterling Nat.*

*Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis added).

**C.**     **Burden of Proof on Claim for Breach of Contract Under New York Law**

6.      To prevail on a breach of contract claim under New York law, a plaintiff "has

the burden of proving his case by a fair preponderance of the credible evidence." *Rinaldi &*

*Sons, Inc. v. Wells Fargo Alarm Serv., Inc.*, 39 N.Y.2d 191, 196 (1976); *accord Grogan v.*

*Garner*, 498 U.S. 279, 286 (1991) ("[W]e presume that [the preponderance of the evidence]

standard is applicable in civil actions between private litigants unless particularly important

individual interests or rights are at stake.") (internal quotation marks omitted).

7.      Establishing a fact by a preponderance of the evidence means proving that the

fact is more likely than not to have occurred.  *Matter of Beautisha B*., 115 A.D.3d 854, 854

(2d Dep't 2014); *see also United States v. Mandanici*, 205 F.3d 519, 528 (2d Cir. 2000) ("A

preponderance means more likely than not.").

8.      If the evidence proffered by the plaintiff and defendant at trial is evenly

balanced, then the plaintiff has not met its burden.  *300 E. 34th St. Co. v. Habeeb*, 248

A.D.2d 50, 55-56 (1st Dep't 1997); *see also Rinaldi & Sons*, 39 N.Y.2d at 196 ("If, at the

close of the proofs, the evidence as a matter of logical necessity is equally balanced, plaintiff

has failed to meet his burden and the cause of action is not made out.").

**D.**     **Ambiguities to be Resolved Against the Drafter (Black Diamond)**

9.      The Commitment Letter does not contain a provision providing that

ambiguities or similar deficiencies will not be construed against its drafter, or that both VCLF

and Black Diamond shall be considered co-equal drafters of the Commitment Letter.  As a

result, the Court's treatment of ambiguities or similar deficiencies in the Commitment Letter

will be determined by application of New York law, the Parties' chosen law for Commitment

Letter.  *See* Ex. S, at BDCF-00028003; *Black Diamond*, 2016 WL 5360950, at *4; *see*

*generally Audio MPEG, Inc. v. Dell Inc.*, 272 F. Supp. 3d 813, 823 (E.D. Va. 2017)

(resolving contractual ambiguities under New York law where the parties agreed that "the

Agreement would be 'governed by, interpreted and construed in accordance with' the laws of the state of New York'"); *PBM Nutritionals, LLC v. Dornoch Ltd.*, 667 F. Supp. 2d 621, 624, 627 (E.D. Va. 2009) (discussing principles of interpretation of ambiguous contract language under New York case law, where contract provided that "[t]his Policy shall be construed according to the laws of the State of New York").

10.     Under New York law, ambiguities in a contract are construed against the drafter. *See SSP Capital Partners, LLC v. Mandala, LLC*, 715 F. Supp. 2d 443, 447 (S.D.N.Y. 2009) ("As the drafter of the Commitment Letter, plaintiff would typically be charged with the ambiguities in the document.") (citing *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 161 (2d Cir. 2003); *see also Natt v. White Sands Condo.*, 95 A.D.3d 848, 849 (2d Dep't 2012) ("It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentum*, against the party who prepared or presented it.") (quoting *151 W. Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (1984)).

11.     Accordingly, when a contract is susceptible to conflicting interpretations, the ambiguity is to be resolved in the light most favorable to the non-drafting party. *See Natt*, 95 A.D.3d at 849 (ambiguous contract is "subject to the rule invoking strict construction of the contract in the light most favorable to the nondrafting party"); *see also id.* (construing "the ambiguities in the offering plan and by-laws in the light most favorable to the plaintiffs, as the nondrafting parties").

12.     "Contract language is ambiguous when it is reasonably susceptible of more than one interpretation, and there is nothing to indicate which meaning is intended, or where there is contradictory or necessarily inconsistent language in different portions of the instrument." *Id.* (citing cases) (internal quotation marks omitted).

13.     Black Diamond, not VCLF, drafted the Commitment Letter. *See* 6/4 Tr. 79:2-3 (Ehrlich direct) ("Q. . . . Who drafted it [the Commitment Letter]?  A.  Black Diamond and

4833-1306-9934

Black Diamond's counsel."); 6/5 Tr. 37:25-38:1 (Ehrlich cross) ("Q.  Black Diamond drafted

the commitment letter, is that right?  A.  That is correct."); *id.* 190:15-16 (Harris cross) ("Q.  I

want to move to the commitment letter.  And you testified that you drafted the commitment

letter; is that right?  A.  That's correct.").  VCLF's Tom Clarke likewise testified that he

received the draft of the Commitment Letter from Black Diamond on Sunday, September 20,

2015, at 8:29 p.m.—the night before it was executed.  *See* 6/11 Tr. 304:18-306:23 (Clarke

direct).

14.     Accordingly, to the extent that there are any ambiguities or similar

deficiencies in the Commitment Letter, they shall be construed against Black Diamond, as

drafter, and in the light most favorable to VCLF, as the non-drafting party.

## III.    ELEMENT #1:  EXISTENCE OF A CONTRACT

### A.    The Commitment Letter Was a Binding Contract Between Black Diamond and VCLF

15.     Neither Party disputes that the Commitment Letter, upon its execution,

became a binding contract governing the short-lived relationship between Black Diamond, as

would-be lender, and VCLF, as would-be borrower.

16.     Accordingly, the first element of the Parties' respective claims for breach of

contract ("existence of a contract," *Nat'l Mkt. Share*, 392 F.3d at 525) is established.

### B.    Resolution of the Parties' Competing Interpretations of the Exclusivity Undertaking Section of the Commitment Letter

#### 1.    Black Diamond Was Not Automatically Entitled to the Equity Interests Merely By Signing the Commitment Letter, Without Further Performance

17.     Black Diamond argues that, as consideration for merely signing and delivering

the Commitment Letter, Black Diamond unconditionally, absolutely, irrevocably, and

immutably earned a fee equal to and measured by the Equity Interests; and that once

execution and delivery occurred, VCLF was obligated, under all circumstances, to convey the

4833-1306-9934

Equity Interests to Black Diamond (even if Black Diamond ultimately never extended a cent of financing to VCLF).

18.     The Court determines that Black Diamond's interpretation of the Commitment Letter is unsustainable as a matter of fact and law, for at least four reasons:[18]

19.     *First*, the "Bid Protections" section of the Commitment Letter expressly provides that "[t]he payments to Black Diamond hereunder [*i.e.*, 50% of the break up fee] shall be consideration for Black Diamond's execution and delivery of this Commitment." Ex. S, at BDCF-00028002.  Nowhere in that section, or the Exclusivity Undertakings Section (where the Equity Interests are addressed), or elsewhere in the Commitment Letter, does it say that Black Diamond's receipt of the Equity Interests constitutes consideration for Black Diamond's execution and delivery of the Commitment Letter.  Therefore, the Court finds that delivery of the Equity Interests was not, as Black Diamond contends, consideration for Black Diamond's execution and delivery of the Commitment Letter that created a delivery requirement divorced from Black Diamond's lending requirements.  The Court will not re-write the Commitment Letter to say otherwise.

20.     *Second,* and instead, the Court interprets and holds that the obligation of VCLF to deliver the Equity Interests to Black Diamond, as set forth in the Exclusivity Undertakings Section, is as an "undertaking."[19]  The term "undertaking" is "frequently used in the special sense of a promise given in the course of legal proceedings by a party or counsel, generally as a condition to obtaining some concession from the court or the opposite

---

[18] The Court previously expressed skepticism regarding Black Diamond's interpretation at the February 5, 2018 hearing on the Parties' cross-motions for summary judgment.  *See* 2/5/18 Hr'g Tr. 107:13-15 ("THE COURT:  Is it your position that even if you hadn't provided the financing, that you [were] still entitled to the equity interest?"); *id.* 109:5-10 ("THE COURT:  And what difference does it make whether they gave them a loan or not? . . . And how does that – how does that measure into your damages if it turns out that Black Diamond is entitled to the equity even if it didn't give the loan?").  The Court now fully and finally rejects Black Diamond's interpretation.

[19] While unnecessary to find so, the trial record supports this holding by the Court.  *See* 6/5 Tr. 38:9-20 (Ehrlich cross).

4833-1306-9934

party."[20]  In other words, an undertaking is a promise by party A conditioned on obtaining

something from party B.

21.     Here, the Parties' agreed-upon anticipated exchange for the Equity Interests is

located in the Commitment Letter's Term Sheet, and defined by its use of the term "Closing

Date."   The Term Sheet provides explicitly that the conveyance of the Equity Interests to

Black Diamond is conditioned upon Black Diamond's "funding" of the $25 million

Commitment at closing.  Specifically, the Term Sheet provides that, "*[o]n the Closing Date*,

Borrowers shall create" Federal Intermediate HoldCo and HealthCo, and Black Diamond

shall receive Equity Interests in these entities.  *See* Ex. S, at BDCF-00028009 (emphasis

added).  "Closing Date" means the date when the "initial funding" of the "Senior Secured

Facilities" (the Term Loan Facility and the ABL Facility) occurs.  *Id.* at BDCF-00028005.

Because VCLF's obligation to convey the Equity Interests to Black Diamond was

conditioned upon "initial funding" of VCLF by Black Diamond, it (*i.e.*, VCLF's obligation)

was an "undertaking."  Furthermore, because the Parties' undertakings were themselves

expressly subject to satisfying specific conditions (*i.e.*, those conditions found in the

"Conditions" section of the Commitment Letter), the undertaking by VCLF to convey the

Equity Interests was, by definition, *not* unconditional, absolute, irrevocable, and immutable.

The Court addresses the consequences of condition failures on VCLF's undertakings

(including those under the Exclusivity Undertakings Section) *infra* Conclusions of Law

§ III.C.

22.     *Third*, interpreting the Equity Interest undertaking as immediate,

unconditional, irrevocable consideration to Black Diamond for execution and delivery of the

Commitment Letter, as Black Diamond urges, is inconsistent with the trial testimony.  As a

---

[20] UNDERTAKING, Black's Law Dictionary (2d ed.), *available at*
http://nfpcar.org/Archive/Blacks_Law/Black's%20Law%20Dictionary.pdf.

4833-1306-9934

factual matter, I have found, based on the *unrebutted* and completely logical testimony of

Messrs. Clarke and Ken McCoy that VCLF never contemplated transferring the Equity

Interests to Black Diamond without Black Diamond providing VCLF with initial funding.[21]

23.     Indeed, Black Diamond's testimony was to the same effect.  Mr. Ehrlich

admitted at trial that, on October 25, 2015, Black Diamond purported to offer VCLF to do a

deal based on the Commitment Letter because *Black Diamond knew that it could not get the*

*Equity Interests unless it performed its financing obligations*:

> Q.  Why was it at this point you still wanted to do a deal with
> them?
>
> A.  Because we wanted Healthco and we – you know, we were
> willing to do – we were willing to do a loan where we knew
> we'd get our money back.
>
> Q.  And you say you wanted to do Healthco, and by that you
> mean?
>
> A.  *We wanted the equity interests.  We wanted the equity*
> *interests.*

6/5 Tr. 8:14-22 (Ehrlich direct) (emphasis added).

24.     In addition, in describing how the transaction contemplated by the

Commitment Letter would play out, Mr. Harris noted that Black Diamond would receive the

equity interests only after extending the financing to VCLF.  *See id.* 187:18-25 (Harris cross)

("Once the loan transaction had closed, Black Diamond *had extended the financing and then*

[been] issued the equity interest to which it was entitled under the terms of the commitment

letter and the transaction.") (emphasis added); *see also id.* 145:13-19 (Harris direct) ("[I]n

---

[21] *See* 6/11 Tr. 315:4-9 (Clarke direct) ("Q.  Mr. Clarke, at any time, either prior or certainly subsequent to the
signing of the commitment letter, was it your understanding that Black Diamond was entitled to receive the
equity interest we talked about no matter what, even if Black Diamond never gave you a cent of financing?
A.  No."); 6/13 Tr. 78:23-79:7 (K. McCoy) ("Q. . . . [W]as it your understanding at the time that that
commitment letter was signed, that Black Diamond would be entitled to its equity interest, even if it didn't
make the loan?  A.  Well, in fairness aside, we had [a] deal.  *You provide the money[,] you get the equity.  I*
*mean, it was implicit you don't provide the money[,] you don't get the equity. . . .*") (emphasis added).

4833-1306-9934

this particular transaction, one of the negotiated parts was that Black Diamond receive certain equity interests, *as part of the ultimate financing transaction . . . .*") (emphasis added).

25.     Mr. Deckoff, for his part, admitted that he was "extremely interested" in making contact with Mr. Clarke and consummating a deal on October 24 and 25, 2015, because he "wanted the equity interest that [he –Mr. Deckoff] understood *would come to [Black Diamond] if the deal was consummated.*"  6/8 Tr. 71:3-16 (Deckoff cross) (emphasis added).

26.     Messrs. Ehrlich and Deckoff thus conceded that Black Diamond's contemporaneous perspective was that it could not receive the Equity Interests without extending VCLF financing under the Commitment Letter.

27.     There is no contrary evidence in the record to the effect that the Parties ever discussed and reached a meeting of the minds that VCLF would unconditionally convey the Equity Interests to Black Diamond without funding.  Accordingly, the Court finds that Black Diamond's position that VCLF absolutely and unconditionally agreed to assign the Equity Interests absent Black Diamond funding has no support in (and is contradicted by) the evidentiary record.[22]

28.     *Fourth*, the interpretation advocated by Black Diamond renders the Commitment Letter non-commercial.  This result is contrary to the law.  *See Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (Contracts must be read "in a manner that accords the words their 'fair and reasonable meaning,' and achieves 'a practical

---

[22] Moreover, the Court concludes that the reference to Equity Interests in the Commitment Letter is insufficient to determine precisely what was to be conveyed for VCLF to have complied with any such requirement.  For example, would the conveyance of Equity Interests in HealthCo have been sufficient without the Peabody-Illinois L/C portion of the W/C Package that Black Diamond at trial conceded should be excluded from its damage claim (*see infra* note 46, regarding Black Diamond's damages expert's reduction of his calculation) or the Old Republic L/C portion of the W/C Package which, as discussed above, could not be conveyed?  *See supra* Findings of Fact ¶¶ 85-93, 116-18.  Black Diamond seems to be taking the position that there are no limits to what VCLF and Patriot could have done to reduce or modify the W/C Package, and yet VCLF was obligated to convey it for no consideration.  The Court finds that this only undermines Black Diamond's already meritless argument.

4833-1306-9934

interpretation of the expressions of the parties.'  Put otherwise, a 'contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'") (citations omitted); *see also id.* (declining to construe guaranty contract in accordance with defendant's interpretation because it would "ignore[ ] common sense, and could lead to absurd results"); *see generally Matter of Cromwell Towers Redevelopment Co. v. City of Yonkers*, 41 N.Y.2d 1, 6 (1976) ("[D]ue consideration must be given to the purpose of the parties in making the contract.  A fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement.") (citation omitted); *Heller v. Pope*, 250 N.Y. 132, 135 (1928) ("The question is as to the fair and reasonable meaning that may be given to the writing sued on.").

29.     The Court has found that, prior to entering into the Commitment Letter, VCLF undertook an exhaustive search for closing financing without any success.  The Court also has found that Black Diamond only agreed to provide financing because of the potential for receiving the Equity Interests at closing.  Given these facts, the Court concludes that, in the absence of being able to convey the Equity Interests, VCLF would never have secured closing financing.

30.     As a result, the Court easily and logically finds that VCLF's ability to locate alternative financing (otherwise unsuccessful as of September 21, 2015), in the event that Black Diamond wound up (even for reasons permitted under the Commitment Letter) not financing the closing, would have been rendered exponentially (and unreasonably) more difficult (if not impossible) if VCLF could not offer the Equity Interests to a new lender.  For VCLF to have bound itself to a contractual provision that would have prevented it from getting financing even if Black Diamond chose not to lend under the Commitment Letter (as it did here) would, by definition, have been commercially unreasonable and Black Diamond's

position that its receipt of the Equity Interests was not conditioned on its making the initial funding is unsupportable.

31.     The lack of commercial reasonableness in Black Diamond's position is only compounded by its other logical implication:  if VCLF is unable to close because it cannot obtain financing from anyone, then obviously Black Diamond does not achieve its desired result of receiving the Equity Interests if VCLF were to close with someone else.

32.     At bottom, Black Diamond urges the Court to interpret the Exclusivity Undertakings Section as a "do or die" term.  Either the deal gets done with Black Diamond or it does not get done at all.  Because this result is not commercially reasonable generally, and it certainly could not be reasonable in the context of the Patriot Case, which required the closing of the VCLF-Patriot transaction to be able to confirm its chapter 11 Plan of reorganization,[23] this Court will not adopt Black Diamond's unreasonable, "do or die" interpretation of the Exclusivity Undertakings Section.

## 2.      The Commitment Letter Did Not Get VCLF Into Any Auction

33.     Having concluded that the Commitment Letter did not provide for the unconditional delivery of the Equity Interests by VCLF in the absence of funding by Black Diamond, it is unnecessary for the Court to address Black Diamond's further argument that the Equity Interest delivery obligation was unconditional because the Commitment Letter was VCLF's ticket into an "auction," without which VCLF could not have acquired any assets from Patriot.  *See* 6/4 Tr. 39:8-13 (Black Diamond opening statement) ("Absent our financing commitment, they would not have been allowed to participate in the auction, and the deal in this contract, explicitly in black and white, is that in exchange for that, they had to give us the equity interest in connection with any deal that they chose to do.").

---

[23] As this Court recognized in the Confirmation Order, the "means for the Plan's execution and implementation" included the "VCLF Transaction."  Ex. 334, at 12 (¶ 26).

4833-1306-9934

34.     Nevertheless, to complete the record, the Court does so; and, for the following

reasons concludes that VCLF did not need the Commitment Letter *on or before September*

*21, 2015*, for purposes of an auction or otherwise.

35.     As noted in the Findings of Fact, Black Diamond has failed to demonstrate

that VCLF was required to have committed financing in place by the time of the September

21, 2015 Blackhawk/Coronado auction to be named the winning bidder for the VCLF assets

or any other reason.

36.     Black Diamond appears to rely solely on this Court's June 25, 2015 Bidding

Procedures Order (Ex. 333) as furnishing such a requirement, but that order merely says that,

*if* there is an auction for assets, a bidder's bid for those assets must include "committed

financing."  *Id.* at 29 of 63 ¶ M; *see also id.* at 25 of 63 (the bidding requirements must be

met "[t]o be eligible to participate in the Auctions") (emphasis added).

37.     What Black Diamond's argument ignores, therefore, is that, pursuant to the

terms of the Bidding Procedures Order itself, there *was no auction* for the assets and

liabilities VCLF was seeking to acquire/assume from Patriot.  The Bidding Procedures Order

specifies that an auction will be held only "[i]f one or more Qualified Bids (in addition to the

Blackhawk Bid and Federal Stalking Horse Bid, if any) are received by the Bid Deadline

[*i.e.*, Friday, September 4, 2015] in connection with either the Blackhawk Sale or the Federal

Sale."  *Id.* at 32 of 63.  VCLF was named the Federal Stalking Horse Bidder, with special

stalking horse protections, prior to September 4, 2015, the scheduled date for the submission

of any competing bids (*see* Ex. FQ, 9/1/15 VCLF Bid Protections Order),[24] and the only bid

for the non-Blackhawk assets was the September 4, 2015 *non-qualified* bid submitted by

---

[24] *See* 6/7 Tr. 180:9-12 (Potter direct) (Exhibit FQ was "the order that approved the status of VCLF as a stalking
horse and the consequences thereof"); 6/5 Tr. 231:19-23 (Harris cross) (admitting that VCLF "was
denominated as the stalking horse and even granted stalking horse protections"); *id.* 45:6-9 (Ehrlich cross)
("[Prior to September 21, 2015, VCLF] did have an APA.  And I believe it would be called the stalking
horse.").

4833-1306-9934

Black Diamond.  Thus, from and after the Friday, September 4, 2015, bid deadline (which

obviously pre-dates the Commitment Letter), the only qualified bid for the assets covered by

the "Federal Sale" was that of VCLF, and there was no auction for those assets.  As Mr.

Clarke credibly and clearly explained:

> Q.  Were the assets that VCLF wanted to assume from Patriot
> being bid at the auction?
>
> A.  No, the auction was cancelled for VCLF because there was
> a date certain that competing bids to VCLF had to be submitted
> and there was only one bid that was submitted and it was a non-
> qualified – one bid other than our stalking horse bid and it was
> a non-qualified bid, so the auction was cancelled for VCLF.
>
> Q.  That being the case, as an authorized representative of
> VCLF, why did you choose to attend the auction?
>
> A.  We were at the auction as an observer and because the
> transactions between the core and the non-core were integrated
> together.  We were there in the event that any of the
> stakeholders in the bankruptcy needed to talk to us about how
> we might integrate with Blackhawk or integrate with Coronado.
> And certainly there were negotiations, even on that day,
> between us and Blackhawk about the allocation of excluded
> and non-excluded assets.
>
> Q.  Mr. Clarke, I think in response to one of my earlier
> questions you referenced a non-qualified bid; is that right?
>
> A.  That's correct.
>
> Q.  Who offered or submitted that non-qualified bid?
>
> A.  That bid was submitted by Black Diamond.
>
> . . .
>
> Q.  Now, for purposes of facilitating your role as an observer at
> the auction, did you need to have a commitment letter by the
> time of the auction on September 21st?
>
> A.  No.
>
> Q.  Why not?
>
> A.  We – we already had an asset purchase agreement.  We
> were the stalking horse bidder.  There was no competing bid.
> You know, our next mission was to close.  We certainly needed
> funding.  We were certainly reminded about that by Patriot

> Coal Corporation every day, but there was no absolute deadline
> that, you know, we had to submit to any third-party a
> commitment letter.

6/11 Tr. 307:25-309:13 (Clarke direct).

38.    Furthermore, no Black Diamond witness testified from personal knowledge

that VCLF required a financing commitment prior to the September 21, 2015

Blackhawk/Coronado auction (or at any time).  Mr. Deckoff lacked personal knowledge of

such a requirement.  *See* 6/8 Tr. 94:15-95:11 (Deckoff cross) ("[M]y understanding was that

they had to have a commitment letter, or they had to have financing before the auction began.

But as I said, I – someone told me that.  I never read the Court's orders regarding the

auction.").  Even Mr. Harris, the drafter of the Commitment Letter, studiously avoided

testifying that VCLF *required* committed financing in advance of the Blackhawk/Coronado

auction.  When asked on direct examination whether it was his "understanding that the

commitment letter needed to be ready for the auction the next day," Mr. Harris did not say,

"Yes," but rather stated merely that it was "very important" for VCLF to have the

commitment letter in place on September 21, 2015.  6/5 Tr. 139:14-140:1 (Harris direct).

Indeed, Mr. Harris had "no personal knowledge" of any purported requirement that VCLF

have committed financing in place prior to the Blackhawk/Coronado auction.  *Id.* 248:4-11

(Harris cross).

39.    The Court finds it unbelievable that, if it were a requirement that VCLF have a

financing commitment on or before the September 21, 2015 Blackhawk/Coronado action (for

some unexplained reason), Black Diamond could not have produced a single witness with

personal knowledge of this fact.

40.    Likewise, as described *supra* Findings of Fact ¶ 56, the Court heard

conflicting testimony about whether the Commitment Letter was signed before the

Blackhawk/Coronado auction (Black Diamond's contention) or after that auction started

(VCLF's contention).  While the Court need not resolve this issue to conclude there was no

requirement that VCLF have committed financing in place before the Blackhawk/Coronado

auction, this conflicting testimony, at a minimum, casts doubt on Black Diamond's

contention.

41.     Accordingly, based on the record, this Court holds, there was no need for

VCLF to have committed financing in place prior to the Blackhawk/Coronado auction held

on September 21, 2015.[25]

### 3.     The Non-Solicitation Clause Prohibited VCLF Only from Soliciting Closing or Transactional Financing, Not Take-Out or any Other Form of Financing

42.     Black Diamond argues that VCLF violated the Non-Solicitation Clause (*i.e.*,

the first sentence of the Exclusivity Undertakings Section) when (a) VCLF solicited certain

financing for the Federal 2 Mine from Mercuria and (b) Jason McCoy solicited financing for

himself from various sources.  To resolve these specific allegations, as the Court does *infra*

Conclusions of Law § IV.C, the Court must first address the scope of the financing

solicitation prohibition in the Non-Solicitation Clause.

43.     The Non-Solicitation Clause provides that "upon acceptance of this

Commitment," VCLF is prohibited from "solicit[ing] or accept[ing] an offer by any person

other than Black Diamond of any debt or equity financing for the purpose of facilitating in

any manner the *consummation* of the transactions contemplated by the VCLF APA."  Ex. S,

at BDCF-00028002 (emphasis added).

44.     VCLF does not dispute that its obligation to honor this undertaking

commenced upon execution of the Commitment Letter.  VCLF maintains, however, that this

undertaking only prohibited VCLF from soliciting financing to replace the closing financing

---

[25] The Court alternatively finds that Black Diamond failed to satisfy its burden to prove this allegation, an allegation that Black Diamond contends, contrary to the Court's ruling, is an essential element of its case.

4833-1306-9937

that Black Diamond was to provide under the Commitment Letter; not from seeking "take-out" financing that would be extended by a different lender or funding source *after* closing to pay off Black Diamond's loan early.  Based on the plain language and structure of the Commitment Letter, as well as the testimony of both Black Diamond and VCLF witnesses at trial, the Court finds that VCLF's interpretation is correct.

45.     The Non-Solicitation Clause, by its terms, applies only to alternative financing to facilitate the "consummation" of the VCLF APA.  *Id.*  To "consummate" means "[t]o bring to completion," or "[t]o achieve; to fulfill."  *See* CONSUMMATE, Black's Law Dictionary (10th ed. 2014).  The plain meaning of this provision, therefore, is that it applies only to solicitation of financing that would replace Black Diamond as VCLF's source of financing to *close*, or bring to completion, the transactions contemplated by the VCLF APA.

46.     The Non-Solicitation Clause, therefore, has no bearing on financing that VCLF might have solicited to pay off the Black Diamond financing before its stated maturity during the post-closing period.

47.     Indeed, under the Commitment Letter's Term Sheet, VCLF had the right to "voluntarily prepay the Term Loans (together with accrued but unpaid interest thereon) under the Term Loan Facility, in whole or in part at any time and from time to time (subject to minimum thresholds as set forth in the Loan Facility Documentation) without premium or penalty." Ex. S, at BDCF-00028007 (the "Optional Prepayment Provision").

48.     The drafter of the Commitment Letter, Adam Harris, admitted at both his deposition and at trial on cross-examination that the Optional Prepayment Provision allowed VCLF to search for financing, even during the pre-closing period, to pay off Black Diamond's loan immediately after the closing of the VCLF-Patriot transaction:

> Q.  All right. Can you tell us what take-out financing means?
>
> A.  The term take-out financing is generally used when a borrower has a loan facility in place and it is looking to

4833-1306-9934

refinance it, either because they were looking for better terms or it's approaching its maturity would be the two most common – or it's looking for more – more financing that its existing lender is not prepared to provide.

