# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>Patriot Coal Corp., *et al.*,<br>　　　　　　　Debtors. | Case No. 15-32450-KLP<br>Chapter 11<br>Jointly Administered |
| Black Diamond Commercial Finance, LLC,<br>　　　　　　　Plaintiff,<br><br>v.<br><br>Virginia Conservation Legacy Fund, Inc., and<br>ERP Compliant Fuels, Inc.,<br>　　　　　　　Defendants. | Adv. Proc. No. 16-03105-KLP |
| Virginia Conservation Legacy Fund, Inc., and<br>ERP Compliant Fuels, Inc.,<br>　　　　　　　Counter-Claimants,<br><br>v.<br><br>Black Diamond Commercial Finance, LLC,<br>　　　　　　　Counter-Defendant. | |

## MEMORANDUM OPINION

*Preliminary Statement*

In October 2015, plaintiff Black Diamond Commercial Finance, LLC,

("Black Diamond") brought this action for breach of contract against

defendants Virginia Conservation Legacy Fund, Inc., ("VCLF") and its

affiliate, ERP Compliant Fuels, LLC, ("ERP") (collectively, also "VCLF" or

"Defendants"), in New York state court.[1]  Black Diamond alleges that the

Defendants breached the parties' contract in which Black Diamond agreed to

provide VCLF with exclusive financing to be used for working capital and

specified fees in connection with VCLF's purchase of certain assets from

Patriot Coal Corporation and its affiliated corporations (collectively,

"Patriot"), then debtors-in-possession in consolidated chapter 11 cases filed in

this Court (*In re Patriot Coal Corp.*, Case No. 15-32450-KLP, the "Patriot

Cases").[2]  The Defendants filed a counterclaim, alleging that it was Black

---

[1] On November 12, 2015, the Defendants filed a Notice of Removal in the District
Court for the Southern District of New York and requested that the action be
transferred to this Court.  The District Court referred the case to the Bankruptcy
Court for the Southern District of New York.  On April 25, 2016, the Bankruptcy
Court for the Southern District of New York transferred the case to this Court.

[2] Related debtors whose cases were jointly administered with that of Patriot Coal
Corporation, Inc. include 15-32455-KLP, Apogee Coal Company, LLC; 15-32460-
KLP, Appalachia Mine Services, LLC; 15-32469-KLP, Black Stallion Coal Company,
LLC; 15-32471-KLP, Brody Mining, LLC; 15-32474-KLP, Catenary Coal Company,
LLC; 15-32476-KLP, Central States Coal Reserves of KY, LLC; 15-32479-KLP,
Colony Bay Coal Company; 15-32480-KLP, Corydon Resources LLC; 15-32487-KLP,
Coyote Coal Company LLC; 15-32482-KLP, Dodge Hill Mining Company, LLC; 15-
32484-KLP, Eastern Associated Coal, LLC; 15-32489-KLP, Eastern Royalty, LLC;
15-32448-KLP, Emerald Processing, L.L.C.; 15-32493-KLP, Gateway Eagle Coal
Company, LLC; 15-32497-KLP, Grand Eagle Mining, LLC; 15-32499-KLP, Heritage
Coal Company LLC; 15-32452-KLP, Highland Mining Company, LLC; 15-23457-
KLP, Hillside Mining Company; 15-32461-KLP, Hobet Mining, LLC; 15-32464-KLP,
Jupiter Holdings LLC; 15-32449-KLP, Kanawha Eagle Coal, LLC; 15-32468-KLP,
Kanawha River Ventures III, LLC; 15-32470-KLP, Little Creek LLC; 15-32473-KLP,
Midland Trail Energy LLC; 15-32475-KLP, Midwest Coal Resources II, LLC; 15-
32478-KLP, Mountain View Coal Company, LLC; 15-32481-KLP, Panther LLC; 15-
32483-KLP, Patriot Coal Company, L.P.; 15-32485-KLP, Patriot Coal Holdings I
LLC; 15-32486-KLP, Patriot Coal Holdings II LLC; 15-32490-KLP, Patriot Coal
Sales LLC; 15-32492-KLP, Patriot Coal Services LLC; 15-32495-KLP, Patriot
Leasing Company LLC; 15-32498-KLP, Patriot Midwest Holdings, LLC; 15-32500-
KLP, Patriot Reserve Holdings, LLC; 15-32451-KLP, Patriot Ventures LLC; 15-
32453-KLP, Pine Ridge Coal Company, LLC; 15-32454-KLP, Remington LLC; 15-
32456-KLP, Rhino Eastern JV Holding Company LLC; 15-32458-KLP, Rivers Edge

2

Diamond that breached the contract, excusing the Defendants' performance thereunder and entitling them to damages.

This Court assumed control over this breach of contract action pursuant to an April 25, 2016, order transferring venue from the Bankruptcy Court for the Southern District of New York.[3]  The transfer order, when received by this Court, was accompanied by 139 documents containing 6,716 pages.  The record has increased exponentially since that time.

Although the contract underlying the dispute is relatively uncomplicated and the operative facts generally straightforward, the parties have left no stone unturned while disagreeing over nearly every facet of the case.  The litigation has been wrought with numerous protracted disputes over the proper forum, scheduling, discovery, and other pretrial matters,[4] adding to the abundance of pleadings and exhibits filed in the case and eventually culminating with an eight-day trial that took place from June 4 through June 13, 2018.[5]

---

Mining, Inc.; 15-32459-KLP, Robin Land Company, LLC;15-32462-KLP, Speed Mining LLC; 15-32463-KLP, Thunderhill Coal LLC; 15-32465-KLP, Wildcat Energy LLC; 15-32466-KLP, Wildcat, LLC; 15-32467-KLP, Will Scarlet Properties LLC; and 15-32472-KLP, WWMV JV Holding Company LLC.

[3] On May 10, 2016, Black Diamond filed a motion to remand or for discretionary abstention, which the parties briefed and argued.  The motion was denied by the Court in a Memorandum Opinion and Order entered on September 23, 2016. *In re Patriot Coal Corp. (Black Diamond Comm. Fin., LLC v. Va. Conservation Legacy Fund, Inc.)*, Adv. Pro. No. 16-03105-KLP, 2016 WL 5360950 (Bankr. E.D. Va. Sept. 23, 2016).

[4] On February 15, 2018, the Court denied cross motions for partial summary judgment  (Dkt. 246).

[5] A significant amount of trial time involved evidence concerning damages.  Bifurcation of the liability and damages portions would likely have substantially reduced the length of the trial; however, when the Court made such a suggestion

After completing the trial and parsing the transcript, the parties

submitted proposed findings of fact and conclusions of law.  Predictably, each

party continues to assert that it acted appropriately while the other

committed a breach entitling it to many millions of dollars in damages.

Having heard the arguments of the parties and having considered the

evidence, the Court concludes that neither party violated the terms of the

contract at issue and neither party is entitled to damages.  Accordingly, the

Court will dismiss both Black Diamond's complaint and VCLF's

counterclaim.  This Memorandum Opinion setting forth the Court's findings

of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of

Civil Procedure[6] provides the explanation for the Court's ruling.

## <u>JURISDICTION</u>

This Court has subject matter jurisdiction over this adversary

proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).  *See also*

*Black Diamond Commercial Fin., LLC v. Va. Conservation Legacy Fund, Inc.*

*(In re Patriot Coal Corp.)*, Adv. Pro. No. 16-03105-KLP, 2016 WL 5360950, at

*2 n.4 (Bankr. E.D. Va. Sept. 23, 2016) (the "Remand Opinion").  The Court

provided all parties with the opportunity, no later than November 14, 2016,

to dispute the Court's ability to enter final orders and ordered that the failure

to act would be "deemed to constitute consent to the entry of final orders by"

during the final pretrial conference, both parties argued against it and the Court
acquiesced.
[6] Made applicable pursuant to Rule 7052 of the Federal Rules of Bankruptcy
Procedure.

this Court in this adversary proceeding.  (Dkt. 44, ¶ 12)  No party acted by

the November 14 deadline.  Therefore, the Court may enter a final order in

this case, subject to review under 28 U.S.C § 158.[7] *See Wellness Int'l Network,*

*Ltd. v. Sharif*, 135 S. Ct. 1932, 1944-45 (2015).

### FINDINGS OF FACT

*Joint Stipulation of Uncontroverted Facts*

No doubt after extensive negotiations and the exchange of numerous

drafts, the parties have managed to agree to one page of stipulated facts (the

"Uncontroverted Facts").[8]  The parties agree that the following is

uncontroverted:

1.     Black Diamond is a Delaware limited liability company that

does business in Greenwich, Connecticut, and Lake Forest, Illinois.