Q.  And that's different than asset financing or transaction financing, right?

A.  Well, it's different than acquisition financing, if that's what you're asking me.

. . .

Q.  Now, to your understanding, VCLF was entitled to inquire or investigate the potential for obtaining take-out financing at any time subsequent to the execution of the commitment letter; is that right?

A.  We – we had a long discussion about this in my deposition, which I'm sure you will remember because you're probably about to show it to me.  And I think where – where I ultimately testified to at that point, which I would agree with, is that there's a very fine line between solicitation of alternative financing prior to closing, which is what was prohibited under the terms of the exclusivity arrangements here and what you refer to as pre-negotiating take-out financing for a later date . . . .

Q.  In fact, at your deposition at line (sic) 104, 5 through 20 . . . [t]he following questions were asked and the following answers were given:  "Let me try to give you an example.  Is it your testimony that VCLF could not negotiate post-closing take-out financing before the closing in order that they be enabled to pay off the Black Diamond loan on day one?"  There was an objection to form by your private counsel.  The answer:  "The financing that was being requested was purely and clearly solely for the purpose that you identify, which is to refinance the loans Black Diamond would be taking after the credit agreement had been entered into and all of the rights and entitlements Black Diamond was entitled to have been received.  I do not believe that would be prohibited by the terms of the exclusivity arrangement."  Did I read that correctly?

A.  Yeah, that's part of the overall testimony, I believe. . . .

6/5 Tr. 186:10-20, 188:5-190:5 (Harris cross).

49.     That the Non-Solicitation Clause applies only to solicitation of financing necessary to close the VCLF-Patriot transaction is confirmed by the understanding of

84

witnesses affiliated with VCLF, who testified that they understood the Exclusivity

Undertakings Section to bar solicitation of alternative closing financing, not take-out

financing.  *See* 6/8 Tr. 161:16-22 (J. McCoy direct) ("Q.  And as of the date of the

commitment letter was signed, did you have an understanding as to whether it was

permissible for you or any other representative of VCLF and ERP to solicit other kinds of

financing that are not closing financing for purposes of the post-closing period?  A.  Correct.

There was nothing in the – in the letter saying we couldn't get post-closing."); *id.* 162:3-12

(J. McCoy direct) ("Q.  Was it your understanding as of the date that the commitment letter

was signed that it was permissible for representatives of VCLF or ERP to solicit take out

financing that would take out Black Diamond's loan after the deal – the VCLF-Patriot

transaction had been closed on? . . . THE WITNESS:  Yes.  We were offered that."); *id.*

163:10-12 (J. McCoy direct) (Jason McCoy's understanding of the Non-Solicitation Clause

was "[t]hat we can't take this term sheet and shop it around.  We can't go out and raise other

money to consummate the closing of this deal."); *id.* 164:12-17 (J. McCoy direct) ("[Q.] . . .

From your perspective, as of the signing of the commitment – the date of the signing of the

commitment letter, when could you start going out to find refinancing?  A. Again, as long as

the term loan refinancing was taking place post-closing, I mean I think we could look at

options at any time.").

    50.    Indeed, at trial, Mr. Clarke provided unrebutted testimony that not only was it

his understanding that VCLF could begin looking for take-out financing even during the pre-

closing period, but it was Black Diamond's understanding as well, as Mr. Deckoff had

encouraged Mr. Clarke to obtain take-out financing in anticipation of the closing:

> Q.  Now, Mr. Clarke, after the execution of the commitment
> and up to October 23rd, 2015, did you or anyone from VCLF
> solicit alternative financing to close the Patriot-VCLF
> transaction?
>
> A.  No.

85

Q.  Did you ever have conversations with Black Diamond regarding a concept called takeout financing?

A.  Yes.

Q.  All right. Do you understand what takeout financing is?

A.  Yes.

 . . .

Q.  Mr. Clarke, do you recall having specific conversations with Steve Deck[ ]off of Black Diamond relating to takeout financing?

A.  Yes.

Q.  What did those conversations entail?

A.  Well, there – there – there was – well, first of all Black Diamond wasn't administering ABOs and coal companies so, you know, we had a lot of discussion about how we would structure that and how that would be maintained.  And we knew that there were companies that would actually provide coal sales and would even enter into take or pay agreements where they would purchase the coal for then remarketing the coal.

Federal actually has done that many times after the closing. We've been able to enter into those agreements.  *So the one in particular was Mercuria and, you know, we had indicated that we were working with Mercuria to do post-closing takeout financing.*

Q.  What was Mr. Deck[ ]off's reaction to that?

A.  Oh, *that was really very positively* and – you know, Steve and I had talked.  I mean let's get you paid out as quick as we can and then let's go on to the next bankruptcy and, you know, we'll – we'll replicate this model over and over again.

Q.  So based on your conversations with Mr. Deck[ ]off, did you achieve an understanding of whether or not Mr. Deck[ ]off would be interested in being taken out as Black Diamond – replaced?

A. I – I did.  *He was interested in being taken out.*

6/11 Tr. 317:12-319:10 (Clarke direct) (emphasis added).[26]

---

[26] VCLF's financial advisor, Mr. Murphy, separately confirmed that Black Diamond assented to the notion of take-out financing as early as September 13, 2015, when Black Diamond and VCLF had their first meeting:

4833-1306-9934

51.     Similarly, Jason McCoy's unsuccessful efforts to obtain small loans to cover his personal expenses to be incurred pre-closing and that were not covered by Black Diamond's lending Commitment did not violate the Non-Solicitation Clause.  Those loans were not intended and could not have replaced Black Diamond as the transaction lender or changed the terms of Black Diamond's deal.

52.     The Parties' course of conduct following the execution of the Commitment Letter thus confirms that they never intended for the Commitment Letter to prohibit VCLF from exploring, during the pre-closing period, financing that would not replace Black Diamond's closing financing.  Accordingly, the Court holds that the Non-Solicitation Clause prohibited VCLF from soliciting alternative closing financing.  It did not, however, prohibit VCLF from seeking any other form of financing, including the acts of which Black Diamond has complained.

### C.     The Commitment Letter Was Subject to Conditions Subsequent that Failed

53.     Although the Commitment Letter constituted a binding contract upon its execution, the undertakings of all Parties (Black Diamond and VCLF) under the Commitment Letter ended (*i.e.*, died) no later than October 9, 2015, due to the incurable failure of one or more conditions set forth in the "Conditions Section" of the Commitment Letter by that date. It is axiomatic that actions taken by a Party in contradiction of an effective (*i.e.*, live) undertaking may be actionable, but the same actions taken after the undertaking is no longer effective (*i.e.*, dead) are not actionable.

---

[T]here was a meeting in our [Teneo's] office on a Sunday afternoon, where various individuals from Black Diamond and – and VCLF and I were present, and the conversation came up in terms of that, you know – *the Black Diamond professionals [consisting of Mr. Deckoff and Mr. Ehrlich] said, look, we're not going to give you the cheapest paper out there, but we'll give you an opportunity to take us out.  And that's why there was provision in the commitment letter that they didn't have -- have any penalty with respect to taking them out post-closing.*

6/11 Tr. 120:9-24 (Murphy direct) (emphasis added).

4833-1306-9934

1.    **The Commitment Letter's Conditions Applied Equally to VCLF's and Black Diamond's Undertakings**

54.    The Conditions Section states, "The Commitment and undertakings hereunder are subject to" five conditions.  Ex. S, at BDCF-00028001.[27]  Those five conditions consist of:

> (a) the preparation, execution and delivery of definitive Loan Facility Documentation;
>
> (b) the entry of a final, non-appealable order of the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, authorizing and approving the VCLF APA (the "Approval Order");
>
> (c) the simultaneous consummation of the transactions contemplated by the VCLF APA,
>
> (d) the absence of any event or circumstance that has had or is reasonably likely to have a material adverse effect on VCLF, and
>
> (e) the satisfaction of each of the conditions to closing set forth in the Loan Facility Documentation.

*Id*.

55.    The Court holds the meaning of the Conditions Section to be plain and unambiguous, and that nothing elsewhere in the Commitment Letter creates any ambiguity.

56.    *First*, the Court holds that the Conditions Section provides that the failure of one or more the five (5) conditions means that the respective undertakings of each Party (as set forth in the Commitment Letter) are no longer enforceable by the other Party.

57.    *Second*, the Court holds that the Conditions Section applies equally and uniformly to the undertakings of both VCLF and Black Diamond.  There is nothing anywhere in the Commitment Letter stating that the Conditions Section applies, whether in whole or in

---

[27] "Commitment" is a defined term referring to Black Diamond's commitment to provide VCLF with asset based loans and/or term loans in the aggregate principal amount of $25,000,000.

4833-1306-9934

part, to the undertakings of one Party and not the other.  The Court refuses to re-write the Commitment Letter to say otherwise.

58.     While the Court need not consider parol evidence (as there is no ambiguity on these points), the testimony and evidence at trial supports the Court's conclusions.  Mr. Ehrlich of Black Diamond confirmed that the reference to "other undertakings hereunder" is not limited to Black Diamond's undertakings.  *See* 6/5 Tr. 39:24-40:2 (Ehrlich cross) ("Q.  But the conditions section referencing undertakings isn't limited to Black Diamond, is it?  A.  If what you're saying is it doesn't say Black Diamond, I agree with you."); *accord id.* 238:7-19 (Harris cross) ("Q. . . . There is no limitation on the undertakings that are subject to excuse by virtue of the failure of conditions in this paragraph, correct?  It says other undertakings hereunder, right?  A.  It says what it says. . . .").  Certainly, had a sophisticated party like Black Diamond wanted to limit the conditions in the Conditions Section to its own undertakings, it could have inserted contract language to this effect.  That it did not do so confirms that even Black Diamond, as drafter, intended the conditions to apply to both its own and VCLF's respective performance obligations.  The Court will not re-write the Commitment Letter to achieve the result sought by Black Diamond.

59.     In so holding, the Court rejects the contention by Black Diamond's attorney, Adam Harris (who drafted the Commitment Letter), that "[a]ny commercial reading of this" provision requires that the conditions apply only to Black Diamond's undertakings.  *See* 6/5 Tr. 238:7-19 (Harris cross).  Mr. Harris testified that reading the Conditions Section to apply to VCLF's undertakings would be unreasonable because that would mean that VCLF's undertakings would not become effective until the stated conditions occurred or did not occur, as appropriate, delaying, for example, VCLF's undertaking not to solicit alternative closing financing.  *Id.* 240:12-242:12 (Harris cross).  As explained below, however, the conditions operate as *conditions subsequent* to VCLF's undertakings; meaning that VCLF

89

4833-1306-9934

*was* required as a matter of law to comply with its undertakings upon execution of the

Commitment Letter and would only be relieved of continued compliance with its

undertakings if a condition failed.  Therefore, Mr. Harris' testimony that "[a]ny commercial

reading of" the Conditions Section makes it inapplicable to VCLF, is incorrect because his

predicate (*i.e.*, that VCLF's undertakings were not effective immediately upon execution of

the Commitment Letter) is contrary to the plain language of the Commitment Letter and New

York law regarding conditions subsequent.  *See supra* Conclusions of Law ¶¶ 53-57; *infra*

Conclusions of Law ¶¶ 61-63.

60.     Finally, to the extent that there is any ambiguity as to whether the Conditions

Section applies only to Black Diamond or to both Black Diamond and VCLF (again, the

Court believes there are none), the Court holds that, under New York law, the ambiguity

should be resolved in favor of VCLF (the non-drafting party); meaning that the conditions

(and consequences of failed conditions) apply equally to VCLF and Black Diamond.

### 2.     The Conditions Section Created Conditions Subsequent to VCLF's Undertakings

61.     Having established that the five conditions set forth in the Commitment Letter

apply to both Black Diamond's and VCLF's respective undertakings thereunder, it is

necessary to identify the legal significance of these conditions for each Party.  Although the

conditions may be conditions *precedent* to Black Diamond's obligation to lend, they are

conditions *subsequent* to VCLF's obligation to continued adherence to its undertakings under

the Commitment Letter.[28]

---

[28]  Black Diamond's Richard Ehrlich admitted that the conditions in the Commitment Letter functioned as
conditions subsequent for VCLF:

> Q.  Okay.  Now, you understand what a condition is, right?
> A.  Yes, I do.
> Q.  A condition is sort of like a requirement maybe?
> A.  Sure.
> Q.  All right.  So I'll drive you to school tomorrow unless it rains, right?  Do
> you understand that?

62.     Unlike a condition precedent, "whose existence is necessary for the obligation

to come into being," a "condition subsequent is *one that, if it arises, will defeat an existing*

*obligation*." *Mereminsky v. Mereminsky*, 20 Misc. 2d 21, 26 (N.Y. App. Term. 1959)

(emphasis added) (citations omitted); *accord Bd. of Ed., Half Follow Hills Cent. Sch. Dist.*

*No. 5 v. Statewide Vending Corp.*, 84 A.D.2d 754, 756 (2d Dep't 1981) ("We conclude . . .

that the parties were obligated to perform the contract upon acceptance of Statewide's bid by

the school district. *Said obligation would be extinguished only upon the happening of a*

*condition subsequent . . . .*") (emphasis added), *order aff'd*, 58 N.Y.2d 718 (1982).

63.     Accordingly, as a matter of law, upon the failure of any of the five conditions

in the Commitment Letter, both VCLF and Black Diamond would be relieved of their

respective undertakings.

### 3.     The Parties Were Relieved of All of Their Performance Obligations Under the Commitment Letter No Later than October 9, 2015

#### a.     *The Parties Agree That Condition (b) Failed:  The 8/16 APA Was Never Approved by the Court*

64.     The evidence at trial established that the Parties were relieved of their

respective obligations under the Commitment Letter no later than October 9, 2015, when

condition (b) of the Conditions Section of the Commitment Letter failed.

65.     That condition, as noted above, required "the entry of a final, non-appealable

order of the United States Bankruptcy Court for the Eastern District of Virginia, authorizing

and approving the VCLF APA (the 'Approval Order')."  Ex. S, at BDCF-00028001

---

A.  I – I do understand what the condition is.

Q.  All right.  What is the condition, that it doesn't rain, right?

A.  A condition – yes.

Q.  Okay.  Because perhaps I have a convertible.  Does that make sense?

A.  It – it does –

Q.  Okay.

A.  – Mr. Sullivan.

6/5 Tr. 18:10-24 (Ehrlich cross).

4833-1306-9934

(hereinafter, "Condition (b)").  The Parties agree that the "VCLF APA" is defined in the

Commitment Letter as "that certain Asset Purchase Agreement, dated as of August 16, 2015,

among Virginia Conservation Legacy Fund, Inc. and ERP Compliant Fuels, LLC . . . , as

purchasers, and Patriot Coal Corporation and certain of its subsidiaries and affiliates, as

sellers . . . as amended, modified or supplemented *prior to the date hereof*"—i.e., prior to

September 21, 2015, the date of execution of the Commitment Letter.  *Id.* at BDCF-00028000

(emphasis added).

66.     The Court's approval of the 8/16 APA was not merely a condition of the

Commitment Letter:  it was also a requirement of the 8/16 APA itself.  Section 7.07 of the

8/16 APA provided:  "Each of the Sellers and Buyer acknowledge that *this Agreement* and

the sale of the Purchased Assets *are subject to Bankruptcy Court approval*.  Ex. 15 (8/16

APA), at 45 § 7.07 (emphasis added).  By its own terms, the 8/16 APA would not be

enforceable unless and until the Court approved it.

67.     The Parties agree that never happened.  Although this Court entered a

confirmation order on October 9, 2015 approving an agreement between VCLF and Patriot,

the confirmation order did *not* approve the VCLF APA as defined in the Commitment Letter.

Instead, it approved "the transaction contemplated by the asset purchase agreement among

the Debtors and Virginia Conservation Legacy Fund and its affiliate (collectively, 'VCLF'),

whereby VCLF agreed to acquire certain assets and assume certain liabilities excluded from

the Blackhawk Transaction (as amended, supplemented, or modified *from time to time*, the

'VCLF APA')."  Ex. 334, at 12 ¶ 26 (italicized emphasis added).

68.     Black Diamond's and VCLF's respective fact witnesses were in agreement

that, in approving the VCLF APA as it may be "amended, supplemented, or modified from

time to time," the confirmation order was *not* approving the VCLF APA as defined in the

Commitment Letter.  *See, e.g.*, 6/4 Tr. 195:16-23 (Ehrlich direct) (the definition of "VCLF

4833-1306-9934

APA," as approved in the Confirmation Order, was "not" the "definition of the VCLF APA

that was contained . . . in [the] commitment letter"); 6/5 Tr. 235:3-7 (Harris cross) (believes it

is "correct" that "the bankruptcy court entered a confirmation order on October 9ᵗʰ, 2015, that

differed from the APA executed on August 16ᵗʰ, 2015").

     69.    Indeed, Black Diamond's counsel *promised* in opening statements that the

evidence would show that the VCLF APA approved in the Confirmation Order was *not* the

8/16 APA:

> After that, Your Honor, on October 9ᵗʰ, this Court did enter an
> order, and this order approved something called a VCLF APA.
> What the Court approved is not the APA that we agreed to
> fund.  The Court's order provides that "Upon entry of this
> confirmation order by this Court all matters provided for under
> the VCLF APA will be deemed authorized and approved."
>
> But the critical question is what is that VCLF APA that the
> Court was approving in this order?  Well, Your Honor, the
> order defines the VCLF APA as the asset purchase agreement –
> and I'm skipping as I go here, Your Honor, but "the asset
> purchase agreement between VCLF and Patriotas amended,
> supplemented, or modified from time to time".
>
> So our deal was tied to the APA as amended, modified, or
> supplemented as of September 21ˢᵗ.  That's the APA in the
> form that it was originally entered into on August 16ᵗʰ.  The
> court approved an order or entered an order approving whatever
> APA VCLF and Patriot ultimately decided to enter into, as
> amended from time to time, before the order or after the order.
> And the deal kept changing.

6/4 Tr. 22:7-18 (Black Diamond opening statement).

     70.    The failure of Condition (b) was not merely a definitional matter.  Under the

8/16 APA, VCLF was going to receive the Old Republic Proceeds.  The Confirmation Order,

however, provided that *Patriot*—not VCLF—would receive those proceeds, stripping more

than $8 million in consideration from VCLF under the transaction:

> In accordance with the settlement agreement between Old
> Republic Insurance Company and its affiliates (collectively,
> "ORINSCO") and the Debtors pursuant to an agreed Court
> order (the "ORINSCO Settlement"), the rights, interest, claims,

4833-1306-9934

and defenses of ORINSCO with respect to ORINSCO's ability to offset applicable prefunded losses, refunded program assessments, incurred loss retrospective premium returns, and tax assessment reimbursements against its Allowed Claim are reserved and preserved in their entirety. *In accordance with the ORINSCO Settlement, the Debtors[ ] have the authority to keep the proceeds from the ORINSCO Settlement in their entirety as property of the Estate for, among other things, any costs incident to the Debtors' emergence from chapter 11.*

Ex. 334, at 62 ¶ 159 (emphasis added).

71.     Once again, both Black Diamond's and VCLF's witnesses confirmed that the Court-ordered diversion of the Old Republic Proceeds from VCLF to Patriot was a *de facto* modification of the 8/16 APA. *See, e.g.*, 6/4 Tr. 193:9-194:25 (Ehrlich direct) (Patriot-Old Republic settlement approved in the Confirmation Order took proceeds that belonged to VCLF under the 8/16 APA and gave them to Patriot; that "would be a modification" of the 8/16 APA); 6/5 Tr. 90:3:-11 (Ehrlich cross) (admitting that Confirmation Order ¶ 159 "says that that money [the Old Republic Proceeds] goes back to Patriot"); 6/7 Tr. 264:6-11 (Potter cross) (the 8/16 APA "had an eight-million dollar hole put in it as a result of the removal of Old Republic that was embodied in the Court's confirmation order of October 9th"); 6/12 Tr. 86:6-9 (Clarke direct) ("Everybody knew the eight million dollars that was our cash at VCLF to be received from Patriot on the effective date, on the closing date, was no longer available under the Old Republic settlement."); *id.* 88:6-8 (Clarke cross) ("the events and conditions in the August 16th asset purchase agreement were no longer valid [as of October 22, 2015], because we had the Old Republic, which is the most significant"); *id.* 98:7-11 (Clarke cross) ("The asset purchase agreement of August 16th had already – as it existed, and amended, on the 21st of September, had already been necessitated to be changed repeatedly, primarily for the loss of the Old Republic money.").

72.     As Mr. Clarke explained at trial, the diversion of the Old Republic Proceeds from VCLF to Patriot was presented to VCLF by Patriot as an emergency measure necessary

to confirm Patriot's Plan, due to Patriot's continuously deteriorating cash position in late

September and October 2015:

> In the asset purchase agreement dated the 16th of August, what happened is that we were to be the beneficiary, VCLF, ERP of 8 million dollars of settlement money that was related to workers' compensation and black lung. . . . Unfortunately, we were notified literally, you know, on the eve of the confirmation order . . . [P]atriot told us we're missing 18 million dollars.  We do not have 18 million; we can't go to the confirmation hearing; we can't confirm; and we will have to liquidate Patriot Coal Corporation.  It will be converted to a Chapter 7.  And UMWA said we will contribute 10 million dollars to the problem and that's where the 10 million dollars from the VEVA fund came from and they asked us if we would contribute 8 million dollars to the problem and we didn't see any other way.  It was serious.  They had gone to Judge Phillips, they had postponed the confirmation hearing, and, you know, we believed that if we had not done that, that in fact the case would not have occurred.  And so we relinquished the 8 million dollars in order to confirm the case.

6/11 Tr. 322:13-323:16 (Clarke direct).[29]  Through these circumstances, Patriot, not VCLF,

forced changes to the 8/16 APA to be able to confirm the Patriot reorganization plan, without

which there would have been neither a Blackhawk-Patriot transaction nor a VCLF-Patriot

transaction.

      73.     Significantly, Black Diamond was not a hapless bystander to the Confirmation

Order's diversion of the Old Republic Proceeds from VCLF to Patriot.  The evidence at trial

established that, while Black Diamond may have objected to the diversion of the Old

Republic Proceeds in discussions with VCLF *after* entry of the Confirmation Order on

October 9, 2015, it failed to do so prior to or contemporaneously with confirmation.  This is

true even though Black Diamond's counsel Adam Harris "had substantial input into . . . the

---

[29] *Accord* 6/7 Tr. 216:12-25 (Potter direct) ("a change occur[red] to the APA with respect to Old Republic": "during the course of the confirmation hearing outside of the courtroom, . . . the debtor came to us . . . and said that they do not have enough money to satisfy their obligations under Section 1129 of the Bankruptcy Code to pay all of their administrative expenses . . . . [T]hey came to us and said look, here are your options; give us the Old Republic money back, or don't give it back to us and we won't be able to confirm our plan and you won't be able to accomplish the transaction that you wanted.").

4833-1306-9934

drafting of the confirmation order" leading up to its entry, 6/7 Tr. 198:5-17 (Potter direct),[30]

and he "attended [the three-day confirmation hearing] by telephone and was quite vocal,

particularly at the end. . . . There was some dispute over language in the confirmation order

that they required the Court to resolve, and the Court did." *Id.* 200:4-14 (Potter direct). Yet,

while Mr. Harris objected to some parts of the Confirmation Order, he did not raise any

objections (whether with the Court or VCLF) to the Confirmation Order's approval of a

VCLF APA other than the 8/16 APA, nor the diversion of the Old Republic Proceeds from

VCLF to Patriot.

74.    Black Diamond had a full and fair opportunity to raise its objections to the *de
facto* modifications effectuated by the Confirmation Order that it helped craft, and ultimately

approved, but did not do so with respect to the matters that both Black Diamond and VCLF

agree caused a failure of Condition (b).  Besides, there was no undertaking or covenant in the

Commitment Letter requiring VCLF to obtain Court approval of the 8/16 APA, as Black

Diamond's witnesses were forced to concede.[31]  At bottom, the failure of Condition (b),

therefore, is just as much the doing of Black Diamond as it is of Patriot and the other parties

that participated in the drafting of the Confirmation Order.  To the extent, therefore, Black

Diamond has argued that VCLF caused the failure of Condition (b) and cannot take

advantage of that failure to excuse its own performance under the Commitment Letter, the

Court hereby rejects the argument as unpersuasive and without merit.

        b.    ***The Parties Agree That Condition (d) Failed:  A Material
            Adverse Change Occurred to VCLF Following the Signing of
            the Commitment Letter***

---

[30] *See also* Ex. 323 (10/8/15 e-mail from A. Harris to P. Potter) (" . . . Also want to discuss with you certain language we'd like to see in the confirmation order . . . .").

[31] *See, e.g.*, 6/5 Tr. 42:20-21 (Ehrlich cross) ("I don't believe they [VCLF] were precluded from pursuing changes to the asset purchase agreement."); 6/5 Tr. 226:16-227:5 (Harris cross) ("There is nothing in here [the Commitment Letter] that precludes VCLF on its own from going off and negotiating modifications to the asset purchase agreement. . . . As a legal matter, I don't think we can preclude you from going to negotiate modifications to the asset purchase agreement.").

4833-1306-9934

75.     In addition to Condition (b), Condition (d) in the Conditions Section of the Commitment Letter failed.  Condition (d) made the Parties' undertakings under the Commitment Letter subject to "the absence of any event or circumstance that has had or is reasonably likely to have a material adverse effect on VCLF." Ex. S, at BDCF-00028001. Once again, the witnesses for both Parties confirmed at trial that, by October 9, 2015, multiple events and circumstances transpired that had a material adverse effect on VCLF and its proxy, Patriot (who, at the time, owned the assets VCLF was to acquire).

76.     The occurrence of these material adverse changes is perhaps best reflected in the trial testimony of Mr. Ehrlich.  On cross-examination, he identified multiple changed circumstances, in addition to and independent of Old Republic, that made Black Diamond concerned about both VCLF's and Patriot's respective financial conditions, and Black Diamond's attendant credit risk which culminated in Black Diamond demanding new and modified lending terms:

> Q. . . . Don't you believe, and wasn't your testimony yesterday, and is your testimony today that VCLF's financial condition and Patriot's financial condition deteriorated during the time you were exercising due diligence under the commitment letter?
>
> A.  Yes, that was my testimony yesterday.
>
> Q.  And for the reasons you mentioned yesterday, that would include the loss of the Old Republic funds?
>
> A.  At least from my understanding, at the time of our discussions we hadn't actually lost the Old Republic funds.  It was just being contemplated.
>
> Q.  Do you recall testifying about the longwall move?
>
> A.  I do.
>
> Q.  And to the extent that there had to be a longwall move, didn't that impair the financial condition of VCLF and Patriot, actually?
>
> A.  Yes.

Q.  How about the moving of the [Bula] Baptist Church? Didn't you consider that to be a problem and a difficulty that VCLF and Patriot had to overcome?