2.     VCLF is a Virginia nonstock corporation.

3.     ERP is a Virginia limited liability company created for the

purpose of consummating VCLF's acquisition of certain assets and

assumption of certain liabilities from debtor Patriot Coal Corporation and

affiliated debtors in the Patriot Cases.

---

[7] Should it be determined that the Court lacks the authority to enter a final order, then this Memorandum Opinion shall be deemed its proposed findings of fact and conclusions of law to the district court.

[8] Dkt. 271, 291.  To be fair, the parties agreed after the trial to withdraw deposition designations to which objections had been interposed and enter into evidence unopposed deposition designations and counter-designations.  *See* Dkt. 396.

4.     On May 12, 2015, Patriot filed voluntary Chapter 11 petitions in the U.S. Bankruptcy Court for the Eastern District of Virginia, commencing the Patriot Cases.

5.     On August 16, 2015, VCLF/ERP, Patriot, and certain Patriot subsidiaries executed an asset purchase agreement, pursuant to which VCLF/ERP would acquire certain assets from Patriot, including the Federal 2 Mine in West Virginia, and assume certain employee and environmental liabilities of Patriot.

6.     On September 21, 2015, Black Diamond executed a commitment letter with VCLF/ERP (the "Commitment Letter").  (The Parties stipulated that a true and correct copy of the Commitment Letter was attached to the stipulations as Exhibit A.)

7.     Stephen Deckoff, representing Black Diamond, and Thomas Clarke, representing VCLF/ERP, executed the Commitment Letter on September 21, 2015.

8.     Black Diamond commenced a lawsuit against Defendants in the Supreme Court of the State of New York, County of New York, on October 26, 2015 (the "Lawsuit").  Black Diamond commenced the Lawsuit by a summary procedure that did not require the preparation of a complaint, but rather only a summons with notice. Black Diamond subsequently filed a complaint.

9.     The Lawsuit was subsequently removed to the U.S. Bankruptcy Court for the Southern District of New York on November 12, 2015, and

transferred to the United States Bankruptcy Court for the Eastern District of

Virginia on April 25, 2016.

10.    VCLF/ERP closed a transaction with Patriot by which it

acquired certain assets and assumed certain liabilities from Patriot on

October 27, 2015.

*The Court's Additional Findings of Fact*

Having adopted the Uncontroverted Facts and considered the evidence

presented at trial, the Court makes the following findings of fact.  Unless

otherwise indicated, citations reference the trial transcripts by date, page,

and line.  Trial exhibits are identified by number.  Docket entries refer to the

docket of the adversary proceeding unless designated as having been

docketed in the Patriot Cases.

The Patriot Cases were filed in this Court on May 12, 2015

(Uncontroverted Facts, ¶ 4).  Patriot's proposed reorganization plan included

selling its profitable working non-union mines and associated equipment,

considered its "core" assets, to Blackhawk Mining, LLC, ("Blackhawk") and

abandoning its "noncore assets" including non-working mines, unionized

mines and nearly all of its environmental and workers' compensation

liabilities.  (Patriot Cases, Dkt. 200, ¶ 5)

Soon after the case was commenced, VCLF expressed an interest in

acquiring Patriot's noncore assets, i.e., those that Blackhawk did not intend

to purchase, including the Federal 2 Mine (a longwall thermal coal mine in

Morgantown, West Virginia), and assuming over $400 million in environmental and employee-related Patriot liabilities.  (Tr. 6/11, 279:17-24, 281:15-282:2).  VCLF, a Virginia nonstock corporation, (Uncontroverted Facts ¶ 2) is a 501(c)(3) charitable organization that is registered as a land trust in the Commonwealth of Virginia.  (Tr. 6/11, 276:22-25)  Its purpose is to protect and conserve land.  (Tr. 6/11, 276:25)  VCLF had prior experience in supporting mining and energy companies with their environmental management and compliance. (Tr. 6/11, 277:4-14)

VCLF's proposal to purchase Patriot's noncore assets and assume environmental and employee-related Patriot liabilities was supported by the Environmental Protection Agency, the Department of Justice, the Department of the Interior and the United Mine Workers of America ("UMWA").  (Tr. 6/11, 282:13-283:5)  As part of its planned acquisition, VCLF agreed that any recovery it might receive on its equity in these assets would be utilized toward environmental remediation.  (Tr. 6/11, 287:19-288:9)

Thomas Clarke ("Clarke") is the chief executive officer of VCLF and is responsible for its day-to-day governance activities.  He directs a management team that oversees land conservation and environmental management.  (Tr. 6/11, 278:8-9, 10-15)  In order to pursue VCLF's proposed transaction with Patriot, Clarke retained Pillsbury Winthrop Shaw Pittman, LLP, ("Pillsbury") as VCLF's legal counsel in May or June 2015 and Teneo

Restructuring ("Teneo") as its investment banker a few weeks thereafter. (Tr. 6/11, 283:9-12, 283:23-284:9)

In July, 2015, Teneo introduced Clarke to Kenneth McCoy ("K. McCoy") and Jason McCoy ("J. McCoy"), who had extensive experience in the coal industry and would add credibility to VCLF's proposal. (Tr. 6/11, 284:10-285:17; Tr. 6/8, 149:10-150:7; Tr. 6/13, 64:19-66:11) On August 5, 2015, Clarke, K. McCoy and J. McCoy met and agreed to become partners to acquire and manage the Federal 2 Mine through ERP. (Tr. 6/8, 152:9-25)

ERP is jointly owned by VCLF and Iron Management, LLC ("Iron Management"). (Ex. 249) K. McCoy is the chief executive officer of ERP and is a member of Iron Management as well. (Tr. 6/13, 67:10-11; Ex. 249 at VCLF-00000006) J. McCoy is a senior vice-president of ERP and is also a member of Iron Management. (Tr. 6/8, 149:1-3; Ex. 249 at VCLF-00000006) Clarke is a managing member of ERP. (Ex. 249 at VCLF-00000006)

VCLF's purchase offer was accepted on August 16, 2015, when VCLF and ERP entered into an asset purchase agreement whereby Patriot would buy certain of Patriot's assets and liabilities, including coal mines and equipment, workers' compensation assets and liabilities, and mine-reclamation assets and liabilities (the "August 16 APA"). (Ex. 15; *see also* Uncontroverted Facts, ¶ 5; Tr. 6/4, 63:20-64:7; Tr. 6/11, 286:17-287:18, 289:10-14) The August 16 APA provided that any of its provisions could be amended or waived to the extent that "such amendment or waiver is in

9

writing and is signed." (Ex. 15 § 12.03(a))  The August 16 APA also provided

that "this Agreement and the sale of the Purchased Assets are subject to

Bankruptcy Court approval." (Ex. 15 § 7.07)  The parties were required to

close on or before January 31, 2016. (Ex. 15 § 11.01 (b))

Under the August 16 APA, VCLF was to purchase the assets and

liabilities associated with the Federal Mine No. 2 and assume "all Workers'

Compensation Liabilities of Sellers or any of their respective Affiliates or any

of their respective predecessors, whenever arising." (Ex. 15 §§ 2.01 & 2.03(f))

The August 16 APA provided that VCLF would acquire Patriot's workers'

compensation liabilities along with rights to the collateral securing those

obligations that had originally been posted in the form of letters of credit

(together with the liabilities, the "W/C Package"). (Ex. 15 §§ 2.01(q), 2.03(f),

2.04(f); Sched. 1.01(a)(vii))  Patriot warranted that the value of the workers'

compensation collateral was $168,995,445 and that the value of the workers'

compensation liabilities was $108,478,658. (Ex. 15 §§ 3.18, 19; Sched.

1.01(a)(vii))  One of the workers' compensation letters of credit included in

the W/C Package under the August 16 APA was a letter of credit issued by

Bank of America for the benefit of Old Republic Insurance Company ("Old

Republic"), in the face amount of $14,805,712 (the "Old Republic L/C"). (Ex.

15, Sched. 1.01(a)(vii))  Pursuant to the August 16 APA, VCLF was to receive

approximately $8 million in cash proceeds from Old Republic's settlement

with Patriot over workers' compensation related liabilities that had been secured by the Old Republic L/C.  (Tr. 6/11, 322:9-20).