A.  It was a difficulty that they had to overcome.

Q.  You talked extensively about less inventory, right, Mr. Ehrlich?

A.  I did.

Q.  That impacted the financial projections you were evaluating for purposes of your due diligence, correct?

A.  Correct.

Q.  You testified that you were getting very concerned about the financial wherewithal of VCLF and the ability to protect your loan; isn't that right?

A.  That is what I testified yesterday.

6/5 Tr. 32:24-34:4 (Ehrlich cross).

77.    These events all arose no later than October 9, 2015:

a.    The Old Republic Proceeds were diverted to Patriot via the Confirmation Order, entered October 9, 2015.  *See* Ex. 334, at 62 ¶ 159.

b.    The likelihood that the longwall move would take place after VCLF acquired the Federal 2 Mine was a known issue to Black Diamond and VCLF no later than October 9, 2015.  *See* Ex. 59 (10/9/15 Deckoff-K. McCoy e-mail exchange).

c.    Mr. Ehrlich himself admitted that Black Diamond learned about the issue involving the need to move the Bula Baptist Church (in order to accomplish VCLF's mining plan at the Federal 2 Mine) no later than September 24, 2015, "[w]hen we [Ehrlich and other Black Diamond personnel and consultants] visited the mine," a mere three days after the Commitment Letter was executed. 6/4 Tr. 189:4-18 (Ehrlich direct).

d.    With respect to coal inventory, Patriot ultimately informed VCLF and Black Diamond that "[t]he September 30, 2015 ending inventory was 38,393 tons" (Ex. 290, at BDCF-00075676)—"significantly less than the 100,000 tons" VCLF and Black Diamond expected Patriot would deliver to VCLF at closing.  6/4 Tr.

98

183:8-16 (Ehrlich direct); *see also id.* 185:6-10 (Ehrlich direct) ("But the fact that there only 38,000 tons at the mine today – you know, as of 9/30/15 was very disappointing.  And it seemed like a shared concern, that there wouldn't be sufficient – there wouldn't be 105,000 tons when this was delivered.").  Mr. Ehrlich admitted that this reduced inventory was a surprise to VCLF, as well as Black Diamond.  *See* 6/4 Tr. 185:4-5 (Ehrlich direct) (" . . . I don't think VCLF felt comfortable with what the number was going to be. . . .").

e.   Finally, "[i]t was common knowledge in [the] Chapter 11 case in this courtroom [as of September 22, 2015] that the Debtor had reported it was scheduled to run out of money perhaps sooner, but certainly by the end of October of 2015."  6/7 Tr. 186:15-21 (Potter direct); *see also id.* 191:13-17 (Potter direct) (it was "[a]bsolutely . . . well known in this courtroom" that "Patriot was running out of money at this time," and "the Debtor did his [*sic*] job of keeping the [C]ourt well apprised of its financial status"); 6/4 Tr. 122:16-22 (Ebetino direct) (ultimately, Patriot "worked to be able to get through to possibly the end of October [2015 without running out of cash], although it was very – very close").

78.    Accordingly, the evidence at trial established that multiple events having or reasonably likely to have had a material adverse effect on VCLF had occurred no later than October 9, 2015.  The impact of these events was to cause a failure of Condition (d) of the Commitment Letter and to relieve both Black Diamond and VCLF of any further undertaking obligations thereunder.  That the events were material is confirmed by Black Diamond's demand for material changes to the Commitment Letter as a result.  *See supra* Findings of Fact ¶¶ 150-180; *infra* Conclusions of Law ¶¶ 130-145.

*    *    *

79.    Based on the foregoing, the Court holds that no Party had any continuing undertaking obligations under the Commitment Letter after October 9, 2015.

80.    Black Diamond does not allege any breach of the Commitment Letter by VCLF prior to October 13, 2015 (*see* Ex. 63):  it alleges only that VCLF improperly solicited

4833-1306-9934

financing on or after October 13, 2015, and that it closed on the transaction without conveying the Equity Interests to it on October 26, 2015.  Similarly, VCLF does not allege a breach by the Commitment Letter by Black Diamond until it repudiated its lending commitment on or about October 22-23, 2015.

81.    Because no alleged breach by either Party occurred before the conditions in the Commitment Letter irreversibly failed, the Court hereby dismisses Black Diamond's claim against VCLF and dismisses VCLF's counterclaims against Black Diamond.

## IV.    ELEMENT #2:  BREACH OF THE CONTRACT

82.    Having held that VCLF and Black Diamond were both relieved of their respective undertakings under the Commitment Letter by October 9, 2015, and that their respective claims against each other will be dismissed, the Court need not address Black Diamond's contention that VCLF breached the Commitment Letter after October 9, 2015, or VCLF's contention that Black Diamond breached the Commitment Letter on October 22 – 23, 2015.

83.    Nevertheless, to the extent some argument can be made that the Conditions did not fail and relieve both Black Diamond and VCLF of their Commitment Letter undertakings, the Court also concludes, applying applicable law to the evidence before it, that VCLF did not breach the Commitment Letter.  Rather, to the extent that any Party breached the Commitment Letter, it was Black Diamond.

### A.    Estoppel/Waiver

84.    To properly assess the element of breach, the Court starts by describing the Parties' respective estoppel/waiver arguments.  Black Diamond maintains that VCLF is precluded under the doctrine of judicial estoppel from arguing that Black Diamond was required to fund the $25 million Commitment for a VCLF APA other than the 8/16 APA.

85.     VCLF, for its part, maintains that the doctrines of equitable estoppel and implied waiver preclude Black Diamond from asserting that it was not obligated to fund the $25 million Commitment.  VCLF also maintains that Black Diamond should be estopped from arguing that, under the Commitment Letter, it was not required to provide a term loan at closing in the amount of $10 million.

86.     As set forth below, the Court concludes that VCLF has the better of the estoppel/waiver arguments.

### 1.     Black Diamond's Estoppel Argument

87.     In its Answer and Counterclaim, VCLF made the following assertions in support of its counterclaim for breach of contract against Black Diamond:

> 47.  The Commitment Letter provided that any modifications thereto must be in writing and signed by the parties.
>
> 48.  The Commitment Letter is a valid and enforceable contract.  The parties never agreed to any modifications to the Commitment Letter in a signed writing.

Answer & Countercl. of Defs./Countercl.-Pls. Va. Conservation Legacy Fund, Inc. & ERP Compliant Fuels, LLC ¶¶ 47-48 (Dec. 4, 2015), ECF Doc. No. 3-68 ("Answer").

88.     During opening statements, Black Diamond's counsel maintained that, as a result of these statements in VCLF's Answer and Counterclaim, VCLF is "judicially estopped" from maintaining the Black Diamond was required to fund the original $25 million Commitment with respect to a VCLF APA other than the 8/16 APA:[32]

---

[32] Though relied upon by Black Diamond's counsel in opening statements, VCLF's Answer and Counterclaim does not appear on Black Diamond's exhibits list.  The Court need not reach the issue of whether this pleading is in evidence, however, given the Court's conclusion below that the doctrine of judicial estoppel does not apply here.  To the extent, however, that the Court needs to rely on VCLF's Answer and Counterclaim to reach its conclusions, the Court takes judicial notice of it.  *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Fed. R. Evid. 201(c) ("The court . . . may take judicial notice on its own"); *Deicher v. City of Evansville, Wis.*, 545 F.3d 537, 541-42 (7th Cir. 2008) (holding that the filing date of a complaint, although not admitted into evidence, was "a matter of public record and subject to judicial notice, [and was therefore] not extrinsic evidence"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a pleading filed after the plaintiffs' second amended complaint); *In re*

Your Honor, defendants are judicially estopped from arguing now that we ever agreed to waive or modify the terms of the commitment letter that tied our financing commitment to the APA as it existed as of September 21st, because they filed an answer and counterclaims in this case, and you have it on your screen, and in their answer and counterclaims, this is what they said.

In paragraph 47, they themselves recited the fact that modifications to the commitment letter have to be in writing and signed by the parties. And then they said in paragraph 48, Your Honor, "The parties never agreed to any modifications to the commitment letter in a signed writing". That is a binding judicial admission that prevents them from arguing now that we ever amended or modified the commitment letter such that our financing commitment was not tied to the specific deal embodied in the APA as it existed on September 21st when we signed the commitment letter, as amended, modified, or supplemented as of the date hereof.

This is critical, Your Honor. The only funding commitment we ever made was tied to that APA. We had no funding obligation in connection with any other deal that VCLF decided to do with Patriot.

6/4 Tr. 20:3-24 (Black Diamond opening statements).

89.    The Court finds that the doctrine of judicial estoppel, however, is inapplicable

here. It is well-established that the doctrine of judicial estoppel applies only where a court

has *accepted* the party's prior position:

Three elements must be satisfied before judicial estoppel will be applied. First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. The position at issue must be one of fact as opposed to one of law or legal theory. *Second, the prior inconsistent position must have been accepted by the court.* Lastly, the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage.

---

*Direxion Shares ETF Tr.*, No. 09 Civ. 8011 (KBF), 2012 WL 717967, at *4 n.5 (S.D.N.Y. Mar. 6, 2012) ("The Court may take judicial notice of pleadings in other actions pursuant to Fed.R.Evid. 201(b)."); *see also Siberius, Inc. v. M.V. Amilla*, 880 F.2d 662, 664 (2d Cir. 1989) (affirming district court's decision to take judicial notice of "a well-known, long-established agreement specifically identified in the charter party [*i.e.*, maritime contract] as the document that would govern the settlement of any disputed cargo claims").

4833-1306-9934

*Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (emphasis added) (citations and internal

quotation marks omitted).

90.     Judicial estoppel does not apply here because, at a minimum, this Court did

not previously accept VCLF's allegations in paragraphs 47-48 of the Counterclaim.

91.     In any event, there is no inconsistency between VCLF's allegations that the

Commitment Letter was an enforceable contract that had not been modified in writing, on the

one hand, and VCLF's contention—accepted by this Court for the reasons set forth below—

that Black Diamond effected an implied waiver of the provision of the Commitment Letter

tying Black Diamond's $25 million financing Commitment to the 8/16 APA (as opposed to

the VCLF APA that VCLF and Patriot ultimately agreed on), on the other hand.  Indeed, the

third affirmative defense in VCLF's Answer is:  "The Complaint is barred, in whole or in

part, by doctrines of laches, estoppel, ratification, *waiver* and/or unclean hands."  Answer, at

17 (emphasis added).

92.     Although the Commitment Letter provides that it "may not be amended or any

provision [t]hereof waived or modified except by an instrument in writing signed by the party

against whom enforcement of the same is sought" (Ex. S, at BDCF-00028003), New York

law teaches that "the existence of a nonwaiver clause does not in itself preclude waiver of a

contract clause."  *Kenyon & Kenyon v. Logany, LLC*, 33 A.D.3d 538, 539 (1st Dep't 2006)

(quoting *Dice v. Inwood Hills Condo.*, 237 A.D.2d 403, 404 (2d Dep't 1997), and citing

*Simon & Son Upholstery, Inc. v. 601 W. Assocs., LLC*, 268 A.D.2d 359, 360 (1st Dep't

2000)).  The "law is abundantly clear in New York that, even where a contract specifically

contains a nonwaiver clause and a provision stating that it cannot be modified except by a

writing, it can, nevertheless, be effectively modified by actual performance and the parties'

course of conduct."  *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 245 (1st Dep't

2013).

93.     In *Aiello*, the Appellate Division (New York's intermediate appellate court)

held that even though the agreement before it (like the Commitment Letter here) contained a

requirement that changes to the agreement be in writing, and even though, "only a few

months after the incident in this case," the parties signed "another, identical agreement"

("changing only the price paid for the services," but not specifying the services

themselves)—which second agreement, the court determined, "was essentially a renewal of

the first contract"—the parties, by their conduct, waived the nonwaiver provision by agreeing

to services not set forth in either agreement.  *Id.*

94.     Similarly, in *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 CV

01796(GBD), 2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012), where plaintiff alleged that

defendant breached a contractual provision requiring that defendant provide plaintiff

quarterly reports, the district court granted summary judgment for defendant on the grounds

that plaintiff waived that provision, even though the agreement at issue contained a

nonwaiver clause.  *Id.* at *5-6 & n.20.  The court noted that "[t]he evidence overwhelmingly

indicates that Plaintiff failed to require performance of the quarterly report provision over a

period of years":

> Plaintiff accepted and was presumably content with
> Defendant's sparse productions of losses data, even though it
> was outside of the quarterly report framework.  Plaintiff has not
> produced any evidence demonstrating that it ever inquired into
> the whereabouts of the quarterly reports, or informed
> Defendant that it wished to receive them over the period of
> years that Defendant repeatedly failed to comply with the
> requirement.

*Id.* at *6.

95.     As set forth in the next section, the evidence at trial demonstrated that,

notwithstanding the Commitment Letter's requirement that modifications be memorialized in

a signed writing, Black Diamond, through its conduct following the execution of the

4833-1306-9934

Commitment Letter, effected an implied waiver of the Commitment Letter's linkage of the

$25 million Commitment to the 8/16 APA.

### 2.    VCLF's Estoppel and Implied Waiver Arguments

96.    VCLF maintains that Black Diamond, through its conduct, either has waived

or is estopped from asserting that it was obligated to provide $25 million in financing only for

the 8/16 APA, as opposed to any amended VCLF APA upon which Patriot and VCLF would

ultimately close.  The Court finds both of VCLF's arguments to be meritorious.

### a.    *Implied Waiver*

97.    As noted above, the "law is abundantly clear in New York that, even where a

contract specifically contains a nonwaiver clause and a provision stating that it cannot be

modified except by a writing, it can, nevertheless, be effectively modified by actual

performance and the parties' course of conduct."  *Aiello*, 110 A.D.3d at 245.  Black

Diamond's conduct here effected just such a waiver, notwithstanding the Commitment

Letter's nonwaiver provision.

98.    On September 26, 2015, just four days after the Commitment Letter was

signed, VCLF's counsel Mr. Potter informed Black Diamond's counsel Mr. Harris that "the

deal . . . changed substantially (eg by adding multiple subsidiaries, taking different assets and

liabilities, etc), from the fairly simple transaction in our original APA."  Ex. 49 (9/26/15 e-

mail from P. Potter to A. Harris), at SRZ-00000074.  Indeed, in that same communication,

Mr. Potter asked Mr. Harris for "BD's input" on "amending the APA," in advance of "the

confirmation hearing on October 5th."  *Id.*

99.    Black Diamond's witnesses confirmed at trial that they knew shortly after the

Commitment Letter was signed that the VCLF APA was in the process of changing

substantially.  *See* 6/5 Tr. 151:12-16 (Harris direct) (believes that "VCLF and Patriot

proposed changes to the APA . . . that is referred to in the commitment letter . . . fairly shortly

4833-1306-9934

after the auction – the auction concluded [on September 21, 2015]"); *id.* 28:2-7 (Ehrlich

cross) (" . . . I was certainly aware on September 26th that there was a possibility that the APA

may change, potentially substantially."); *id.* 52:2-9 (Ehrlich cross) (Mr. Ehrlich knew "as of

that early email from Patrick Potter" on September 26, 2015 that "changes to the APA would

be in play," and that "the point of Patrick Potter's email was to specifically advise Black

Diamond, so that Black Diamond would be aware and in the know"); *accord* 6/8 Tr. 59:1-6

(Deckoff cross) (it "was communicated to [Black Diamond's] lawyer" that "VCLF's lawyer

had communicated to him that substantial changes were being pursued with regard to the 8/16

APA," although Deckoff "can't tell you when it was communicated to our lawyer").  Mr.

Harris candidly acknowledged that he knew during this period that "the unchanged terms of

the August 16th APA were not going to be the terms upon which [the] VCLF[-]Patriot

transaction would or could close."  6/5 Tr. 235:17-20 (Harris cross).

     100.    Far from invoking the provision of the Commitment Letter tying Black

Diamond's $25 million Commitment to the 8/16 APA, Black Diamond, aware of the

substantial changes not only to the VCLF APA but also to the post-transaction enterprise as

discussed above (*see supra* Conclusions of Law ¶¶ 76-78, discussing the longwall move, the

discovery of less coal inventory than anticipated, the need to move the Bula Baptist Church,

and other developments constituting material adverse changes), nonetheless pressed on with

the transaction, giving no indication that Black Diamond would not provide $25 million in

financing to support the transaction that VCLF and Patriot would ultimately agree on.  As

Mr. Harris admitted at trial:

> And Black Diamond, *notwithstanding that, continued to work
> with VCLF and its representatives through from whenever that
> first change came – I believe the email we looked at before was
> dated September 26th – right through October 23rd* in con – in
> conducting additional diligence – substantial diligence,
> expending significant resources in dollars to try and make this
> transaction work on terms that would work for, not only

4833-1306-9934

themselves, *but also an asset purchase agreement that would
work for Patriot and VCLF.*

. . . We were presented with a new deal and they said, would
you finance it?  And that's what we were working towards,
diligently, right up through the October 23rd – the weekend of
October 23rd.

6/5 Tr. 164:15-165:3 (Harris direct) (emphasis added).

101.    Mr. Ehrlich, for his part, admitted that, as late as October 22, 2015, he "never

discussed with Mr. Clark[e his] concerns . . . about [the failure of] those conditions" in the

Commitment Letter, which—as noted above—included conditions that the 8/16 APA be the

VCLF APA approved by the Court and consummated by VCLF and Patriot and that VCLF

had suffered or was likely to suffer an event likely to have a material adverse affect on

VCLF.  6/5 Tr. 54:12-56:10 (Ehrlich cross).[33]  Mr. Clarke's recollection is the same.  *See*

6/12 Tr. 87:18-19 (Clarke cross) ("Black Diamond never raised an issue about any of the

conditions, never.").

102.    Not only that, but on October 6, 2015—two weeks *after* it learned from VCLF

that the VCLF APA needed to change "substantially" and that many of these changes would

materially and negatively affect VCLF—Black Diamond affirmatively proposed to VCLF

that the term of the $25 million Commitment Letter be *extended* so that it wouldn't lapse by

the October 8, 2015 termination date specified in the Commitment Letter itself.  *See* Ex. 53

(10/6-7/15 Ehrlich-Clarke e-mail exchange agreeing to extend term of Commitment Letter;

Ehrlich:  "Given the delay in the confirmation process, we believe it makes sense for the

parties to agree to extend each of [the termination] dates [in the Commitment Letter] by 30

days . . . .").

---

[33] *See also* 6/5 Tr. 49:6-14 (Ehrlich cross) ("Q. . . . My question is specifically relating to the conditions
provision of the commitment letter.  And whether you discussed the failure of those conditions at any time
with anyone at VCLF?  A.  *I don't recall specific discussions with VCLF saying you've – you have failed to
meet the conditions of the APA [*sic*] personally. . . .*") (emphasis added).

4833-1306-9934

103.    Black Diamond's conduct in pressing forward with the $25 million

Commitment even after it learned on September 26, 2015, that the VCLF APA "changed

substantially" and that events having a material adverse effect had or were likely to occur

allows for only one interpretation:  Black Diamond was waiving any requirement under the

Commitment Letter that the Commitment be linked to the 8/16 APA and the condition

requiring no material adverse effect.  Consequently, the Court finds that Black Diamond,

through its conduct, agreed to fund the $25 million Commitment with respect to the VCLF

APA upon which Patriot and VCLF would ultimately agree.  The Court finds that Black

Diamond's implicit waiver is consistent with its motivations as developed by the testimony of

its own witnesses.  Black Diamond primarily was interested in the Equity Interest in

HealthCo.  Implicitly waiving conditions related to the loan for the Federal 2 Mine by

pressing forward with the loan and not mentioning the failure of any condition makes logical

sense where making the loan was a prerequisite to delivery of the HealthCo Equity Interest.

It also set the stage for Black Diamond to be able to demand material changes to its proposed

lending terms at a time when VCLF was most vulnerable—the business day before the

scheduled closing with Patriot.

### b.    *Equitable Estoppel*

104.    Separately, the doctrine of equitable estoppel precludes Black Diamond from

making the following two arguments with respect to the duties imposed by the Commitment

Letter:  (1) that the $25 million Commitment was tied only to the 8/16 APA (as discussed

above, with respect to the issue of implied waiver), and (2) that the Commitment Letter did

not obligate Black Diamond to provide $10 million in term loan financing at closing.  As to

both, Black Diamond's contemporaneous words and conduct represented that the opposite

was true, and VCLF relied on Black Diamond's representations to its detriment.  Under New

4833-1306-9934

York's doctrine of equitable estoppel, Black Diamond is precluded from making these arguments now.

105.    Equitable estoppel "'is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'" *Veltri v. Bldg. Serv. 32 b-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) (quoting *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001)).  "Under New York law, the elements of equitable estoppel are with respect to the party estopped:  (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The parties asserting estoppel must show with respect to themselves:  (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003).

106.    Detrimental reliance occurs when a party "relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the [equitable] estoppel did not know nor should it have known that its adversary's conduct was misleading." *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005).

> **(i)**      *The $25 Million Commitment Applied to the VCLF*
> *APA Ultimately Closed on by Patriot and VCLF*

107.    As noted in the previous section regarding implied waiver, Black Diamond's words and conduct between September 26, 2015, and October 22, 2015, constituted representations to VCLF that Black Diamond was *not* demanding that the $25 million financing Commitment be tied to the 8/16 APA or to the elimination of the events that had or were likely to occur and have a material adverse effect on VCLF.  To the contrary, Black Diamond's witnesses admitted at trial that, *at no time prior to October 22, 2015*, did Black

4833-1306-9934

Diamond even raise the topic of changes to the terms of Black Diamond's financing

Commitment, notwithstanding the fact that substantial changes were being made to the VCLF

APA and materially adverse events had occurred or were likely to occur.  Mr. Ehrlich

admitted this point squarely in both direct and cross examination:

> Q. . . . [A]ll through that time when those APA revisions were
> being pursued you did testify on direct that all during that time,
> you and no one from VCLF ever had discussions about
> substantive changes to the commitment letter, correct?
>
> A.  I don't recall any conversations about substantive changes
> to the commitment letter.
>
> Q.  So those conversations started on October 22nd, right?
>
> A.  Those conversations started on October 22nd.

6/5 Tr. 52:17-25 (Ehrlich cross).

108.    Mr. Harris agreed.  *See* 6/5 Tr. 210:2-8 (Harris cross) ("Other than the

agreement to extend certain dates that we discussed earlier in your questioning, I am not

aware of any specific discussions regarding amendments or waivers to the commitment letter

or the term sheet prior to the 22nd [of October 2015]."); *id.* 223:7-224:12 (Harris cross) (not

"personally aware" of any "communications from Black Diamond to VCLF that oh, by the

way, by virtue of your 9/26 email representing significant changes to the asset purchase

agreement, the commitment letter is also going to have to change").

109.    Perhaps the clearest evidence that Black Diamond did not link its financing

Commitment to the 8/16 APA is the fact that, even as late as October 22-23, 2015, when

Black Diamond finally got around to demanding changes to the terms of its financing

Commitment, Black Diamond still did not link the $25 million Commitment to the 8/16 APA,

as reported by Mr. Clarke:

> Q.  Sir, now I'm going to ask you to answer my question.  I'll
> put it to you again.  Black Diamond never refused to provide
> the financing set forth in the commitment letter in order for you
> to close on the APA as amended, modified, or supplemented as
> of September 21st, did it?

4833-1306-9934

A.  That question never came to me from Black Diamond
connecting together.  Black Diamond never raised an issue
about any of the conditions, never.  What we were talking
about on the night of the 22nd, and the morning of the 23rd, is
would they fund the term loan.  I was pushing for ten million.
*Nobody ever said to me, Tom, let's go back to August 16th.
Let's go back in time and then I'll fund you.  That would have
been nonsensical.  We knew what we had.*  Steve and I talked
about this.  I valued Steve's input.  I used Steve by going to
Patriot and saying I can't get the funding unless you do this and
this.  And I was so proud that he said go get the [five million
back from Patriot on October 22, 2015].  And Ken McCoy got
it.  I was proud of him.  We were new partners.  *Nobody said
they weren't going to fund, because* – I mean, how – *why would
they waste their time sitting here negotiating knowing that the
events and conditions in the August 16th asset purchase
agreement were no longer valid*, because we had the Old
Republic, which is the most significant, but it's the major piece
that cost us to go get the [five million].  So I – it never came up
that way. . . .

6/12 Tr. 87:12-88:10 (Clarke cross) (emphasis added).

110.   The above-quoted testimony from Mr. Clarke confirms that VCLF had relied

on Black Diamond's conduct and reasonably believed that Black Diamond was not

conditioning its $25 million Commitment on the 8/16 APA.  The trial record is devoid of any

attempt by Black Diamond to warn VCLF, prior to October 23, 2015, that it would not extend

$25 million in financing unless and until VCLF and Patriot revived the un-revivable 8/16

APA.  To the contrary, the evidence confirms that Black Diamond intentionally refrained

from making any statement or disclaimer to VCLF that linked the $25 million in funding to

the 8/16 APA.

      **(ii)**    ***Black Diamond Was to Provide $10 Million in Term
Loan Financing to VCLF at Closing Under the
Commitment Letter***

111.    Apparently as an afterthought at trial,[34] Black Diamond's counsel argued with VCLF's witnesses that the Commitment Letter did not obligate Black Diamond to provide VCLF with a term loan of $10 million (as opposed to a lower amount) at closing.

112.    Though the Commitment Letter does not specify that the amount of the term loan is to be $10 million, the Term Sheet attached to the Commitment Letter refers to "borrowings under the Senior Secured Facilities *on the Closing Date*," and the "Senior Secured Facilities" are defined as "[a] term loan credit facility . . . and an asset based credit facility . . . in an aggregate principal amount of $25,000,000.00." Ex. S, at BDCF-00028005, BDCF-00028007. If anything, the text of the Commitment Letter points towards the conclusion that the transaction to be closed upon by VCLF and Black Diamond would entail advancing all $25 million in financing on the closing date—a contention that VCLF does not make here. At a minimum, the Commitment Letter supports and is consistent with VCLF's position that Black Diamond was to extend $10 million of term loan financing to VCLF at closing.

113.    As both sides' witnesses testified at trial, moreover, it was the contemporaneous understanding of all Parties during the period September 21 – October 23, 2015, that the Commitment Letter obligated Black Diamond to extend $10 million of term loan financing to VCLF. As described in detail in the Findings of Fact above, Mr. Erlich's testimony clearly indicates that he understood that VCLF was going to get $10 million of term loan financing at closing and that the Gravenhorst Emails reflected an intent to dramatically lower (and at one point eliminate) the funded amount at closing. There is no dispute that VCLF and Mr. Clarke both understood $10 million would be advanced at closing and that anything less was insufficient. *See supra* Findings of Fact ¶¶ 63-66, 159-60.

---

[34] For reasons that this Court does not understand, Black Diamond's counsel did not raise this point until the very last day of trial, June 13, 2018, on recross and cross examination of Mr. Clarke and Mr. Ken McCoy, respectively.