The sale of the assets and liabilities described in the August 16 APA was "subject to higher and better bids, including a potential auction."  (Ex. 15, § 5.07(c))  On June 25, 2015, the Court entered a bidding procedures order (the "Bidding Procedures Order") in the Patriot Cases, setting forth procedures for parties to bid on the core and noncore Patriot assets.  (Ex. 333)  Blackhawk was chosen to be the "stalking horse" purchaser for the core Patriot assets.  VCLF was named the "Federal Stalking Horse Bidder," the initial proposed purchaser for the noncore assets, with special stalking horse protections that included a breakup fee in the event it was outbid.  (Ex. FQ)  The Bidding Procedures Order specified that the auctions would occur only "[i]f one or more Qualified Bids (in addition to the Blackhawk Bid and Federal Stalking Horse Bid, if any) are received by the Bid Deadline in connection with either the Blackhawk Sale or the Federal Sale."  (Ex. 333 at 32)

An auction was held on September 21, 2015, in the Patriot Cases at the offices of its counsel.  VCLF attended the auction but did not bid on the core assets.  There were no other qualified bidders for the noncore assets being purchased by VCLF.  (Tr. 6/11, 307:25-308:13; 308:14-16)  Accordingly, VCLF remained the purchaser of Patriot's noncore assets.

The August 16 APA was terminable to the extent that VCLF did not

"demonstrate[] the financial wherewithal to own and operate the Purchased

Assets and perform the Assumed Liabilities, as demonstrated by one or more

written, binding commitments for equity and debt financing, on or prior to

October 9, 2015."  (Ex. 15, § 11.01(m))  Patriot's obligation to close the

transaction was also contingent on VCLF's "obtain[ing] sufficient financing

and/or credit support . . . to consummate the transactions contemplated [by

the August 16 APA]."  (Ex 15, § 10.03(g))  Accordingly, between July and

September 2015, VCLF, through its financial advisor Teneo, tried to obtain

third-party financing to enable it to consummate the VCLF-Patriot

transaction and provide working capital for the Federal 2 Mine after closing.

(Tr. 6/11, 109:15-17)

Black Diamond was the only investor to come forward and offer a term

sheet to provide financing for VCLF to close on its transaction with Patriot.

(Tr. 6/11, 115:19-24)  Black Diamond, which originates and administers

loans, (Tr. 6/4, 57:17-23), is an affiliate of Black Diamond Capital

Management, an asset management firm that manages different types of

financial vehicles, including a hedge fund and a distressed private equity

fund.  (Tr. 6/4, 57:19-20, 56:15-22)

Prior to the commencement of the Patriot Cases, Black Diamond had

been part of a syndicate of lenders to Patriot, through a "Letter of Credit

Facility."  (Tr. 6/4, 59:18-19; Tr. 6/8, 15:2-10)  In this capacity, Black Diamond

had undertaken extensive diligence and obtained confidential information

regarding the Patriot assets, including the Federal 2 Mine.  (Ehrlich Dep.

Tr.[9] 46:22-47:10, 48:13-49:7, 49:10-50:3, 50:13-51:10, 51:18-52:4)  Black

Diamond's membership in the Letter of Credit Facility also afforded it

knowledge regarding the W/C Package.

On Sunday, September 13, 2015, a meeting was held in Teneo's offices

to discuss a possible financing deal between and among VCLF, ERP, and

Black Diamond.  (Ex. 314; Ex. 315; Tr. 6/4, 74:7-9; 74:19-22; Tr. 6/11, 124:24-

125:4)  During the course of the meeting, the parties engaged in substantive

discussions about VCLF and ERP's business plan, including their plan for

developing the Federal Mine.  (Tr. 6/8, 10:4-14; Tr. 6/11, 125:21-25)  The

parties also discussed the nature of Black Diamond's business.  (Tr. 6/8, 10:4-

8)  Black Diamond had experience with mining and mining assets but was

particularly interested in the W/C Package.  (Tr. 6/4, 64:8-12)  Black

Diamond had determined that there was value in the W/C Package and

wanted to obtain an ownership interest in it.  (Tr. 6/8, 14:13-16)

Black Diamond's attorney, Adam Harris ("Harris"), was instructed by

Black Diamond to draft a commitment letter on Sunday, September 20, 2015.

(Tr. 6/5, 138:12-22)  Harris drafted a commitment letter (Tr. 6/5, 37:25-38:1)

and, later on September 20, 2015, it was e-mailed to Clarke.  This was the

---

[9] The citation convention "[name] Dep. Tr.," as used herein, refers to the designated
deposition testimony admitted into evidence in this adversary proceeding by
agreement of the Parties.  *See* Stip. Entering into Evid. Unopposed Dep.
Designations & Counter-Designations, Dkt. 396.

only pre-execution draft of the Commitment Letter. There were no negotiations with Clarke, Pillsbury or anyone else on the VCLF team regarding the terms of the Commitment Letter, other than brief, in-person conversations the following morning. (Tr. 6/5, 228:2-12; Tr. 6/11, 267:8-15) There were no significant changes made to the Commitment Letter between the September 20, 2015, e-mailed draft and the final executed version. (*Compare* Ex. N (draft commitment letter) with Ex. 40 (final Commitment Letter))

Black Diamond, VCLF, and ERP executed the Commitment Letter on September 21, 2015. (Ex. 40 at BDCF-00028161) The Commitment Letter is a five-page letter agreement and includes its own Exhibit A summarizing "principal terms and conditions." Deckoff signed the Commitment Letter on behalf of Black Diamond, and Clarke signed on behalf of VCLF and ERP. (Ex. 40 at BDCF-00028161) By signing the Commitment Letter, Black Diamond agreed "to provide VCLF with asset-based loans and/or term loans in the aggregate principal amount of $25,000,000.00," subject to the conditions set forth in the Commitment Letter. (Ex. 40 at BDCF-00028157)

The Commitment Letter is the contract upon which this action is based. The purpose of the Commitment was "(a) paying certain fees, costs and expenses in connection with the consummation of the transactions contemplated by the VCLF APA, and (b) providing VCLF with working capital from and after the consummation of such transactions." (Ex. 40 at

BDCF-00028157)  Pursuant to the Commitment Letter, in exchange for the loan, Black Diamond was to receive loan payments, including interest, and equity interests (the "Equity Interests") in companies to be formed by VCLF and ERP for the purpose of acquiring and holding the Federal Mine and W/C Package.  (Ex. 40 at BDCF-00028163-64 & BDCF-00028166)  It was understood by the parties that Black Diamond would fund $10 million of the term loan at closing.  (Tr. 6/11, 343:20-21; Tr. 6/12, 24:2-5; Tr. 6/5, 83:13-19; 135:3-5)  It was also understood that despite the inclusion of certain non-solicitation provisions in the Commitment Letter, VCLF would potentially use other sources of funding for items such as pre-closing expenses.  (Tr. 6/5, 146:24-147:2)

Black Diamond's financing commitment related solely to the transaction set forth in the "VCLF APA," which was defined as the August 16 APA "as amended, modified or supplemented prior to the date hereof [September 21, 2015]."  (Ex. 40 at BDCF-00028157)  If VCLF and Patriot materially modified the August 16 APA after September 21, 2015, Black Diamond would not be required to fund the transaction set forth in that modified agreement because Black Diamond's performance under the Commitment Letter was expressly conditioned on the consummation of the transaction described in the August 16 APA, as amended *before* September 21.  (Ex. 40 at BDCF-00028158)  The Commitment Letter stated that "[t]he Commitment and other undertakings hereunder are subject to . . . the entry

of a final, non-appealable order of the United States Bankruptcy Court for

the Eastern District of Virginia, Richmond Division, authorizing and

approving the VCLF APA."[10]  (Ex. 40 at BDCF-00028158)  The Commitment

Letter was further conditioned on "the approval and consummation of a

transaction for the Excluded Assets (as defined in the VCLF APA) in form

and substance acceptable to Lender."  (Ex. 40 at BDCF-00028164)  The

Commitment Letter contained other conditions, including: (a) "the

simultaneous consummation of the transactions contemplated by the VCLF

APA"; (b) "the absence of any event or circumstance that has had or is

reasonably likely to have a material adverse effect on VCLF"; and (c) the

"completion of Lender's business and legal due diligence."  (Ex. 40 at BDCF-

00028158, 164)

The Commitment Letter specified that the "consideration" for Black

Diamond's execution and delivery of the Commitment Letter was a portion of

a "break-up fee" that VCLF would be paid by Patriot if Patriot did not sell the

noncore assets to VCLF:[11]

---

[10] As defined in the Commitment Letter.

[11] *See* Ex. 15 § 11.02(b) (if "this Agreement is terminated," and Patriot consummates
an "Alternative Transaction," then Patriot shall pay to VCLF the "Break-Up Fee by
wire transfer of immediately available funds concurrently with the consummation of
such Alternative Transaction"); *id*. § 1.01(a) (defining "Alternative Transaction" as
"(i) the filing of a plan of reorganization contemplating the sale or retention of all or
any material portion of the Purchased Assets that is inconsistent with the terms of
this Agreement or (ii) a sale, lease or other disposition directly or indirectly by
merger, consolidation, tender offer, share exchange or otherwise to one or more third
parties of all or any material portion of the Purchased Assets (whether in one or a
series of transactions)").