4833-1306-9934

114.    Contemporaneous documentation from the period, all in evidence, likewise confirms the Parties' mutual understanding that a $10 million term loan would be funded at closing pursuant to the Commitment Letter.  At 7:55 p.m. on Thursday, October 22, 2015, VCLF's financial advisor Brendan Murphy, of Teneo, sent an e-mail outlining "the latest from BDCM" (*i.e.*, the changes Black Diamond was demanding to the Commitment Letter), which Black Diamond asked Teneo to model.  *See* Ex. BK.  One of the changes was the *removal* of the $10 million term loan, which had previously been in Teneo's model:

- $10M Term Loan at close – deleted [you may want to keep this toggled in case we need come back to this in the future]

  . . .

- NEW FACILITY -- $5M Term Loan issued on December 2, 2015 (e.g. after the long-wall move)

*Id.* at TEN0028715.  Indeed, Teneo's "VCLF business plan" models generated up to that point (which were prepared in consultation with, and provided to, Black Diamond) consistently included a "Term Loan" of "$10,000,000."[35]  Mr. Murphy's October 22, 2015 e-mail, coupled with the prior Teneo models, confirms that the Parties understood that Black Diamond would extend a $10 million term loan at closing.

115.    Importantly, VCLF *relied* on Black Diamond's representation that it would provide $10 million in term loan financing at closing.  As Mr. Clarke testified, it was VCLF's basis for moving forward on its plan to acquire and operate the Federal 2 Mine:

> We determined, you know, that the appropriate amount of money was, you know, consistent with our commitment from Black Diamond, twenty-five million dollars.  *We always knew we needed about ten million dollars just to start on the day of closing*, in addition to our Old Republic money, and then we

---

[35] *See* Ex. 286 (10/21/15 e-mail from B. Murphy to Black Diamond, attaching "VCLF_Business_Plan" model), at 16th page of document ("Total Term Loan" listed as "$10,000,000"); Ex. 287 (same); Ex. 288 (10/21/15 e-mail from B. Murphy to J. Kucish, C. Childers, and K. McCoy, copying Black Diamond), at 17th page of document (same); Ex. 290 (10/22/15 e-mail from B. Murphy to J. Kucish, C. Childers, and K. McCoy, copying Black Diamond), at 22nd page of document; Ex. 291 (10/22/15 e-mail from B. Murphy to R. Lattouf), at 12th page of document (same); Ex. 294 (10/22/15 e-mail from Z. Messenger to R. Lattouf), at 13th page of document (same).

4833-1306-9934

> would have an ABL or receivable-based loan.  As receivables
> grew, we would finance more.

6/11 Tr. 297:2-8 (Clarke direct) (emphasis added).

116.    Mr. Clarke was blindsided by the changes to the financing terms Mr. Ehrlich

was demanding on the evening of October 22, 2015, and during the day on October 23, 2015

(which included a halving of the term loan amount and a delayed draw on top of that),

precisely because, up until that point, Black Diamond had promised to provide $10 million in

term loan financing at closing:

> Q.  What did you say to Mr. Ehrlich [on October 22, 2015]
> after you understood him to be attempting to substantially
> modify the terms of the commitment letter?
>
> A.  I told him it didn't work and that we had to find a solution
> that worked.  I told him that we could not close unless we had
> at least the original, you know – and by this point, we had been
> talking about a ten million dollar term loan, and a fifteen
> million dollar asset-based loan.  I told him at a minimum, we
> had to have the ten million dollar term loan.

*Id.* 334:19-335:3 (Clarke direct); *see also* 6/12 Tr. 19:9-12 (Clarke direct) (". . . I repeatedly

indicated [to Mr. Ehrlich on October 22-23, 2015] that without cash at closing – *the original*

*committed, at a minimum, ten million dollars of cash at closing* – the transaction simply

would not work.") (emphasis added); *id.* 28:14-17 (Clarke direct) ("[A]lmost all of Thursday

and early Friday morning [October 22-23, 2015] was spent on trying to convince [Mr.

Ehrlich] *to fund the ten million under the commitment letter* up front") (emphasis added).

117.    Having repeatedly reaffirmed to VCLF, during the period September 21 –

October 23, 2015, that $10 million in term loan financing would be available to VCLF at

closing, Black Diamond is now estopped from taking the position that the Commitment

Letter entailed no such requirement.  The trial record confirms that VCLF relied on Black

Diamond's representation to its detriment throughout this period in pursuing its transaction

with Patriot and in incurring expenses in connection with the transaction.  Accordingly, Black

4833-1306-9934

Diamond may not now claim that a $10 million term loan at closing was not a requirement of the Commitment Letter.

**B.      Black Diamond Repudiated the Commitment Letter**

118.      The evidence at trial supports VCLF's contention that, by its words and conduct, Black Diamond repudiated[36] the Commitment Letter (to the extent it was still in effect) on the evening of October 22, 2015, and during the day on October 23, 2015.  Under New York law, the impact of Black Diamond's repudiation was to immediately relieve VCLF of all remaining undertakings under the Commitment Letter—including any prohibition on solicitation of alternative closing financing set forth in the Exclusivity Undertaking Section and any undertaking to convey the Equity Interests to Black Diamond.

**1.      New York Legal Standards on Repudiation**

119.      Under New York law, repudiation constitutes a breach of contract, "entitling the nonrepudiating party to recover damages for a total breach *and* excusing it from further performance." *SPI Commc'ns v. WTZA-TV Assocs. Ltd. P'ship*, 229 A.D.2d 644, 645 (3d Dep't 1996) (citing *Long Is. R. R. Co.*, 41 N.Y.2d at 463-64) (emphasis added).

120.      It is well-established under New York law that an anticipatory breach (or repudiation) by one party to a contract excuses performance by a nonrepudiating counter-party.  *See Long Is. R. R. Co.*, 41 N.Y.2d at 463 ("[R]epudiation entitles the nonrepudiating party to claim damages for total breach."); *Kain Dev., LLC v. Krause Properties, LLC*, 130 A.D.3d 1229, 1232 (3d Dep't 2015) ("Upon a showing of [] anticipatory repudiation, the nonrepudiating party is entitled to forgo further performance and to claim damages for total breach."); *QK Healthcare, Inc. v. InSource, Inc.*, 108 A.D.3d 56, 63 (2d Dep't 2013) ("Under

---

[36] Repudiation is sometimes also described as an anticipatory breach of a contract.  *See Long Is. R. R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463-64 (1977) ("under the doctrine of anticipatory breach[,] . . . if one party to a contract repudiates his duties thereunder prior to the time designated for performance and before he has received all of the consideration due him thereunder, such repudiation entitles the nonrepudiating party to claim damages for total breach") (citation omitted).

4833-1306-9934

the doctrine of anticipatory repudiation, where one party repudiates its contractual obligations prior to the time designated for performance, the nonrepudiating party may immediately claim damages for total breach and be absolved from its obligations of future performance.") (internal quotation marks omitted).

121.   Additionally, as New York's highest court, the Court of Appeals, made clear almost a century ago, repudiation not only excuses the other party from further performance, but also "the ceremony of a futile tender." *De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293 (1926).

122.   Once a party repudiates a contract, it can retract the repudiation and revive the contract only if the other party has not "change[d] its position in reliance on the repudiation." *Argonaut P'ship, L.P. v. Grupo Sidek, S.A. de C.V.*, No. 96 Civ. 1967 (MBM), 1996 U.S. Dist. LEXIS 15925, at *18 (S.D.N.Y. Oct. 24, 1996).

123.   Whether a party has repudiated a contract is assessed objectively; and although the subjective perceptions of the nonrepudiating party are relevant to this assessment (*see infra* Conclusions of Law ¶ 128), the repudiating party's subjective intent to repudiate is "irrelevant." *See DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 642 (S.D.N.Y. 2011).  The communication of intent not to perform can be based on the repudiating party's "words or deeds," and must be unequivocal. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998).

124.   A party can repudiate a contract by adopting a "take-it-or-leave-it" position by refusing to perform the contract unless the other party accepts new terms or an untenable construction of an essential term.  *See IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 92 N.Y.2d 989, 993 (1998) (plaintiff's "insistence on an untenable interpretation of a key contractual provision, and refusal to perform otherwise, constituted an anticipatory breach of the contract"); *see also REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d

116

Cir. 1976) ("Under New York law, insistence upon terms which are not contained in a

contract constitutes an anticipatory repudiation thereof.") (cited favorably in *Kelly Capital,*

*LLC v. S & M Brands, Inc.*, 873 F. Supp. 2d 659, 677-78 (E.D. Va. 2012) (applying New

York law)).

125.    Repudiation "can be grounded upon a finding that the other party . . . has

communicated its intent to perform only upon the satisfaction of extracontractual conditions."

*SPI Commc'ns*, 229 A.D.2d at 645; *see also Wecare Holdings, LLC v. Bedminister Int'l Ltd.*,

No. 08-CV-6213, 2009 WL 604877, at *7 (W.D.N.Y. Mar. 9, 2009) (finding anticipatory

repudiation where defendant threatened to "walk . . . away from [the] transaction" unless

plaintiff agreed to less favorable terms).[37]

126.    Repudiation can also be established when a party demands material changes to

a preliminary agreement on the eve of the closing of the definitive agreement.  *See Rhodes v.*

*Davis*, 628 F. App'x 787, 790 (2d Cir. 2015) (anticipatory repudiation of preliminary

stipulation found where party, on day before closing deadline, required counterparty to

assume personal obligations not set forth in the stipulation).  In *Rhodes*, the court held that

one party repudiated a preliminary stipulation by presenting to the counterparty, the day

before the closing deadline, a 12-page draft definitive agreement whose terms were at odds

with the stipulation, including by requiring the counterparty to assume personal obligations

not set forth in the stipulation:

> The 12–page stock purchase agreement that Davis sent Rhodes
> *the day before the closing deadline contained several terms at*

---

[37] *See also Mometal Structures, Inc. v. T.A. Ahern Contractors Corp.*, No. 09-CV-2791 (MKB), 2013 WL
764717, at *8 (E.D.N.Y. Feb. 28, 2013) (finding that plaintiff repudiated a subcontract by sending a letter
stating it would not perform unless defendant "agreed to modify the terms of the Subcontract" to reflect seven
substantial modifications, such as requiring the defendant to "pay the steel escalation costs and storage costs,"
and to void a portion of the subcontract "pertaining to liquidated damages"); *Israel Cancer Research Fund,*
*Inc. v. Harvey & Gloria Kaylie Found., Inc.*, 33 Misc. 3d 1237(A), at *2 (Sup. Ct., N.Y. Cty. 2011) (holding,
on a motion to dismiss, that allegations that defendant failed to make payments despite plaintiff's repeated
requests and that defendant had "explicitly taken the position that it will continue to withhold that funding
unless [plaintiff] takes on obligations beyond those set forth in the [Agreements]" sufficiently supported claim
for repudiation).

4833-1306-9934

*odds with the Stipulation,* including, for example, substitution of new entity ASI Services, Inc., for Davis himself as purchaser of Rhodes's shares, as well as that entity's assumption of post-closing obligations (including liabilities) that the Stipulation specifically assigned to Davis individually.  The agreement also required *Rhodes* to make representations and grant warranties not agreed to in the Stipulation, and *to assume indemnification obligations for breach of representations in the purchase agreement.*  Further, while the purchase agreement represented that it constituted the entire agreement between the parties, it notably omitted a Stipulation provision requiring defendants to indemnify Rhodes for any post-January 1, 2008 liability.  Meanwhile, a membership agreement that *Davis sent Rhodes on the closing date* further *expanded* Rhodes's indemnification, non-disparagement, and warranty obligations *beyond those agreed to in the Stipulation.*

. . .

On this record, we conclude as a matter of law that Rhodes satisfactorily demonstrated a breach by Davis, and Rhodes's willingness and ability to perform his obligations when due under the Stipulation.  Before the closing deadline passed, *Davis unequivocally and positively repudiated the Stipulation by insisting on terms that were not agreed to in the Stipulation, and not necessary to effect the closing called for therein.*

*Id.* at 790-91 (emphasis added).  The Court recognized that, "[w]hile the question of

anticipatory breach is generally an issue of fact for the jury, where, as here, the relevant

communications are in writing and unambiguous, the issue may be decided as a matter of

law."  *Id.* at 790.  The Court therefore affirmed the district court's granting of summary

judgment in favor of Rhodes (the nonrepudiating party) based on the new terms insisted on

by Davis.  *Id.* at 793.

127.    *Hospital Authority of Rockdale County v. GS Capital Partners V Fund LP*,

No. 09 CIV. 8716 PAC, 2013 WL 840851 (S.D.N.Y. Mar. 6, 2013), is also instructive.  In

that case, the plaintiff and defendants entered into a commitment letter under which

defendants (the would-be lenders) committed to provide plaintiff "financing in the amount of

$87.7 million, the entire purchase price of an asset purchase agreement for Plaintiff's sale" of

a hospital to a buyer.  *Id.* at *1; *see also id.* at *2 (noting that the commitment letter provided

118

"for consideration of up to $87.7 million in the aggregate," which could be reduced if the

buyer did not require all of the promised financing).  Plaintiff claimed that defendants

repudiated the commitment letter when they told plaintiff during a telephone call "[s]hortly

before the anticipated closing date" that defendants "would not provide $87.7 million but

would provide no more than $35 million in financing." *Id.* at *3.  As a result of defendants'

refusal to provide the full financing, the underlying sale transaction failed to close.  *Id.*  On

defendants' motion for summary judgment, the court determined that a reasonable trier of

fact could interpret defendants' statements on the telephone call "as an unequivocal

expression of its intention not to secure the entire purchase price," and therefore concluded

that plaintiff had "provided sufficient evidence to support a theory of repudiation."  *Id.* at *4.

128.    Under New York law, the perception of the nonrepudiating party, in light of

all the circumstances, is relevant to the objective assessment of whether a repudiation

occurred.  *See BT Triple Crown Merger Co. v. Citigroup Global Mkts., Inc.*, 19 Misc. 3d

1129(A), at *5 (Sup. Ct., N.Y. Cty. 2008) (holding, in a case dealing with alleged repudiation

of a Commitment Letter by a party that demanded allegedly conflicting new terms, that

"Barns' and Brizius' perception that the defendants were threatening them with non-

performance, when coupled with the rather ominous tone of the defendants' internal emails,"

could be sufficient to demonstrate that "the defendants presented the plaintiffs with an

ultimatum").

129.    New York law is clear that a nonrepudiating party's attempts to persuade the

repudiator to perform as originally agreed do not constitute a waiver of the breach.  *See In re

Randall's Island Family Golf Ctrs., Inc.*, 261 B.R. 96, 101-02 (Bankr. S.D.N.Y. 2001), *aff'd*,

272 B.R. 521 (S.D.N.Y. 2002) ("He may refuse, for a time, to acquiesce in the repudiation,

and urge the repudiator to perform without waiving any of his rights.") (internal citations

omitted); *Mindel v. Image Point Prods., Inc.,* 725 F. Supp. 189, 194 (S.D.N.Y. 1989)  ("This

effect of Mindel's repudiation was not altered by Image Point's attempts to convince Mindel

to change his mind, nor was it altered by Image Point's proposal for amicable termination.");

*AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 318 (S.D.N.Y. 1999) ("However, a

party's reluctance to terminate a contract upon a breach and its attempts to encourage the

breaching party to adhere to its obligations under the contract do not necessarily constitute a

waiver of the innocent party's rights in the future.") (citing *Seven-Up Bottling Co. (Bangkok),

Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988)); *Grp. 1 Auto., Inc. v.

Country Imported Car Corp.*, No. 07-CV-1454(RRM)(WDW), 2012 WL 11955634, at *16

(E.D.N.Y. Aug. 15, 2012) ("Although plaintiff here attempted to help Country and IRL cure

their defaults under the Amended Agreement and Promissory Note, those efforts do not go so

far as to constitute a waiver of plaintiff's rights under those agreements."); *AG Properties of

Kingston, LLC v. Besicorp-Empire Dev. Co., LLC*, 14 A.D.3d 971, 974 (3d Dep't 2005)

("[W]here a nonrepudiating party affords the repudiating party an opportunity to repent, but it

does not do so, the nonrepudiating party's subsequent failure to perform is not a breach.")

(citing *De Forest*, 243 N.Y. at 292-93).

### 2. On the Eve of the Scheduled Closing, Black Diamond Repudiated the Commitment Letter by Demanding Materially Different Terms, on a Take-it-or-Leave-It Basis

130.    As noted above, at no point between September 21, 2015, and the evening of

October 22, 2015, did Black Diamond communicate to VCLF that Black Diamond required

material modifications to the terms of the Commitment Letter.  *See supra* Findings of Fact

¶ 154; Conclusions of Law ¶¶ 107-108.  Not only that, but Black Diamond did not even

discuss the terms or final documentation for the Commitment Letter with VCLF between

September 21 and October 22, 2015, and indisputably provided no draft loan documentation

to VCLF.  *See, e.g.*, 6/5 Tr. 155:9-23 (Harris direct) (admitting that Schulte's "financing

side . . . was probably lagging behind the other areas," and that he recalls "hearing comments

120

4833-1306-9934

from Pillsbury about expectations that the financing documents should already have been prepared").

131.   The Court concludes that, in the context presented (with closing scheduled for October 26, 2015), Black Diamond's words and conduct conveyed take-it-or-leave changes to its lending terms, and that VCLF reasonably perceived Black Diamond to be saying on October 22 – 23 that it would only lend to VCLF on different and materially worse terms than had been contained in the Commitment Letter.

132.   *First*, the timing of Black Diamond's demands supports this conclusion. Knowing full well that the closing of the VCLF-Patriot transaction (and the Black Diamond-VCLF financing transaction) was scheduled for 12:01 a.m. on Monday, October 26, 2015,[38] Black Diamond waited and demanded material modifications to the Commitment Letter, beginning by telephone on Thursday evening, October 22, 2015, and continuing by telephone and e-mail during the day on Friday, October 23, 2015—literally the business day before the anticipated closing. *See* 6/5 Tr. 54:7-11 (Ehrlich cross) ("Q. . . . So we're clear, you raised substantive issues with Tom Clark[e] on Thursday night, October 22nd, before a scheduled Monday, October 26th closing, correct?  A.  Correct.").  It did so even though it concluded that it wanted to change the lending terms before Mr. Ehrlich first raised the concept on October 22, 2015.  *See supra* Findings of Fact ¶¶ 145-48.[39]  The only plausible explanation for Black Diamond's conduct is that it intended to present new lending terms to VCLF when

---

[38] *See, e.g.*, 6/4 Tr. 211:8-9 (Ehrlich direct) (the "target date for closing" was "October 26th"); 6/5 Tr. 53:6-15 (Ehrlich cross) ("Q. . . . You also testified that you understood that the closing between VCLF and Patriot was scheduled for October 26th, right?  A.  *I did know that*.  Q.  And that would be Monday, October 26th, right?  A.  Correct.  Q.  All right.  And so the intervening days, between October 22nd, and October 26th included a weekend, right?  A.  Correct.") (emphasis added); *id.* 181:6-8 (Harris cross) ("It's my understanding that there were negotiations that were continuing on the Thursday and Friday *preceding what was anticipated to be a Monday closing*.") (emphasis added).

[39] The eve-of-closing outreach to VCLF to change the terms of the Commitment Letter was unusual even for the Black Diamond representatives involved.  Mr. Harris admitted that, in his decade of experience representing Black Diamond, he had "not been involved in – with them in a transaction where we've been – still negotiating terms of financing within ninety-six hours of closing. . . . Based on the experience I've had with them, this would be the first case."  6/5 Tr. 180:11-25 (Harris cross).

4833-1306-9934

VCLF was most vulnerable, expecting that VCLF would have no choice but to accept Black

Diamond's new and onerous lending terms. *See* 6/11 Tr. 171:22-172:9 (Murphy direct) ("Q.

In your mind, does the concept as you just testified of a jam job apply to your perception of

Black Diamond's activities as of Thursday and Friday October 22, 23, 2015?  A. . . . I was

surprised to hear days before it [the transaction] was supposed to close of an alternative

scenario they wanted us to run, and I was concerned that they [Black Diamond] were going

to, somehow, leverage that into changes that they would be requiring pursuant to closing the

deal on Monday."); *id.* 249:7-10 (Murphy cross) ("based on the reputational history of Black

Diamond as a firm, based on my knowledge of restructuring, it – it purportedly seemed like

they were looking to potentially change the deal").

133.    *Second*, the use of Mr. Gravenhorst as a mouthpiece for Mr. Ehrlich supports

the Court's conclusion that Black Diamond was trying to convey that the terms of the

Gravenhorst E-mails were take-it-or-leave-it.  As Mr. Clarke testified, it was like being

turned over to the manager after negotiating the price of a car with the salesperson.  *See supra*

Findings of Fact ¶¶ 169-73.

134.    *Third*, as noted in the Findings of Fact, the Court rejects Mr. Ehrlich's

testimony that Mr. Clarke agreed to any of the modifications Black Diamond demanded on

the evening of October 22, 2015, and during the day on October 23, 2015, and that all that

happened on October 22 – 23, 2015 was continued, uninterrupted negotiations.  Mr. Ehrlich's

account of his conversations with Mr. Clarke was riddled with contradictions and

inconsistencies.  The most glaring inconsistency is Mr. Ehrlich's claim that Black Diamond

only demanded changes to the Commitment Letter on October 22, 2015, because Patriot had

rejected the October 21, 2015 joint VCLF-Black Diamond revised draft VCLF APA, and

Black Diamond, confronted with Patriot's rejection, saw no choice but to modify the

financing terms of the Commitment Letter so that they would apply in conjunction with the

VCLF APA that was acceptable to Patriot.  *See* 6/4 Tr. 210:23-213:6 (Ehrlich direct).  This

explanation by Mr. Ehrlich, however, is squarely belied by the text of the Gravenhorst E-

mails themselves, each of which states that the Commitment Letter modifications set forth

therein are intended to apply *in conjunction* with the October 21st draft, not the APA that

Patriot had tendered.  *See, e.g.*, Ex. BP (Gravenhorst E-mail #1) ("Our commitment remains

subject to VCLF and Patriot executing the draft revised APA dated October 21, 2015, that we

previously approved.  Any changes to that APA remain subject to our approval.") (emphasis

added).

135.    In contrast, Mr. Clarke's account is both internally consistent and corroborated

by contemporaneous documentation.  In privileged communications with his attorney on

Sunday, October 25, 2015—less than 48 hours after the transmission of the last Gravenhorst

E-mail—Mr. Clarke emphatically told his attorney, Mr. Potter, that he did not "verbally

agree" to any of the modifications in the Gravenhorst E-mails.  Ex. DM, at VCLF-00183651-

52.  Rather, he "was pushing Rich [Ehrlich] *to perform under the commitment*," and "kept

pushing Rich on the telephone *to fund the $10 million up front*."  *Id.* at VCLF-00183651.

These e-mail communications, in which Mr. Clarke had no reason not to be candid (and

which VCLF produced voluntarily to moot Black Diamond's year's worth of aggressive

discovery motions) corroborate Mr. Clarke's account perfectly.

136.    Mr. Ehrlich's own testimony supports Mr. Clarke's account.  Mr. Ehrlich

admitted that Mr. Clarke "absolutely raised concerns" with Black Diamond's modifications

when Mr. Ehrlich presented them to him on October 22 and 23, 2015.  6/5 Tr. 64:21-65:2

(Ehrlich cross).  Importantly, Mr. Ehrlich acknowledged Mr. Clarke's "specific concern [of]

the lack of capital at closing" under Black Diamond's modifications, and merely couldn't

"recall" whether Mr. Clarke was "concerned that he wouldn't be able to run the mine, and

wouldn't be able to deliver Healthco to [Black Diamond] under the new modifications

4833-1306-9934

demanded by [Black Diamond]" on the night of October 22, 2015.  *Id.* 65:3-14 (Ehrlich

cross).

137.    Black Diamond relies heavily on Mr. Clarke's two e-mails sent at or around

7:01 a.m. on Friday, October 23, 2015, to support its contention that Mr. Clarke agreed to

Black Diamond's modifications or at least was just engaging in continued negotiations.  *See*

Ex. 109 (10/23/15, 7:01 a.m. T. Clarke e-mail to R. Ehrlich) ("You are right…we have an

abundance of cash in Q4.  I am going to write up a couple of thoughts on structure."); Ex. 110

(10/23/15, 7:04 a.m. T. Clarke e-mail to J. Fontana, R. Ehrlich, R. Lattouf, and B. Murphy)

(attaching back-of-the-envelope model, "[u]pdated for 'Receivables Purchase Facility', Penn

Virginia proposal, $5,000,000 Term Loan (2 fundings) and $5,000,000 equity proposal").

But these documents are fully consistent with Mr. Clarke's explanation that his purpose in

sending these e-mails was to illustrate to Black Diamond that its demanded modifications to

the financing terms would *not* work because there would be insufficient cash at closing under

Black Diamond's modifications.[40]  As Mr. Clarke explained:  "So what I was trying to

explain to Rich is but Rich, if you look at the cash at the end of the fourth quarter, you're

right, we've got a lot of cash.  Lend us the ten million, so we can get to the fourth quarter.

Without the ten million up-front, you know, it was almost as though he didn't want to

acknowledge you need working capital or cash to operate the business."  6/11 Tr. 343:25-

344:6 (Clarke direct).

138.    Indeed, as Mr. Ehrlich himself acknowledged, when Mr. Clarke told him at

7:01 a.m. on October 23, 2015, that VCLF was projected to have "an abundance of cash in

Q4," he did not say that this cash would be in hand any time before the *end of the quarter*.

---

[40] Black Diamond's alternative structure, as memorialized in Mr. Murphy's 7:55 p.m. e-mail to Mr. Clarke on
October 22, 2015, did not contemplate issuance of the term loan until "December 2, 2015 (e.g. after the long-
wall move)," more than a month after VCLF was scheduled to take ownership of, and be responsible for
running, the Federal 2 Mine.  Ex. BK, at TEN0028715.

4833-1306-9934

*See* Ex. 109; *see also* 6/5 Tr. 118:21-23 (Ehrlich cross) ("Q.  Now, [Mr. Clarke] doesn't say

anything about having an abundance of cash at the beginning of Q4, right?  A.  Correct.").

139.    Far from showing that Mr. Clarke agreed to Mr. Ehrlich's new terms or that

Mr. Ehrlich and Mr. Clarke were just negotiating, the evidence shows that Mr. Clarke

objected to take-it-or-leave it terms being pressed by Black Diamond and urged Black

Diamond to return to the Commitment Letter.  Mr. Clarke's conduct on October 22 and 23,

2015, in no way changes this Court's conclusion that Black Diamond had demanded material

modifications to the Commitment Letter on a take-it-or-leave-it basis.

### 3.    The Contemporaneous Perception of All of VCLF's Representatives Was that Black Diamond's Words and Conduct Constituted Repudiation

140.    As noted above, the perception of the nonrepudiating party is relevant to the

inquiry of whether the other party's words or conduct constitute repudiation.  *See BT Triple

Crown*, 19 Misc. 3d 1129(A), at *5.

141.    Here, as noted in the Findings of Fact, VCLF's three principals (Messrs.

Clarke, Ken McCoy, and Jason McCoy), financial advisor (Mr. Murphy), and attorney (Mr.