> VCLF has advised that pursuant to an order of the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, VCLF is entitled to payment of a "break up fee" and expense reimbursement from Patriot Coal Corporation under certain circumstances.  By its execution of this Commitment letter, VCLF agrees that in the event it is entitled to receive payment of the break up fee, it will remit fifty percent (50%) of the amounts so received to Black Diamond.   In addition, in the event VCLF is entitled to receive payment of any expense reimbursement, it will remit to Black Diamond its ratable share of the amount so received.   The payments to Black Diamond hereunder shall be consideration for Black Diamond's execution and delivery of this Commitment.

(Ex. 40 at BDCF-00028158-59)  Nowhere else in the Commitment Letter is there a reference to any consideration that would be owed by VCLF in exchange for Black Diamond's delivery of the Commitment Letter, nor is there any other document or communication memorializing or evidencing an agreement by VCLF to pay any additional consideration to Black Diamond in exchange for delivery of the Commitment Letter.

Exhibit A attached to and made a part of the Commitment Letter provides that upon the "Closing Date," (defined as the date of the "initial funding" of the Senior Secured Facilities (Ex. 40 at BDCF-00028162)) and as part of the consummation of the financing transaction contemplated by the Commitment Letter, VCLF would convey the Equity Interests to Black Diamond.

> Equity Interests:   On the Closing Date, Borrowers shall create a new intermediate holding company to acquire a 75% interest in ERP Federal Mining

17

Complex, LLC (the entity that owns (or will own) the assets and liabilities associated with the Federal Mine Complex; ("Federal Intermediate HoldCo"). Black Diamond shall receive equity in Federal Intermediate HoldCo representing a 40% interest on a fully diluted basis.

In addition, on the Closing Date Borrowers[12] shall create a new entity to acquire the assets and liabilities associated with the workers' compensation programs currently administered by Patriot Coal Corporation and its affiliates ("HealthCo"). Black Diamond shall receive equity in HealthCo representing a 90% interest on a fully diluted basis.

Ex. 40 at BDCF-00028166.

The Commitment Letter also included the following non-solicitation and exclusivity provisions (the "Non-Solicitation Provisions") intended to prevent VCLF from seeking alternative acquisition financing or excluding Black Diamond in connection with the August 16 APA:

VCLF hereby acknowledges and agrees that upon acceptance of this Commitment it shall not solicit or accept an offer by any person other than Black Diamond of any debt or equity financing for the purpose of facilitating in any manner the consummation of the transactions contemplated by the VCLF APA. In addition, VCLF acknowledges and agrees that it shall not submit or pursue any offer for all or any material portion of the Purchased Assets (as defined in the VCLF APA) in conjunction with any other person or entity other than Black Diamond and its affiliates, or that does not provide for the receipt by Black Diamond of the Equity Interests contemplated by the Term Sheet.

Ex. 40, at BDCF-00028159).

---

[12] Defined therein as VCLF.

After consummation of the anticipated transaction, VCLF would be
entitled to pay off Black Diamond's loan at any time before its three-year
maturity, without premium or penalty.  The Commitment Letter provided:

> Optional Prepayments:  The  Borrower  may
> voluntarily prepay Term Loans (together with
> accrued but unpaid interest thereon) under the
> Term Loan Facility in whole or in part at any time
> and  from  time  to  time  (subject  to  minimum
> thresholds  as  set  forth  in  the  Loan  Facility
> Documentation) without premium or penalty.  Any
> amounts  prepaid  under  the  Term  Loan  Facility
> may not be reborrowed.

Ex. 40 at BDCF-00028164.

The Commitment Letter explicitly required any modifications or

amendments to be in writing in order to be effective, specifying that it "may

not be amended or any provision hereof waived or modified except by an

instrument in writing signed by the party against whom enforcement of the

same is sought."  (Ex. 40 at BDCF-00028160)  This requirement was

understood, acknowledged, and honored by the parties during the course of

their dealings.  On the only occasion upon which the parties agreed to a

modification, on October 7, 2015, they amended the Commitment Letter in a

signed writing to extend its termination date from October 8 until November

9, 2015.  (Ex. 53; Ex. AG; Tr. 6/4, 88:14-89:5; Tr. 6/5, 192:7-193:4; Tr. 6/11,

340:24-341:4; Tr. 6/12, 90:21-91:4)[13]  Other than the extension of the

termination date, the Commitment Letter was never modified and no

---

[13] The parties effected this modification by email.  (Tr. 6/4, 88:14-19; Tr. 6/11,
340:24-341:4; Tr. 6/12, 90:21-91:4; Ex. 53)

provision of the Commitment Letter was ever waived.  (Tr. 6/5, 210:2-8; Tr. 6/11, 341:5-11; *see also* Answer & Counterclaim, Dkt. 3, p. 30, ¶ 48.

On September 21, 2015, the same day that VCLF and Black Diamond executed the Commitment Letter, Patriot filed a motion seeking approval of a settlement agreement between Patriot and Old Republic, which had issued the Old Republic L/C to secure certain of Patriot's workers' compensation liabilities.  (Ex. 41)  Pursuant to the agreement, Old Republic agreed to cover these workers' compensation liabilities and return $8,060,310.80 in surplus collateral to Patriot.  (Ex 41, ¶ 10)  The Bankruptcy Court entered an order approving the settlement agreement on October 13, 2015.  (Ex. 65)  Under the terms of the August 16 APA, VCLF was entitled to this surplus collateral. (Ex. 15, § 2.01(q), Sched. 1.01(a)(vii)); Tr. 6/11, 322:15-20)  The confirmation order entered by the Court in the Patriot Cases (the "Confirmation Order"), however, conveyed these funds to Patriot, thus divesting VCLF of over $8 million in proceeds at closing.  (Ex. 334 at 62 ¶ 159)  The Confirmation Order, in effect, substantially modified the August 16 APA.

The diversion of the Old Republic proceeds from VCLF to Patriot was presented to VCLF by Patriot as a measure necessary to obtain confirmation of Patriot's Plan, due to Patriot's continuously deteriorating cash position. VCLF agreed to relinquish the proceeds in order to confirm the Plan.  (Tr. 6/11, 322:13-323:16).  VCLF understood that without this modification, it

would not be able to accomplish the transaction with Patriot.  (Tr. 6/7, 216:12-25)

Additional changes to the August 16 APA took place after the Commitment Letter was signed.  Under the August 16 APA, Patriot agreed to provide VCLF and ERP with ten days' worth of coal inventory.  (Ex. 15, § 5.01(iv); Tr. 6/4, 179:25-180:16)  Patriot subsequently informed VCLF that it would not provide ten days' worth of inventory but, instead, would deliver substantially less coal inventory at closing.  (Ex. 360; Tr. 6/4, 183:8-185:10) This change would significantly reduce VCLF's liquidity.  (Tr. 6/4, 182:4-9)

It was also discovered that VCLF would be responsible for a longwall move that was originally scheduled to be completed by Patriot in September 2015.  (Tr. 6/4, 187:8-20; Tr. 6/8, 28:9-29:4)  Patriot had slowed production at the Federal Mine so that the longwall move would not be completed until after Patriot and VCLF's planned closing date.  (Ex. 56; Ex. 59; Tr. 6/4, 187:8-20; Tr. 6/8, 113:1-24; Tr. 6/13, 132:21-23)  The effect of this delay was to shift responsibility for, and the substantial expense associated with, the longwall move from Patriot to VCLF, which would further reduce VCLF's profitability. (Tr. 6/4, 187:16-20; Tr. 6/8, 28:11-29:4)

The parties also learned that VCLF's mining plan interfered with property owned by the Bula Baptist Church, which sat atop the Federal Mine.  (Tr. 6/4, 189:1-18; Tr. 6/8, 29:5-9) Patriot did not have a contract with Bula Baptist Church, meaning that VCLF would need to purchase or pay for

the relocation of the church in order to effectively mine the coal, an additional expense not anticipated when the August 16 APA was executed.  (Tr. 6/4, 189:1-18; Tr. 6/8, 29:5-9; Tr. 6/13, 80:10-15; 81:20-23)