Potter) all understood Black Diamond to have been demanding from VCLF material

modifications to the Commitment Letter on a take-it-or-leave-it basis.  Based on the language

used by Black Diamond, both in writing in the Gravenhorst E-mails and in conversations

with Mr. Clarke, and their sense that Black Diamond waited until it thought VCLF would

have no choice but to accept the demanded changes with the closing just one business day

away, the Court finds that this perception was reasonable and genuinely and sincerely held at

the time.  The Court also finds that the written communications between Mr. Potter and

Mr. Harris after October 23, 2015, discussed below, confirm that VCLF's perception on

October 22 and 23, 2015, that Black Diamond had intended to make a take-it-or-leave-it

proposal, was reasonable and genuinely and sincerely held at the time.

4833-1306-9934

4.      **Black Diamond's Counsel Confirmed on October 25, 2015, that the Gravenhorst E-mails Were a Take-it-or-Leave-It Demand**

142.    If the Gravenhorst E-mails and Mr. Ehrlich's verbal statements to Mr. Clarke on October 22 and 23, 2015, were not enough to demonstrate that Black Diamond transmitted the Gravenhorst E-mails to VCLF on a take-it-or-leave-it basis, the correspondence sent by Black Diamond's counsel, Mr. Harris, to VCLF's counsel, Mr. Potter, on Sunday evening, October 25, 2015, confirms it.

143.    In his first e-mail to Mr. Potter on October 25, 2015, Mr. Harris was clear that Black Diamond was not interested in providing financing under the Commitment Letter, but rather only on the terms set forth in the Gravenhorst E-mails: " . . . Black Diamond is prepared to proceed with consummation of the financing for VCLF *on the terms set forth in Mr. Gravenhorst's emails to Mr. Clarke from Friday, October 23rd . . . .*" Ex. DD (emphasis added).

144.    There is only one way to interpret these words:  Black Diamond meant it on October 23, 2015, when it wrote that it would *only* do a deal on the terms in the Gravenhorst E-mails, which were materially different from the terms of the Commitment Letter, and when Mr. Ehrlich told Mr. Clarke that the Gravenhorst E-mails represented the "best [Black Diamond] can do." *See supra* Findings of Fact ¶ 176.  Mr. Harris confirmed this interpretation at trial. *See* 6/5 Tr. 168:20-24 (Harris direct) (" . . . [Mr. Potter] wanted a finance off [*sic*] the new deal that they had cut with Patriot, and I was explaining to him that we were prepared to do that *if they agreed on the financing terms that were outlined in Mr. Gravenhorst's emails of the 23rd.*") (emphasis added).  Mr. Clarke's testimony about his conversations with Mr. Ehrlich, representing that the Gravenhorst E-mails were the best Black Diamond could do (*see supra* Findings of Fact ¶¶ 176-77), is credible and unrebutted.

\*     \*     \*

126

145.     Accordingly, the Court finds that Black Diamond's words and conduct on October 22 and 23, 2015, in light of all of the surrounding circumstances (including the uniform perception of VCLF's witnesses), constituted an unequivocal expression of intent not to perform under the Commitment Letter as it had been modified in fact by Black Diamond's implicit waiver of certain requirements as set forth above.  VCLF has therefore made out its affirmative defense and counterclaim for repudiation.

### C.     VCLF Did Not Breach the Non-Solicitation Clause Clause

146.     Black Diamond maintains that Mr. Jason McCoy's discussions with Mercuria regarding inventory financing, as well as his few discussions with certain friends regarding personal loans to him, not VCLF, to undertake pre-closing due diligence and other administrative tasks necessary to ensure that the Federal 2 Mine would be operational on the day after the closing, constituted breaches of the Non-Solicitation Clause.[41]

147.     The Court rejects Black Diamond's contention.  As noted above, Mercuria's inventory financing was going to be post-closing take-out financing, which had been discussed with Black Diamond's representatives and was consistent with VCLF's rights under the Commitment Letter.  It therefore in no way ran afoul of the Commitment Letter's prohibition on VCLF soliciting financing "for the purpose of facilitating in any manner *the consummation* of the transactions contemplated by the VCLF APA."  Ex. S, at BDCF-00028002 (emphasis added).

148.     The same is true of Mr. Jason McCoy's discussions with some of his friends regarding small personal loans to Mr. McCoy in order to complete certain discrete tasks leading up to close.  It is undisputed that Black Diamond was never going to advance to

---

[41] Black Diamond also maintains that VCLF's discussions with Patriot, UMWA, Mercuria, and Govind Chandak beginning in the evening on October 23, 2015, through October 27, 2015, also constituted breaches of the Non-Solicitation Clause.  Given the Court's determination that Black Diamond had already repudiated the Commitment Letter by that time, relieving VCLF of any continuing obligation to adhere to the Non-Solicitation Clause, the Court rejects this contention.

4833-1306-9934

VCLF any of its committed $25 million in financing prior to the closing.  That left the VCLF

principals in a situation where they had to rely either on credit or payment forbearance or

their own resources to accomplish and pay for certain pre-closing tasks.  As Mr. Jason

McCoy testified, there is no possibility that the small personal loans he was inviting (which

were primarily for the benefit of the would-be lenders, who had suffered losses in the real

estate market) would replace Black Diamond's committed financing as a source of either

acquisition financing or working capital financing.  *See* 6/8 Tr. 217:24-218:3 (J. McCoy

cross) ("I'm saying I was not telling Mike Johnson and David Williams the seventy-year-old-

guy is going to give me 100,000 dollars, that I think their money's going to replace the

twenty-five million from Black Diamond, if that's what you're asking."); *id.* 226:3-4 (J.

McCoy cross) ("Now, again, I knew they couldn't replace Black Diamond."); *id.* 268:4-7 (J.

McCoy redirect) ("Q. . . . Can you close or would you have been able to close on the VCLF-

Patriot transaction using the various personal loans reflected in the emails that Mr. Sperling

showed you?  A.  No, I would not.").

149.    Accordingly, having previously found that the Commitment Letter did not

prohibit any of the discussions undertaken by Mr. Jason McCoy (*i.e.*, relating to post-closing

inventory financing for VCLF, and pre-closing personal financing for Mr. Jason McCoy), the

Court finds that Mr. Jason McCoy's actions prior to October 23, 2015, did not violate any

aspect of the Commitment Letter and its Non-Solicitation Clause.  The Court further finds (as

discussed *infra* Conclusions of Law § V.A.2) that these potential loans (neither of which

actually came to fruition) could not have had and had no causal connection to VCLF not

closing on the financing with Black Diamond or failing to provide Black Diamond with the

Equity Interests.  In short, Black Diamond was not harmed by these acts.

4833-1306-9934

## V.    ELEMENT #3:  RESULTING DAMAGES

### A.    Black Diamond Has Failed to Prove Damages on Any Component of Its Breach of Contract Claim

#### 1.    General Legal Principles Governing Damages Under New York Law

150.    Under New York law, the burden is on the complaining party to prove that "a defendant's breach *directly and proximately caused* his or her damages."  *Nat'l Mkt. Share*, 392 F.3d at 525-26 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)) (emphasis added); *see also Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 839-40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well.").  Actionable damages therefore cannot be purely speculative and must flow from the defendant's breach.  *See Town Sports Intl., LLC v. Ajilon Sols.*, 112 A.D.3d 409, 410 (1st Dep't 2013) (setting aside an award of damages because such damages were "speculative and not supported by the evidence").

151.    Beyond proving non-speculative damages—*i.e.*, damages directly and proximately caused by a breach—a plaintiff must prove that "the amount of damages claimed [is] measurable with a reasonable degree of certainty . . . ."  *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974);[42] *see also Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986) ("First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty.  In other words, the damages may not be merely speculative, possible or imaginary,

---

[42] In *Freund*, the plaintiff author successfully proved that his damages were directly and proximately caused by the defendant publisher's breach of its promise to publish the plaintiff's book.  34 N.Y.2d at 383.  However, "the amount of royalties plaintiff would have realized [after publication of the plaintiff's book] was not ascertained with adequate certainty and, as a consequence, [the court held that] plaintiff may recover nominal damages only."  *Id.* at 384-85.

4833-1306-9934

but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.").

152.    As part of the inquiry into whether damages have been proven with adequate certainty, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).  While a business may be able to prove lost profits by reference to a comparable business when no track record of past performance exists (*see Kenford*, 67 N.Y.2d at 261), "[a]lmost inevitably, some crucial difference between the two ventures will make comparison inapt and, thus, legally insufficient.  For example, a movie theater on one side of town cannot serve as a yardstick for a theater on the other side because their traffic and proximity to competitors were different." *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *8 (S.D.N.Y. July 15, 2016) (citing *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 109-110 (1919) (Cardozo, J.)).

## 2.    Black Diamond Failed to Prove Damages Arising From Any Alleged Solicitation of Financing

153.    Under New York law, "[f]ailure to prove the essential element of damages is fatal to a cause of action for breach of contract." *Proper v. State Farm Mut. Auto. Ins. Co.*, 63 A.D.3d 1486, 1487 (3d Dep't 2009); *see also Tillage Commodities Fund, L.P. v. SS&C Tech., Inc.*, 151 A.D.3d 607, 608 (1st Dep't 2017) (holding that a "breach of contract claim must fail" because "plaintiff cannot demonstrate that it suffered any damages from defendant's [breach]."); *accord Kelly v. Bensen*, 151 A.D.3d 1312, 1315 (3d Dep't 2017) (holding that a breach of contract action was properly dismissed because, in relevant part, the plaintiff failed to prove damages).

154.    The only two alleged solicitations of financing prior to October 23, 2015, by VCLF are Mr. Jason's McCoy's efforts to obtain some personal loans and discussions with

130

Mercuria.  For the reasons set forth above, the Court has concluded that neither effort

violated the Commitment Letter.

155.    Even if the described solicitations somehow violated the Non-Solicitation

Clause, neither caused Black Diamond any harm.  Mr. Jason McCoy's solicitation of personal

loans, prior to October 23, 2015, would never have interfered with a closing with Black

Diamond.  They were for small loans, and there is no proof that the potential lenders would

have required, were offered, or would even have asked for any change to the deal with Black

Diamond.  More significantly, though, the efforts never resulted in a single loan.  *See* 6/8 Tr.

265:22-23 (J. McCoy redirect) ("Q. . . . Did any of those loans come about?  A.  No, they did

not."); *id.* 268:4-7 (J. McCoy redirect) ("Q. . . . Can you close or would you have been able to

close on the VCLF-Patriot transaction using the various personal loans reflected in the emails

that Mr. Sperling [Black Diamond's counsel] showed you?  A.  No, I would not.").  And,

nothing came of the discussions relating to take-out financing with Mercuria.  *See* Loreman

Dep. Tr. 95:21-23 ("[Q.]  Did Mercuria provide financing to VCLF or ERP?  A.  No.").

156.    However one characterizes these actions, Black Diamond did not establish that

they had any causal relationship to the failure of the closing in this case; none of the alleged

solicitation efforts actually or proximately caused the failure of the closing with Black

Diamond.  Black Diamond has failed to demonstrate any damages flowing from these alleged

breaches of the Commitment Letter.  Accordingly, none of the pre-October 23, 2015 acts of

solicitation alleged by Black Diamond is actionable.

### 3.    Black Diamond's Claim for Lost Interest Fails

157.    Black Diamond's claim for 2 ½ years of lost interest at the rates set forth in

the Commitment Letter fails as a matter of law.

158.    *First*, Black Diamond never provided any financing to VCLF that could have

resulted in it being entitled to any interest and fees.  *See* 6/5 Tr. 95:3-5 (Ehrlich cross) ("Q.

Isn't it true, Mr. Ehrlich, that you didn't make the loan which would have enabled you to get

the interest and fees?  A.  That is true.").  Indeed, according to Black Diamond, it was

excused from having to make a loan to VCLF, and as a result, it chose not to make the loan.

If Black Diamond were not obliged to make the loan to VCLF, VCLF cannot be obliged to

pay interest on the loan Black Diamond chose not to make.

159.    *Second*, there was a complete failure of proof on the actual return Black

Diamond received on the money (regardless of the amount) that it would have deployed by

lending to VCLF.  At most, the damages would be limited to the difference between the

interest that could be proven beyond speculation to have been lost and the interest/return

enjoyed from an alternative use of the funds because Black Diamond did not make the loan.

*See Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 416

(S.D.N.Y. 1991) ("[L]ost interest income is measured as the difference between (a) the

interest income [the lender] would have earned had the contract been performed, and (b) the

interest income [the lender] would be deemed to have earned by timely mitigating its

damages—*i.e.*, by making an investment with similar characteristics at the time of the

breach.").  For all the Court knows, Black Diamond deployed the funds elsewhere and

obtained a greater return than the interest to which it claims it was deprived—in which case,

Black Diamond would have no time-value (interest) damages.  There is simply no way for the

Court to ascertain if Black Diamond suffered any actual damages related to interest or use of

funds.[43]

---

[43] Importantly, Black Diamond's own counsel asked Mr. Deckoff whether, "[s]ince the time that this deal fell
apart," Mr. Deckoff has had "any reluctance . . . to do the same deal that [he] signed on September 21st,
2015." 6/8 Tr. 48:20-22 (Deckoff direct).  Mr. Deckoff did not respond that he had any reluctance; to the
contrary, he stated:  "We were ready to do that deal back then, and if an identical deal presented itself today, I
would do that deal today as well." *Id.* 48:25-49:2.  Mr. Deckoff also did not disavow that Black Diamond
took the $25 million it was supposed to lend VCLF and used it for a different deal with similar
characteristics.  This evidence, together with Mr. Deckoff's own descriptions of Black Diamond and its focus
on "making money" are sufficient for me to conclude that Black Diamond has not been holding the $25
million (or even the reduced $20 million it proposed in the Gravenhorst E-mails) aside without obtaining
some return on it. *See* Deckoff Dep. Tr. 40:25-41:2 ████████████████████████████

4833-1306-9934

160.    *Third*, even if Black Diamond has a legal claim for interest on the loan it did

not make (in the face of no evidence on actual loss or harm), the Court finds that Black

Diamond also failed to prove that the amount of interest it would have been paid is more than

speculative.  Black Diamond's "evidence" of lost interest consisted solely of seventeen lines

of self-serving testimony by Mr. Ehrlich, which was riddled with assumptions and provided,

at most, a "ballpark" estimate:

> Q.  How much was the original loan for twenty-five million
> dollars worth to Black Diamond?
>
> A.  We – we would have earned interest, you know, for – it was
> a three-year loan.  You know, I calculated *somewhere in the
> neighborhood* of five million dollars' worth of interest.
>
> Q.  Okay.  Explain to me how that calculation works, sir.
>
> A.  It was – I *assumed* an average balance of fourteen, fifteen
> million dollars.  Call it fourteen-and-a-half million dollars.  I
> used seventeen percent in the first year and then twelve percent
> in years 2 – I actually *assumed* in my calculation only – it was a
> two-and-a-half year loan.  These loans usually pay off a little
> early, so I *assumed* two-and-a-half years, seventeen percent the
> first year, twelve percent for the next one-and-a-half years, and
> I came up with a number of approximately five million dollars.
>
> Q.  And that five million dollars represents what, sir?
>
> A.  The interest we would have earned on that loan.

6/5 Tr. 9:5-21 (Ehrlich direct) (emphasis added).

161.    Mr. Ehrlich's "assumptions" are not entitled to any weight by this Court.  He

is a lay witness, and was not qualified as an expert.  His reliance on his experience for the

various assumptions he makes (*e.g.*, that there would be a $14.5 million average balance

outstanding and that the loan would be outstanding for two-and-a-half years, to be paid off

just "a little early") is therefore not cognizable as an evidentiary matter.  *See United States v.*

*Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) ("[Fed. R. Evid.] 701 forbids the admission of

---

████████████████████████  6/8 Tr. 65:12-19 (Deckoff cross) ("My business is" "simply to
make money").  Black Diamond either did or could have mitigated its damages entirely.

expert testimony dressed in lay witness clothing."); *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, No. 1:08cv955 (JCC), 2009 U.S. Dist. LEXIS 76043, at *1-2, 2009 WL 2762146 (E.D. Va. 2009) (refusing to allow testimony from plaintiff's chief operating officer regarding damages because (1) the COO's testimony "would necessarily constitute expert opinion as to Plaintiff's economic loss" and (2) the COO had not been identified as an expert). Even as a lay witness, though, Mr. Ehrlich's assumptions should be given no weight as he failed to demonstrate that they had any basis in fact either generally (though examples of comparable transactions in which he has been involved) or specifically (through examples of specific borrowing needs projections for Federal Mine 2) over any period of time.

162.     In addition, Mr. Ehrlich's assumption that VCLF would not have paid off the Black Diamond loan for two-and-a-half years is necessarily speculative because *the Commitment Letter* (as Black Diamond's attorney Mr. Harris acknowledged) *allowed VCLF to pay off the loan early, without any prepayment premium or penalty.* See 6/5 Tr. 187:13-17 (Harris cross) ("Q. Now, you testified on direct examination that the commitment letter in this case has a nonpenalty optional prepayment provision, correct? A. I testified that it permits the borrower to prepay the loans after closing at any time without penalty."); Ex. S (Commitment Letter), at BDCF-00028007. Several courts have held that the presence of optional prepayment provisions renders any damage claim for lost interest speculative and, therefore, not cognizable, particularly where early payment carries no premium or penalty. *See SSP Capital Partners, LLC v. Mandala*, LLC, 715 F. Supp. 2d 443, 447 (2009) (in breach-of-contract action applying New York law, that "plaintiff conceded that the damages at issue were limited to the $132,000 loan origination fee and *could not include the lost profits originally sought because the Commitment Letter did not provide for any prepayment penalty*") (emphasis added), *aff'd*, 402 F. App'x 572 (2d Cir. 2010); *Lincoln Nat'l Life Ins.*

4833-1306-9934

*Co. v. NCR Corp.*, 603 F. Supp. 1393, 1408 (N.D. Ind. 1994) (holding that lenders that sued

borrower for breach of commitment letter failed to fulfill their burden of proof on damages,

in part because of the uncertainty of potential damages due to the possibility of prepayment).

163.    In *Lincoln*, for instance, part of the expectation damages claimed by lenders

under a commitment letter related to interest the lenders would have obtained based on

payments by the borrower following the tenth year of the loan, when prepayment became

possible, albeit with a premium.  *See id.* at 1408.  Even though, "at any time in between the

tenth and the twenty-fifth year, prepayment could occur," plaintiff nonetheless maintained

that "prepayment should not be assumed," and calculated their interest damages on this basis.

*Id.*  The court rejected this assumption, in light of the fact that the commitment letter gave the

borrower a prepayment right, and determined that plaintiff failed "to prove that they have, in

*fact*, been damaged."  *Id.* at 1409 (emphasis in original).[44]

164.    Here too, the fact that the Commitment Letter provided VCLF a right to

prepay the Black Diamond financing early without premium or penalty renders Black

Diamond's damages calculation inherently speculative.  Moreover, this Court heard

testimony during trial that VCLF and Black Diamond discussed taking out the Black

Diamond as soon as possible after closing, possibly with Mercuria inventory financing.  *See,*

*e.g.*, 6/11 Tr. 319:2-14 (Clarke direct) ("So the one in particular was Mercuria and, you

---

[44] The fact that Black Diamond did not include a prepayment penalty or premium provision in the Commitment Letter is fatal to its claim for interest damages.  New York courts regularly recognize that a "prepayment fee" or "make-whole" premium is included in a loan because "the lender had originally 'bargained for a stream of income over a fixed period of time.'" *Wilmington Savings Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15-CV-5027 (JMF), 2016 WL 5092594, at *5 (S.D.N.Y. Sept. 19, 2016) (quoting *In re Solutia Inc.*, 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007)).  "[A] prepayment penalty is a liquidated damages clause designed to compensate a lender for costs incurred in connection with early payment on a long-term loan, resulting from the possibility that interest rates will be lower when the repaid funds are relent, or that the lender will not be able to rely on a stable flow of funds over a known period." *In re MarketXT Holdings Corp.*, 376 B.R. 390, 417 (Bankr. S.D.N.Y. 2007); *see also Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F. Supp. 2d 510, 514 (S.D.N.Y. 2005) (describing loan agreement that included provision for optional prepayment, which was tied to a "make whole premium," which must be paid if prepayment is made; the make whole premium was "calculated as the discounted present value of the remaining principal and interest payments owing under the Credit Agreement through the maturity date less the amount of the principal being repaid").  Had Black Diamond intended or wanted to secure interest damages no matter what, it could and should have bargained for such a provision.

know, we had indicated that we were working with Mercuria to do post-closing takeout

financing. . . . [Mr. Deckoff's reaction to that was] really very positively . . . . He was

interested in being taken out."); 6/12 Tr. 112:13-14 (Clarke cross) ("Steve Deckoff, Rich

Ehrlich knew about Mercuria; we told them about Mercuria.").  Far from supporting Mr.

Ehrlich's assumption that the principal on the Black Diamond financing would remain

outstanding for 2 ½ years, this evidence highlights the speculative nature of Black Diamond's

claim for interest.

165.    The Court further finds that Black Diamond failed sufficiently to prove

damages based on lost interest because it produced no evidence that it would have been paid

any interest if it, in fact, had made the loan.  Based on the evidence, the Court finds it highly

speculative that the Federal 2 mine would have survived and made a sufficiently sustainable

profit over time in an amount that would have provided for the payment of interest to Black

Diamond.

166.    Black Diamond has failed to carry its burden on the portion of its claim

relating to allegedly lost interest.  The Court hereby denies its claim for any lost interest.

### 4.    Black Diamond's Claim for Damages in Connection with the Equity Interests Fails

#### a.    *General Legal Principles Applicable to Valuing Equity Interests for Damages Purposes*

167.    "The calculation of damages in a breach of contract case governed by New

York law is guided by two fundamental principles.  First, damages for breach of contract

should put the plaintiff in the same economic position he would have occupied had the

breaching party performed the contract.  Second, New York courts are clear that breach of

contract damages are measured from the date of the breach.  It is also fundamental that,

where the breach involves the deprivation of an item with a determinable market value, the

market value at the time of the breach is the measure of damages." *Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*, 191 F. Supp. 3d 312, 321 (S.D.N.Y. 2016).

168.    As noted above, however, New York law also requires that the damages "be reasonably certain [and] [] not based upon speculation." *Haber v. Gutmann*, 64 A.D.3d 1106, 1108 (3d Dep't 2009).

169.    Where the value of the item at issue is too speculative to calculate because of the many variables and assumptions necessary to assign a value, plaintiff cannot sustain its burden to prove damages. *See Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16cv2379(DLC), 2017 WL 5312187, at *13 (S.D.N.Y. Nov. 13, 2017) (reasoning that "the Joint Venture's value or lost profits [were] not capable of proof with reasonable certainty. . . . [as] [t]he number of unsupported assumptions at play in the [two valuations] render them useless," and thus, Lightbox could not show that consequential damages could be "assessed with reasonable certainty"); *Strough v. Conley*, 257 A.D. 1057, 1057 (3d Dep't 1939) (diminution in the amount of milk produced by a dairy as a result of breach of contract by village to provide water to farm was too "speculative and conjectural"); *Kenford Co. v. Erie Cty.*, 67 N.Y.2d 257, 262 (1986) (plaintiff could not recover loss of prospective profits for its contemplated 20-year operation of domed sports stadium because "the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty").

170.    Here, Black Diamond claims that it is entitled to damages in connection with the Equity Interests totaling $61,887,680 (for ERP Settlement and the Federal 2 Mine),

corresponding, at best, to its hoped-for value of the Equity Interests as of October 25, 26, or 27, 2015.[45]

171.    *Any* value in the Equity Interests, however, was completely speculative as of these dates:  Black Diamond's damages calculations are riddled with a multitude of unproven assumptions and variables that preclude this Court from concluding (even assuming *arguendo* all other breach-of-contract elements had been proven) that Black Diamond suffered damages that can be proven with adequate certainty.

172.    Further, the Court also notes an inherent tension in Black Diamond's position that the Equity Interests had significant realizable value in October 2015 for which it deserves to be compensated in the form of damages given that under the Commitment Letter, Black Diamond was to pay $0.00 for those Equity Interests.  The only money contemplated to be advanced by Black Diamond under the Commitment Letter was for the fully secured financing for the Federal 2 Mine described above.

173.    Had the Equity Interests, in fact, had a value of nearly $62 million in October 2015, one would have expected that Black Diamond would have simply made the loan with whatever additional risks it saw in getting repaid on that loan, as the Equity Interests alone would have provided more than a 100% absolute return on the loan itself.  Any payment on the loan would only have increased Black Diamond's rate of return.  Given that this did not happen, and given Black Diamond's own testimony that it exists to make money (*see supra* note 43), the Court concludes that, notwithstanding its protestations to the contrary, Black Diamond did not believe in 2015 that the Equity Interests provided it with anything other than a potential, truly speculative, return.

---

[45] It is still not clear to this Court why Black Diamond utilizes different dates for valuation of different pieces of the Equity Interests.

4833-1306-9934

b.    *Equity in ERP Settlement ("HealthCo")*

174.    Black Diamond claims that it is entitled to more than $35 million in damages

related to HealthCo, corresponding to the 90% equity stake it asserts it should have received

in HealthCo (now ERP Settlement) under the Commitment Letter:

> The first [type of damages that Black Diamond is asking the
> Court to award] is the equity interest in what we refer to as
> Healthco, Your Honor.  Healthco is the entity that was to hold
> the assets and liabilities associated with workmen's
> compensation obligations.
>
> You'll hear the expert testimony showing that Healthco had an
> equity value at the time of defendants' breach of thirty-nine
> million dollars plus . . . .  Under the terms of the commitment
> letter, we would receive a 90 percent equity interest in that,
> which means we were entitled to 35,220,895 dollars for that as
> a result of defendants' breach.

6/4 Tr. 39:23-40:8 (Black Diamond opening statement).[46]

175.    Black Diamond's counsel's opening statement confirms that Black Diamond's

calculation of the value of the 90% equity interest in HealthCo rises and falls on the opinion

of Black Diamond's expert, Robert K. Briscoe.

### (i)    Mr. Briscoe's Opinion Testimony is Unreliable and Does Not Sustain Black Diamond's Damages Claim

176.    "An expert's opinion should be excluded when it is based on assumptions

which are speculative and are not supported by the record."  *Tyger Constr. Co. v. Pensacola*

*Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  Where an expert makes a damages assessment

based on an assumption without any supporting evidence for such an assumption, the court

must disregard that assessment and its related testimony.  *See, e.g.*, *E. Auto Distribs., Inc. v.*

---

[46] During Black Diamond's counsel's examination of Mr. Briscoe, Mr. Briscoe reduced his valuation of the so-called surplus collateral in HealthCo from $39,134,328.20 to $35,779,725, to account for information regarding the letter of credit posted by Peabody for the benefit of Illinois, which (among other things) Black Diamond's counsel failed to provide him prior to the issuance of his expert report.  *See* 6/7 Tr. 54:9-55:12 (Briscoe redirect).  Black Diamond's counsel did not acknowledge this reduction in his opening statement, but the Court finds that Mr. Briscoe's testimony requires that Black Diamond's claimed damages relating to HealthCo be reduced to $32,201,752.50, or 90% of $35,779,725.  Regardless, as set forth below, the Court finds that even this damages calculation is too speculative to support a judgment against VCLF.