The Confirmation Order approved a transaction called the "VCLF APA" that was defined as "the transaction contemplated by the asset purchase agreement among the Debtors and Virginia Conservation Legacy Fund and its affiliate (collectively, 'VCLF'), whereby VCLF agreed to acquire certain assets and assume certain liabilities excluded from the Blackhawk Transaction  . . . as amended, supplemented, or modified from time to time . . . ."  (Ex. 334 at ¶¶ 26, 12, 122)  The Commitment Letter, by contrast, defined the "VCLF APA" as the August 16 APA "as amended, modified or supplemented prior to the date hereof [September 21, 2015]."  (Ex. 40 at BDCF-00028157)  The changes to the transaction put in place after September 21, 2015, were included in the VCLF APA approved by the Court; thus, the Confirmation Order substantially modified the August 16 APA as it existed on September 21, 2015.  (Tr. 6/4, 195:16-23; Tr. 6/5, 235:3-7; Tr. 6/7, 197:2-22; Ex. 334)

Between September 21 and October 23, 2015, representatives of VCLF sought only two kinds of financing, neither of which consisted of closing or acquisition financing that would replace Black Diamond's Commitment—(i) post-closing inventory financing from Mercuria Energy Group ("Mercuria"), which was the subject of discussions between J. McCoy and Michael Loreman

of Mercuria beginning on or about October 13, 2015 (which could be used to refinance the Black Diamond debt after the transaction took place), and (ii) small personal loans to J. McCoy to defray certain pre-closing diligence and administrative costs for the Federal 2 Mine.  (Ex. AT; Loreman Dep. Tr. 117:17-20, 117:22; Tr. 6/11, 319:2-14, 328:13-25; Tr. 6/8, 264:19-265:13)

After the substantial changes were made to the August 16 APA and numerous circumstances having a material adverse effect on VCLA occurred, Black Diamond and VCLF attempted, without success, to negotiate mutually acceptable amendments to the Commitment Letter.  As part of these negotiations, Black Diamond proposed changes to VCLF's modified asset purchase agreement with Patriot.  (Ex. 289; Tr. 6/4, 203:21-204:10; 204:14-205:7; Tr. 6/12, 99:6-12)  VCLF submitted a revised draft of the modified asset purchase agreement incorporating Black Diamond's requirements to Patriot on October 21, 2015.  (PX 289; Tr. 6/4, 210:25-211:2; Tr. 6/7, 112:12-17)  On October 22, 2015, Patriot rejected Black Diamond's proposed changes.  (Ex. 304; DX BF; Tr. 6/4, 210:23-24; Tr. 6/5, 159:25-160:4; Tr. 6/7, 113:16-22)  Patriot, VCLF, and Black Diamond never agreed on a modified asset purchase agreement.  (Tr. 6/4, 231:2-8; Tr. 6/5, 152:16-153:1; Tr. 6/12, 86:1-16)

Black Diamond and VCLF engaged in further discussions and exchanged emails on October 22 and 23 regarding the terms on which Black Diamond would finance the VCLF-Patriot transaction.  However, no

agreement was reached between Black Diamond and VCLF, either verbally

or in writing, to amend the Commitment Letter or enter into a new

agreement. By the evening of October 23, 2015, Black Diamond and VCLF

had ceased negotiations, and it was apparent that the Patriot-VCLF

transaction would not be financed by Black Diamond.

On October 24, 2015, VCLF reached agreements in principle with

Patriot and the UMWA to enable it to close the VCLF-Patriot transaction.

(Ex. 175; Ex. 301; Ex. 221; Tr. 6/12, 97:12-17)  VCLF was able to complete the

transaction by obtaining a $1 million coal inventory true-up from Patriot and

the return of a  $10 million UMWA equity investment that VCLF had

previously relinquished to Patriot during Patriot's confirmation hearing ($5

million of which would have to be repaid to Patriot).  (Tr. 6/12, 31:17-32:17)

On October 27, 2015, VCLF and Patriot completed the VCLF-Patriot

transaction.  (Ex. 388, Tr. 6/11, 309:18-19)  Black Diamond did not provide

any funding for the transaction or otherwise participate, and VCLF did not

convey an interest in the purchased assets to Black Diamond.  (Tr. 6/5, 128:1-

7; 181:14-25)

## CONCLUSIONS OF LAW[14]

### *Governing Law*

The Commitment Letter, by its terms, "shall be governed by, and

construed in accordance with, the laws of the State of New York."  Ex. 40 at

---

[14] To the extent any finding of fact shall be determined to be a conclusion of law, it
shall be so deemed, and to the extent any conclusion of law shall be determined to be
a finding of fact, it shall be so deemed.

BDCF-00028160; *see also Remand Opinion,* 2016 WL 5360950, at *4 (the

Commitment Letter "contains a choice of law provision requiring it to be

interpreted in accordance with New York law"); *McPike v. Zero-Gravity*

*Holdings, Inc.*, 280 F. Supp. 3d 800, 806 n.5 (E.D. Va. 2017) ("Under Virginia

law, contractual choice-of-law provisions are dispositive on the question of

what substantive law applies to a given cause of action.").  Accordingly, New

York law governs both Black Diamond's claim and VCLF's counterclaim,

since both actions are based on alleged breaches of the Commitment Letter.

### *Elements of Breach of Contract and Burden of Proof*

The elements of an action for breach of contract in New York are:

"(1) formation of a contract between plaintiff and defendant; (2) performance

by plaintiff; (3) defendant's failure to perform; and (4) resulting damage."

*Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009)

(quoting *Hecht v. Components Int'l, Inc.*, 22 Misc. 3d 360, 364, 867 N.Y.S.2d

889, 895 (N.Y. Sup. Ct. 2008)); *see also Nat'l Mkt. Share, Inc. v. Sterling Nat'l*

*Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ( "[T]o establish a prima facie case for

breach of contract [under New York law], a plaintiff must plead and prove:

(1) the existence of a contract; (2) a breach of that contract; *and* (3) damages

resulting from the breach.") (emphasis added);  *Paxi, LLC v. Shiseido Ams.*

*Corp.*, 636 F. Supp. 2d 275, 281-82 (S.D.N.Y. 2009).  Here, if it is to establish

that VCLF breached the Commitment Letter, Black Diamond must

demonstrate that it performed and that VCLF failed to perform pursuant to

the terms of the Commitment Letter. VCLF must prove the opposite in order to succeed in its counterclaim that Black Diamond breached the terms of the Commitment Letter — that VCLF performed and that Black Diamond failed to perform pursuant to the terms of the Commitment Letter.

To prevail on a breach of contract claim under New York law, a plaintiff "has the burden of proving his case by a fair preponderance of the credible evidence." *Rinaldi & Sons, Inc. v. Wells Fargo Alarm Serv., Inc.*, 347 N.E.2d 618, 620 (N.Y. 1976); *accord Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("[W]e presume that [the preponderance of the evidence] standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake." (quotation omitted)). Thus, Black Diamond must prove by a preponderance of the evidence that VCLF breached the Commitment Letter in order to prevail on its claim, and VCLF must prove by a preponderance of the evidence that Black Diamond breached the Commitment Letter in order to prevail on its counterclaim.

Establishing a fact by a preponderance of the evidence means proving that the fact is more likely than not to have occurred. *In re Beautisha B.*, 982 N.Y.S.2d 351, 352 (N.Y. App. Div. 2014); *see also United States v. Mandanici*, 205 F.3d 519, 532 (2d Cir. 2000) ("A preponderance means more likely than not."). If the evidence proffered by the plaintiff and defendant at trial is evenly balanced, then the plaintiff has not met its burden. *300 E. 34th St. Co. v. Habeeb*, 683 N.Y.S.2d 175, 178 (N.Y. App. Div. 1997); *see also Rinaldi*

& *Sons*, 39 N.Y.2d at 196 ("If, at the close of the proofs, the evidence as a

matter of logical necessity is equally balanced, plaintiff has failed to meet his

burden and the cause of action is not made out.").

Under New York law,[15] ambiguities in a contract are construed against

the drafter. *SSP Capital Partners, LLC v. Mandala, LLC*, 715 F. Supp. 2d

443, 447 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 572 (2d Cir. 2010); *see also Natt*

*v. White Sands Condominium*, 943 N.Y.S.2d 231, 232-33 (N.Y. App. Div.

2012). Contract language is ambiguous if it is "reasonably susceptible of

more than one interpretation"[16] and "there is nothing to indicate which

meaning is intended, or where there is contradictory or necessarily

inconsistent language in different portions of the instrument."[17] *Id.* An

ambiguous contract is "subject to the rule invoking strict construction of the

contract in the light most favorable to the nondrafting party." *Id.* at 233.

The Commitment Letter was drafted by Harris, Black Diamond's counsel.