4833-1306-9934

*Peugeot Motors of Am., Inc.*, 795 F.2d 329, 337-38 (4th Cir. 1986) (excluding expert's

damages calculation based on assumption that vehicle shortages set back growth in the

number of plaintiff's car dealerships because no evidence supported that assumption);

*MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297, 306-07 (4th Cir. 2013) (reversing

admission of expert damages opinion based on assumption that disregarded plaintiff's lack of

resources compared to benchmark companies in opinion); *Perry v. Scruggs*, 17 F. App'x 81,

87 (4th Cir. 2001) (excluding expert's damages calculation based on speculative assumptions

concerning would-be construction of a golf course and profits therefrom); *SMD Software,*

*Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 636-37 (E.D.N.C. 2013) (excluding expert

testimony regarding market share loss calculation based on unsupported assumption that

representations on a chart would have impacted clients' decisions to make purchases).

177.    At bottom, courts given little, if any, weight to an expert's damages report or

testimony that is "too speculative and not sufficiently reliable."  *Jackson v. United States*, No.

4:16-cv-03219-RBH, 2018 WL 1755503, at *19 (D.S.C. Apr. 12, 2018) (refusing award of

lost future earnings based on speculative and unreliable expert testimony).  Likewise,

inaccuracies in an expert's calculations or assessment reduce or eliminate the weight the

Court gives to such testimony.  *See Acosta v. Vinoskey*, No. 6:16-CV-00062, – F. Supp. 3d –,

2018 WL 1806589, at *5 (W.D. Va. Apr. 17, 2018) (mistakes in damages calculations go to

weight given to expert's opinion).  The Court also must give less weight to expert opinions

that are based on insufficient data.  *See id.* at *7 (expert's "failings" to "consider important

information . . . go to the weight" to be assigned to the opinion).

178.    Prior to trial, VCLF moved to disqualify and exclude Mr. Briscoe's damages

opinion because, *inter alia*, it is unreliable under *Daubert* and Federal Rule of Evidence 702.

*See* ECF Doc. No. 276.  After giving VCLF the opportunity to conduct *voir dire* on Mr.

4833-1306-9934

Briscoe during trial, the Court allowed him to testify regarding the substance of his opinion,

but reserved decision on whether to disregard Mr. Briscoe's opinion for lack of reliability:

> [THE COURT:]  I think that the trier of fact in this case, which is me, certainly can ascertain the reliability of Mr. Briscoe's testimony.  That is something that is under Daubert considered a stage of his testimony.  *It does need to be reliable.*
>
> *The concerns raised by his – Mr. Briscoe's apparent lack of extensive experience in monetizing these types of surplus collateral may cast doubt on the reliability of his opinion.* However, I'm of the opinion that effective cross-examine [*sic*], much of which you've demonstrated already and which is previewed in your pleadings, accompanied by my ability to consider the application of Daubert factors after hearing the testimony, are sufficient safeguards.
>
> Given the discretion afforded to me under the rules, I'm going to allow Mr. Briscoe to testify in connection with the matters set forth in his report.  *I'll reserve the discretion to strike any of his testimony or disregard it in contemplating the decisions I make in this case.*

6/6 Tr. 80:8-24 (colloquy) (emphasis added).

179.    The Court has now heard Mr. Briscoe's opinion testimony, including under

cross-examination by VCLF's counsel—which cross-examination was indeed effective.  Mr.

Briscoe's trial testimony confirms that his opinion testimony that Black Diamond may have

suffered up to the $33 million in damage based on HealthCo Equity Interests is unreliable

and, if anything, supports the conclusion that the value of HealthCo in October 2015 was so

speculative that Black Diamond has no legally cognizable claim for damage based on not

receiving HealthCo Equity Interests.

180.    Mr. Briscoe's opinion boils down to one, unsupported sentence in his expert

report:  "It is my opinion that a sophisticated financial entity like Black Diamond would have

been successful in executing one or more of these strategies."  Ex. 261, at 22.  "[T]hese

strategies" refer to the three "Methods for Monetization of Surplus Collateral" that Mr.

141

Briscoe discusses in his report:  (1) swapping letters of credit, (2) loss portfolio transfer, and

(3) voluntary release of collateral by the state authority or insurer holding it.  *Id.* at 21-22.

181.    As an initial matter, the Court gives no weight to Mr. Briscoe's opinion

because the Court finds that Black Diamond had no intention in October 2015 of executing

on any accelerated monetization strategy for the W/C Package, let alone any of the three

identified by Mr. Briscoe.  As both Mr. Deckoff and Mr. Ehrlich testified at trial, Black

Diamond's plan for ERP Settlement was to let the workers' compensation liabilities resolve

("extinguish") themselves and be paid from associated collateral over time.  *See* 6/5 Tr. 99:4-

22 (Ehrlich cross) (Black Diamond knew that "any realization of excess collateral would take

time . . . because realization of excess collateral is a function of what liabilities need to be

paid"); 6/8 Tr. 127:4-17 (Deckoff cross) (" . . . Black Diamond didn't need to monetize the

asset [HealthCo].  Black Diamond would be perfectly happy just to sit and wait. . . . We

weren't in any rush where we needed to monetize the asset."); *see also infra* Conclusions of

Law ¶ 193.

182.    This fundamental disconnect between what Black Diamond had actually

planned and intended to do with the W/C Collateral at the time of closing (basically nothing)

and the options that Mr. Briscoe purportedly analyzed to support his opinion that Black

Diamond could realize meaningful value from the W/C Collateral (which required Black

Diamond to do a lot) is fatal to Mr. Briscoe's opinion because its fundamental assumptions

about what would happen to the W/C Package were wrong.  Mr. Deckoff's testimony that

Black Diamond could have decided after it controlled HealthCo to execute an accelerated

monetization of the W/C Collateral does not change this conclusion.  As both Black Diamond

and VCLF have argued, Black Diamond's damages are to be calculated as of the date of the

4833-1306-9934

alleged breach in October 2015,[47] and on that date, Black Diamond's wait-and-see intentions

as to the future of the W/C Package are undisputed.

183.    Furthermore, Black Diamond's HealthCo Equity Interest damages claim must

fail because of something that Mr. Briscoe did confirm at trial.  Mr. Briscoe conceded that,

from an actuarial perspective (there is no dispute over whether Mr. Briscoe is an expert

actuary), if Black Diamond's wait-and-see plan for the W/C Package were followed, there

would be no excess collateral to distribute to Black Diamond once the workers'

compensation claims were fully resolved.  *See infra* Conclusions of Law ¶¶ 194-99.  Black

Diamond advanced no other expert opinions or facts at trial to refute this conclusion by its

own proffered expert.[48]

184.    If the disconnects described above are not sufficient to discredit completely

Mr. Briscoe's report and testimony on the issue of whether Black Diamond was harmed by

approximately $33 million, the Court finds that his report and testimony fail to demonstrate

with any reasonable certainty the amount of damage that Black Diamond did suffer from not

receiving the HealthCo Equity Interests.[49]

185.    Mr. Briscoe conceded at trial that each of his three monetization strategies is

far from assured to succeed, rendering them inherently speculative, and in no way a basis to

award damages:

---

[47]  *See supra* Conclusions of Law ¶ 167.

[48]  Indeed, the testimony by Black Diamond's other third-party witness on the issue of damages, Sean Logan, confirmed Mr. Briscoe's conclusion that if Patriot's workers' compensation claims were to be resolved and paid from collateral over time, there could be no excess collateral to recover.  *Cf.* 6/11 Tr. 19:9-20:7 (Logan direct) (the anonymous coal company was considering the option of "running out the liabilities over time," which would impact the amount of collateral, if any, to be realized by the coal company in the future).

[49]  The Court notes that, at trial, Mr. Briscoe confirmed that his report was not intended to convey as exact amount by which Black Diamond was harmed by not getting the HealthCo Equity Interest.  *See* 6/7 Tr. 37:13-20 (Briscoe cross) ("Q.  Okay.  And to be clear, you were not retained to provide an opinion as to how much of the surplus collateral Black Diamond could have recovered, were you?  A.  Could have recovered.  Yeah, I – I presented the upper end of the range.  I would agree that there would have been a slight erosion of the number based on expenses and fees and whatever.  I was not retained to calculate a lower end of a range, if that's responsive to your question.").

4833-1306-9934

- With respect to swapping letters of credit, Mr. Briscoe admitted that he has never participated in a successful letter-of-credit swap.  6/6 Tr. 72:4-24 (Briscoe voir dire).

- With respect to loss portfolio transfers—

  o Mr. Briscoe was not aware of "any recent transactions [from the last five or six years] involving an LPT with the State of Kentucky"—the beneficiary of the largest letter of credit in the W/C Package.  6/7 Tr. 58:16-19 (Briscoe cross).

  o Moreover, Mr. Briscoe was not aware of *any* "loss-portfolio transaction where the self-insured party, like Patriot in this case, . . . had stopped paying claims and then effectuated a loss-portfolio transfer."  6/6 Tr. 74:17-24 (Briscoe voir dire) ("This may be the first time I've encountered the fact situation that we're all here today talking about.").

- With respect to voluntary release of collateral, Mr. Briscoe admitted that, "[a]s a practical matter, the state regulators are very reluctant to reduce it [the collateral]," and that voluntary release of collateral has become rarer as coal company bankruptcies have increased in recent years."  6/6 Tr. 113:6-114:17 (Briscoe direct) ("As we come forward in time, to recent years especially in the coal industry and especially in light of all the bankruptcies, that method [release of collateral] has been less and less useful, simply because the regulators are not willing to take any chances that somebody is not going to get paid.").

186.    Beyond the speculative nature of each of the methods for monetizing surplus collateral, Mr. Briscoe's opinion is unreliable because¸ *as of the time he drafted his report, he had no factual basis to opine that Black Diamond was a "sophisticated financial entity" that could have successfully executed one or more of the three strategies.*

187.    So unfamiliar was Mr. Briscoe with the details of the underlying transaction that he admitted that he did not know whether, prior to October 26, 2015, the plan was for Black Diamond or ERP Settlement to execute any accelerated monetization strategy either when he delivered his report or at trial:

Q. . . . In connection with the transaction at issue here, where ERP Settlement LLC, a new entity, was going to assume the

144

4833-1306-9934

liabilities of Patriot.  That ERP Settlement is different from
Black Diamond, isn't it?

A.  *In recent information I've learned*, yes, I believe that's the
case.

Q.  So it would have been an entity other than Black Diamond
which actually executed on a potential strategy, isn't that right?

A.  I really can't say yes or no, because *I don't know what the
specifics of that is*.  I believe it's correct, but *I'm not going to
agree that I knew that at any point along the time here*.

6/6 Tr. 156:12-24 (Briscoe cross) (emphasis added).

188.    Mr. Briscoe likewise suffered from various fundamental factual

misunderstandings and lack of information that impact the reliability of his opinion:

- He wrongly believed that Black Diamond *signed* the VCLF
  APA.  6/6 Tr. 161:8-162:10 (Briscoe cross).

- He did not know "what kind of financing Black Diamond was
  providing" for this transaction, nor was he told how, or perhaps
  more significantly if,  Black Diamond was going to be
  investing in ERP Settlement, and if so in what amounts or on
  what terms.  6/6 Tr. 162:20-163:4, 164:2-13 (Briscoe cross).

- He did not know, as of the time he issued his report, "whether
  any or all of the letters of credit had been drawn by the states
  for whose benefit they had been posted."  6/6 Tr. 175:9-12
  (Briscoe cross).  Indeed, he did not bother to contact any of the
  issuing banks to ascertain whether the letters of credit had been
  drawn.  6/6 Tr. 182:17-22 (Briscoe cross).  Yet, he admitted
  that, "[i]f the letters of credit had been drawn, such that the
  states were holding cash, the states would have been no more
  willing to part with the cash than they had been with the letters
  of credit."  6/6 Tr. 176:20-24 (Briscoe cross).

- Though relying heavily on Black Diamond's purported status
  as an $8 billion hedge fund, Mr. Briscoe "did not" review any
  Black Diamond balance sheet and merely "assumed" Black
  Diamond's size, but did not identify that as an assumption in
  his report.  6/6 Tr. 173:13-174:19 (Briscoe cross).

- Mr. Briscoe merely assumed that the cash posted as
  reimbursement collateral for the letters of credit was at or about
  100% of their face value.  He "didn't know" this for a fact.  6/6
  Tr. 176:3-13 (Briscoe cross).

145

- He did not reach out to Kentucky, AIG, West Virginia, or Illinois to see whether any of these States or insurers would do an LPT or other monetization transaction with Black Diamond. *See* 6/6 Tr. 182:23-183:10 (Briscoe cross) ("I did not talk to them [Kentucky] with respect to the Black Diamond or the Patriot situation here."); *id.* 183:19-184:8 (same answers for AIG, West Virginia, and Illinois).

- He was not aware that, pursuant to a stipulation with AIG that Black Diamond reviewed and approved prior to October 26, 2015, there was a two-year moratorium on any monetization event for the AIG letter of credit, until January 2018.  6/7 Tr. 13:25-14:3 (Briscoe cross).

189.    Mr. Briscoe also had no basis, other than conjecture and speculation, for maintaining that Black Diamond would have executed one of the three monetization strategies, which as described above was incorrect speculation.  He admitted that he did not ask Mr. Goldfarb (Black Diamond's general counsel and the only in-house Black Diamond representative Mr. Briscoe communicated with before issuing his report) "whether, in fact, they [Black Diamond] would do one of these transactions."  6/6 Tr. 166:9-16 (Briscoe cross). He further confirmed that he was not provided this information on a call he had with Mr. Goldfarb and Mr. Ehrlich after he issued his report, but before he sat for his deposition in this case.  6/6 Tr. 166:17-168:2 (Briscoe cross).

190.    Mr. Briscoe lacked any factual basis to opine that Black Diamond could have done a letter-of-credit swap.  He did not know whether Black Diamond was aware of this monetization method as of October 26, 2015.  6/6 Tr. 164:14-20 (Briscoe cross) ("I am not sure that they were aware of that as a viable method at the point that we're talking about here.").  He further admitted that Mr. Goldfarb did not tell him that Black Diamond would have been willing to put its balance sheet at risk to effectuate a letter-of-credit swap.  6/6 Tr. 158:23-159:6 (Briscoe cross);[50] *see also* 6/6 Tr. 165:7-23 (Briscoe cross) ("Q.  Did anyone at

---

[50] Though Mr. Ehrlich, Mr. Deckoff, and Mr. Briscoe all touted Black Diamond's $8 billion in assets under management, Mr. Deckoff admitted in his testimony that Black Diamond's ▮▮▮▮▮▮▮▮ are only ▮▮▮▮▮▮▮▮▮▮▮▮▮ 6/8 Tr. 22:25-23:3 (Deckoff direct) ("That's at Black Diamond; that's not including the funds that Black Diamond manages.").

Black Diamond tell you . . . that Black Diamond would put its credit on the line to support the

issuance of a letter of credit in a letter of credit transaction?  A.  No. . . . Q.  Okay.  And did

you see any document that committed Black Diamond to put its credit on the line to obtain a

letter of credit for a letter of credit swap transaction?  A.  I don't believe so.").  Rather, he

simply made a "fundamental assumption" that Black Diamond would have pledged its $8

billion assets under management to monetize any surplus collateral *(see id.* 160:3-10 (Briscoe

cross)), even though assets under management are not the same thing as assets available to

support a credit extension to ERP Settlement.  *See id.* 160:22-161:3 (Briscoe cross).[51]  There

is no dispute that effectuating a letter-of-credit swap transaction would have required, at least,

the posting of a new letter of credit supported by a reimbursement promise to the issuer of the

letter of credit from a credit-worthy party—all transaction-related activities that Black

Diamond's witnesses testified were *not* remotely underway prior to the October 26, 2015

scheduled closing date.[52]  *See* 6/6 Tr. 157:21-158:5 (Briscoe cross) (a letter-of-credit swap

---

[51]  Mr. Briscoe was unable to explain how a fiduciary like Black Diamond could pledge its investors' assets to
monetize surplus collateral.  6/6 Tr. 160:22-161:3 (Briscoe cross).

[52]  The Court notes that Mr. Deckoff's response to whether Black Diamond would have put its balance sheet at
risk was cavalier and unsupported.  After accounting for the removal of the Peabody-Illinois L/C and
liabilities and Old Republic L/C from the aggregate W/C Package, there remained $145,694,131 in cash
proceeds being held by various States that Black Diamond would have had to replace at least dollar-for-dollar
assuming, as Mr. Briscoe did, that a monetization transaction could be achieved.  *See* 6/6 Tr. 157:9-13
(Briscoe cross) ("Q. . . . But I believe you testified earlier given the current market that banks are requiring
dollar-for-dollar collateralization of letters of credit, or pretty close to it, isn't that what you testified?  A.
Yes. . . .").  Given that Black Diamond's non-fund assets were estimated at some amount more than ██
██ replacing the held cash would represent perhaps as much as 14.5% of Black Diamond's available
cash.  That would seem to be a significantly concentrated investment for Black Diamond, at least to the point
that the Court would have expected Black Diamond to have had a plan and analysis as to its future conduct
with respect to the W/C Package.  Black Diamond's witnesses, however, testified that they had no such plan
and analysis.  *See, e.g.,* 6/5 Tr. 98:6-24 (Ehrlich cross) (prior to October 23, 2015, the only thing Black
Diamond did to "confirm the collateral was what [Black Diamond] expected it to be" was to analyze the
Oliver Wyman reports, but those relate only to the value of Patriot's liabilities, not the collateral itself); *id.*
100:18-102:3 (Ehrlich cross) (Black Diamond "didn't" contact "any brokers at th[at] point in time
[September – October 2015] to evaluate feasibility of an LPT; "didn't" take "any steps to contact the State of
Kentucky" or any other state; doesn't "recall" talking "to a letter of credit issuer; does not believe that he
talked to "[a]n insurer in connection with this"; and does not recall "giv[ing] any instructions or
recommendations or suggestions to Mr. Clarke or VCLF in connection with attempts to monetize excess
collateral") 6/8 Tr. 118:3-13 (Deckoff cross) (Black Diamond did not do anything to effect a monetization of
HealthCo promptly upon closing—not an LPT, not a letter-of-credit swap, and not collateral release:  "[W]e
didn't need to, nor did we want to."); *id.* 124:25-125:8 (Deckoff cross) (Black Diamond "didn't talk to
JPMorgan [the issuer of its line of credit] about" a "monetization event for Healthco"); *id.* 133:10-134:2
(Deckoff cross) (did not "discuss any potential steps relating to monetization" with Tom Clarke or Ken

4833-1306-9934

requires the issuance of a new letter of credit from "an acceptable bank"; in such a swap,

"[i]t's the security behind the letter of credit that produces the conversion of surplused cash");

6/11 Tr. 69:13-15 (Logan cross) (in the monetization transaction Mr. Logan facilitated for the

anonymous coal company, "the State of Kentucky got a new dollar-for-dollar letter of

credit"); *id.* 26:14-18 (Logan direct) (in that transaction, "There was a letter of credit posted.

We replaced that letter of credit with an identical letter of credit.").

191.     Mr. Briscoe also lacked a basis for his position that Black Diamond could

have done an LPT transaction.  Mr. Briscoe was not told whether Black Diamond "had

executed successfully on an LPT or monetization transaction."  6/6 Tr. 169:12-170:21

(Briscoe cross).  Mr. Briscoe was not provided any "document that evidenced a commitment

by Black Diamond to contribute capital to ERP Settlement, LLC in order to effectuate the

loss-portfolio-transfer transaction."  6/6 Tr. 165:14-19 (Briscoe cross).  Moreover, as Mr.

Briscoe concedes, if Black Diamond executed an LPT strategy, it would have required Black

Diamond to assume all of the covered workers' compensation liabilities or obtain an

insurance policy to cover the entirety of those liabilities.  6/6 Tr. 156:25-157:8 (Briscoe

cross).[53]  Yet, he "didn't ask Black Diamond whether it had set up an insurance policy to

substitute for anyone, anyone of the letters of credit . . . . " (6/6 Tr. 166:9-16 (Briscoe cross)),

even though it is a requirement of Kentucky's checklist that the party proposing the LPT have

an insurance carrier lined up.  *See* 6/7 Tr. 15:12-16:10 (Briscoe cross) ("Q.  Yeah, did they

tell you they had a carrier lined up?  A.  No.  Q.  Did they show you a document that they had

---

McCoy, and did not recall any such discussions with Rich Ehrlich; "we were under no pressure.  We wanted to close the deal.  We were in no rush to monetize it."); *id.* 137:23-140:4 (Deckoff cross) (did not pursue self-insurance option "prior to October 24th, 2015"; did not "generate a written business plan outlining how [Black Diamond] would step in and pursue the excess collateral in Healthco").

[53]  Mr. Briscoe had no factual basis for assuming that Black Diamond was going to assume these liabilities:  his only alleged source for this understanding was "Covington counsel," although the Court finds Mr. Briscoe's reference to a conversation on this subject with Covington unreliable.  He could not remember any details of the conversation and he could not identify with any confidence with whom he spoke at Covington.  6/7 Tr. 17:3-15 (Briscoe cross).  He likewise did not see any document "that committed Black Diamond's capital or its balance sheet to paying any such unpaid award of workers' compensation liabilities."  *Id.* 18:15-18 (Briscoe cross).

4833-1306-9934

a carrier lined up?  A.  No.").  Nor did he confirm Black Diamond was prepared to assume

these workers' compensation liabilities—he was simply told by Black Diamond's attorneys

to assume that, and they did not even convey to him "[h]ow they [Black Diamond] was going

to assume them [the liabilities]."  *See* 6/7 Tr. 17:3-18:14 (Briscoe cross) ("Q.  Okay.  So who

told you that Black Diamond was going to assume these liabilities?  A.  Covington

counsel.").

192.    With respect to release of collateral, Mr. Briscoe acknowledged that he "didn't

see any document where Black Diamond agreed to stand behind all of the assumed workers'-

compensation liabilities" in order to facilitate a voluntary collateral release by the state

regulators.  6/6 Tr. 165:24-166:6 (Briscoe cross).  He further admitted that States generally

are unlikely to release collateral, particularly cash collateral like they were holding in this

case.  *See* 6/6 Tr. 176:20-24 (Briscoe cross) (agreeing that, "[i]f the letters of credit had been

drawn, such that the states were holding cash, the states would have been no more willing to

part with the cash than they had been with the letters of credit").

**(ii)    Black Diamond's Fact Witnesses Did Not Furnish
the Factual Predicates for Mr. Briscoe's Unfounded
Assumptions**

193.    Despite the attention given to letter-of-credit swaps and LPT transactions in

Mr. Briscoe's testimony, Black Diamond's fact witnesses admitted at trial (and/or in

designated deposition testimony) that Black Diamond's strategy for HealthCo prior to

October 26, 2015 (the relevant date for understanding and evaluating Black Diamond's actual

monetization strategy), was *not* to do a letter-of-credit swap or an LPT transaction.[54]  Rather,

it was simply to *wait* until the workers' compensation liabilities extinguished, and then

---

[54] *See, e.g.,* 6/8 Tr. 121:25-122:4 (Deckoff cross) ("I believe an LPT transaction would have been possible [for
HealthCo], *but we weren't pursuing an LPT transaction.*") (emphasis added); *id.* 118:3-13 (Deckoff cross)
("Q.  You did not develop a plan to implement a loss-portfolio transfer promptly upon the closing or shortly
before the closing?  A.  No.  Q.  You didn't arrange for a replacement letter of credit upon the same time
frame?  A.  No.  Q.  You didn't arrange for any state workers' compensation funds to release collateral
voluntarily, promptly upon the closing?  A.  No, we didn't need to, nor did we want to.").

4833-1306-9934

collect any excess collateral.  6/13 Tr. 127:4-17 (Deckoff cross) (" . . . Black Diamond didn't need to monetize the asset [HealthCo].  Black Diamond would be perfectly happy just to sit and wait. . . . We weren't in any rush where we needed to monetize the asset."); *id.* 24:13-26:8 (Deckoff direct) ("Q.  With respect to the time horizon that you expected on these healthcare receivables, how long did you think it would take to realize the value or how long did you need to realize the value?  A. . . . [W]e can certainly wait.  We don't need the cash for anything."); *id.* 19:19-24 (Deckoff direct) ("We haven't had to, actually, [do a letter-of-credit-swap] in the deals we've done . . . . [W]e just got the cash back because the – *we waited a few years, but we got the cash back because the liabilities extinguished*.") (emphasis added); 6/4 Tr. 66:3-7 (Ehrlich direct) ("We've been very successful at just waiting – waiting till the liabilities reduce over time and negotiate with the insurance companies or states to have them return collateral.").[55]  This testimony confirms that Mr. Briscoe's opinion that Black Diamond would have done a quick monetization in the weeks and months following October 26, 2015, to realize 100% or close to 100% of the difference between the face value of the letters of credit and the estimated liabilities is unsupported as a factual matter.

194.    Perhaps more importantly, though, and as also discussed elsewhere, Mr. Briscoe, who is an actuarial expert even if he is not an expert on any the three monetization alternatives on which he expressed opinions before this Court, did testify that if one simply waited until the workers' compensation liabilities were extinguished (resolved) over time, as was Black Diamond's plan, there would be no excess collateral:

> Q. . . . Excluding investment income on the 154 million dollars that had been converted to cash, for which you are unable to identify any obligation by a state guaranty fund or any other state authority, to give that investment income away, right – so excluding that, and assuming no monetization transaction, I believe you agreed with me that *if the claims were just paid out*

---

[55]  *See also* Lattouf Dep. Tr. 310:5-311:21 ████████████████████████████████
████████████████████ (emphasis added).

> *over time* – and here we use the 163-million-dollar
> undiscounted value, because it's being paid out over time –
> over time, that *all of that money would be used to pay claims,*
> correct?
>
> A.   *If there was no monetization at all, yes, I would agree.*

6/7 Tr. 36:18-37:3 (Briscoe cross) (emphasis added).  In other words, Black Diamond's own

expert witness testified that if Black Diamond pursued its stated course, it likely would not

have realized excess collateral.  This admission by Black Diamond's expert is fatal, as a

matter of law, to its claim for damages based on the HealthCo Equity Interests.

195.    The speculative nature of this wait-and-see approach is manifest.  Black

Diamond's own rebuttal witness, Sean Logan, testified that, "[a]s they like to say, all

actuarial analyses are wrong.  They just will be.  They're a guess.  They're an estimate.  And

they're probably – the chances of them being exact and dead-on are – are – are remote."  6/11

Tr. 51:10-24 (Logan cross).[56]  Even Mr. Briscoe admitted in his expert report that he did not

"audit[ ] or verif[y]" the "data and other information provided via [the actuarial] reports

authored by Oliver Wyman," for which Mr. Briscoe relies to calculate the amount of

traumatic injury liabilities as of October 26, 2015.  *See* Ex. 261, at 22.  Fundamentally, this

means that the liabilities could end up exceeding the actuarial estimates.

196.    In fact, as Mr. Briscoe conceded, the liabilities as of October 26, 2015, *did*

exceed the collateral on an undiscounted basis, "[s]o the states in the aggregate were upside

down vis a vis the estimated liabilities, and the letters of credit they were actually holding."