Therefore, to the extent there are any ambiguities in the language of the

Commitment Letter (i.e, where different interpretations may be gleaned), the

language must be construed in the light most favorable to VCLF.[18]

---

[15] The Court's treatment of any ambiguities in the Commitment Letter is
determined by application of New York law, the parties' chosen law. Ex. 40 at
BDCF-00028160; *Black Diamond*, 2016 WL 5360950, at *4; *see generally Audio
MPEG, Inc. v. Dell Inc.*, 272 F. Supp. 3d 813, 823 (E.D. Va. 2017) (resolving
contractual ambiguities under New York law when the parties had agreed that the
contract would be governed by New York law).

[16] Quoting *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 233(N.Y. 1986).

[17] Quoting *Travelers Ins. Co. v. Castro*, 341 F.2d 882, 884 (1st Cir. 1965).

[18] Neither party presented evidence of any significant negotiations that took place
between the delivery of the initial draft by Black Diamond's counsel and the

*The Commitment Letter*

The Commitment Letter is the product of VCLF's desire to obtain the financing necessary to enable it to consummate its transaction with Patriot and of Black Diamond's desire to receive interest on its loans and an equity stake in the assets being acquired by VCLF.  When the Commitment Letter was executed, VCLF had been designated the stalking horse purchaser for Patriot's noncore assets.  As the stalking horse purchaser under the August 16 APA, if VCLF were to be outbid by another bidder, it would have been entitled to receive a breakup fee.  VCLF was willing to share the breakup fee with Black Diamond in exchange for its loan commitment.  The parties contemplated that the alternative to VCLF's being outbid was that it would consummate the transaction, with Black Diamond providing the financing and, in exchange for doing so, sharing ownership of the acquired assets with VCLF.

In order to prevent VCLF from "shopping" the loan commitment in an effort to secure more favorable financing, the parties agreed to an exclusivity provision under which Black Diamond would be entitled to the Equity Interests if its failure to provide the loan resulted solely from VCLF's having breached its obligations.  The Commitment Letter explicitly stated that Black Diamond's commitment was based on the August 16 APA. Were the terms of the transaction to change materially, Black Diamond would no longer be

---

execution of the final version, and there were no material changes to the initial draft before its execution.

obligated to provide the loan.  However, if Black Diamond chose not to

finance the transaction because the transaction had materially changed for

reasons unrelated to a breach by VCLF, then VCLF would no longer be

obligated to convey an interest in the purchased assets to Black Diamond.

This understanding was memorialized in the Commitment Letter.  The

Commitment Letter was executed by both parties and is a valid and

enforceable contract.

*Consideration for the loan commitment did not include a
transfer of the Equity Interests*

The Commitment Letter expressly provides that "[t]he payments to

Black Diamond hereunder [*i.e.*, 50% of the breakup fee] shall be consideration

for Black Diamond's execution and delivery of this Commitment." (Ex. 40 at

BDCF-00028159)  This is the *only* consideration for Black Diamond's

execution and delivery of the Commitment Letter that was expressly

identified.  Nowhere does the Commitment Letter state that Black Diamond's

receipt of the Equity Interests constitutes further consideration for Black

Diamond's execution and delivery of the Commitment Letter.  If that had

been the intent of the parties, then presumably it would have been

specifically stated as well.  It follows that VCLF's contention that it did not

agree to convey the Equity Interests to Black Diamond as consideration for

Black Diamond's execution and delivery of the Commitment Letter is the

correct interpretation of the Commitment Letter.  To the extent that the

Commitment Letter may be interpreted to provide otherwise, it is, at best,

ambiguous and must be strictly construed in the light most favorable to

VCLF, the nondrafting party.

Black Diamond is not entitled to receive the Equity Interests solely in

exchange for delivering the Commitment Letter.  Moreover, since VCLF did

not receive the breakup fee, no consideration is due to Black Diamond in

exchange for delivering the Commitment Letter.[19]

### VCLF Did Not Violate the Non-Solicitation Provisions

The Commitment Letter prohibited VCLF from soliciting alternative

financing to replace the closing financing that Black Diamond was to provide,

but it did not prohibit VCLF from seeking "take-out" financing that would be

extended by a different lender after closing in order to pay off Black

Diamond's loan before maturity, nor was VCLF prohibited from using other

sources to fund miscellaneous expenses in connection with the transaction.

The purpose of the Non-Solicitation Provisions was to prevent VCLF from

replacing Black Diamond as its "partner,"[20] the source of financing needed to

---

[19] The Court rejects Black Diamond's contention that VCLF needed the Commitment
Letter to be in place on or before September 21, 2015, for purposes of participating in
the auction or otherwise.  Neither the language of the Commitment Letter nor the
weight of the evidence supports this contention.  Furthermore, even if Black
Diamond's contention were to be correct, the provisions of the Commitment Letter
addressing the agreed upon consideration govern, and under these provisions Black
Diamond is not entitled to the Equity Interests.

[20] Clarke characterized the relationship with Black Diamond as "the perfect
partnership."  (Tr. 6/11, 314:23-315:3)  K. McCoy stated:  "you're [Black Diamond]
now our partner.  We –we won't – we won't shop this.  You know, you're our one and
only."  (Tr. 6/13, 84:9-19).  J. McCoy:  "[W]e had a group [Black Diamond] who was
going to – could give us a twenty-five million dollar commitment.  The coal market
was a tough market, and the fact that they were going to step in with us and be
partners with us on this project, that meant a lot to me . . . .  I trust them.  These are
my partners."  (Tr. 6/8, 186:18-187:6)  This testimony, which the Court finds

acquire the noncore assets from Patriot, thereby depriving Black Diamond of the benefit of the interest it would earn on the loans and the Equity Interests it would acquire at closing.

### Non-Solicitation

The Commitment Letter provides that VCLF agrees that it will not solicit or accept "debt or equity financing" other than from Black Diamond. The Court interprets this phrase to mean what the parties intended, as described by VCLF's witnesses, — that VCLF would not solicit or accept financing for the purpose of replacing the financing contemplated in the Commitment Letter. The parties agreed that post-closing inventory financing by VCLF and small loans that might be obtained by a member of VCLF in order to deal with pre-closing expenses were permitted so long as the loans were not intended to replace the financing described in the Commitment Letter.

Under the terms of the Commitment Letter, VCLF had the right to "voluntarily prepay the Term Loans (together with accrued but unpaid interest thereon) under the Term Loan Facility, in whole or in part at any time and from time to time (subject to minimum thresholds as set forth in the Loan Facility Documentation) without premium or penalty." (Ex. 40 at BDCF-00028164). The discussions with Mercuria were for the purpose of replacing Black Diamond's loan *after* the transaction had occurred and were

---

particularly credible, illustrates the intention of the parties at the time the Commitment Letter was executed.

not an attempt to secure financing to replace Black Diamond as the source of

financing to consummate the transaction with Patriot.  Interpreting the

language to mean that VCLF could not solicit financing of *any* kind would be

contrary to the parties' understanding that VCLF was not prohibited from

seeking post-closing financing intended to prepay Black Diamond.

Similarly, J. McCoy's attempts to obtain small loans to cover personal

expenses being incurred pre-closing were not prohibited under the

Commitment Letter.  Those loans were not intended to replace Black

Diamond as the transaction lender or to change the terms of Black Diamond's

deal, nor could they have done so.  Black Diamond's contention that the

exclusivity language was meant to prohibit VCLF from arranging any

additional financing that might be necessary in order to prepare for closing

cannot be reconciled with the mutual goal of successfully consummating the

transaction with Patriot.

VCLF did not solicit financing for the purpose of replacing Black

Diamond.  The only evidence that VCLF approached other sources of

financing after execution of the Commitment Letter and before October 23,

2015, involves Mercuria and the small loans that were sought by J. McCoy.

None of these potential sources of funding contemplated debt or equity

financing intended for the purpose of financing the purchase of Patriot's

noncore assets without Black Diamond's loans.

It is also significant that neither the Mercuria financing nor the loans sought by J. McCoy were obtained.  Even if VCLF's communications were in violation of the Commitment Letter's exclusivity provision, which they were not, Black Diamond has failed to establish a causal connection between this alleged breach and its alleged damages.

## Exclusivity

The Confirmation Order was entered on October 9, 2015.  The Confirmation Order approved a materially modified version of the August 16 APA.  In addition, the parties had become aware of circumstances arising after execution of the Commitment Letter that would have a material adverse effect on VCLF's post-closing operations, including the reduction in the amount of coal inventory to be delivered at closing, responsibility for a longwall move being shifted to VCLF, and the addition of the expense associated with relocating Bula Baptist Church.  As of October 9, 2015, but certainly no later than October 22, 2015, Black Diamond was aware that the transaction described in the August 16 APA, as contemplated in the Commitment Letter, would not take place.  Pursuant to the terms of the Commitment Letter, Black Diamond had no obligation to finance the modified transaction.