6/6 Tr. 177:15-20 (Briscoe cross).

---

[56]  At trial, the Court noted the significance of this testimony, and how it supports VCLF's position, when VCLF
renewed its motion to strike Mr. Logan's testimony in its entirety.  *See* 6/13 Tr. 210:12-21 (colloquy) ("THE
COURT:  And you want to strike all of Mr. Logan's testimony?  MR. TROOP:  Yes, Your Honor.  THE
COURT:  All right.  Including the part where he said that – I believe he indicated that in his opinion or *the
actuarial analysis are never correct.*  You don't like that testimony, right?  MR. TROOP:  Oh, I – okay.
There are – Your Honor, there are things I like about it.  There are things I like about it in that – THE
COURT:  So you just want to pick parts of it that you want to strike.  MR. TROOP:  If you would let me,
Your Honor, I would but I doubt you would.") (emphasis added).  As noted *infra* note 60, in light of the
Court's findings and conclusions, the Court has given appropriate weight to the different passages of Mr.
Logan's testimony, and denies VCLF's motion to strike as moot.

4833-1306-9934

197.    Mr. Briscoe further admitted that, if no quick monetization succeeded, and no investment income is voluntarily returned by state authorities (because states are not obliged to turn over investment income), then there will be *zero* excess collateral, because all of the collateral will then be used to pay the (undiscounted) claims.  6/7 Tr. 36:18-37:12 (Briscoe cross) (agreeing that "the range here of possible results from . . . these letters of credit, was zero at the low end, if there was no monetization transaction, and not even up to thirty-nine million dollars on the high end"); *see also supra* Conclusions of Law ¶ 183.

198.    Yet, inexplicably, Mr. Briscoe was asked to assume that Black Diamond would have monetized 100% of any excess collateral, and "was not retained to calculate a lower end of a range."  6/7 Tr. 37:13-38:5 (Briscoe cross).

199.    This has particular relevance for Black Diamond's *actual* planned wait-and-see approach.  Not only did Mr. Briscoe testify that this planned wait-and-see approach would not produce any excess collateral to provide a recovery to Black Diamond, but the evidence showed that the liabilities assumed by ERP Settlement in fact exceeded the collateral—just as Mr. Logan noted.

       (iii)    **Events Subsequent to October 26, 2015 Confirm that Any Hoped-For Value in ERP Settlement Was Always Speculative**

200.    Not only was it uncertain on October 26, 2015, whether the liabilities would exceed the collateral and not only did the actuarial assumptions relied upon by Mr. Briscoe demonstrate that over time the liabilities would exceed the value of the collateral, the historical experience since October 26, 2015, confirms that, in fact, the liabilities do exceed the collateral, precluding ERP Settlement from monetizing any excess.  As a holder of Equity Interests in HealthCo, Black Diamond would have assumed the risk of post-transaction events that would negatively impact HealthCo's purported equity value.

201.    Prior to trial, this Court ruled that evidence concerning attempts to monetize any excess collateral in ERP Settlement after October 26, 2015, is "relevant to these proceedings." 5/23/18 Hr'g Tr. 19:2-19 (ECF Doc. No. 297).  Indeed, even Black Diamond's expert, Mr. Briscoe, admitted that the results of actual efforts to monetize excess collateral could be relevant to his opinion.  That is why, prior to the issuance of his report, Mr. Briscoe asked Black Diamond's counsel whether any attempts had been made to monetize any surplus collateral in ERP Settlement.  He, however, was not provided any such information. *See* ECF Doc. No. 279 (Defs.' Sealed Mem. of Law in Supp. of Mot. to Strike Briscoe), at 50-51.

202.    Furthermore, because it was Black Diamond's plan to wait and see, it took the risk that subsequent events would impact HealthCo's value.  As discussed above, taking this investment risk makes a claim for damages, particularly in a new venture without historical data on which to rely, speculative as a matter of law.  *See supra* Conclusions of Law ¶ 152.

203.    In any event, the Court finds that the actual, unsuccessful serious efforts to monetize any excess collateral related to the W/C Collateral after the closing of the VCLF-Patriot transaction supports the conclusion that Black Diamond's damage claim based on the value of excess HealthCo collateral is speculative and has not been proven at all, and definitely not with reasonable certainty as to causation and amount as of October 26, 2015.

### (A)    Kentucky

204.    Entities and parties with a direct economic interest in maximizing the amount received on any excess collateral from Commonwealth of Kentucky tried to monetize the largest piece of collateral in ERP Settlement—the cash drawn on the $47,239,343 letter of credit issued by Fifth Third Bank for the benefit of the Commonwealth of Kentucky. Towards the end of 2015, the PCC Liquidating Trust (which had the authority under the October 27, 2015 note from ERP Settlement to enter into monetization transactions) retained

153

4833-1306-9934

A&M to "to do work . . . in connection with the Kentucky worker's compensation package."
6/13 Tr. 172:19-22 (Spragg direct). Specifically, Daniel Spragg of A&M was "personally
retained to . . . run the process to try to either negotiate or to achieve a loss portfolio transfer
solution to return . . . worker's compensation collateral that was being held by the state of
Kentucky." *Id.* 173:1-7 (Spragg direct). Mr. Spragg and A&M started this work "right
away." *Id.* 173:8-10 (Spragg direct).

205. For the next eighteen months, Mr. Spragg, A&M, and the PCC Liquidating
Trustee "sought out parties willing and able to enter into a transaction." 6/13 Tr. 206:19-
207:15 (Spragg direct). Acting through Alan Gray (A&M's broker) and Vanbridge (A&M's
actuary), A&M was able to procure proposals from sophisticated parties such as Berkshire
Hathaway and Randall & Quilter. *Id.* 182:19-204:5 (Spragg direct).[57] The Kentucky Coal
Guaranty Fund, however, rejected each of these proposals (*see id.*), leading the PCC
Liquidating Trustee to commence an adversary proceeding against Kentucky in this Court to
compel it to enter into an LPT or similar transaction. *See* Ex. FT (adversary proceeding
docket sheet).

206. The PCC Liquidating Trustee's counsel summarized the efforts to monetize
the Kentucky excess collateral at a hearing that took place in this Court on June 22, 2017:

> As Your Honor will recall, the liquidating trust, together with
> its advisors at Kirkland & Ellis, and Alvarez & Marsal, and at
> Kutak Rock have engaged in what amounted to basically an
> eighteen-month marketing process to find a potential third party
> to enter into a transaction that would allow the liquidating trust

---

[57] In this regard, the Court finds unpersuasive Mr. Briscoe's attempts to disregard the PCC Liquidating Trust's
efforts to monetize the Kentucky W/C Package, contending that the parties from which it obtained proposals
were not sophisticated. Indeed, when pushed on cross-examination, Mr. Briscoe had to admit that Berkshire
Hathaway is a sophisticated party in these kinds of transactions (*see* 6/6 Tr. 147:19-148:16 (Briscoe cross)),
and the most he could do was to speculate that the individuals who worked on Berkshire Hathaway's
proposal were unsophisticated. *See* 6/7 Tr. 91:25-92:7 (Briscoe recross) ("I do not know whether the
particular people at Berkshire who were approached with respect to this transaction, knew the Kentucky
rules."). Mr. Briscoe did not speak with Berkshire Hathaway and had no basis to opine that it was
unsophisticated when it made its economic proposal related to the Kentucky W/C Package.

4833-1306-9934

> to monetize the debtors' rights to any of the potential excess
> Workers' Compensation collateral that was held at Kentucky.
>
> The liquidating trust concentrated, at first, its efforts at finding
> one or more loss portfolio transfers.  We received multiple
> indications of interest, but for a variety of reasons, these
> proposals proved to be not economical or otherwise
> unworkable, although certainly not on account of lack of effort.

Ex. FF (6/22/17 Hr'g Tr.) 5:21-6:9.

207.    Mr. Spragg testified at trial that the initial guess that the Kentucky excess

collateral might be worth as much as $17 million proved incorrect because, among other

reasons, the impact of external factors, like actual claims experience being more expensive

than anticipated and the legal landscape changing.  *See* 6/13 Tr. 201:9-205:20 (Spragg direct).

208.    One of the external factors that effectively eviscerated any hope of realizing

excess value from the Kentucky's W/C Package was its Supreme Court's decision in *Parker*

*v. Webster Cty. Coal, LLC (Dotiki Mine)*, 529 S.W.3d 759 (Ky. 2017), *reh'g denied* (Nov. 2,

2017).  *Parker* validated Kentucky's restrictive approach to valuing workers' compensation

liabilities in the PCC Liquidating Trust's adversary proceeding seeking to compel Kentucky

to enter into an LPT and, in turn, the relative lack of availability of excess collateral securing

those claims.  Mr. Spragg estimated that the impact of this decision reduced the already small

amount of excess collateral by over $2 million.  *See* 6/13 Tr. 204:23-205:16 (Spragg direct)

(impact of *Parker* on "the amount of surplus collateral that was then available to be

monetized from Kentucky . . . was material.  It was over two million dollars").

209.    As a result, in part, of the *Parker* decision and the inability to find a market

player able or willing to satisfy Kentucky's requirements for an LPT transaction, the PCC

Liquidating Trust was forced to settle its adversary proceeding with Kentucky for a mere

$1,001,000.  *See* Ex. FG; 6/13 Tr. 206:11-18 (Spragg direct).  In its order approving the

settlement, this Court determined that $1,001,000 was "the highest or otherwise best offer

available to the Liquidating Trustee and *is fair and reasonable and constitutes fair market*

155

4833-1306-9934

*value.*"  Ex. FG, at 2 (emphasis added).  This recovery, however, was offset by the

professional fees incurred by the PCC Liquidating Trust in the process of attempting to

monetize the Kentucky collateral:  Mr. Spragg confirmed that his professional fees alone (not

including attorneys' fees, which the Court understands were substantial) amounted to

"130,000 dollars," consisting of "just over 200 hours at [Mr. Spragg's rates]."  6/13 Tr.

209:6-17 (Spragg direct).  While $130,000 is less than the $1,001,000 recovery, the burden of

proving the other costs to recover this sum was Black Diamond's (not VCLF's) because the

value of HealthCo's equity necessarily would account for the cost of realizing excess

collateral.  Black Diamond failed to provide any evidence to prove that the costs of the time

spent by the other professionals in the case (including Kirkland and Kutak Rock), which

consumed much of two years, did not exceed a total of $870,000.  While the Court is familiar

with the time spent by these firms, and their rates (due to the fee application process in the

Patriot Case), and could easily estimate that total fees and costs to litigate the matter with

Kentucky exceeded $870,000, it need not do so in light of the failure of evidence.

210.    At trial, Black Diamond tried to counter this evidence of A&M's unsuccessful

attempt to monetize any surplus collateral held by Kentucky by calling Sean Logan as a

rebuttal witness to testify about a successful LPT transaction that took place between

Kentucky and another, unnamed coal company.[58]  This Court rejects any analogy between

that anonymous coal company and Patriot.

211.    Unlike Patriot, Mr. Logan's anonymous coal company was not in default on

its workers' compensation obligations, and it was not relieved of such obligations in

bankruptcy.  *See* 6/11 Tr. 59:7-62:1 (Logan cross).  Additionally, also unlike Patriot, that

anonymous coal company reorganized in bankruptcy, emerged, is "financially viable," and

---

[58] Mr. Logan contended that it would be a breach of his confidentiality agreement to name this coal company.
The Parties agreed to proceed without naming the company, but they did extract sufficient information from
Mr. Logan about the company and the nature of the transaction in which he was involved for the Court to
reach the conclusions set forth in this Opinion.

notwithstanding the LPT transaction, remains fully liable for the underlying workers'

compensation claims.  *Id.* 67:23-68:2, 76:8-13 (Logan cross).  Moreover, in order to

accomplish the anonymous coal company's LPT, the coal company had to arrange for a new

dollar-for-dollar letter of credit for which it paid *more* than the original letter of credit.  *Id.*

66:17-67:13, 69:13-19 (Logan cross).  Given these distinguishing factors, it is not surprising

that the anonymous coal company was able to effectuate an LPT transaction, but the PCC

Liquidating Trust (through A&M) could not.  The Court, therefore, finds that the LPT

transaction to which Mr. Logan testified (a) fails to fill any gaps in Mr. Briscoe's testimony

or expert report regarding the potential to effectuate an LPT transaction with the collateral in

ERP Settlement's W/C Package by Black Diamond or anyone else and (b) provides no

evidence as to the value of any excess Kentucky collateral in the W/C Package.

### (B)   West Virginia

212.    Attempts were also made after October 26, 2015, to monetize any surplus

collateral held by West Virginia.  As Mr. Clarke explained at trial, however, those efforts

failed because of West Virginia's approach to pooling of workers' compensation collateral:

> . . . We learned that West Virginia, the law in West Virginia
> was it didn't matter what the liability or the collateral was.  If
> there was a default on payment, all the collateral went into a
> pool.  The bonds and letters of credit were drawn.  It went into
> a pool.  And the liabilities went into a pool.  So there was no
> individual accounting.

6/11 Tr. 290:8-13 (Clarke direct); *see also* 6/12 Tr. 35:17-23 (Clarke direct) ("All of those

letters of credit [assigned to ERP Settlement] have been drawn and, by operation of state law

– or state regulations, all of the collateral has been placed into state-controlled pools.  In West

Virginia, that was automatic.  You know, it happened, you know, without our ability even to

make argument against it.  That was the law in West Virginia.").  Black Diamond offered no

rebuttal evidence to counter Mr. Clarke's account.

4833-1306-9934

213.    Given Mr. Clarke's and VCLF's clear expertise and success in monetizing

surplus collateral securing environmental liabilities (*see* 6/12 Tr. 33:6-35:5 (Clarke direct)),

the fact that VCLF tried but failed to monetize any surplus collateral at West Virginia

confirms that this piece of the W/C Package had nothing more than speculative value on

October 26, 2015.  On the environmental side of the collateral and liabilities assumed from

Patriot, VCLF has realized substantial collateral value and applied it to remediation

obligations.  *See* 6/12 Tr. 33:6-35:1 (Clarke direct) (Mr. Clarke has been able to devote

"approximately 147 million dollars" in "surplus collateral to the environmental fund to pay

off liabilities," of which "80-million-plus has already been spent on the mine reclamation

work.  We're probably about halfway through all of the work that needs to be completed").

### (C)    AIG

214.    As noted above, prior to October 26, 2015, Black Diamond negotiated and

approved a stipulation between VCLF and AIG that precluded VCLF from attempting to

monetize the AIG-related letters of credit in the W/C Package until January 2018.  *See, e.g.*,

Ex. CB (10/23/15 e-mail from AIG's counsel to Black Diamond and Schulte, attaching draft

of AIG stipulation, which provided:  "ERP and its successors and assigns shall not request a

collateral adjustment or a close-out be conducted until a date after losses valued as of

December 31, 2017, are available"); 6/5 Tr. 103:24-104:2 (Ehrlich cross) ("Q.  You did

know, as of October 23, that VCLF was negotiating a stipulation with insurer AIG that would

prevent any monetization event for two years, correct?  A.  Correct.").  Indeed, as Mr. Harris

testified, Schulte was fully engaged in negotiating and documenting the resolution with AIG

on behalf of Black Diamond.  *See* 6/5 Tr. (Harris direct) ("My insurance partner, Howard

Epstein, was working on the worker's compensation issues and was very engaged in

negotiating – ultimately negotiating a settlement with AIG that – pursuant to which, AIG

recognized the VCLF affiliate as the beneficiary of any residual interest in funds that had

4833-1306-9934

been deposited to secure the worker's compensation obligations."). Accordingly, as of

October 26, 2015, Black Diamond knew and had agreed that a monetization of any excess

collateral with respect to the AIG letters of credit was impossible for at least two years.[59]

215. At the end of that moratorium period, AIG confirmed to VCLF that—contrary

to Black Diamond's optimistic predictions—the liabilities secured by the AIG collateral were

expected to exceed the value of the collateral, so there was no opportunity for a monetization

event. As Mr. Clarke recounted, once again in unrebutted testimony:

> Now, the reality became the claims. And one of the things
> that's very different from any other workers' comp situation,
> what we found in the coal industry was that, you know, when
> people were laid off, when the mine closed, there were just
> unbelievable numbers of workers' comp claims that were filed
> immediately thereafter. *So even AIG, which we believed there
> would be in excess of ten million dollars, their actual claim
> experience now indicates that all of the collateral will be used
> to satisfy those claims.*

6/12 Tr. 40:4-12 (Clarke direct) (emphasis added).

216. VCLF's actual experience with AIG thus confirms, as with the other

components of the collateral in the W/C Package, that any perceived value in ERP Settlement

was always uncertain.

\* \* \*

217. Accordingly, the Court finds that Black Diamond has failed to prove the value

of HealthCo as of October 26, 2015, with reasonable certainty, and therefore it has not

sustained this component of its damages claim.[60]

---

[59] Mr. Briscoe did not account for this Court-endorsed delay in trying to monetize the AIG collateral in his opinion. Omitting this fact from his opinion that effectively presumed prompt monetization of all excess collateral further erodes the reliability of his opinion.

[60] In light of these findings and conclusions, the Court has given appropriate weight to the respective testimony of Mr. Briscoe and Mr. Logan, and deny VCLF's motion to strike these witnesses' testimony as moot.

4833-1306-9934

c.    *Equity in the Federal 2 Mine*

218.    Black Diamond has similarly failed to show that the 30% equity stake in the

Federal 2 Mine that constituted part of the Equity Interests had anything more than

speculative value as of October 27, 2015.[61]  It unquestionably has not proven with a

reasonable degree of certainty that the Federal 2 Mine had a market equity value of $89

million at that time, which is the predicate for Black Diamond's damage claim based on the

Federal 2 Mine Equity Interests.  To the contrary, the Court finds that the market value of the

Federal 2 Mine on October 27, 2015 was negligible or negative.  Accordingly, this prong of

Black Diamond's claim for damages fails as well.

219.    As discussed above, the Federal 2 Mine was a noncore asset for Patriot.

Although the Federal 2 Mine was subjected to a marketing process and could have been the

subject of an auction, no one made a qualifying competing offer for this mine other than

VCLF.  Accordingly, the best indication of the value of the Federal 2 Mine in or about

October 2015 is the purchase paid for it by VCLF.  *See* Ex. EJ (10/27/15 Amended &

Restated Asset Purchase Agreement), at 22 (§ 2.06(a)) (consideration for the "Purchased

Assets" was not cash, but rather (i) "assum[ption of] the Assumed Liabilities and

(ii) caus[ing] the Issuer [ERP Settlement and not ERP Federal Mining Complex] to issue to

Patriot the Secured Note").  Here, no matter how one looks at the VCLF-Patriot transaction,

whether on the basis of the 8/16 APA or the VCLF APA that governed the closing of the

transfer of the Federal 2 Mine to ERP, it is clear that VCLF paid nothing to Patriot for the

Federal 2 Mine and that mine had no positive value.  Furthermore, based on the record before

me in the Patriot Case, the Court finds conclusively that had there been $89 million in equity

value at the Federal 2 Mine in October 2015 (or even a fraction of that value), Patriot's

---

[61] Black Diamond, inconsistently, uses the date October 27, 2015, with respect to the value of the Federal 2
Mine, even though it used the date October 26, 2015, with respect to the value of ERP Settlement.

creditors would have insisted on receiving it.  Creditors fought over the value of a long-wall

mining machine at the Federal 2 Mine worth no more than $6 million according to the

objecting creditor, and the Court found this equipment had no value because no one would

pay for it.

220.    As Black Diamond concedes, the only basis for its claim that the contemplated

30% equity stake in the Federal 2 Mine had value as of October 26, 2015, consists of two

unaudited balance sheets, as of October 26, 2015, and September 30, 2016, which were

attached to VCLF's interrogatory responses in this litigation (*see* Ex. 249, at Exs. B & C):[62]

> The second category of damages, Your Honor, is the equity
> interest in Holdco (ph.).  That's our name for the entity that was
> to hold the Federal Mine.  Black Diamond was supposed to
> receive a thirty percent interest in the Federal Mine.  It's the
> second of the two equity interests that they promised to give us
> if they did any deal for the Patriot assets.  *And their own
> interrogatory responses, Your Honor, show that at the time of
> their breach, the Federal Mine had an equity value of 88
> million dollars plus, the nearly 89 million dollars that's
> reflected on the screen, and so the 30 percent interest that they
> owed us is worth 26,666,785 dollars.*

6/4 Tr. 40:9-19 (Black Diamond opening statement) (emphasis added).

221.    Black Diamond's counsel derived his numbers from the "members' capital"

line on the ERP Federal Mining Complex unaudited balance sheets.  *See* Ex. 249, at Ex. B

(unaudited balance sheet as of October 27, 2015—showing $88,889,282.16 in total member's

capital); *see also id.*, at Ex. C (unaudited balance sheet as of September 30, 2016—showing

$42,944,134.37 in total member's capital).

222.    As Mr. Clarke explained at trial, however, the "total member's capital" lines

on the unaudited balance sheets do not represent realizable or market value of ERP Federal

---

[62] Oddly, in its most recent Rule 26(a)(1) disclosures, Black Diamond promised that it would "provide an expert
report describing [its] damages [related to HoldCo] at a later time" (Ex. EV, at 8), but failed to do so by the
April 17, 2018 deadline set forth in the operative scheduling order.  ECF Doc. No. 249 ¶ 2.  As explained
*infra* Conclusions of Law ¶ 228, Black Diamond's failure to provide the promised expert testimony is fatal to
this component of its damages claim.

4833-1306-9934

Mining Complex equity, because the balance sheets do not reflect the substantial deficits at

the Federal 2 Mine that completely offset this members' capital:

> . . . Exhibit B [to Exhibit 249] is the unaudited, condensed
> balance sheet for October 27th, 2015, of ERP Federal Mining
> Complex.  C is the unaudited condensed balance sheet as of
> September 30th, 2016 for the ERP Group Federal Mining
> Complex. . . .
>
> Q.  Mr. Clarke, can you describe for us the relationship
> between assets and liabilities on each of those exhibits?
>
> A.  Yes.  For Exhibit B, which is the October 27th, 2015
> balance sheet of the Federal Mining Complex, we are showing
> current assets of 15.9 million dollars.  We're showing current
> liabilities of 7.2 million dollars.  We're showing debt, other
> liabilities of 27.3 million.  And we're showing member's equity
> of 88.9 million.  However, the member's equity of 88.9 consists
> totally of the plant property and equipment of 107.5 million
> dollars, and we're obligated to carry the plant property and
> equipment, under generally accepted accounting principles, but
> the value of that equipment we now know is 500,000 dollars.
> That's what we sold the Federal Mining Complex for, half a
> million dollars and the assumption of the environmental
> liabilities.
>
> Q.  And just to move this forward a little bit, and you can take
> your time to look at these, but is it your understanding that for
> each of the subsequent exhibits that the assets are higher than
> the liabilities, as was indicated in the first exhibit?
>
> A.  So the – the – the liquid assets are higher than the liabilities.
> The total assets are greater than the liabilities but include assets
> that are recorded, for accounting principles, at their cost less
> their depreciated values.  And we know those assets are grossly
> overstated compared to fair market value.  We – we have the
> evidence now by selling Federal.
>
> Q.  Based on your review of these balance sheets, what is the
> implication for member's capital for each of these entities –
>
> A.  They're –
>
> Q.  – as of –
>
> A.  They're –
>
> Q.  – October 27, 2015?

A.  They're – *on a valuation basis, there is no member's capital*.

Q.  Why is that?

A.  *Because the value of the assets is significantly less than the net book value of the assets of the organization.*

6/12 Tr. 46:16-48:10 (Clarke direct) (emphasis added).

223.   Mr. Clarke's unrebutted trial testimony was accurate, compelling, and credible, and accordingly, VCLF's interrogatory responses should be read consistent with Mr. Clarke's explanation.  Furthermore, the Court finds no inconsistency between the balance sheets' calculation of net book value and Mr. Clarke's testimony that the actual market value of assets at the Federal 2 Mine was less than the amount of its liabilities.  There is no reason to discount Mr. Clarke's testimony regarding these unaudited balances sheets given his interest in the outcome of this litigation.  Indeed, he said nothing remarkable nor controversial about the unaudited balance sheets.  *See, e.g.*, *In re Spreadbury*, No. ADV. 09-1254, 2010 WL 2998907, at *1 (Bankr. E.D. Va. July 27, 2010) ("[E]videntiary admissions are not binding, and a party against whom it is offered may explain what he or she actually intended or understood when the admission was made.  At the same time, the court, in assessing the weight to be given to testimony contradicting or explaining away prior admissions, may properly take into account the party's obvious interest in the outcome of the litigation."); *Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir. 1975) ("Plaintiffs will be entitled to attempt to explain these admissions, and the trier of fact will judge the truth of these explanations and weigh these admissions together with the other evidence.").

224.   Although it did nothing to rebut the factual accuracy of Mr. Clarke's testimony or put on lay or expert evidence of the value of Federal 2 mine, Black Diamond maintains that the balance sheets constitute VCLF's "admission" of  ERP Federal Mining Complex's value as of October 27, 2015 for the purpose of calculating its damages, because

163

they were attached to VCLF's interrogatory responses.  In taking this position, Black

Diamond ignores that:

a.  Black Diamond did not ask VCLF to identify fair market or otherwise

realizable value of the ERP Federal Mining Complex in its

Interrogatories.  It merely asked that VCLF "[i]dentify the value of

Federal Mine Complex on October 25, 2015 and as of the date of your

response to this Interrogatory, and provide the basis for each value."

Ex. 249, at 15.  Black Diamond did not define "value," and VCLF

objected to the Interrogatory because, among other things, it was

vague.  *See id.* at 5 (¶ 7), 15.

b.  Nowhere in its interrogatory responses does VCLF state that the

unaudited  balance sheets, let alone the "Total Member's Capital" line,

represents the fair market or other realizable value of ERP Federal

Mining Complex, as of October 27, 2015, or derivatively the actual

economic value of a 30% equity stake in the mine at that time.

c.  Indeed, in its response, VCLF stated merely that "information

responsive" to Black Diamond's interrogatory is set forth in the

attached balance sheets.  *Id.* at 16.

d.  The balance sheets do contain information that is responsive to the

interrogatory, because, as Mr. Clarke explained, they reflected the net

*book* value of the company.

e.  Book value can be very different from, and in this case, based on

Mr. Clarke's credible testimony, was very different from fair market or

otherwise realizable value.

164

225.     The Court, therefore, finds that VCLF's interrogatory response and the

unaudited balance sheets attached to it do not constitute admissions as to the value of ERP

Mining Complex as of October 25, 2015 or September 30, 2016, for the purpose of

demonstrating any alleged economic value that Black Diamond would have received had it

been granted the Equity Interests in ERP Federal Mining Complex in October 2015.