No later than October 22, 2015, Black Diamond made it known to VCLF that the conditions under which it was obligated to provide the agreed-upon loan no longer existed and, consequently, it would not provide financing

on the terms set forth in the Commitment Letter.  Although Black Diamond

remained willing to attempt to negotiate alternative financing terms in

conjunction with changes it proposed to the modified asset purchase

agreement between VCLF and Patriot, the parties were unable to come to

any agreement, either verbally or in writing.  By October 23, 2015, it was

apparent to both parties that no agreement would be reached.  VCLF was

also aware that it would be unable to consummate its transaction with

Patriot unless it was able to find sources of funding other than Black

Diamond.  It was not until that time that VCLF began seeking a replacement

for Black Diamond's financing that would enable it to complete its

transaction with Patriot.

The relationship between the parties, their conduct, and the attendant

circumstances that existed on October 23 unequivocally establish that

neither party considered itself to be further bound by the Commitment

Letter. Out of its desire to obtain the Equity Interests, Black Diamond sought

the agreement of VCLF and Patriot to new terms under which Black

Diamond would agree to provide financing.  Hoping to receive the financing it

needed to consummate the transaction with Patriot, including $10 million in

cash to be funded at closing, VCLF sought to convince Black Diamond to

agree to loan terms similar to the terms contemplated under the original

transaction.  Neither party was willing to accept the other's new terms but,

more importantly, each of the parties' actions was inconsistent with an intent

to be further bound by the stated terms of the Commitment Letter.  Under these facts, the obligations of the Commitment Letter terminated.  *See Rothko v. Reis (In re Estate of Rothko),* 372 N.E.2d 291, 299 (N.Y. 1977) (the question of whether a contract has been cancelled by mutual agreement is generally a question of fact); *In re Schanzer v. Herz (In re Schanzer's Estate),* 182 N.Y.S.2d 475, 479 (N.Y. App. Div. 1959), *aff'd sub nom. In re Schanzer's Estate,* 8 N.Y. 2d 972 (1960); Restatement, (Second) of Contracts § 283, cmt. a ("an agreement of rescission may be inferred from conduct").

The Commitment Letter having terminated no later than October 23, 2015, the parties were released from its provisions.  It was not until that point that VCLF initiated discussions with Patriot and the UMWA, enabling it to close with pursuant to agreements it reached with them.  Accordingly, VCLF did not breach the Non-Solicitation Provisions.

### *VCLF Did Not Breach the Commitment Letter*

The purpose of Black Diamond's loan commitment was to "(a) [pay] certain fees, costs and expenses in connection with the consummation of the transactions contemplated by the VCLF APA, and (b) [provide] VCLF with working capital from and after the consummation of such transaction."  (Ex. 40 at BDCF-00028157)  Black Diamond "commit[ted] to provide VCLF with asset based loans and/or term loans in the aggregate principal amount of $25,000,000. . . ."  (*Id.*)  In short, Black Diamond agreed to lend VCLF the funds necessary to enable it to complete its transaction with Patriot.

Financing the transaction was the consideration VCLF was to receive from

Black Diamond under the terms of the Commitment Letter.

In exchange for the financing, VCLF was obligated to pay back the

loans with interest and convey the Equity Interests on the "closing date"

(defined as the date of the "initial funding" of the loan).  (Ex. 40)  Clearly,

funding the loans was a condition precedent to Black Diamond's obtaining

the Equity Interests.

The Commitment Letter provided that "[t]he Commitment and other

undertakings hereunder" were subject to various other conditions, few of

which, if any, were demonstrated at trial to have been satisfied.  Due to the

failure of these conditions,[21] Black Diamond had no obligation to finance

VCLF's acquisition and VCLF had no obligation to accept financing from

Black Diamond on whatever modified terms Black Diamond might have been

willing to lend.[22]

---

[21] There was no evidence offered to suggest that VCLF orchestrated changes to the
August 16 APA in order to manipulate the termination of the Commitment Letter.
Therefore, VCLF is not prevented from relying on the failure of these conditions,
including the condition that Black Diamond provide financing. *See W. Alton Jones
Found. v. Chevron U.S.A. Inc. (In re Gulf Oil/Cities Service Tender Offer Litig.),* 725
F. Supp. 712, 737 n.9 (S.D.N.Y. 1989) ("The prevention doctrine is an exception to
the general rule that one has no duty to perform under a contract containing a
condition precedent until the condition occurs.  The doctrine excuses a condition
precedent when a party wrongfully prevents that condition from occurring.").
[22] The Commitment Letter did not provide that the conditions were enforceable only
by Black Diamond, and it is not evident from the nature of most of these conditions
that they were intended to be enforceable only by Black Diamond.  In light of Black
Diamond's having drafted the Commitment Letter without specifying either party's
enforcement or waiver rights, the Court finds that the conditions are equally
enforceable by either party.

Black Diamond's entitlement to the benefits due in exchange for providing financing to VCLF was subject to the condition that the loan be consummated or, as stated in the contract, that Black Diamond provide the "initial funding." Funding, which was to be the event giving rise to VCLF's duty to deliver the consideration due to Black Diamond, did not occur. Therefore, VCLF is not obligated to Black Diamond. *Comptroller General of Bolivia ex rel. Bolivian Airforce v. Int'l Promotions & Ventures, Ltd.,* 618 F. Supp. 202, 207 (S.D.N.Y. 1985) ("Fundamentally, the parties to a contract may condition the performance of either party, or the validity of the entire contract itself, on the occurrence of an event. If that event does not occur, the contractual obligation does not arise." (citation omitted)). To the extent that the Commitment Letter may be interpreted to provide otherwise, the Court finds that the language is ambiguous and must be construed against Black Diamond, the drafter of the document.[23]

---

[23] As the Court has stated, the Non-Solicitation Provisions were intended to prevent VCLF from leaving a willing Black Diamond at the altar by partnering instead with a more favorable source of financing. Once Black Diamond elected not to provide financing on the terms set forth in the Commitment Letter, VCLF was no longer bound to accept Black Diamond as its lender and, upon termination of the Commitment Letter, was no longer subject to the Non-Solicitation Provisions. VCLF was no longer seeking financing for the purpose of consummating the transaction contemplated by the Commitment Letter but rather for an alternative transaction that was unacceptable to Black Diamond. The language in the Commitment Letter obligating VCLF to utilize financing solely from Black Diamond cannot be read to survive Black Diamond's election not to go forward with the loan on the terms described in the Commitment Letter, for to do so would require VCLF to either accept whatever terms Black Diamond were to dictate, no matter how onerous, or abandon any effort to complete a transaction with Patriot. Such an interpretation would not only be incongruous with other language in the Commitment Letter but is contrary to the intent of the parties.

By October 23, 2015, it was clear that Black Diamond was not going to

finance VCLF's transaction with Patriot pursuant to the Commitment Letter

or otherwise.[24]  VCLF's subsequent efforts to consummate the transaction

without Black Diamond's involvement were not in breach of the Commitment

Letter which, by that time, had terminated.

The evidence does not support the contention that VCLF sought to

exclude Black Diamond from the transaction by procuring or negotiating

changes to the asset purchase agreement or that VCLF otherwise acted in

---

Moreover, there is no language indicating that VCLF's obligation to convey
the Equity Interests to Black Diamond would survive the termination of the
Commitment Letter even if the termination were the result of its conditions having
not been satisfied, and the Court will not read such language into the contract.  Such
an interpretation would be commercially unreasonable and tantamount to finding
that Black Diamond was entitled to receive the Equity Interests solely in exchange
for delivering the Commitment Letter, a contention that the Court has already
rejected.  *See Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348
(N.Y. App. 2010) (declining to construe guaranty contract in accordance with
defendant's interpretation because it would "ignore[ ] common sense, and could lead
to absurd results" and holding that contracts must be read "in a manner that
accords the words their fair and reasonable meaning, and achieves a practical
interpretation of the expressions of the parties.  Put otherwise, a contract should not
be interpreted to produce a result that is absurd, commercially unreasonable or
contrary to the reasonable expectations of the parties." (citations omitted)); *see
generally In re Cromwell Towers Redevelopment Co. v. Yonkers*, 359 N.E.2d 333
(N.Y. 1976) ("[D]ue consideration must be given to the purpose of the parties in
making the contract.  A fair and reasonable interpretation, consistent with that
purpose, must guide the courts in enforcing the agreement." (citation omitted));
*Heller v. Pope*, 164 N.E. 881, 882 (N.Y. 1928) ("The question is as to the fair and
reasonable meaning that may be given to the writing sued on.").
[24] VCLF's demand that Black Diamond close on the terms set forth in the
Commitment Letter and Black Diamond's offer to do so provided that VCLF and
Patriot revert to the August 16 APA as it existed on September 21, 2015, were
disingenuous, made solely in anticipation of litigation, and are of no consequence.
VCLF knew that Black Diamond was not obligated to provide financing pursuant to
the Commitment Letter's terms in light of the modifications to the asset purchase
agreement and Black Diamond knew that reversion to the original August 16 APA
was not possible.  By the time these communications took place, after October 23,
2015, the Commitment Letter had terminated.

bad faith.  VCLF's intention was to complete the transaction with Black Diamond, until it became clear that Black Diamond was unwilling to finance the transaction on terms that VCLF reasonably believed would enable it to acquire Patriot's noncore assets and establish a viable business model.  The contract expired on its own terms, with neither party having a remaining obligation to the other.