226.     Even if interrogatory responses are admissions, however, the Court finds that

the fact allegedly admitted by VCLF's interrogatory response and read into the unaudited

balance sheets by Black Diamond—*i.e.*, that the actual economic value of the capital it would

have received can be derived simply by multiplying the "Total Members' Capital" line by

30%—is wrong.  Federal courts routinely hold that admissions may be outweighed by other

relevant evidence.  *See, e.g.*, *Tzu Wei Chen Food Co. v. Chia-Chi Enters., Inc.*, 73 F.3d 379

(Fed. Cir. 1995) ("[E]vidential admissions are not binding; instead, they merely constitute

admissible evidence to be considered in combination with all other relevant evidence.");

*Matter of Cont'l Airlines, Inc.*, 125 B.R. 415, 417 (Bankr. D. Del. 1991) ("The [admission] is

not conclusive but may be rebutted, and it must be weighed along with all other evidence by

the trier of fact."); *see also Sperry*, 523 at 711 ("[T]he trier of fact will . . . weigh these

admissions together with the other evidence.").  Accordingly, the Court declines to rely on

this alleged admission as proof of Black Diamond's damages based on the otherwise

overwhelming evidence that the Federal 2 Mine had no demonstrable value in October 2015.

227.     In addition, Black Diamond may not rely on VCLF's interrogatory responses,

standing alone and without any supporting expert opinion testimony, to establish its damages

with respect to the Equity Interest in the Federal 2 Mine.  Complex damages issues such as

valuation of a coal mining operation requires expert testimony, and an unintended party

admission cannot substitute for such expert testimony, unless the admission is "clear,

unambiguous, and concrete."  *Cf. In re Mirena IUD Prod. Liab. Litig.*, 202 F. Supp. 3d 304,

4833-1306-9934

315 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017), *cert. denied sub nom. Mirena*

*MDL v. Bayer Healthcare Pharm., Inc.*, 138 S. Ct. 1299 (2018) ("[I]f it is conceivable at all

that a statement by a party opponent could be used in place of expert testimony to prove

causation, the circumstances in which this might occur would be exceedingly rare, especially

in the pharmaceutical or medical contexts . . . . [I]f admissions could ever substitute for

expert testimony in a complex case that requires expert testimony as to causation under state

law, those admissions would have to be clear, unambiguous, and concrete, rather than an

invitation to the jury to speculate as to their meaning.").

228.    It is impossible to describe VCLF's interrogatory response and the attached

unaudited balance sheets as "clear, unambiguous, and concrete" admissions by VCLF that the

market value of Federal 2 Mine was nearly $89 million in October 2015 and that Black

Diamond suffered a cognizable loss of nearly $27 million when it did not receive a 30%

interest in the mine.  In addition, as noted *supra* note 62, Black Diamond conceded in its

initial disclosures that expert testimony would be required to sustain its damages case with

respect to the Equity Interest in the Federal 2 Mine.  Consequently, Black Diamond cannot

now prevail on this component of its damages claim without the promised expert testimony,

and in reliance solely on (at most) interrogatory responses that do not "clear[ly],

unambiguous[ly], and concrete[ly]" admit that the economic value of a 30% interest in the

Federal 2 Mine in October 2015 was worth nearly $27 million.

229.    Finally, the history of the Federal 2 Mine since October 26, 2015, confirms

that there was never any equity value in the mine.  VCLF's three principals (Messrs. Clarke,

Ken McCoy, and Jason McCoy) all confirmed that, apart from a blip of positive cash flow

soon after the closing of the VCLF-Patriot transaction, the cash flows of the mine were

uniformly negative,[63] necessitating an injection and/or commitment of almost $50 million

(almost $25 million more than the most Black Diamond had ever committed) into the mine

by the principals to cover the mine's losses and obligations.[64]  Ultimately, even that infusion

of capital was insufficient:  the mine shut down in fall 2017, and was sold in 2018.  *See* 6/12

Tr. 44:18-21 (Clarke direct) ("We have sold the Federal Mine.  That was sold within the last

thirty days."); 6/13 Tr. 121:13-19 (K. McCoy direct) ("[Q.]  . . . Now, finally, what is the

current status of the mine?  Is Federal mine still operational?  A.  No.  It's shut down.  Q.

When did it shut down, sir?  A.  Really, in two parts.  Last year, which would have been

2017, mid-fall we had a very significant layoff, and then end of October we – maybe 1st of

November, we shut the mine down.").

230.    Black Diamond is the plaintiff, and it bears the burden of proving damages

with respect to its claimed 30% equity interest in the Federal 2 Mine.  Black Diamond has

produced no evidence of the market value of the Federal 2 Mine through comparable

transactions or even expert testimony, which is fatal to its claim for damages.  *See Coventry

Enters.*, 191 F. Supp. 3d at 321 ("It is . . . fundamental that, where the breach involves the

deprivation of an item with a determinable market value, the market value at the time of the

breach is the measure of damages.").  Black Diamond has failed to carry its burden on this

major component of its damages.

---

[63] *See* 6/8 Tr. 203:16-204:5 (J. McCoy direct) ("Q.  Were the cash flows of the Federal 2 Mine ever positive after October 27th, 2015?  A.  You know, I think early on, when we first acquired the project, we had high offtake agreements.  We had coal inventory.  And so maybe for a couple of weeks, a very short while, but overall, no.  I mean, maybe for a couple of weeks to a month.  Q.  Separate and apart from that very short period, in connection with the offtakes and the coal inventory, have the cash flows of the Federal 2 Mine been negative?  A.  Very much so.  Q.  Can you give us an order of magnitude of how negative they've been?  A. Yeah.  I think we've lost somewhere to the tune of forty million dollars."); *see also* 6/12 Tr. 45:5-7 (Clarke direct) ("I believe we lost probably in excess of fifty million dollars between the 27th of October [2015] and, you know, the date that we shut the mine down.").

[64] *See* 6/13 Tr. 123:19-25 (K. McCoy direct) ("Q.  In terms of the money that you yourselves put in, do you have an understanding, a recollection, as to how much money you put in personally to keep the mine operational without the liquidity promised by Black Diamond?  A.  Well, you know, we still had the vendors that we want to pay.  And so, when you include that[,] *it will be close to fifty million dollars between my son and Tom and me.*") (emphasis added).

4833-1306-9934

5.     **Black Diamond's Claim for Reimbursement of Attorneys' Fees
Fails**

231.     The Commitment Letter's Term Sheet provided that, in the event the financing

transaction between Black Diamond and VCLF was consummated, Black Diamond could

look to VCLF for reimbursement of certain of its legal fees:

> Fees and Expenses:  On the Closing Date Borrowers shall
> reimburse Agents and Lenders for all out of pocket fees and
> expenses (including the reasonable fees and expenses of
> counsel) incurred in connection with the preparation,
> negotiation, execution and delivery of the Loan Facility
> Documentation and the consummation of the transactions
> contemplated thereby.

Ex. S, at BDCF-00028009.  As noted above, "Loan Facility Documentation" is defined in the

Term Sheet as "the terms of the definitive documentation with respect to the ABL Facility or

the Term Loan Facility."  *Id.* at BDCF-00028005.

232.     Initially, the obligation to reimburse "Fees and Expenses" reflected in the

Term Sheet requires a closing on the loan facilities under negotiated and agreed-upon loan

documentation.  There was no closing and thus no obligation to pay "Fees and Expenses"

could have arisen.  The interrelatedness of a closing and the reimbursement of "Fees and

Expenses" is clear in the Term Sheet.  Had Black Diamond intended to be reimbursed its fees

and expenses even if there was not a closing, it could have, and should have, drafted the

Commitment Letter to so provide.  Furthermore, to the extent that it is not clear that this

obligation arises only if there is a closing, the Commitment Letter and Term Sheet are

ambiguous as to whether the obligation to reimburse fees and expenses arises other than if

there is a closing.  For the reasons noted above regarding drafting and interpretation

presumptions under New York law, any such lack of clarity or ambiguity is construed against

Black Diamond as the drafter of the Commitment Letter.  *See supra* Conclusions of Law

¶¶ 9-14.

4833-1306-9934

233.     If, however, Black Diamond could have a claim for reimbursement of its fees

and expenses even without a closing of the Senior Secured Facilities, it would need to comply

with the various requirements of New York law governing the reimbursement of fees and

expenses under a contract, which it has not.

234.     New York courts read attorneys-fees provisions strictly.  For example, in *In re*

*Sandy Hills*, LLC, No. 12-74482 (DTE), 2014 WL 953840 (Bankr. E.D.N.Y. Mar. 10, 2014),

the United States Bankruptcy Court for the Eastern District of New York held that a similar

provision (providing for reimbursement of attorneys' fees incurred in connection with the

"negotiations, preparation and administration of" the agreement) allowed for recovery of

attorneys' fees relating to the negotiation of the agreement, but did not allow for recovery of

legal fees expended in the formation of the company which would be the subject of the

agreement.  *See id.* at *2, 5 ("[I]t is questionable whether legal services relating to

Empower's formation should be allowed as such services do not fall into the category of

negotiating and preparing the Empower Agreement, nor directly relate to the purchase of the

Bank's interest in the Loan and the foreclosure action.").

235.     Applying New York's strict requirements, Black Diamond's request to recoup

from VCLF $286,454, purportedly corresponding to Black Diamond's "pre-closing

attorneys' fees,"[65] fails.  Black Diamond's request for nearly all of its "pre-closing attorneys'

fees" is predicated on an insupportable expansive reading of the Commitment Letter and

related evidence.

236.     On direct examination, Black Diamond's restructuring attorney, Mr. Harris,

clarified that Black Diamond arrived at the $286,454 figure by adding up the vast majority of

the time entries in Schulte's invoices to Black Diamond from September and October 2015:

---

[65]  6/4 Tr. 40:25-41:2 (Black Diamond opening statement).

4833-1306-9934

Q. . . . Now, Black Diamond incurred legal fees *in connection with Schulte's work on this transaction* before VCLF terminated it, correct?

A.  Yeah, they did, yes.

Q.  And could you take a look at Defendant's Exhibit AN in evidence, which is under tab 32, and Defendant Exhibit ER in evidence, which is in – under tab 33?

A.  Okay.

Q.  Do you recall approximately how much in damages – how much in attorneys' fees that Black Diamond paid Schulte for the work prior to VCLF's termination of the transaction?

A.  Yes.  So Your Honor, just to put this in context so you can interpret these two exhibits appropriately, these are Schulte's bills to Black Diamond related to the Patriot Coal matter for the months of September and October 2015.  The redacted – the fully redacted entries relate to advice we were giving Black Diamond in connection with things *other than the VCLF transaction*.

So for instance, the inter-creditor relationship between the LC facility, the ABL facility, the term facility, and the bank debt, and things like that.  So when you look at the totals for each of the two months, the September number says it's 48,048, but the actual amount *related to the VCLF transaction* was somewhat less than that.  But when you adjust the totals of the two invoices for the redactions and the fees associated with *non-VCLF-related matters*, the total came to approximately 286,000 dollars.

6/5 Tr. 177:3-178:4 (Harris direct) (emphasis added).

237.   Mr. Harris' effort to haircut the Schulte invoices by excluding what he describes as "things other than the VCLF transaction" is insufficient.  Under the Commitment Letter's Term Sheet, VCLF would have been required to reimburse Black Diamond *only* for legal fees incurred in connection with the "Loan Facility Documentation," and "the transactions contemplated *thereby*"—*i.e.*, the term and ABL loan facilities.  Ex. S, at BDCF-00028009 (emphasis added).  It does not refer to other aspects of the VCLF-Black Diamond transaction, such as the formation of HealthCo and HoldCo, or any time spent relating to the Equity Interests.  *See Sandy Hills*, 2014 WL 953840, at *5 (similar attorneys' fees provision

4833-1306-9934

did not allow for recoupment of fees incurred in connection with company to be formed

under agreement).  This provision, therefore, does not include reimbursable fees and

expenses for *all* work conducted by Schulte on behalf of Black Diamond in connection with

tasks "related to the VCLF transaction," which is far broader than the Loan Facility

Documentation and the transactions contemplated thereby.

238.    Likewise, neither Mr. Harris' testimony nor the Schulte invoices furnish

grounds for awarding Black Diamond a smaller amount in attorneys' fees.  The evidence

contradicts any claim by Black Diamond that Schulte performed any significant work on the

Loan Facility Documentation and the transactions contemplated thereby, or—even if Schulte

did do some work—that the fees associated with that limited scope of work are reasonable.

239.    Mr. Harris admitted that the Loan Facility Documentation contemplated by the

Commitment Letter was substantial:

> . . . You would have a loan agreement, relevant security
> agreement would be the two principal documents that would be
> required.  Then there would be ancillary documents and closing
> certificates, UCC financing statements.  To the extent there's
> real estate that's being pledged, obviously you would need
> mortgages but in a deal like this, that would have been done
> post-closing, to the extent there were real estate assets being
> pledged.  That would be the general categories.

6/5 Tr. 217:18-218:5 (Harris cross).

240.    Yet, Mr. Harris separately admitted that Schulte spent *almost no time*

preparing Loan Facility Documentation.  *See, e.g.*, 6/5 Tr. 155:9-23 (Harris direct) (admitting

that Schulte's "financing side . . . was probably lagging behind the other areas," and that he

recalls "hearing comments from Pillsbury about expectations that the financing documents

should already have been prepared").  Indeed, Mr. Harris was unable to confirm that

Schulte's finance team had even produced "internal drafts" of the financing documents for

the transaction and, in any event, no drafts of financing documents were ever shared outside

of Schulte.  *Id.* 218:6-16 (Harris cross).

4833-1306-9934

241.    In fact, according to Mr. Harris' own testimony, Schulte could not and did not perform work on the Loan Facility Documentation up to and including October 23, 2015, purportedly because the business diligence and discussions among the business persons had not been completed. *See, e.g.*, 6/5 Tr. 155:15-19 (Harris direct) ("So for instance, the financial covenants we discussed earlier and things like that, really couldn't be drafted until such time as the business diligence and the discussions among the businesspersons had been substantially completed.").

242.    During trial, Black Diamond failed to point to specific time entries showing significant work on the Loan Facility Documentation. Even if it were to do so now, however, I would find that Black Diamond has not established that any Schulte fees incurred in connection with the Loan Facility Documentation were "reasonable," as required by the Term Sheet. The evidence recited above confirms that Schulte purposely dragged its feet and did not meaningfully advance the Loan Facility Documentation at any point after September 21, 2015. The burden rests with Black Diamond to show how the specific work, if any, done by Schulte in connection with the Loan Facility Documentation was "reasonable." It has failed to do so.

## B.      VCLF Has Established Damages on Its Counterclaim

243.    To the extent that any Party suffered cognizable damages, it was VCLF. The evidence at trial confirms that, due to Black Diamond's refusal to perform under the Commitment Letter, the Federal 2 Mine was insufficiently capitalized following the closing of the VCLF-Patriot transaction. As a result, VCLF was forced to shutter the Federal 2 Mine in 2017, and sell it in 2018.

244.    Damages are available where a borrower's business fails because of a lender's failure to extend committed financing. *See Rio Grande Oil Co. v. Pankey*, 50 Ariz. 529, 539 (1937). In *Rio Grande*, plaintiffs—gasoline station owners—and defendant financier entered

172

into an agreement in which defendant agreed to finance and provide an open line of credit to plaintiffs in exchange for plaintiffs' promise to exclusively sell defendant's gasoline. Soon thereafter, defendant refused to extend credit to plaintiffs and, instead, required plaintiffs to pay cash on delivery for all gasoline and oil delivered to them by defendant. "As a result of defendant's refusal to extend credit, in accordance with the terms of the agreement, plaintiffs were compelled to discontinue the large majority of their credit customers . . . [and] were finally compelled to go out of business." *Id.* at 533-34. On appeal, after plaintiffs won damages for lost profits in connection with plaintiffs failure to fund, the court reversed the judgment on other grounds,[66] but held that the unique facts of the case fell within an exception to the rule that special damages "are not recoverable in an action for the failure to deliver goods on credit where no such damages were contemplated by the parties at the time the contract was made." *Id.* at 537-38. The Court based its ruling on the fact that "plaintiffs were unable to borrow money anywhere so that they might purchase the necessary gasoline for cash. Nor could they, without a breach of their contract, go to any one else to secure a different gasoline, for they had agreed to use defendant's product exclusively." *Id.* at 539. Plainly, the unique position of the lender warranted judicial intervention.

245. Here too, Black Diamond's actions warrant judicial intervention. When Black Diamond repudiated its lending commitment at the last second, VCLF was left defenseless: having been under Exclusivity up until October 23, 2015, VCLF could not find third-party alternative financing to fully replace Black Diamond within 48 hours. Knowing this, Black Diamond demanded materially different, more onerous terms from VCLF at the eleventh hour. Just as in *Rio Grande,* Black Diamond abused its power as a lender intending to extract materially different financing terms, to VCLF's detriment.

---

[66] More specifically, the Court reversed plaintiffs' recovery on the ground that the damages awarded were so excessive when compared against the total amount plaintiffs could have possibly made in sales had they been able to get gasoline on credit—which the Court determined was less than one-fourth of plaintiffs' jury verdict.

4833-1306-9934

246.    And Black Diamond's abuse of power had consequences.  Because Black

Diamond refused to lend on the terms of the Commitment Letter, VCLF was forced to

operate the Federal 2 Mine with insufficient liquidity, leading to its ultimate shutdown in

2017 and sale in 2018.  At trial, Mr. Clarke cogently explained the causal link between Black

Diamond's failure to lend and the Federal 2 Mine's ultimately shutdown:

> Q.  All right.  Thank you, Mr. Clarke.  Mr. Clarke, does ERP
> still own the Federal Mine?
>
> A.  We have sold the Federal Mine.  That was sold within the
> last thirty days.
>
> Q.  Did there come a time when the mine shut down?
>
> A.  Yes, there did.
>
> Q.  Did you have an understanding of why the mine shut down?
>
> A.  The demand for thermal coal in the United States has
> declined precipitously.  When that occurred, we started
> shipping internationally, but the demand internationally has
> also declined, so there was really no market for our coal.  We
> had very difficult geological conditions, and we were unable to
> commercially operate the mine.  I believe we lost probably in
> excess of fifty million dollars between the 27th of October and,
> you know, the date that we shut the mine down.
>
> Q.  Do you believe there was any impact from Black
> Diamond's failure to fund?
>
> A.  Yes, I do.
>
> Q.  Please explain.
>
> A.  Well, when we assumed the mine, Patriot Coal Corporation
> knew they were selling it.  You know, they had not invested
> any capital in the mine, and so we had difficulties with our
> equipment, primarily the underground belts.  You know, you
> have to have maximum belt availability to get the coal out of
> the ground and up to the preparation plant.  So we didn't have
> the capital that we would have needed.  If we had had the
> twenty-five million dollars available to us, we could have made
> those capital improvements, and it would have kept us – you
> know, it would have advanced us forward.
>
> Q.  How many jobs were lost, Mr. Clarke?

174

A.  Approximately 500.

6/12 Tr. 44:18-45:23 (Clarke direct).

247.    Mr. Jason McCoy, ERP's senior vice president (with background and

expertise in finance), further noted that ERP's shutdown of the Federal 2 Mine is not

attributable merely to the difficult market for thermal coal mines.  As Mr. Jason McCoy

explained, thermal coal mines that are well-capitalized (which would have been the case for

the Federal 2 Mine had Black Diamond provided the committed-to financing to VCLF) have

weathered this difficult market:

> Q.  Do you have an understanding as to why the Federal 2 Mine
> has not done well as compared to . . . the other thermal coal
> mines that have continued to be operational[?]
>
> A.  Yes.  The primary reason was we just weren't capitalized.  I
> mean, there was a reason we were asking for twenty-five
> million dollars.  None of that money was going into our pockets
> at closing.  That money was going to get put to use in the mine.
> The mine had been neglected, given the Patriot difficulties.
>
> There's a lot of equipment that needs a lot of work.  Once you
> fix the equipment up to where it can operate efficiently, I mean,
> you've got a longwall mine and thick coal that you can make
> money on.  But we never had the money to go in and fix that –
> fix the longwall, fix any of the equipment, the preparation
> plant, to simply be able to even come close to running the mine.
>
> Q.  Do you have an understanding as to why the Federal 2 Mine
> wasn't properly capitalized as of October 27th, 2015?
>
> A.  Clearly because we never had the closing financing.  We
> didn't have the twenty-five million dollars, or really any money
> to put into the maintenance and make sure of that.

6/8 Tr. 205:22-206:20 (J. McCoy direct); *accord* 6/13 Tr. 121:25-123:7 (K. McCoy direct)

("Q.  Is it your understanding that for those mines that weathered the market downturn, they

were able to do so because of their capitalization and liquidity?  A.  The ones that made it,

yes.").

248.    The testimony of Messrs. Clarke, Ken McCoy, and Jason McCoy regarding

the causal link between Black Diamond's failure to fund and the shutdown of the Federal 2

4833-1306-9934

Mine is sufficient to establish proximate cause for damages purposes.  Unlike the speculative

testimony of Mr. Ehrlich regarding Black Diamond's claim for interest damages, the

testimony of Messrs. Clarke, Ken McCoy, and Jason McCoy regarding the Federal 2 Mine is

equivalent to the testimony of an owner regarding the value of his property, which is

admissible for such purpose under Federal Rules of Evidence 701 and 702.  *See United States*

*v. 68.94 Acres of Land*, 918 F .2d 389, 397 (3d Cir.1990) ("The Federal Rules of Evidence

generally permit landowners to give opinion evidence as to the value of their land due to the

special knowledge of property which is presumed to arise out of ownership."); *LaCombe v.*

*A–T–O, Inc.*, 679 F.2d 431, 433 (5th Cir.1982) ("[T]he owner of property is qualified by his

ownership alone to testify as to its value.")); *Glendale LLC v. AMCO Ins. Co.*, No. 3:11–cv–

3–RJC–DCK, 2012 WL 3025122, at *1 (W.D.N.C. July 24, 2012) ("An owner's opinion can

be evidence as to the value of real property.") (citation omitted); *see also S. Cent. Livestock*

*Dealers, Inc. v. Sec. State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980)

(financial officer of corporation was qualified to testify as to excess value of corporation's

assets over its liabilities because the officer's testimony was "closely akin to the testimony of

an owner of a business about that business's value").

249.    In particular, Mr. Ken McCoy demonstrated extensive expertise and

knowledge not just regarding the Federal 2 Mine, but regarding the coal industry generally,

owing to his 43 years of experience in the coal industry, with "experience in basically all

aspects of mining operations."  6/13 Tr. 63:7-64:14 (K. McCoy direct).  If there is anyone

qualified to give testimony regarding the relationship between liquidity, coal mine financial

success, and coal industry market forces, it is Mr. Ken McCoy.  The Court finds Mr. Ken

McCoy's testimony in these areas credible and reliable.

250.    As noted *supra* Conclusions of Law ¶ 229, to keep the Federal 2 Mine

operational after Black Diamond deprived it of liquidity, Messrs. Clarke, Ken McCoy, and

4833-1306-9934

Jason McCoy had to invest and/or commit almost $50 million in personal cash to sustain the

mine.  Ultimately, even that measure failed, and VCLF was forced to sell the Federal 2 Mine

in 2018 to "another company called Phoenix Resources" for $500,000 and assumption of $18

million worth of environmental reclamation obligations,[67] although VCLF remains

responsible for all of the outstanding vendor payments (which Mr. Ken McCoy said he is

committed to pay because "those people gave us that money in good faith, they provided

service, and I'm going to pay it").  6/13 Tr. 121:20-24, 124:1-125:11 (K. McCoy direct).

251.    Based on the foregoing evidence, the Court concludes that VCLF has suffered

actual, reasonably certain, and quantifiable damages actually and proximately caused by

Black Diamond's breach (repudiation) of the Commitment Letter, in the amount of $49.5

million.  This amount reflects the amount that ERP Federal Mining Complex will not be able

to repay, because Black Diamond failed to perform.  The amount consists of (a) the amount

that VCLF's principals had to invest in and/or commit to the mine due to Black Diamond's

repudiation of the Commitment Letter ($25 million for the unfunded loans and $25 million to

account for ERP Federal Mining Complex's initial lack of working capital and liquidity)

(b) plus remaining unpaid liabilities that Mr. Ken McCoy has said he will repay,[68] (c) less the

$500,000 VCLF received from the sale of the mine.  I find Mr. Ken McCoy's intent to be

credible.

## CONCLUSION

At his deposition, Mr. Gravenhorst of BDCF told VCLF's counsel that it was his

███████████████ that ███████████████████████ Gravenhorst Dep. Tr.

257:7-11, 257:13-16, 257:18.  This Court agrees:  Black Diamond's initiation of this

---

[67] Though not elucidated specifically at trial, the Court notes that these liabilities may have been backed by reclamation bonds or the proceeds thereof, in any event, such that there was no net positive to VCLF from the relinquishment of these liabilities in the sale of the Federal 2 Mine.

[68] Because the amount of unpaid liabilities was not confirmed at trial, the Court does not include it in the damages calculation.  Nevertheless, the fact that these liabilities (which must be substantial) remain outstanding gives the Court comfort that a damages award of $49.5 million to VCLF is conservative.

4833-1306-9934

litigation, replete with baseless claims, defenses, and litigation tactics and positions has

wasted the time and money of this Court and VCLF.  Having found VCLF's positions herein

to be meritorious, the Court shall enter judgment:

- Dismissing Black Diamond's claim with prejudice;

- Granting VCLF's counterclaim; and

- Awarding VCLF damages on its counterclaim in the amount of $49.5 million.

The Clerk is directed to enter a separate judgment consistent with the foregoing.


Dated: _____        _____
      Richmond, Virginia         THE HONORABLE KEITH L. PHILLIPS
                                UNITED STATES BANKRUPTCY JUDGE

4833-1306-9934

WE ASK FOR THIS:

*/s/ Patrick J. Potter*
  Patrick J. Potter (VSB No. 39766)
  PILLSBURY    WINTHROP    SHAW
  PITTMAN LLP
  1650 Tysons Boulevard, Suite 1400
  McLean, Virginia 22102-4856
  Telephone:  (703) 770-7900
  Facsimile:  (703) 770-7901
  E-mail:  patrick.potter@pillsburylaw.com

  - and -

  William M. Sullivan, Jr. (admitted *pro hac vice*)
  PILLSBURY    WINTHROP    SHAW
  PITTMAN LLP
  1200 Seventeenth Street, NW
  Washington, DC 20036-3006
  Telephone:  (202) 663-8027
  Facsimile:  (202) 663-8007
  E-mail:  wsullivan@pillsburylaw.com

  - and -

  Andrew M. Troop (admitted *pro hac vice*)
  Samuel S. Cavior (admitted *pro hac vice*)
  Joshua I. Schlenger (admitted *pro hac vice*)
  PILLSBURY    WINTHROP    SHAW
  PITTMAN LLP
  1540 Broadway
  New York, New York 10036-4039
  Telephone:  (212) 858-1000
  Facsimile:  (212) 858-1500
  E-mail:  andrew.troop@pillsburylaw.com

  *Counsel to Virginia Conservation Legacy Fund, Inc. and ERP Compliant Fuels, LLC*

4833-1306-9934

## <u>CERTIFICATE OF ENDORSEMENT</u>

Pursuant to this Court's Local Rule 9022-1(C), I hereby certify that the foregoing Proposed Order has been served on or endorsed by all necessary parties.

*/s/ Patrick J. Potter*

180