Black Diamond has not met its burden of proving by a preponderance of the evidence that VCLF failed to perform its obligations under the Commitment Letter or otherwise breached its terms.  Therefore, the Court will dismiss Black Diamond's breach of contract claim.[25]

### Black Diamond Did Not Breach the Commitment Letter

Black Diamond correctly states that it had no obligation to fund a proposed modified asset purchase agreement because its obligations under the Commitment Letter related only to the transaction embodied in the August 16 APA.[26]  VCLF has essentially conceded this point, stating that "[b]ecause no alleged breach by either Party occurred before the conditions in the Commitment Letter irreversibly failed, the Court [should dismiss] Black

---

[25] As a result of Black Diamond's failure to establish VCLF's liability, the Court is not required to address the amount of damages that Black Diamond may have been entitled to recover had it prevailed.  Nevertheless, having heard extensive testimony concerning damages, the Court wishes to note that the speculative nature of Black Diamond's damage claim, both with respect to the value of the W/C Package and the interest it claims it would have earned on the loans it did not make, coupled with its failure to address its duty to mitigate, would make it very difficult, if not impossible, to arrive at an appropriate amount.

[26] Black Diamond's Proposed Findings of Fact and Conclusions of Law, Dkt. 409, ¶ 173.

Diamond's claim against VCLF and . . . VCLF's counterclaims against Black Diamond."[27]

Alternatively, VCLF contends that if the conditions did not fail,[28] Black Diamond breached the Commitment Letter, arguing that equitable estoppel and implied waiver preclude Black Diamond from asserting that it was not required to provide the loan described in the Commitment Letter. Citing New York law, VCLF contends that a contract's provision stating that its terms may only be modified or waived by an instrument in writing signed by the party against whom enforcement is sought can nevertheless be abrogated by a party's course of conduct.[29] VCLF asserts that Black Diamond effectively waived the written modification requirement when it continued to pursue the transaction after it became aware of the changes and that, as a result of its failure to advise VCLF that it would not fund the modified transaction, it should be precluded from arguing that a written instrument was required. VCLF maintains that it relied on Black Diamond's conduct to its detriment in the belief that Black Diamond would finance the transaction according to the terms described in the Commitment Letter.

---

[27] VCLF's Proposed Findings of Fact and Conclusions of Law, Dkt. 412, ¶ 81.

[28] Having found that the conditions did fail, relieving both parties from their obligations under the Commitment Letter, the Court's ruling is in keeping with the Defendants' preferred outcome; nevertheless, the Court will address VCLF's alternative contentions because they raise an independent theory of recovery.

[29] VCLF cites *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 245 (N.Y. App. 2013); *Kenyon & Kenyon v. Logany, LLC*, 33  823 N.Y.S.2d 72 (N.Y. App. 2006); *Simon & Son Upholstery, Inc. v. 601 W. Assocs., L. L. C.*, 702 N.Y.S.2d 256 (N.Y. App. 2000).

The evidence does not support VCLF's contention that it was misled by

Black Diamond's course of conduct.  Both parties offered repetitive,

exhaustive, and detailed evidence of the failed negotiations that occurred

after the mutual recognition that the transaction upon which the

Commitment Letter was based was no longer possible.  Both parties were

keenly aware that Black Diamond's financing of the transaction would occur

only if they could agree on revised terms.[30]  Both parties admit that there

was no written instrument signed by the party against whom enforcement

was being sought.  VCLF never accepted any of the revised terms being

proposed by Black Diamond and, therefore, could not have relied upon them.

Black Diamond did not mislead VCLF nor did it breach the provisions of the

Commitment Letter.

VCLF has not met its burden of proving by a preponderance of the

evidence that Black Diamond breached the Commitment Letter.[31]

Accordingly, the Court will dismiss the Counterclaim.

## CONCLUSION

The parties entered into a contract that, in essence, created a

partnership that would enable VCLF to acquire certain assets from Patriot

---

[30] For the same reason, Black Diamond did not repudiate the Commitment Letter.
Black Diamond was not contractually bound to provide financing for a transaction
other than that set forth in the August 16 APA, the transaction as it existed at the
time the Commitment Letter was executed.  By October 9, 2015, that transaction no
longer existed.
[31] Were VCLF to have prevailed on its counterclaim, the Court would have been
challenged to arrive at a quantifiable amount of damages in light of the scant
evidence submitted by VCLF.

with the financial assistance of Black Diamond.  In exchange for providing
the financing, Black Diamond was to receive an ownership interest in the
assets being acquired.  The parties agreed that if the transaction did not
occur because Patriot received a better offer, then they would split the
breakup fee to which VCLF would be entitled as the stalking horse.  In
addition, VCLF agreed that it would not seek a replacement for Black
Diamond.  This understanding was incorporated into the Commitment
Letter.

VCLF was not outbid; however, due primarily to the needs of Patriot,
the transaction upon which the Commitment Letter was based changed to
the substantial detriment of VCLF.  Despite the increased challenges, VCLF,
seeking to fulfill its altruistic mission, chose to move forward with the
acquisition.  However, Black Diamond, also acting true to its purpose, was
unwilling to offer the same financing terms in connection with the less
attractive investment opportunity and, under the provisions of the
Commitment Letter, was not obligated to do so.  The parties attempted to
negotiate mutually acceptable modifications to the Commitment Letter but
were unable to do so.  As a result, the Commitment Letter terminated, with
neither party remaining obligated to the other.  VCLF completed the
transaction without Black Diamond but was only able to do so with the
assistance of Patriot and the UMWA.  Black Diamond was not involved and
contributed nothing in connection with VCLF's purchase.

Black Diamond contends that the parties agreed that in exchange for Black Diamond's delivering the commitment for a loan that it ultimately chose not to make, Black Diamond is entitled to an ownership interest in the assets acquired by VCLF; i.e., that its entitled to the benefits of the partnership that it rejected.  There is no evidence that VCLF agreed to this.  More importantly, the Commitment Letter, which was drafted by Black Diamond's attorney, does not make this clear; on the contrary, it specifies consideration for delivering the commitment that does *not* include an interest in the assets being acquired.  In short, under the facts of this case and the language of the contract, Black Diamond is not entitled to an ownership interest in the acquired assets or anything else.

In sum, Black Diamond had the burden of proving that VCLF breached the Commitment Letter.  It has failed to meet that burden.

Neither has VCLF met its burden of proving that Black Diamond breached the Commitment Letter.  As a result of the changes to the VCLF-Patriot transaction, Black Diamond was no longer obligated to provide the financing described in the Commitment Letter.  Under the terms of the Commitment Letter, Black Diamond was allowed to walk away from the transaction, and that is what it chose to do.

The Court will enter a separate order dismissing Black Diamond's Complaint and dismissing VCLF's counterclaim.

Date:  September 28, 2018                    /s/ Keith L. Phillips
                                    United States Bankruptcy Judge

Entered on Docket:  September 28, 2018

Copies:

Dianne F. Coffino
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405

David W. Haller
Covington & Burling LLP
620 8th Avenue
New York, NY 10018

Dion W. Hayes
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219

John H. Maddock III
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Micaela R.H. McMurrough
Covington & Burling LLP
620 8th Avenue
New York, NY 10018

C. William Phillips
Covington & Burling LLP
620 8th Avenue
New York, NY 10018

David Zorian Pinsky
Covington & Burling LLP
620 8th Avenue
New York, NY 10018

Patrick J. Potter
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036

Joshua I. Schlenger
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

Jonathan M. Sperling
Covington & Burling LLP
620 8th Avenue
New York, NY 10018

William M. Sullivan, Jr.
Pillsbury Winthrop Shaw Pittman LLP
2300 N. Street, NW
Washington, DC 20037

William Michael Sullivan
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036

Andrew M. Troop
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036